UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

| | | |
|---|---|---|
| STEVEN S. NOVICK, | | : |
| | Plaintiff, | : Docket |
| | | : # 07 CIV 7767-AKH-KNF |
| -against- | | : |
| | | : **COMPLAINT** |
| AXA NETWORK, LLC, | | : |
| | | : (Jury trial demanded) |
| | Defendant. | : |

---

Plaintiff Steven S. Novick, through undersigned counsel, as and for his Complaint against defendant AXA Network, LLC, respectfully alleges that:

## PARTIES

### Steven S. Novick

1.      Steven S. Novick ("Mr. Novick" or "Plaintiff"), an individual, at all times relevant to this claim was domiciled in Connecticut and maintained residence at 87 North Wilton Road, New Canaan, Connecticut 06840.

### AXA Network, LLC

2.      AXA Network, LLC ("AXA") is a limited liability company organized and existing under the laws of the State of Delaware with its principal place of business at 1290 Avenue of the Americas, New York, New York 10104.  AXA has been registered with the Division of Corporations of New York's Department of State since October 7, 2002.

## JURISDICTION AND VENUE

3.      This Court has original jurisdiction over this action under 28 U.S.C. § 1332(a).  The amount in controversy exceeds $75,000, exclusive of interest and costs.

4.     Venue is proper in this district under 28 U.S.C. § 1391(a) as a substantial part of the events giving rise to the claim occurred within this district. Venue is further proper in this district pursuant to agreement among the parties.

## INTRODUCTORY STATEMENT

5.     AXA is in the insurance industry. AXA's affiliate, AXA Advisors, LLC ("AXA Advisors"), is a broker/dealer and member of the Financial Industry Regulatory Authority (formerly the National Association of Securities Dealers). At times relevant to this claim, Mr. Novick was affiliated with AXA for insurance business and AXA Advisors, LLC for securities business.

6.     Mr. Novick is a successful stockbroker and insurance salesman with a substantial and valuable book of business which he cultivated before joining AXA in 2002. He joined AXA, in large part, because it is a company with an "independent" business model. Its representatives are independent contractors rather than employees and Mr. Novick did business as The New Canaan Group, LLC and New Canaan Financial Group, LLC. Mr. Novick was responsible for substantially all costs associated with running his business including rent, support-staff salaries, E&O insurance, communications equipment including telephone and computer lines, office furniture, and supplies. In exchange for absorbing those costs, Mr. Novick received a payout of approximately 82% and proprietary "ownership" of his clients' accounts. Nevertheless, as set forth more fully below, AXA terminated Mr. Novick in a manner violative of its own internal policies, and maliciously conspired with its broker/dealer affiliate (AXA Advisors) to damage Mr. Novick with inaccurate disclosure language on his Form U5

and raid Mr. Novick's client accounts.     Following termination, AXA improperly demanded repayment of monies from Mr. Novick relating to certain "loans."

<u>FACTS COMMON TO ALL COUNTS</u>

Background Information Concerning
<u>AXA's Conspiracy with AXA Advisors, LLC</u>

A.     Novick Brings Improprieties
       <u>To the Attention of Senior Management</u>

7.     Mr. Novick's father-in-law, Ronald Lorch, was also a representative with AXA.     Although Mr. Lorch primarily sold insurance products, he also managed approximately $20 million of securities – through AXA Advisors – under a joint-rep agreement with Larry Pasaretti, a veteran AXA broker who received preferential treatment from AXA Advisors' senior management.[1]     Mr. Lorch, who was nearing retirement, intended to transition his entire securities and insurance business over to Mr. Novick.

8.     In or around 2004, it was discovered that Mr. Pasaretti was surreptitiously moving Mr. Lorch's accounts out of the joint-rep number and into Mr. Pasaretti's individual rep number.     By doing so, Mr. Pasaretti was depriving Mr. Lorch of income and depriving Mr. Novick of accounts which were supposed to transition to him.     At or about that time, it was also discovered that Mr. Pasaretti had "sold away" limited partnership interests in Gemini I, L.P. to various customers who were introduced by Mr. Lorch.

9.     To prevent further improprieties by Mr. Pasaretti, Mr. Novick brought written proof of same to various members of AXA Advisors' management and others,

---

[1] Upon information and belief, Pasaretti received an override from all persons registered with AXA Advisors and effectively served as national sales manager.

including, Bob Jones (President of AXA Distribution Holding Corp.), Ned Dane (President), Rich Ferone (compliance officer), Chris Aguele (compliance officer), William DeMatteo (compliance officer), Joe Colombo (VP and Regional Manager), Barry Salzhauer (compensation department) and Mike Rynicker (SROP). Although AXA chose not to discipline Mr. Pasaretti for selling away, senior management had disdain for Mr. Novick for reporting on "one of their own." At that time, however, senior managements' contempt for Mr. Novick was outweighed by their business interests in retaining Mr. Novick's substantial production.[2]

B.    AXA Advisors Decides to
      Exit the Securities Brokerage Industry

10.    In recent years, AXA Advisors' sole member (AXA Holding Distribution Corp.) was forced to make substantial capital contributions to fund AXA Advisors' operating losses to ensure AXA Advisors had sufficient operating resources. For example, AXA Holding made a capital contribution of $11,500,000 in 2004, $13,321,000 in 2005, and $22,600,000 in 2006.

11.    Since securities brokerage was a money-loser and insignificant to the core business of AXA Advisors' parent (i.e., insurance), AXA Advisors crafted an exit strategy in 2006 by agreeing to "outsource" its securities business. On December 15, 2006, AXA Advisors entered into agreements with Linsco/Private Ledger Corp. ("LPL"), whereby LPL agreed to provide brokerage, clearing, and custody services on a fully disclosed basis; offer LPL investment advisory programs and platforms for AXA Advisors customers; and provide technology and additional processing and related

---

[2] Mr. Novick brought other improprieties to the attention of senior management which they similarly ignored. AXA's internal policies required representatives to report instances of misconduct, and promised protection "against retaliation," yet afforded Mr. Novick no such protection.

services to AXA Advisors advisers and customers.  The terms of the agreements are five years, subject to additional 24-month extensions.

12.     Throughout 2006, AXA Advisors' intended "outsource" to LPL was widely discussed.   Agents, including Mr. Novick, wanted a voice in this process, particularly because a new platform would be imposed on them and their customers would be asked to sign LPL new account documents.  Being vocal, however, served to further alienate Mr. Novick from senior management.  Given the obvious uncertainties accompanying the intended "outsource", Mr. Novick explored the possibility of leaving AXA in 2006, which was known by the firm.

C.     AXA Terminates Mr. Novick

13.     Mr. Novick's assertive personality annoyed certain members of AXA's senior management and they were only too happy to repay Mr. Novick for "whistle blowing" when the opportunity presented itself.  That opportunity arose in October 2006, just when AXA Advisors was negotiating with LPL to exit the securities business.

14.     AXA conspired with AXA Advisors to fire Mr. Novick and falsely file a Form U5 describing the basis for termination as: "Solicited interest in a private securities transaction without the approval of the firm."[3]  As demonstrated by the chronological timeline below, the lightning-fast Form U5 disclosure was outrageous and part of AXA's intentional scheme with AXA Advisors to damage Mr. Novick:

(a) September 27, 2006 – On or about this date Mr. Novick receives an unsolicited email from Michael Zimmerman, the managing member of Prentice Capital Management, LP, a private investment limited

---

[3] The Form U5 is the Uniform Termination Notice for Securities Industry Registration.  Broker/dealers, investment advisors, or issuers of securities must use this form to terminate the registration of an individual in the appropriate jurisdictions and/or self-regulatory organizations.

partnership.  Mr. Zimmerman's email concerned NAU, Inc., an outdoor apparel company that Prentice Capital had financed.  NAU's management was planning a "road show"-type visit to New York in contemplation of a $17 million financing and Mr. Zimmerman was notifying people of same.

