# EXHIBIT B

# 2005 AXA ADVISORS COMPLIANCE MANUAL

# Table of Contents

## Chapter 1: Introduction

| | |
|---|---|
| A. Topics Covered & Key Terms | 6 |
| B. Reporting Violations | 10 |
| C. Insurance Marketplace Standards Association ("IMSA") | 10 |

## Chapter 2: Licensing & Securities Registration

| | |
|---|---|
| A. Representatives' Qualifications | 12 |
| B. Supervisors' Qualifications | 15 |
| C. Securities Registration Applications: Proper Disclosures & Procedures | 17 |
| D. Procedures for Renewal of Licenses & Securities Registrations | 18 |
| E. Revisions to Form U-4 Applications | 19 |
| F. Continuing Education | 20 |
| G. Termination Procedures | 23 |

## Chapter 3: Representatives' Disclosures, Notifications & Prohibited Activities

| | |
|---|---|
| A. Outside Business Activities | 26 |
| B. Practice Enhancement Program | 28 |
| C. Personal Accounts with Other Broker/Dealers | 29 |
| D. Private Securities Transactions/Selling Away | 31 |
| E. Initial Public Offerings | 33 |

1

## 2005 AXA ADVISORS COMPLIANCE MANUAL

| | |
|---|---|
| F. Insider Trading | 33 |
| G. Unauthorized Trading: Discretionary Accounts, Powers of Attorney & Trustees | 34 |
| H. Interest in Client Matters: Sharing Ownership & Profits | 35 |
| I. Commingling and Misappropriation of Client Funds | 35 |
| J. Excessive Trading in Client Accounts | 36 |
| K. Market Timing Services | 36 |
| L. Recommending Independent Investment Advisors | 36 |
| M. Viatical Settlements | 37 |
| N. Privacy, Authenticity & Accuracy of Client Information, Documentation and Accounts | 37 |
| O. Client Address of Record | 40 |
| P. Fair Competition | 40 |

**Chapter 4: Sales & Business Practices**

| | |
|---|---|
| A. Prospecting | 43 |
| B. Sales Presentations | 46 |
| C. Suitability | 47 |
| D. Replacements | 52 |
| E. Insurance Sales Disclosures and Delivery | 55 |
| F. Annuity Sales Disclosures and Delivery | 58 |
| G. Approved Insurance Applications & Forms | 58 |
| H. Prospectuses | 59 |
| I. Sample Documents | 60 |

2005 AXA ADVISORS COMPLIANCE MANUAL

| | |
|---|---|
| J. Mutual Fund Sales | 60 |
| K. Brokerage Services | 64 |
| L. Investment Advisory Activities | 67 |

**Chapter 5: Commissions, Payments & Gifts**

| | |
|---|---|
| A. Gifts, Gratuities & Promotional Items | 75 |
| B. Cash/Non-Cash Compensation | 77 |
| C. Client Payments | 78 |
| D. Commission Sharing | 80 |
| E. Anti-Money Laundering Policy | 81 |
| F. International Business Transactions | 84 |

**Chapter 6: Communications**

| | |
|---|---|
| A. Stationery & Business Cards | 86 |
| B. Titles & Designations | 87 |
| C. D/B/A Names | 90 |
| D. Company Signage | 93 |
| E. Unauthorized Use of Company Name and Logo | 94 |
| F. Advertising & Sales Materials | 94 |
| G. Outgoing Correspondence | 102 |
| H. Incoming Correspondence | 103 |
| I. Internet Policy: Electronic Correspondence, Advertising & Sales Materials | 107 |
| J. Compliance-Related Field Communications | 110 |

2005 AXA ADVISORS COMPLIANCE MANUAL

K. Other Communications ... 110

**Chapter 7: Additional Compliance & Supervisory Requirements**

A. Supervision of Representatives ... 112

B. Branch Manager Delegations ... 117

C. Manager's Fund ... 119

D. Client Complaints ... 120

E. Disciplinary Action Program ... 123

F. Annual Compliance Meetings ... 125

G. Annual Compliance Notification Forms ... 127

H. Annual Compliance Interviews ... 127

I. Compliance Examinations & The Regional Compliance Officer Program ... 128

**Chapter 8: Record Keeping and Contact with Regulators**

A. Required Documentation ... 131

B. Documentation Retention Periods ... 152

C. Contact with Regulators ... 154

**APPENDIX** ... 156

NASD Notice to Members 98-38

## 2005 AXA ADVISORS COMPLIANCE MANUAL

Copies of the Notification Forms must be maintained in Representatives' individual compliance files.

