# EXHIBIT F

07-2464

FINRA DISPUTE RESOLUTION

|  |  |
|---|---|
| In the Matter of the Arbitration Between | : |
| STEVEN S. NOVICK, | : |
| Claimant, | : FINRA Docket |
| -against- | : # _____ |
| AXA ADVISORS, LLC, | : **STATEMENT OF CLAIM** |
| Respondent. | : |

Claimant Steven S. Novick, through undersigned counsel, as and for his Statement of Claim against respondent AXA Advisors, LLC, pursuant to NASD Code of Arbitration Procedure for Industry Disputes ("NASD Code") Rule 13302, respectfully alleges upon information and belief that:

## PARTIES

### Steven S. Novick

Steven S. Novick ("Mr. Novick") was registered as a registered representative with AXA Advisors, LLC ("AXA") as an independent contractor from December 2002 through on or about October 13, 2006. At all times relevant to this claim, Mr. Novick (i) was registered with AXA at 1266 East Main Street, Stamford, Connecticut 06902, doing business as The New Canaan Group, LLC and New Canaan Financial Group, LLC; and (ii) maintained residence at 87 North Wilton Road, New Canaan, Connecticut 06840.

### AXA Advisors, LLC

AXA is a broker/dealer organized and existing under the laws of the State of Delaware with its principal place of business at 1290 Avenue of the Americas, New York, New York 10104.

-1-

## JURISDICTION AND VENUE

This dispute is properly submitted for arbitration (NASD Code Rule 13200) and New York, New York is the appropriate hearing location (NASD Code Rule 13213).

## INTRODUCTORY STATEMENT

Mr. Novick is a successful registered representative with a substantial and valuable book of business which he cultivated before joining AXA in 2002. He joined AXA, in large part, because it is a broker/dealer with an "independent" business model. Its registered representatives are independent contractors rather than employees. Although Mr. Novick offered securities through AXA, he did business as The New Canaan Group, LLC and New Canaan Financial Group, LLC. Mr. Novick was responsible for substantially all costs associated with running his business including rent, support-staff salaries, E&O insurance, communications equipment including telephone and computer lines, office furniture, and supplies. In exchange for absorbing those costs, Mr. Novick received a payout of approximately 82% and proprietary "ownership" of his clients' accounts. Nevertheless, as set forth more fully below, AXA terminated Mr. Novick in a manner violative of AXA's own internal policies, maliciously damaged Mr. Novick with inaccurate disclosure language on his Form U5, and then raided Mr. Novick's client accounts.

## FACTS COMMON TO ALL COUNTS

### Novick Brings Improprieties To the Attention of Senior Management

Mr. Novick's father-in-law, Ronnie Lorch, was also registered with AXA. Although Mr. Lorch primarily sold insurance products on behalf of AXA's affiliate (AXA Network, LLC), he also managed approximately $20 million of securities under a

- 3 -

joint-rep agreement with Larry Pasaretti, a long-standing broker who received preferential treatment from AXA's senior management.[1] As Mr. Lorch was nearing retirement, he intended to transition his entire securities and insurance business over to Mr. Novick.

In or around 2004, it was discovered that Mr. Pasaretti was surreptitiously moving Mr. Lorch's accounts out of the joint-rep number and into Mr. Pasaretti's individual rep number. By doing so, Mr. Pasaretti was depriving Mr. Lorch of commission income and depriving Mr. Novick of accounts which were supposed to transition to him. At or about that time, it was also discovered that Mr. Pasaretti had "sold away" limited partnership interests in Gemini I, L.P. to various customers who were introduced by Mr. Lorch.

To prevent further improprieties by Mr. Pasaretti, Mr. Novick brought written proof of same to various members of AXA management including Bob Jones (President of AXA Distribution Holding Corp.), Ned Dane (President of AXA), Rich Ferone (compliance officer), Chris Aguele (compliance officer), William DeMatteo (compliance officer), Joe Colombo (VP and Regional Manager), Barry Salzhauer (compensation department) and Mike Rynicker (SROP). (Exhibit A). Although AXA chose not to discipline Mr. Pasaretti for selling away, senior management had disdain for Mr. Novick for reporting on "one of their own." At that time, however, senior managements' contempt for Mr. Novick was outweighed by their business interests in retaining Mr. Novick's substantial production.[2]

---

[1] Pasaretti received an override from all persons registered with AXA and effectively served as national sales manager.
[2] Mr. Novick brought other improprieties to the attention of senior management which they similarly ignored. AXA's internal policies require representatives to report instances of misconduct, and promise protection "against retaliation," but afforded Mr. Novick no such protection.