(b) October 4-5, 2006 – Mr. Novick forwards Mr. Zimmerman's email to certain people, including Ned Dane, AXA Advisors' President, whom Mr. Novick frequently communicated with.  When forwarding the email, Mr. Novick wrote that:  "This is a venture opportunity that, on paper looks to be great. … I would like to invite you to come meet and discuss this unique situation with NAU's management … to discuss how we may benefit from investing."

(c) October 6, 2006 – Georgette Geller of AXA Advisors notifies Mr. Novick in writing that he must "cease and desist [from] soliciting or recommending this, or any other, non-AXA Advisors investment to anyone.  Your conduct in this matter may be deemed by the Firm to be 'selling away.'"  Mr. Novick willingly accepted AXA Advisors' mandate of heightened supervision, taking comfort knowing that he did not solicit, recommend or sell any non-approved security to any customer.  Mr. Novick took further comfort believing that AXA Advisors would ultimately conclude that he simply invited people, including AXA Advisors President, to attend NAU's "road show" meeting.

(d) October 6-10, 2006 – Ned Dane purposefully avoids all communications with Mr. Novick on the advice of "Law and Compliance."

(e) <u>October 10, 2006</u> – Edward Lantigua of AXA Advisors approves Mr. Novick to purchase NAU in his personal account.

(f) <u>October 11, 2006</u> – Mr. Novick asks Mr. Lantigua how he can get NAU approved to present to clients.

(g) <u>October 12, 2006</u> – AXA fires Mr. Novick without warning.

(h) <u>October 13, 2006</u> – AXA Advisors files a Form U5 without seeking any input from Mr. Novick.

<u>AXA Violated its Own Policies</u>

A.      <u>Disciplinary Action Program</u>

15.     AXA maintained a Disciplinary Action Program, the goal of which "[wa]s to maintain uniform, fair and beneficial disciplinary processes for Representatives and supervisors." AXA also maintained a National Disciplinary Action Committee to review allegations of selling away, improper sales practices, and use of unapproved sales materials. If the National Disciplinary Action Committee recommends a termination, the registered representative has a right to appeal that recommendation to the Management Disciplinary Action Committee.

16.     Mr. Novick's termination was not reviewed by the National Disciplinary Action Committee nor was he afforded appellate review by the Management Disciplinary Action Committee. Mr. Novick was thus wrongfully terminated and deprived of the Disciplinary Action Program's stated objectives of uniformity and fairness. Instead, as will be proven, Mr. Novick's termination was arbitrary, malicious and driven by personality conflict and greed, rather than the reason disclosed on the Form U5.

B.    Required Reporting of Misconduct

17.    AXA mandates that agents report instances of misconduct and promises "protect[ion] against retaliation" for any such reporting.  Mr. Novick received no such protection and, upon information and belief, his termination was directly linked to his reports of personnel misconduct.

AXA's Conspiracy to Attack Novick's Book

18.    The culmination of AXA's scheme required that AXA keep Mr. Novick's business as AXA Advisors' relationship with LPL, upon information and belief, required AXA to retain a customer base of business.  Knowing that Mr. Novick was seeking to leave AXA, AXA's conspiracy against Mr. Novick required AXA to disable Mr. Novick with a "dirty" Form U5 while simultaneously attacking Mr. Novick's book of business.  By filing a "dirty" Form U5, AXA believed it would impair Mr. Novick's ability to defend his book of business.

19.    The damaging information contained on the Form U5 caused various broker/dealers to refrain from extending offers of employment to Mr. Novick.  Those firms that would previously hire Mr. Novick – with a seven figure up-front check – would no longer do so.  As Mr. Novick was scrambling to register with a new broker/dealer, AXA Advisors instructed Georgette Geller to mass mail letters in an effort to retain Mr. Novick's clients.  AXA also "assigned" Mr. Novick's book to two registered representatives, Joseph Miller and Joel Miller, who further solicited Mr. Novick's clients.  AXA had absolutely no right to raid the accounts of an independent contractor and Mr. Novick has been substantially damaged by this conduct.

20.     AXA's malicious conduct toward Mr. Novick remains ongoing as evidenced by AXA's refusal to provide an accounting of renewal compensation, service fees, and asset based compensation earned by Mr. Novick.

## FIRST CAUSE OF ACTION

(Declaratory Relief – 28 U.S.C. § 2201)

21.     The allegations above are repeated as if fully set forth herein.

Written Agreements Among Parties

A.     Agent Agreement

22.     On November 12, 2002, Mr. Novick executed an Agreement Between AXA Network, LLC and Associate (the "Agent Agreement") (Exhibit A) which, among other things:

(a)     incorporates by reference AXA's internal "rules and regulations" (Section VII);

(b)     disclaims Mr. Novick from workers' compensation benefits (Section XVI); and

(c)     designates Mr. Novick an independent contractor (Section XVII).

23.     AXA unilaterally terminated the Agent Agreement on October 12, 2006, purportedly in reliance upon Section XIII(a).

B.     Proven Producer Transition Allowance Loan

24.     On January 15, 2003, Mr. Novick executed a Promissory Note for payment of $500,000 to AXA (Exhibit B) which was retroactively amended by letter dated May 22, 2006.  (Exhibit C).  The Promissory Note, named a Proven Producer

Transition Allowance Loan, stated that its purpose was to pay Mr. Novick for some of the costs he incurred when leaving his employer to affiliate with AXA.

25.     Mr. Novick incurred costs of approximately $1 million resulting from vacating his employment-related agreements with Morgan Stanley DW, Inc. to affiliate with AXA.   Such costs included paying Morgan Stanley DW, Inc. approximately $600,000 of a forgivable loan.

26.     The Proven Producer Transition Allowance Loan, as amended, contained the following terms among others:

(a)     $100,000 reduction of principal and interest owing for every $1 million of "production credits" generated by Mr. Novick (Exhibit C);

(b)     sole and exclusive jurisdiction in the state or federal courts of New York in connection with any action arising out of the Note (Ex. B, Section H);

(c)     AXA's review of all "production credits" achieved at the earlier of sixty (60) months after execution or termination of the Agent Agreement (Ex. B, Schedule 1, pg. 4);

(d)     designation of Mr. Novick as an independent contractor (Ex. B, Schedule 1, pg. 4); and

(e)     termination of the Agent Agreement is a default event (Ex. B, Section G).

27.     Production credits, upon information and belief, included all transaction-based revenues received by AXA, AXA Advisors or its affiliates in connection with transactions in all products and services, including fee-based asset management products and services, equity and fixed income products, mutual funds, and other investment

products and services offered by AXA Advisors, including life insurance and annuity products.

28.    By letter dated November 21, 2006, AXA Financial, Inc. demanded repayment of the Proven Producer Transition Allowance Loan in the amount of $400,000. Mr. Novick disputes the repayment demand for various reasons, including (a) the "loan" was in fact a payment to Mr. Novick to defray costs associated with leaving Morgan Stanley DW, Inc., and (b) in any event, Mr. Novick generated sufficient "production credits", upon information and belief, to offset most, if not the entire, "loan."

29.    Since terminating the Agent Agreement, AXA has refused Mr. Novick's requests for an accounting of various revenues generated by him.

30.    By reason of the foregoing, an actual controversy exists within the meaning of 28 U.S.C. § 2201 with regard to monies due, if any, under the Proven Producer Transition Allowance Loan. This Court is vested with the power in the instant case to declare and adjudicate the rights and other legal relationships of the parties to this action with reference to the issues raised by this complaint.