Representatives must immediately advise AXA Advisors of the existence of any unreported securities accounts and comply with the above procedures relating to transaction reporting (unless the accounts involve securities exempt from this policy such as variable contracts, open-end mutual funds and unit investment trusts).

3. When Must Representatives Disclose Other Personal Securities Transactions?

Any Representative who personally wishes to purchase a security outside any B/D (such as a private placement) must provide written notice to Divisional Counsel through his or her BRM. The transaction may not take place until the Representative receives a written acknowledgment of the notice and approval from the Divisional Counsel.

D.   **Private Securities Transactions/Selling Away**

1. What Is AXA Advisors' Policy Regarding Private Securities Transactions And Selling Away?

A "private securities transaction" is any securities transaction (with a few exceptions) outside the regular course or scope of a registered representative's association with his or her broker/dealer. Private securities transactions include transactions on behalf of a client or non-client and personal purchases or sales by a Representative.

Examples of the type of securities typically involved in private securities transactions outside of a Representative's association with AXA Advisors are:

- mutual funds or variable contracts that are not offered by or through AXA Advisors or its affiliates, such as AXA Network;

- stocks not sold in the secondary market;

- private placements and shares or participation in oil well drilling and similar ventures;

- promissory notes; and

- certificates of participation.

Private securities transactions also include, but are not limited to, any involvement with new offerings of securities whether registered or not with the SEC, variable annuities, group variable annuities, coins, investments in any entity owning real estate, limited partnerships, and certificates of deposit. They may also involve certain types of loans by clients to or from the Representative, which are also prohibited. See Section on Prohibited Interest in Client Policies or Investments.

## 2005 AXA ADVISORS COMPLIANCE MANUAL

"Selling away" is a term used in the securities industry to describe those private securities transactions that are:
- outside the regular course or scope of a registered representative's association with his or her broker/dealer, *and*
- the broker/dealer has not given written approval for the transaction, *and*
- the transaction is one in which a registered representative participates with, or on behalf of, another person (who is not necessarily a client of his or her broker/dealer).

Selling away includes any manner of involvement in the securities transaction and is not limited to the sale of securities. *Further, it includes involvement without receipt of compensation.* Thus, uncompensated referrals and client introductions may be considered selling away in some circumstances. Selling away is strictly prohibited by AXA Advisors as well as by NASD Conduct Rules.

Representatives are prohibited from any involvement in private securities transactions in any capacity and at any level of involvement unless they have provided prior written notice to AXA Advisors and they have received written permission from AXA Advisors *prior to any involvement* in the transaction. If a Representative would like to be involved in a private securities transaction, either personally or on behalf of a client, the Representative must first provide detailed written notice of the proposed transaction. The notice must include a description of the Representative's proposed role and must state whether the Representative has or will receive selling compensation in connection with the transaction. Selling compensation is any compensation paid directly or indirectly in connection with, or as a result of, the purchase or sale of security. Thus, selling compensation includes, but is not limited to, finder's fees, commissions, rights to acquire securities and expense reimbursements. If AXA Advisors approves participation by the Representative, AXA Advisors is responsible for supervising the Representative's activities. Therefore, Representatives must abide by any conditions AXA Advisors may place upon the Representative's activities.