### AXA Decides to Exit the Securities Brokerage Industry

In recent years, AXA's sole member (AXA Holding Distribution Corp.) was forced to make substantial capital contributions to fund AXA's operating losses to ensure AXA had sufficient operating resources. For example, AXA Holding made a capital contribution of $11,500,000 in 2004, $13,321,000 in 2005, and $22,600,000 in 2006.

Since securities brokerage was a money-loser and insignificant to the core business of AXA's parent (insurance), AXA crafted an exit strategy in 2006 by agreeing to "outsource" its securities business. On December 15, 2006, AXA entered into agreements with Linsco/Private Ledger Corp. ("LPL"), whereby LPL agreed to provide brokerage, clearing, and custody services on a fully disclosed basis; offer LPL investment advisory programs and platforms for AXA customers; and provide technology and additional processing and related services to AXA advisers and customers. The terms of the agreements are five years, subject to additional 24-month extensions.

Throughout 2006, AXA's intended "outsource" to LPL was widely discussed. Registered representatives, including Mr. Novick, wanted a voice in this process; particularly because a new platform would be imposed on them and their customers would be asked to sign LPL new account documents. Being vocal, however, served to further alienate Mr. Novick from senior management. Given the obvious uncertainties accompanying the intended "outsource", Mr. Novick explored the possibility of leaving AXA in 2006, which was known by the firm.

### AXA Terminates Mr. Novick

Mr. Novick's assertive personality annoyed certain members of AXA's senior management and they were only too happy to repay Mr. Novick for "whistle blowing"

when the opportunity presented itself. That opportunity arose in October 2006, just when AXA was negotiating with LPL to exit the securities business.

AXA fired Mr. Novick on October 12, 2006 and filed a Form U5 the next day describing the basis for termination as: "Solicited interest in a private securities transaction without the approval of the firm." As demonstrated by the chronological timeline below, AXA's lightning-fast Form U5 disclosure was outrageous and part of its intentional scheme to damage Mr. Novick:

- <u>September 27, 2006</u> – On or about this date Mr. Novick receives an unsolicited email from Michael Zimmerman, the managing member of Prentice Capital Management, LP, a private investment limited partnership. Mr. Zimmerman's email concerned NAU, Inc., an outdoor apparel company that Prentice Capital had financed. NAU's management was planning a "road show"-type visit to New York in contemplation of a $17 million financing and Mr. Zimmerman was notifying people of same.

- <u>October 4-5, 2006</u> – Mr. Novick forwards Mr. Zimmerman's email to certain people, including Ned Dane, AXA's President, whom Mr. Novick frequently communicated with. When forwarding the email, Mr. Novick wrote that: "This is a venture opportunity that, on paper looks to be great. ... I would like to invite you to come meet and discuss this unique situation with NAU's management ... to discuss how we may benefit from investing."

- <u>October 6, 2006</u> – Georgette Geller of AXA notifies Mr. Novick in writing that he must "cease and desist [from] soliciting or recommending this, or

any other, non-AXA Advisors investment to anyone. Your conduct in this matter may be deemed by the Firm to be 'selling away.'" Mr. Novick willingly accepted AXA's mandate of heightened supervision, taking comfort knowing that he did not solicit, recommend or sell any non-approved security to any customer. Mr. Novick took further comfort believing that AXA would ultimately conclude that he simply invited people, including AXA's President, to attend NAU's "road show" meeting.

- October 6-10, 2006 – Ned Dane purposefully avoids all communications with Mr. Novick on the advice of "Law and Compliance."
- October 10, 2006 – Edward Lantigua of AXA approves Mr. Novick to purchase NAU in his personal account.
- October 11, 2006 – Mr. Novick asks Mr. Lantigua how he can get NAU approved to present to clients.
- October 12, 2006 – AXA fires Mr. Novick without warning.
- October 13, 2006 – AXA files a Form U5 without seeking any input from Mr. Novick.

AXA Violated its Own Policies

AXA maintained a Disciplinary Action Program, the goal of which "[wa]s to maintain uniform, fair and beneficial disciplinary processes for Representatives and supervisors." AXA also maintained a National Disciplinary Action Committee to review allegations of selling away, improper sales practices, and use of unapproved sales materials. If the National Disciplinary Action Committee recommends a termination, the

registered representative has a right to appeal that recommendation to the Management Disciplinary Action Committee.

Mr. Novick's termination was not reviewed by the National Disciplinary Action Committee nor was he afforded appellate review by the Management Disciplinary Action Committee. Mr. Novick was thus wrongfully terminated and deprived of the Disciplinary Action Program's stated objectives of uniformity and fairness. Instead, as will be proven at the arbitration hearing, Mr. Novick's termination was arbitrary, malicious and driven by personality conflict and greed, rather than the reason disclosed on the Form U5.