C.    Loan Note

31.    On August 28, 2003, Mr. Novick executed a loan note with AXA (Exhibit D) pursuant to which he received $1 million. The loan note contained the following terms among others:

    (a)    repayment upon termination of the Agent Agreement but no later than October 1, 2008;

    (b)    AXA's security interest in the renewal commissions of a third-party (Ronald Lorch); and

- 11 -

(c)   sole and exclusive jurisdiction in the state or federal courts of New York in connection with any action arising out of the Note.

32.   By letter dated November 21, 2006, AXA Financial, Inc. demanded repayment of $460,491.78, representing the loan note's outstanding balance. Mr. Novick disputes the repayment demand for various reasons, including the fact that AXA's conduct has damaged Mr. Novick in an amount in excess of $460,491.78.

33.   By reason of the foregoing, an actual controversy exists within the meaning of 28 U.S.C. § 2201 with regard to monies due, if any, under the $1 million Loan Note. This Court is vested with the power in the instant case to declare and adjudicate the rights and other legal relationships of the parties to this action with reference to the issues raised by this complaint.

<u>SECOND CAUSE OF ACTION</u>

(Breach of Contract)

34.   The allegations above are repeated as if fully set forth herein.

35.   The Agent Agreement was a contract drafted by AXA and signed by Plaintiff.

36.   The terms and conditions in the Agent Agreement were material to Plaintiff and Plaintiff relied upon same in expectation that said terms and conditions would govern Plaintiff's affiliation with AXA.

37.   The Agent Agreement specifically incorporates by reference AXA's internal rules and regulations.

38.   AXA's internal rules and regulations were embodied in its Compliance Manual among other places.

39.     AXA's Compliance Manual promised Plaintiff that he would be free from retaliation in connection with reporting of misconduct.  Plaintiff relied upon said promise when reporting misconduct.  AXA dishonored said promise by terminating Plaintiff for reporting misconduct.  AXA breached the Agent Agreement by failing to protect Plaintiff against retaliation.  Plaintiff has been damaged by said breach, in an amount to be proven at trial, but believed to exceed $10 million.

40.     AXA's Compliance Manual further promised Plaintiff that AXA maintained a Disciplinary Action Program designed to provide a structure for remedial and disciplinary actions taken in response to alleged violations of laws, regulations and company policy.  AXA did not implement the Disciplinary Action Program before terminating Plaintiff.  AXA sanctioned Plaintiff (termination) without prior review by the National Compliance Office or National Disciplinary Action Committee and Plaintiff was not afforded appellate review by the Management Disciplinary Action Committee.

41.     AXA breached the Agent Agreement by failing implement the Disciplinary Action Program.  Plaintiff has been damaged by said breach, in an amount to be proven at trial, but believed to exceed $10 million.

### THIRD CAUSE OF ACTION

(Unfair Business Practices)

42.     The allegations above are repeated as if fully set forth herein.

43.     AXA conspired with AXA Advisors to falsely report information on Plaintiff's Form U5.  AXA did so to make Plaintiff unattractive to potential employers and to render Plaintiff unable to receive an up-front check.  Due directly to such unfair

business practices, Plaintiff was unable to receive an up-front check of at least $1 million from broker/dealers.

44.    AXA further conspired with AXA Advisors to attack Plaintiff's client accounts by mass mailing letters to said clients and transferring Plaintiff's clients to a team of agents (Joseph Miller and Joel Miller).  AXA did so to disrupt Plaintiff's ability to move his book of business.  Due directly to such unfair business practices, Plaintiff has lost a substantial percentage of his customers and all fees that have been and will be generated by such customers' accounts.

45.    Plaintiff has been damaged by said unfair business practices, in an amount to be proven at trial, but believed to exceed $10 million.

FOURTH CAUSE OF ACTION

(Tortious Interference With Prospective Business Relations)

46.    The allegations above are repeated as if fully set forth herein.

47.    AXA conspired with AXA Advisors to falsely report information on Plaintiff's Form U5 in violation of the duty to accurately report such information.  AXA did so to make Plaintiff unattractive to potential employers and to render Plaintiff unable to receive an up-front check.  Due directly to such false information, Plaintiff was unable to receive an up-front check of at least $1 million from broker/dealers.

48.    AXA further conspired with AXA Advisors to attack Plaintiff's client accounts by mass mailing letters to said clients and transferring Plaintiff's clients to a team of agents (Joseph Miller and Joel Miller).  AXA did so to disrupt Plaintiff's ability to move his book of business.  Due directly to such actions, Plaintiff has lost a substantial

percentage of his customers and all fees that have been and will be generated by such customers' accounts.

49.     Plaintiff has been damaged by said interference with prospective business relations, in an amount to be proven at trial, but believed to exceed $10 million.

FIFTH CAUSE OF ACTION

(Aiding and Abetting Unfair Business Practices)

50.     The allegations above are repeated as if fully set forth herein.

51.     AXA conspired with AXA Advisors to falsely report information on Plaintiff's Form U5 in violation of the duty to accurately report such information. The object of said conspiracy was to make Plaintiff unattractive to potential employers and to render Plaintiff unable to receive an up-front check. Due directly to said conspiracy, Plaintiff was unable to receive an up-front check of at least $1 million from broker/dealers.

52.     AXA further conspired with AXA Advisors to attack Plaintiff's client accounts by mass mailing letters to said clients and transferring Plaintiff's clients to a team of agents (Joseph Miller and Joel Miller). The object of said conspiracy was to disrupt Plaintiff's ability to move his book of business. As a direct result of said conspiracy, Plaintiff has lost a substantial percentage of his customers and all fees that have been and will be generated by such customers' accounts.

53.     Plaintiff has been damaged by said conspiracy, in an amount to be proven at trial, but believed to exceed $10 million.

## SIXTH CAUSE OF ACTION

### (Aiding and Abetting Tortious Interference With Prospective Business Relations)

54.    The allegations above are repeated as if fully set forth herein.

55.    AXA conspired with AXA Advisors to falsely report information on Plaintiff's Form U5 in violation of the duty to accurately report such information. The object of said conspiracy was to make Plaintiff unattractive to potential employers and to render Plaintiff unable to receive an up-front check. As a direct result of said conspiracy, Plaintiff was unable to receive an up-front check of at least $1 million from broker/dealers.

56.    AXA further conspired with AXA Advisors to attack Plaintiff's client accounts by mass mailing letters to said clients and transferring Plaintiff's clients to a team of agents (Joseph Miller and Joel Miller). The object of said conspiracy was to disrupt Plaintiff's ability to move his book of business. As a direct result of said conspiracy, Plaintiff has lost a substantial percentage of his customers and all fees that have been and will be generated by such customers' accounts.

57.    Plaintiff has been damaged by said conspiracy, in an amount to be proven at trial, but believed to exceed $10 million.

### JURY TRIAL DEMAND

58.    Plaintiff demands a jury trial.

WHEREFORE, Plaintiff prays judgment as follows:

(a) compensatory damages of at least $10,000,000.00, with the exact amount to be proven at trial;

(b) that the Court declare that Plaintiff is relieved of any financial obligation created pursuant to either the Proven Producer Transition Allowance Loan or the $1 million Loan Note;

(c) punitive damages;

(d) all costs and fees associated with this action including attorneys' fees; and

(e) all other and further relief that this Court deems just and proper.