Representatives should also note that persons who the Representative solicits, refers or introduces to investments offered privately may erroneously believe that AXA Advisors has researched and recommended the investments, even if the person is not a client of AXA Advisors. This may lead to litigation and/or regulatory investigation and action. However, AXA Advisors will not permit its Representatives to offer any security without appropriate due diligence and approval by the Company. Representatives must consult with their BRM or DBP, who must then consult with Divisional Counsel, prior to engaging in any outside securities transaction for any purpose.

## 2005 AXA ADVISORS COMPLIANCE MANUAL

Violation of company policy regarding private securities transactions, including selling away, will subject Representatives to significant disciplinary action by the Company and by regulatory authorities.

E.      **Initial Public Offerings**

In most cases, it is a violation of NASD rules for a broker/dealer to sell an initial public offering (a newly issued security) to a registered representative. Representatives may not purchase initial public offerings. However, they *may* purchase shares of the stock when trading commences on the secondary market.

Other broker/dealers' representatives occasionally do not realize that Representatives are registered representatives and may offer IPO shares to them. Representatives must decline any such offer. If purchased, the NASD will fine and sanction both the selling broker/dealer and the registered representative who is the purchaser.

F.      **Insider Trading**

1. What Is Insider Trading?

Insider trading is trading securities based on material non-public information ("inside information") or passing along such information to others who may act on it. Generally, information is "material" if it is likely to affect the price of a security or if it is likely to be relevant to a reasonable investor making a decision about whether to buy, hold or sell the security. Information is not considered "public" unless it has been reported in the news media, disclosed in a public filing, submitted to a regulatory body or widely disseminated outside the Company by some other means. "Inside" information may include corporate information such as sales, the number of surrenders, mortality experience, earnings, dividend changes, projections, new products, acquisitions, new stock or debt issues or other significant developments.

2. What Is The Company's Insider Trading Policy?

The AXA Financial Insider Trading Policy ("Insider Trading Policy") sets forth the policy of AXA Financial with respect to trading in securities of AXA and Alliance Capital (including options and other related derivative products) while in possession of material nonpublic information about the issuer. The Insider Trading Policy applies to all directors, officers, employees and associates of AXA Financial. All Representatives must familiarize themselves with the Insider Trading Policy and comply with the rules and procedures it describes. In addition, Representatives acknowledge on their Annual Compliance Notification Form that they will comply with the terms of the Insider Trading Policy. See Sections regarding Annual Compliance Notification Form and Record Keeping. Questions regarding the Insider Trading Policy should be directed to the DBP or

**2005 AXA ADVISORS COMPLIANCE MANUAL**

| | |
|---|---|
| 4 | BRM must decide whether he or she wants to retain or terminate the Representative; if the decision is to retain, the BRM must seek approval of the DP and show the recommendation is reasonably supported by the facts. The BRM must continue the plan of enhanced supervision, as described directly above, augmented by the following: |

- BRM must pre-approve all the Representative's transactions;

- BRM must increase frequency of on-site visits to monthly, and

- The BRM must suspend the Representative's entitlement to receive express commissions and notify the appropriate Operations Center(s).

| | |
|---|---|
| 5 | Representative is terminated subject to the DP's determination to appeal a decision to terminate to the President of Retail Distribution. If the Representative is not terminated, the enhanced supervision shall be augmented as the President of Retail Distribution, in consultation with Divisional Counsel, shall determine. |

Prior to taking any action to terminate a Representative, a BRM must consult with Divisional Counsel or employment counsel in the Law Department. See Section regarding Termination Procedures.

4. Which Files Must Be Maintained?

The branch must maintain a chronological log of client complaints as well as an individual file for each matter. See Section regarding Record Keeping. The log and files should include copies of all complaints and any responses to the complaints. Questions regarding complaint files should be directed to the appropriate RCO.