AXA Attacks Novick's Book

The culmination of AXA's scheme required that AXA keep Mr. Novick's business as AXA's relationship with LPL required AXA to retain a customer base of business. Knowing that Mr. Novick was seeking to leave AXA, AXA's conspiracy against Mr. Novick required AXA to disable Mr. Novick with a "dirty" Form U5 while simultaneously attacking Mr. Novick's book of business. By filing a "dirty" Form U5, AXA believed it would limit Mr. Novick's ability to defend his book of business.

The damaging information contained on the Form U5 caused various broker/dealers to refrain from extending offers of employment to Mr. Novick. Those firms that would previously hire Mr. Novick – with a seven figure up-front check – would no longer do so. As Mr. Novick was scrambling to register with a new broker/dealer, AXA instructed Georgette Geller to mass mail letters in an effort to retain Mr. Novick's clients. AXA also "assigned" Mr. Novick's book to two registered representatives, Joseph and Joel Miller, who further solicited Mr. Novick's clients. AXA

had absolutely no right to raid the accounts of an independent contractor and Mr. Novick has been substantially damaged by this conduct.

AXA's malicious conduct toward Mr. Novick remains ongoing as evidenced by AXA's refusal to provide an accounting of renewal compensation, service fees, and asset based compensation. Discovery will reveal what, if any, compensation AXA has wrongfully withheld in violation of applicable labor laws.

## CAUSES OF ACTION

The facts set forth above give rise to causes of action for breach of contract, unlawful termination, tortious interference with contractual relations, and tortious interference with prospective contractual relations.

WHEREFORE, Steven S. Novick respectfully requests entry an award with:

(a) compensatory damages of at least $10,000,000.00, with the exact amount to be proven at the hearing;

(b) punitive damages in an amount to be determined by the arbitration panel;

(c) all costs and fees associated with this arbitration including attorneys' fees;

(d) an Order (i) expunging the Form U5 disclosure submitted by AXA, and (ii) requiring the submission of accurate Form U5 disclosure language; and

(e) all other and further relief that the arbitration panel deems just and proper.

Dated: August 24, 2007

        Respectfully submitted,

        GUSRAE, KAPLAN, BRUNO & NUSBAUM PLLC
        *Attorneys for Steven S. Novick*

By: _____
        Martin H. Kaplan, Esq.
        Robert L. Herskovits, Esq.
        Gusrae, Kaplan, Bruno & Nusbaum PLLC
        120 Wall Street
        New York, NY 10005
        (212) 269-1400
        (212) 809-5779 – facsimile



**PROFESSIONAL PLANNING SERVICES, INC.**
201 North Service Road, Suite 400, Melville, NY 11747-3179
phone (516) 424-6000 ext 460 fax (516) 547-4109

LAWRENCE N. PASSARETTI
Managing Partner

March 4, 1997

Mr. Bruce Toll
1477 Rydal Road
Rydal, PA 19046

Dear Bruce,

Enclosed you will find your confirmations of your investment into the Gemini I L.P.

As noted in the confirmation, statements will be generated for the quarters ending March 31st, June 30th, September 30th and December 31st.

If you wish to have monthly updates please call Tom Shea at (516) 424-6000 x461 and he will be happy to assist you.

Please call me if you have any questions regarding Gemini I L.P., its managers or performance.

Sincerely,

Lawrence N. Passaretti, SPC

*Registered Representative*
EQ Financial Consultants, Inc.*
Distributor of variable life and annuity products, mutual funds, and other investment products and services

*Agent*
The Equitable Life Assurance Society of the United States
Life insurance and annuities

New York, NY 10019
(212) 554-1234

*Agent*
Equitable Variable
Life Insurance Company*
Variable Life Insurance

* A subsidiary of Equitable Life

# GEMINI FUND I, L.P.

201 North Service Road
Melville, New York 11747
(516) 423-9300
Fax (516) 423-9394

February 20, 1997

Mr. Bruce E. Toll
1477 Rydal Road
Rydal, PA  19046

*Personal & Confidential*
*To Be Opened By Addressee Only*

RE:   **BRUCE E. TOLL**

Dear Mr. Toll::

Thank you for your investment in the Gemini Fund I, L.P.  Gemini's philosophy is based on the belief that prudent professional investment management consists of investing with managers who demonstrate consistent records of superior performance.

This letter will serve to acknowledge the $250,000.00 investment into Gemini Fund I, L.P. effective January 31, 1997.

Please be advised that performance statements will be provided on a quarterly basis for the periods ending March 31, June 30, September 30 and December 31.  Performance statements are prepared ten days after the close of the quarter.

Sincerely,

*Edward T. Stein*

Edward T. Stein
GEMINI FUND I, L.P.
General Partner

ETS:das
cc:  Professional Planning Services, Inc.