Dated: August 31, 2007

Respectfully submitted,

GUSRAE, KAPLAN, BRUNO & NUSBAUM PLLC
*Attorneys for Steven S. Novick*

By: _____

Martin H. Kaplan, Esq. (MK 6258)
Robert L. Herskovits, Esq. (RH 2586)
Gusrae, Kaplan, Bruno & Nusbaum PLLC
120 Wall Street
New York, NY 10005
(212) 269-1400
(212) 809-5779 – facsimile
mkaplan@gkblaw.com
rherskovits@gkblaw.com

# EXHIBIT A

## AGREEMENT BETWEEN

AXA NETWORK, LLC, its subsidiaries and AXA Network of Texas, Inc.,
hereinafter collectively called "AXA Network"
and the undersigned, hereinafter called the ASSOCIATE

IT IS MUTUALLY AGREED, that

**I.     Authority.** The Associate, when properly licensed, shall canvass on behalf of AXA Network for applications for insurance policies and annuity contracts to be issued by The Equitable Life Assurance Society of the United States (hereinafter "The Equitable"), or any insurance company affiliate thereof as may be provided by agreement between The Equitable and/or AXA Network and such insurance company affiliate, and the Associate shall collect the first premiums and considerations thereon.

Notwithstanding the foregoing, the Associate shall canvass on behalf of AXA Network for such applications only in jurisdictions in which AXA Network is properly licensed to distribute such policies and contracts.

**II.     Territory.** The Associate may canvass for applications for insurance policies and annuity contracts and otherwise operate within any jurisdiction and territory where both the Associate and AXA Network are properly licensed to sell such policies and contracts, but is assigned no exclusive rights in any territory.

**III.     Commissions and Service Fees.** The Associate shall be allowed commissions, service fees and additional compensation on premiums, and considerations for insurance policies and annuity contracts secured under this Agreement in accordance with the Schedules of Commissions (issued by AXA Network with notice to the Associate) in force on the date of the application for the policy or contract, as such premiums and considerations become due and are paid. If the Associate held an Equitable agent's agreement immediately prior to entering into this Agreement, the Associate shall continue to be allowed commissions, service fees and additional compensation on premiums, and considerations for insurance policies and annuity contracts secured under such prior agent's agreement in accordance with the applicable schedules of commissions in force on the date of the application for the policy or contract, as such premiums and considerations become due and are paid. Upon termination of this Agreement, however, service fees and additional compensation, if any, shall no longer be allowed, and renewal commissions shall be allowed only as provided in the Vesting Provisions of Paragraph IV below.

**IV.     Vesting of Commissions.** Renewal commissions on premiums for insurance policies and considerations for annuity contracts secured by the Associate under this Agreement, or under any prior agent's agreement between the Associate and The Equitable in effect immediately prior to this Agreement, to the extent allowable under the applicable schedules of commissions in force on the date of the application for the policy or contract, shall become vested on the occurrence of the earliest of the following events:

A.   Completion of 12 years of continuous service with AXA Network and/or The Equitable, or 10 years of continuous service with AXA Network and/or The Equitable and the attainment of 120,000 production credits. Any period under agreement as an Associate with, or in the service of, The Equitable or any of its insurance company affiliates, or AXA Network immediately preceding this Agreement or immediately following the termination of this Agreement shall be deemed part of such service.

B.   The Associate's 65th birthday, if this Agreement is then in full force and effect, or if immediately following the termination of this Agreement the Associate continues under agreement with or in the service of AXA Network and/or The Equitable or any of their insurance company affiliates until age 65.

C.   The death of the Associate, if this Agreement is then in full force and effect, or if immediately following the termination of this Agreement the Associate continues under agreement with or in the service of AXA Network and/or The Equitable or any of their insurance company affiliates until death.

If this Agreement shall terminate, a collection charge, as specified in the Schedules of Commissions, shall be deducted from payments of vested renewal commissions, except where such commissions have vested as provided in Sub-paragraphs B or C.

**V.     Assignments.** No assignment of this Agreement shall be valid. No assignment of commissions or other payments due or to become due under this Agreement shall be recognized unless written acknowledgment of its receipt and filing is issued by AXA Network.

**VI.     Limitations on Associate's Authority.** The Associate shall have no authority with respect to AXA Network and/or The Equitable or any of their insurance company affiliates other than as expressly stated in this Agreement. Without limiting the generality of the foregoing, the Associate shall not:

- make, alter or discharge contracts,
- waive forfeitures,
- grant permits,
- name special rates or guarantee dividends,
- make any endorsements on policies and annuity contracts,
- accept or issue receipts for deferred or renewal premiums or considerations,
- receive any moneys due or to become due except as specified in Paragraph I of this Agreement or as

specifically authorized in writing by an officer of AXA Network, provided, however, that any existing, written authorizations to receive any moneys due or to become due, specifically issued to the Associate by an officer of The Equitable under any prior agent's agreement between the Associate and The Equitable, shall remain in full force and effect,

- deliver a policy of life insurance or accident and health insurance unless payment of the premium shall have been made during the applicant's good health, or
- bind AXA Network and/or The Equitable or any of their insurance company affiliates in any way.

**VII.     Regulations.** This Agreement is subject to such rules and regulations as AXA Network has established or may hereafter establish covering the conduct of its business.

**VIII.     Rejections.** The Equitable and/or any of its insurance company affiliates shall at all times have the right in their sole discretion to reject any applications for their policies of insurance and annuity contracts.

**IX.     Reservation of Rights** The rights reserved to AXA Network and/or The Equitable in this Agreement or in any prior agent's agreement between the Associate and The Equitable, including without limitation those contained in Paragraphs X, XI, and XIV, and Subparagraph B of Paragraph XIII, shall survive the termination of this Agreement.

**X.     Collections and Return of Property.** All collections made by the Associate hereunder shall be kept in trust entirely separate and distinct from other funds, and shall forthwith be paid over in cash to AXA Network. Any and all property of AXA Network held by the Associate shall be returned to AXA Network at an appointed time, or on demand. All unpaid policies or contracts and all other property of The Equitable or any insurance company affiliate thereof held by the Associate shall be delivered to AXA Network at an appointed time, or on demand.

**XI.     Indebtedness.** AXA Network may offset as a first lien against any claim for compensation under this Agreement any debt due or to become due, hereunder or otherwise, from the Associate to AXA Network or any of its affiliates. Debt not fully satisfied by such offset is a personal debt of the Associate recoverable at any time with interest under AXA Network's rules. "Debt" as used herein includes, but is not limited to, paid but unearned commissions attributable to refunded termination values or to premiums wholly or partially unpaid or refunded, loans, and amounts claimed by AXA Network or any of its affiliates under any account with the Associate.

**XII.     Bond.** The Associate hereby agrees to furnish, on request, a bond of indemnity satisfactory to AXA Network and maintain the same in force, in such an amount and with such sureties as AXA Network may require. Any bond of indemnity furnished to The Equitable or any of its affiliates shall continue to be maintained by the Associate.

**XIII.     Termination.**

A.  This Agreement shall be terminable forthwith if the Associate shall enter under contract with or into the service of any insurance company other than The Equitable or any insurance company affiliate thereof, or if the Associate shall fail to comply with any of the provisions or conditions of this Agreement, or if the Associate shall violate any law in force in the territory in which the Associate is doing business.

B.  If this Agreement is terminated by reason of violation of Paragraph X or Sub-paragraphs A and B of Paragraph XIV or Paragraph XV, or if after termination of this Agreement the Associate engages in acts or practices proscribed by Paragraph X or Sub-paragraphs A and B of Paragraph XIV, the Associate shall forfeit all commission interest which might otherwise have been acquired under any agreement with AXA Network or under any prior agreement between the Associate and The Equitable.

C.  This Agreement shall be terminable by AXA Network upon 30 days prior written notice to the Associate where the Associate in the sole discretion of the Branch Manager has failed to achieve applicable production standards.

D.  Unless otherwise terminated, this Agreement may be terminated by either party with or without cause, by a notice in writing delivered personally, or mailed to the other party at the last known address, at least thirty days before the date therein fixed for such termination.