E.     **Disciplinary Action Program**

The Company has a Disciplinary Action Program that is designed to provide a structure for remedial and disciplinary actions to be taken in response to violations of laws, regulations and company policies. The Disciplinary Action Program was developed with the

123

## 2005 AXA ADVISORS COMPLIANCE MANUAL

objective of fulfilling the Company's obligations under insurance and securities laws to adequately supervise its Representatives and to detect and prevent, insofar as possible, violations of those laws. The goal is to maintain uniform, fair and beneficial disciplinary processes for Representatives and supervisors. Review of alleged violations is conducted on two levels: local and national. Field supervisors conduct local review of alleged violations and, when appropriate, impose sanctions after consultation with Divisional Counsel. At the national level, the National Disciplinary Action Committee ("NDAC") and the Management Disciplinary Action Committee ("MDAC"), review alleged violations and, when appropriate, recommend sanctions. Sanctions include, but are not limited to, letters of caution or reprimand, fines, enhanced supervision and termination.

    1.    What Are the NDAC and The MDAC?

The NDAC is a five member committee comprised of DPs and BRMs. The NDAC reviews cases involving alleged violations of the Company's compliance policies or regulatory requirements by Representatives and DMs when branch level discipline is not appropriate. Examples of violations which should be referred to the National Compliance Office for possible referral to the NDAC include, but are not limited to, allegations of improper sales practices, unadmitted replacements, selling away, repeated violation of a compliance policy or regulatory requirement or use of unapproved sales materials.

The NDAC recommends measures to prevent any recurrence of improper conduct; the Committee may recommend sanctions ranging from a warning to termination. Representatives and DMs may not appeal recommendations for a reprimand or monetary fine. However, they may appeal, to the MDAC, recommendations for a suspension or termination.

The MDAC reviews cases involving appeals of the NDAC recommendations for suspension or termination and disciplinary matters involving DPs' or BRMs' sales practices and/or supervisory responsibilities. The MDAC is comprised of members of corporate management.

In addition to fulfilling the Company's regulatory obligations, the program, in certain cases, may effectively preempt similar or possibly more severe sanctions from being imposed by the NASD or state regulators against a Representative.

    2.    How Does the NDAC Determine Which Recommendations Are Appropriate?

When a matter is referred to the NDAC, the Representative involved should submit a written response to the allegations. The BRM supervising the Representative should also submit a written statement providing relevant information regarding the allegations. Once the NDAC receives the statements and supporting documentation, its members will weigh a number of

124

**2005 AXA ADVISORS COMPLIANCE MANUAL**

factors to determine an appropriate recommendation. Some of the factors the NDAC considers are as follows:

- The manner in which the Company learned about the violation (i.e., admitted or discovered via a customer complaint, regulatory inquiry or RCO examination);

- The Representative's tenure with the Company and disciplinary history;

- The intention associated with the violation (i.e., was the violation inadvertent, negligent or purposeful);

- The Representative's experience and level of training; and

- The level of supervisory knowledge, oversight and involvement in the matter.

    3.     What Disciplinary Action May Be Taken By Field Supervisors?

Effective supervision includes taking appropriate disciplinary measures to correct conduct that is inconsistent with company guidelines and/or regulatory requirements. BRMs review most alleged compliance violations by Representatives and DMs and impose discipline when appropriate. BRMs should fully investigate each alleged violation of compliance policy or procedure and should consult with Divisional Counsel prior to imposition of a sanction. Divisional Counsel will assist the BRM in determining what sanction, if any, is appropriate for the violation and is consistent with prior local and national disciplinary actions.

**F.    Annual Compliance Meetings**

  1. What Are the Requirements for Attending and Documenting Annual Compliance Meetings?

All **active** Representatives (including retired, Senior Sales Force (SSF) and precontract Representatives) must attend an annual compliance meeting. Active Representatives are Representatives who are licensed and registered to sell insurance and/or securities. Representatives who are disabled pursuant to the Company's disability program and are not soliciting new business, and retired Representatives who are no longer NASD registered or state insurance appointed are not required to attend an annual compliance meeting. Nonsecurities registered brokers and sub-producers under a selling agreement are also exempt from the meeting requirement.

The annual compliance meeting may be held in conjunction with other branch meetings or as an independent compliance meeting. An attendance list, meeting agenda