**XIV.     Unauthorized Practices.**

A.  **Twisting.** The Associate shall not at any time induce or endeavor to induce policyowners of The Equitable or any insurance company affiliates thereof to relinquish their policies or contracts.

B.  **Proselyting.** The Associate shall not at any time induce or endeavor to induce associates of AXA Network to terminate their relationship with AXA Network in order to become sales representatives or sales managers with another insurance company, agency, or broker.

C.  **Rebates.** The Associate shall under no circumstances pay or allow, or offer to pay or allow, any rebate of premium or consideration in any manner whatsoever, directly or indirectly.

**XV.     Adverse Activity.** The Associate shall not violate any law in force in any territory in which the Associate is doing business. Additionally, the Associate shall not engage or become involved in any activity or other conduct or association, whether or not lawful, which affects or tends to affect adversely the reputation of AXA Network and/or The

Equitable, or their affiliates, or of any of their associates or employees generally or specifically in their community, or which casts odium on them or on the officers or directors of AXA Network and/or The Equitable, or their affiliates or which might otherwise be detrimental to the business of AXA Network and/or The Equitable or their affiliates.

**XVI. Associate Benefit Program.** The Associate may participate in the Associate Benefit Program as now or hereafter provided by AXA Network to the extent for which such Associate is qualified. The Associate shall not be eligible for workers' compensation benefits.

**XVII. Independent Contractor.** Nothing contained herein shall be construed to create the relationship of employer and employee between AXA Network or The Equitable and the Associate. The Associate shall be free to exercise independent judgment as to the persons from whom applications for policies and annuity contracts will be solicited and the time and place of solicitation.

The Associate shall abide by the rules and regulations of AXA Network in accordance with Paragraph VII hereof but such rules and regulations shall not be construed so as to interfere with the freedom of action of the Associate as described in this Paragraph.

**XVIII. Violations.** Without prejudice to AXA Network's right of termination under Paragraph XIII hereof, AXA Network shall have the right, if the Associate shall violate any of the terms of this Agreement, to suspend and withhold payment of any commission or service fee otherwise payable hereunder or under any prior agreement between the Associate and The Equitable, until satisfied that such violation has ceased or been cured.

**XIX. AXA Network's Prior Right.** While this contract is in effect, the Associate shall not, and shall not agree to, solicit, obtain or submit any application to any company other than The Equitable or any insurance company affiliate thereof, for any insurance policy or annuity contract, nor shall the Associate in any other way assist in obtaining or providing any such insurance or annuity from any such other company, unless specifically authorized in writing by AXA Network, provided, however, that any existing, written authorizations issued by an officer of The Equitable shall remain in full force and effect.

**XX. Sole Agreement.** This Agreement is intended to be the entire and final understanding of the parties hereto, with respect to the Associate's authority as specified in Paragraph I of this Agreement, and shall supersede all prior agreements if any, of the parties hereto with respect to such Associate's authority only. In addition, as of the date on which AXA Network becomes properly licensed in a particular jurisdiction to distribute insurance policies and annuity contracts of The Equitable or any of its insurance company affiliates, this Agreement shall supersede any agent's agreement between the Associate and The Equitable, to the extent then in effect, for the sale of such policies and contracts in that particular

jurisdiction. This Agreement may not be modified other than by a writing approved by an officer of AXA Network. It is understood, however, that all existing obligations to AXA Network and/or The Equitable heretofore incurred or assumed by the Associate, and existing liens created in connection therewith, shall continue to exist, and the Associate's rights under any prior contracts and agreements, with AXA Network and/or The Equitable are not impaired, provided, however, that any rights under any prior agent's agreement between the Associate and The Equitable and/or AXA Network shall not be in addition to any rights accorded the Associate under this Agreement.

**XXI. Effective Date.** This Agreement shall take effect in any jurisdiction where the Associate is properly licensed to sell insurance policies and annuity contracts of The Equitable or any of its insurance company affiliates, as of the later of (a) January 1, 2000, (b) the date on which AXA Network becomes properly licensed to distribute such policies and contracts in that particular jurisdiction or (c) the date this Agreement is duly signed by the Associate and countersigned by an authorized representative of AXA Network.

**IN WITNESS WHEREOF,** the parties to this Agreement have subscribed their names this ___12___ day of ___Nov.___ ___200✓___

EXECUTED IN DUPLICATE

___Steven Novick___
ASSOCIATE

___494 Canoe Hill Rd___
STREET ADDRESS

___New Canaan CT 06840___
CITY (COUNTY) STATE

AXA NETWORK, LLC
for itself and its subsidiaries and as
agent of AXA Network of Texas, Inc.

By: _____
AUTHORIZED REPRESENTATIVE

116684

(219-1405-91-8)
14A Edition

# EXHIBIT B

**PROMISSORY NOTE**

$500,000
January _15_ , 2003

a. Statement of Loan.

FOR VALUE RECEIVED, the Undersigned promises to pay to the order of AXA Network, LLC, or the holder hereof ("the Payee") at 1290 Avenue of the Americas, New York, NY 10104, or at such other place as the Payee may designate in writing to the Undersigned, the principal sum of Five Hundred Thousand Dollars ($500,000.00) with interest in immediately available funds in lawful money of the United States of America as hereinafter provided.

b. Maturity; Payment.

This Note and accrued interest shall be repaid in full upon the maturity hereof, on January _____, 2008, (the "Payment Date") unless required to be repaid at an earlier date in accordance with the provisions following.  Repayment shall include all then unpaid principal and any accrued but unpaid interest on this Note.  This note is not a contract of employment.  Nothing herein, including any reference to a payment date, guarantees that the Undersigned will continue to be affiliated with AXA Network, LLC and/or AXA Advisors, LLC on a particular date.

c. Reduction of Principal and Interest.

Notwithstanding the payment provisions described above, the principal and accrued interest shall be reduced upon the Undersigned's attainment of certain sales targets, as follows:  During the course of the undersigned's association with AXA Advisors, LLC and AXA Network, LLC, for every Two Million Dollars ($2,000,000) in Gross Dealer Concessions ("GDC"), as defined in Schedule 1 to Promissory Note, created, generated or brought in by the undersigned to AXA Advisors, LLC by or through the sale of any and all investment products offered by AXA Advisors, LLC, as defined in Schedule 1 to Promissory Note, One Hundred Thousand Dollars ($100,000) of the principal balance owed hereunder and all interest accrued at such time shall be forgiven.

d. Application of Payments.

Payments made hereunder shall first be applied against payments of interest and then toward the reduction of principal.

e. Interest.

Interest shall accrue on this Note at the applicable federal short-term rate in effect under Internal Revenue Code Section 1274(d).  Interest shall be due and payable on the Payment Date or upon termination of the Undersigned's agreements with AXA Network, LLC and AXA Advisors, LLC, whichever is earlier.

f. Prepayment.

The Undersigned shall, at any time, have the right to prepay, without penalty or premium, all or any portion of the loan evidenced by this Note.

g. Events of Default.

Each of the following shall constitute an Event of Default hereunder:
(1) Nonpayment when due of any principal or interest amount payable hereunder, which nonpayment shall continue unremedied for five (5) banking days;

(2) Breach of any covenant by the Undersigned hereunder or under Undersigned's agreements with AXA Network, LLC or AXA Advisors, LLC, which breach shall continue unremedied for thirty (30) days after written notice;

(3) Termination by either party of the Undersigned's agreements with AXA Network, LLC or AXA Advisors, LLC.

Upon the occurrence and during the continuation of any Event of Default hereunder, the Payee may declare this Note to be due and payable and this Note shall become immediately due and payable without notice of any kind.

h. Action To Enforce.

(1) If the Payee shall prevail in any action to enforce collection of this Note, there shall become due and payable from the Undersigned, in addition to the unpaid principal and interest, all costs and expenses of such action (including reasonable attorneys' fees).

(2) The Undersigned irrevocably consents to the sole and exclusive jurisdiction of the Courts of the State of New York and of any Federal court located in New York in connection with any action or proceeding arising out of, or related to, this Note.

(3) The Undersigned waives presentment, demand for payment, notice of dishonor, and all other notices or demands in connection with the delivery, acceptance, performance, default, or endorsement of this Note.

(4) In any such proceeding, the Undersigned agrees that personal service shall be deemed made when mailed by registered or certified mail return receipt requested to the Undersigned. Within twenty (20) days after such service, the Undersigned shall appear or answer the summons, complaint, or other process.

(5) The Undersigned waives any right to trial by jury in any action or proceeding to enforce or defend any rights under this Note.

i. No Waiver, etc.

No delay or failure on the part of the Payee on this Note to exercise any power or right given hereunder shall operate as a waiver thereof, and no right or remedy of the Payee shall be deemed abridged or modified by any course of conduct. The rights or remedies of the Payee as herein specified are cumulative and not exclusive of any rights or remedies which the Payee may otherwise have.

j. State Law.

This Note shall be governed by and construed in accordance with the laws of the State of New York applicable to agreements made and to be performed in New York, but without regard to its conflicts of law principles.

k. Amendment.

This Note may only be amended in writing with the consent of both parties.

l. Assignment.

This Note may not be assigned by the Undersigned. However, the Payee may assign this Note to its subsidiaries, affiliates, successors, or assigns without prior written or oral notice to the Undersigned.

m. Exclusivity.

The provisions herein and in the attached Schedule 1, which is incorporated herein by reference, are the exclusive terms of the agreement between the parties and are controlling as to the terms and conditions of this loan and its repayment.

UNDERSIGNED:

By: _____

Date: Jan 15 2003

Address for Communication: _____ 494 Canoe Hill Rd

_____ New Canaan CT 06840

State of CONNECTICUT          )
                             )SS: 0837022359
County of FAIRFIELD          )

On JAN. 15 _____, 20 03, before me personally came Steve Novick, to me known and known to me to be the individual described in and who executed the foregoing instrument, and he duly acknowledged to me that he executed the same.

_____
Notary Public

**JOHN DUNSMORE**
**Notary Public**
**My Commission Expires October 31, 2005**

## Schedule 1 to Promissory Note:
## The Proven Producer Transition Allowance Loan
## (Jointly issued by AXA Network, LLC and AXA Advisors, LLC)

### What is the Transition Allowance Loan?

The *Transition Allowance* is a payment to eligible Proven Producers ("Producers") intended to defray some of the costs that such Producers will incur when they leave their existing business relationships to join AXA Advisors and AXA Network. To *qualify* for a Transition Allowance, the Producer must commit to achieving specific production targets. The *amount* of the Transition Allowance was calculated based on 1) the Producer's anticipated production during his/her association with AXA Advisors.and 2) the projected Gross Dealer Concession ("GDC")[1] generated on investment products offered by AXA Advisors.

### When and how will it be paid?

The Transition Allowance is paid to the Producer in one lump sum payment. This payment is contingent on the Producer signing the Associates' Agreements with AXA Advisors and AXA Network, committing to meeting certain gross dealer concession targets, and successfully clearing all background checks. Forgiveness of the Transition Allowance Loan may be triggered by the Producer achieving specific gross dealer concessions generated on investment products Milestones, as described more fully below: (See Table 1)

---

[1] GDC includes transaction-based revenue received by AXA Advisors in connection with transactions in all investment products and services, including fee-based asset management products and services, equity and fixed income products, mutual funds, and other investment products and services offered by AXA Advisors, excluding life insurance and annuity products. GDC does not include certain types of revenues received by AXA Advisors which do not result in commission payments to representatives, such as expense sharing payments received from product sponsors.

TABLE 1: Projected Gross Dealer Concession generated on Investment Product Milestones

| PROJECTED GDC: | | Milestone 1 | Milestone 2 | Milestone 3 | Milestone 4 | Milestone 5 |
|---|---|---|---|---|---|---|
| ➢ Annualized: | | | | | | |
| | Investment Products GDC | 2,000,000 | 2,000,000 | 2,000,000 | 2,000,000 | 2,000,000 |
| ➢ Cumulative: | | | | | | |
| | Investment Products GDC | 2,000,000 | 4,000,000 | 6,000,000 | 8,000,000 | 10,000,000 |
| | | | | | | |

Producer Initials

Based on the above projections, the Transition Allowance payments would be made as follows:

<u>Initial Payment:</u>     $500,000 will be paid as a loan, up front upon completion of all due diligence and signing of your Associates' Agreements with AXA Advisors and AXA Network.

## How will it be earned ... and forgiven?

Portions of the Transition Allowance will be forgiven as the Producer "hits" his/her Milestones, or gross dealer concession generated on Investment product targets, as specified in Table 1. The Producer earns portions of his/her Transition Allowance as he/she achieves the Milestones, as explained more fully below. When the GDC target for a Milestone is achieved, a proportionate share of the Transition Allowance loans is forgiven, as set forth in Table 2 below.

Loan and Forgiveness amounts cited herein refer to principal amounts. As described in the attached Promissory Note(s), interest accrues on the loan amounts and will be forgiven according the terms of the Promissory Note(s).

Milestone 1 Forgiveness:
- When the Producer reaches the Milestone 1 gross dealer concession target for Investment products (as specified in Table 1), $100,000 of his/her initial loan amount will be forgiven.

Milestone 2 Forgiveness:
- When the Producer reaches the Milestone 2 gross dealer concession target for Investment products (as specified in Table 1) $100,000 of his/her initial loan amount will be forgiven.

Milestone 3 Forgiveness:
- When the Producer reaches the Milestone 3 gross dealer concession target for Investment products (as specified in Table 1) $100,000 of his/her initial loan amount will be forgiven.

Milestone 4 Forgiveness:
- When the Producer reaches the Milestone 4 gross dealer concession target for Investment products (as specified in Table 1) $100,000 of his/her initial loan amount will be forgiven.

Milestone 5 Forgiveness:
- When the Producer reaches the Milestone 5 gross dealer concession target for Investment products (as specified in Table 1), the remaining balance of his/her initial loan amount will be forgiven.

The following illustration of your transition allowance forgiveness is based on the gross dealer concession targets, as described above, to which you and your manager have committed.

Table 2: Loan Payment/Forgiveness – Investment Products

|  | at Contract | Milestone 1 | Milestone 2 | Milestone 3 | Milestone 4 | Milestone 5 |
|---|---|---|---|---|---|---|
| Prior Loan Balance (excluding interest) | -- | 500,000 | 400,000 | 300,000 | 200,000 | 100,000 |
| Payment / New Loan | 500,000 | -- | -- | -- | -- | -- |
| Newly Earned / "Forgiven" (excluding interest) | -- | 100,000 | 100,000 | 100,000 | 100,000 | 100,000 |
| Outstanding Loan Balance | 500,000 | 400,000 | 300,000 | 200,000 | 100,000 | «Mile3Bal Wrap» |

A review of all gross dealer concession achieved and Transition Allowance payments made will be conducted at the end of 60 months, if the Producer is still associated with AXA Advisors and AXA Network, or at the termination of the Producer's Associates' Agreements, whichever is sooner. If the actual gross dealer concession achieved is less than the targets identified in Table 1, then the Producer will either be granted additional time (a loan term extension) to produce to the target or will be required to repay any paid Transition Allowance that has not been earned pursuant to the terms of the attached Promissory Note. The determination of whether or not to grant a Producer additional time or instead to require immediate loan repayment and/or the amount of additional time granted, if any, is at the sole discretion of AXA Advisors and AXA Network. A Proven Producer must achieve the Gross Dealer Concession generated on Investment product Milestones to earn loan forgiveness. A Milestone will not be deemed achieved until the cumulative target has been achieved, as specified in Table 1. There will be no proration of loan forgiveness between Milestones. If a Proven Producer fails to achieve any Gross Dealer Concession Milestone, any unearned but paid Transition Allowance amounts must be repaid, pursuant to the terms of the attached Promissory Note.

## Independent Contractor

Achievement of the Milestone targets and/or forgiveness of the Transition Allowance Loans will not alter the rights and/or contractual requirements as outlined in the Associates' Agreements with AXA Network and/or AXA Advisors. Achievement of the Milestone targets as outlined above is not a contract nor does it guarantee association with AXA Advisors and/or AXA Network at any time.

## Receipt Acknowledged

The Producer hereby acknowledges receipt of this Schedule and understands that this Schedule is incorporated into the attached Promissory Note, and together, the provisions of both are the exclusive agreement between the parties with respect to the terms and conditions of the Transition Allowance Loans and their repayment, and are controlling with respect to such terms and conditions.

Producer:          Steven S. Nosick
                   (Please Print Full Name)

                   _____    Jan 15th 2005
                           Signature              Date

Schedules may be modified at any time at the sole discretion of AXA Network and AXA Advisors.

# EXHIBIT C



Al Escobar
*Senior Vice President*
*Financial Office*

May 22, 2006

Mr. Steven S. Novick
87 North Wilton Road
New Canaan, CT 06840

Re:    *AMENDMENT TO PROMISSORY NOTE*
    *DATED January 15, 2003*

Dear Steven:

This letter amends the Promissory Note between AXA Network, LLC/AXA Advisors, LLC and you, dated January 15, 2003 in the amount of $500,000, and Schedule 1 to Promissory Note, as follows:

(a)    Paragraph b of the Promissory Note shall be amended by adding at the end of the second sentence the following: "Notwithstanding the foregoing, AXA Network, LLC and AXA Advisors, LLC, at their discretion, can reestablish Production Credits Milestones, to continue the forgiveness period after the Payment Date, provided the Payee is still affiliated with AXA Network, LLC and/or AXA Advisors, LLC.";

(b)    Paragraph c of the Promissory Note shall be amended by deleting the phrase "for every Two Million Dollars ($2,000,000) in Gross Dealer Concessions ("GDC")", and substituting in its place the phrase "for every One Million (1,000,000) in Production Credits ("PCs")"; and

(c)    Schedule 1 to Promissory Note shall be amended as follows:

(1) by deleting the phrases "gross dealer concession", "Gross Dealer Concession" or the acronym "GDC" wherever it appears in the Promissory Note and inserting in their place the phrase "Production Credits" or the acronym "PCs" where appropriate;
(2) by deleting in its entirety footnote 1; and
(3) amending Table 1 as follows:

✓ **AXA FINANCIAL**

✓AXA ADVISORS      ♀EQUITABLE      AllianceCapital ⚠      BERNSTEIN ✿

AXA Financial, Inc . 1290 Avenue of the Americas, New York, NY 10104. Tel: (212) 314 5495. Fax: (212) 314-3377
alvaro.escobar@axa-financial.com

TABLE 1: Projected Production Credits generated on Investment Product Milestones

| PROJECTED PCs: | | | Milestone 1 | Milestone 2 | Milestone 3 | Milestone 4 | Milestone 5 |
|---|---|---|---|---|---|---|---|
| ► Annualized | | | | | | | |
| | PCs | | 1,000,000 | 1,000,000 | 1,000,000 | 1,000,000 | 1,000,000 |
| ► Cumulative: | PCs | | 1,000,000 | 2,000,000 | 3,000,000 | 4,000,000 | 5,000,000 |
| | | | | | | | |

_____
Producer Initials

The above amendments shall be effective from January 15, 2003, the initial date of the Promissory Note.

By: _____
   Alvaro Escobar
   Senior Vice President
   AXA Network, LLC/
   AXA Advisors, LLC

Acknowledged:

By: _____
   Steven S. Novick

# EXHIBIT D

<u>LOAN NOTE</u>

<u>$1,000,000</u>
Dated: August 2θ, 2003

<u>Promise to Pay</u>.    FOR VALUE RECEIVED, I, Steven Novick (the "Undersigned"), promise to pay the principal sum of one million dollars ($1,000,000) and interest at the rate specified below on the unpaid principal sum hereof, in US dollars to the order of AXA Network, LLC ("AXA Network"), or the holder hereof (the "Lender") at the Lender's office located at 1290 Avenue of the Americas, New York, N.Y. 10104 (to the attention of William E. Mills, 4th Floor) or at such other place as the Lender may designate in writing to the Undersigned. AXA Network and its parent, affiliates and subsidiaries are referred to herein as "AXA".

<u>Interest</u>.    Interest on this Note shall accrue at the rate of Prime plus 1% percent per annum from the date of this Note and shall be adjusted quarterly prior to each payment date as specified on Schedule A attached hereto. (the "Payment Date"). Interest shall be due and payable in the amounts and on each Payment Date as specified on Schedule A attached hereto.

<u>Payments</u>.    The Undersigned agrees to make quarterly payments of principal and accrued interest under this Note on each Payment Date in accordance with Schedule A attached hereto.

October 1st

<u>Maturity</u>.    This Note shall be repaid in full on ~~August 31~~st 2008 (the "Maturity Date"). The Undersigned acknowledges that there will be a principal payment due on the Maturity Date and that Lender shall have no obligation, expressed or implied to refinance this loan.

<u>Prepayment</u>.    The Undersigned shall, at any time, have the right to prepay without penalty or premium, all or any portion of the loan evidenced by this Note, at a price equal to the principal amount being prepaid plus the interest on such amount being prepaid accrued to the date of prepayment.

<u>Event of Default; Late Charge; Fee for Bounced Checks</u>.    Nonpayment when due of any installment of principal or interest amount payable hereunder, which nonpayment shall continue unremedied for 30 calendar days shall constitute an event of default (an "Event of Default"). Upon an Event of Default, the Undersigned shall pay a late charge equal to 2% on the unpaid principal amount of the loan plus any accrued interest not yet paid from the date of the Event of Default until payment of the amount(s) otherwise due and payable. In the event that the Lender receives a bounced or otherwise deficient check, the Undersigned shall pay a fee of $25 for each such occurrence.

155200v2

<u>Remedies upon Default.</u>    Upon the occurrence, and during the continuation, of an Event of Default hereunder, the Lender may declare the Note to be due and payable and this Note shall automatically become immediately due and payable without presentment, demand, protest or other notice of any kind.

If the Undersigned is in default, the Lender may, to the extent permitted by applicable law, appropriate and hold, or apply (directly or by the way of set-off) to the payment of any amounts owing by the Undersigned under this Note, all commissions, compensation of any kind and other amounts in any form payable to the Undersigned under any of the Undersigned's agreements with AXA (the "AXA Agreements"). In the event that any or all of the Undersigned's indebtedness hereunder is not satisfied by any such set-off or to the extent that set-off is not legally permissible, the Undersigned shall continue to remain responsible for payment of the outstanding balance.

In addition to the above paragraph, if an Event of Default has occurred and is continuing, and irrespective of whether this Note has been declared immediately due and payable, the Lender may proceed to protect and enforce its rights by an action at law, suit in equity or other appropriate proceeding.

<u>Security.</u>    To secure payment of all sums payable under this Note, and to the extent permitted by applicable law, (a) the Undersigned grants to the Lender a security interest in, and assigns to the Lender, commissions, compensation and other amounts payable to the Undersigned under any of the AXA Agreements or by AXA; and (b) Ronald Lorch, grants to Lender a security interest in, and assigns to the Lender, all current and future renewal commissions arising from his sales of proprietary AXA products in accordance with the Pledge Agreement attached hereto as Exhibit A. Notwithstanding the granting of any such security, the Undersigned is responsible on a fully recourse basis for the payment of the amounts evidenced by this Note.

<u>Action To Enforce.</u>    (i) If the Lender shall institute any action to enforce collection of this Note or to enforce its security interest, there shall become due and payable from the Undersigned, in addition to the unpaid principal and interest, all costs and expenses of such action to enforce or defend (or in determining whether or how to enforce or defend) any related bankruptcy proceedings or any of its rights hereunder or in responding to a subpoena or other legal process issued in connection with the Note (including reasonable attorneys' fees); (ii) the Undersigned irrevocably consents to the sole and exclusive jurisdiction of the Courts of the State of New York and any Federal court located in New York in connection with any action or proceeding arising out of, or related to, this Note; and (iii) the Undersigned waives presentment, demand for payment, notice of dishonor, and all other notices or demands in connection with the delivery, acceptance, performance, default, or endorsement of this Note.

<u>Termination of Agent's Agreement.</u>  If any of the Undersigned's AXA Agreements or the Undersigned's affiliation with AXA is terminated for any reason, the entire amount owed under this Note shall automatically become immediately due and payable.

Loan Charge. If it should be finally determined that any interest rate or other charge imposed in connection with this Note exceeds applicable legal limits, such rate or charge(s) will be reduced to the maximum amount legally permitted. In that case, any excess amount that the Undersigned has already paid shall, at the Lender's option, be refunded to the Undersigned or applied to reduce the principal balance owed. Any such refund or credit shall not affect the Undersigned's obligations under this Note or excuse, waive or cure any default that may occur.

Waiver.    No delay or failure on the part of the Lender to exercise any power or right hereunder shall operate as a waiver thereof, and no right or remedy of the Lender shall be deemed abridged or modified by any course of conduct. The rights or remedies of the Lender as herein specified are cumulative and not exclusive of any rights or remedies that the Lender may otherwise have.

Governing Law.    This Note shall be governed by and construed in accordance with the laws of the State of New York without regard to the principles of the conflict of laws.

Amendment.  This Note may only be amended in writing with the consent of all parties.

Assignment.  This Note may not be assigned by the Undersigned. The Lender may assign this Note without prior written or oral notice to the Undersigned.

Severability.  In case any provision or obligation hereunder shall be invalid, illegal or unenforceable in any jurisdiction, the validity, legality and enforceabilty of the remaining provisions or obligations, or of such provision or obligation in any other jurisdiction, shall not in any way be affected or impaired thereby.

Exclusivity.    The provisions herein and in the attached Schedule A are the exclusive terms of the agreement between the parties and are controlling as to the terms and conditions of this Note.

155200v2

JURY TRIAL.        THE UNDERSIGNED AND LENDER EACH HEREBY
ABSOLUTELY, IRREVOCABLY AND UNCONDITIONALLY WAIVE TRIAL BY
JURY AND THE RIGHT TO CLAIM OR RECEIVE CONSEQUENTIAL OR
PUNITIVE DAMAGES IN ANY LITIGATION, ACTION, CLAIM, SUIT OR
PROCEEDING, AT LAW OR IN EQUITY, ARISING OUT OF, PERTAINING TO OR
IN ANY WAY ASSOCIATED WITH THE INDEBTEDNESS EVIDENCED HEREBY,
THE RELATIONSHIP OF THE PARTIES HERETO AS LENDER AND BORROWER,
THIS NOTE OR THE ACTIONS OF THE PARTIES HERETO IN CONNECTION
WITH ANY OF THE FOREGOING.

In Witness whereof, the Undersigned has signed this Note as of the date first above
written.

                                        Steven Novick,
                                        as Undersigned


State of _____CT_____ )
                )SS:
County of _____Fairfield_____ )

On __August 28__, 2003, before me personally came Steven Novick to me
known and known to me to be the individual described in, and who executed the
foregoing instrument, and acknowledged to me that he/she executed the same.

_____
Notary Public

            DOROTA LUPINSKA
              Notary Public
My Commission Expires February 28, 20___

155200v2

EXHIBIT A

## PLEDGE AGREEMENT

Agreement, made August 2ᴏ , 2003, between Ronald Lorch (the "Pledgor"), and AXA Network, LLC (the "Lender"). The Lender and its parent, affiliates and subsidiaries are referred to herein as "AXA."

### Recitals:

At the time of the execution of this Agreement, the Lender is lending to Steven Novick (the "Borrower") $1,000,000, as evidenced by a promissory note (the "Note") for such amount of even date herewith.

To induce the Lender to make such loan, the Pledgor has agreed to grant to Lender a security interest in, and assigns to the Lender, all current and future renewal commissions arising from sales by the Pledgor of proprietary AXA products for the repayment of such loan.

It is therefore agreed:

1.  Pledge.  In consideration of the sum of $1,000,000 loaned to the Borrower by the Lender, receipt of which is hereby acknowledged, the Pledgor hereby grants to Lender a security interest in, and assigns to the Lender, all current and future renewal commissions arising from sales by the Pledgor of proprietary AXA products.

2.  Default.  In the event that the Borrower defaults in the performance of any of the terms of the Note, the Lender may retain Pledgor's current and future renewal commissions arising from sales by the Pledgor of proprietary AXA products in an amount equal to the principal and interest and any other amounts then due on the loan.  In the event that the Pledgor's commissions are insufficient to cover the principal of and the interest on the loan, the Pledgor shall remain liable to the Lender for any such deficiency.

3.  Action To Enforce.  (i) If the Lender shall institute any action to enforce its security interest, there shall become due and payable from the Pledgor, in addition to the unpaid principal and interest, all costs and expenses of such action to enforce or defend (or in determining whether or how to enforce or defend) any related bankruptcy proceedings or any of its rights hereunder or in responding to a subpoena or other legal process issued in connection with the Note (including reasonable attorneys' fees); (ii) the Pledgor irrevocably consents to the sole and exclusive jurisdiction of the

155200v2

Courts of the State of New York and any Federal court located in New York in connection with any action or proceeding arising out of, or related to, this Agreement; and (iii) the Pledgor waives presentment, demand for payment, notice of dishonor, and all other

4.    <u>Governing Law</u>.    This Agreement shall be governed by and construed in accordance with the laws of the State of New York without regard to the principles of the conflict of laws.

5.    <u>Severability</u>.    In case any provision or obligation hereunder shall be invalid, illegal or unenforceable in any jurisdiction, the validity, legality and enforceabilty of the remaining provisions or obligations, or of such provision or obligation in any other jurisdiction, shall not in any way be affected or impaired thereby.

6.    <u>Jury Trial</u>.  The Pledgor and Lender each hereby absolutely, irrevocably and unconditionally waive trial by jury and the right to claim or receive consequential or punitive damages in any litigation, action, claim, suit or proceeding, at law or in equity, arising out of, pertaining to or in any way associated with the security interest evidenced hereby, the relationship of the parties hereto as Lender and Pledgor, this Agreement or the actions of the parties hereto in connection with any of the foregoing.

In Witness whereof, the Pledgor has signed this Agreement as of the date first above written.


Pledgor:
Ronald Lorch

By: _____
       [name/title]


Lender:  AXA NETWORK, LLC

By: _____
       [name/title]


155200v2