UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

STEVEN S. NOVICK,                                    :   **ECF CASE**
                              Plaintiff,             :
                                                     :   Case No:
                  - against -                        :   07 CIV 7767 (AKH)(KNF)
                                                     :
AXA NETWORK, LLC,                                    :
                              Defendant.             :
                                                     :
                                                     :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


### DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS AND TO COMPEL ARBITRATION, OR ALTERNATIVELY, TO STAY ACTION


EPSTEIN, BECKER & GREEN, P.C.
250 PARK AVENUE
NEW YORK, NEW YORK 10177-1211
____
212.351.4500
Attorneys for Defendant

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ...............................................................................................1

FACTUAL BACKGROUND ................................................................................................2

A.    The Parties .................................................................................................................2

B.    Plaintiff's Agent Agreement, Representative  Agreement and Form U-4 ..........................3

C.    Plaintiff's Promissory Notes ........................................................................................4

    1.    January 15, 2003 Promissory Note:  Transition Loan ............................................4

    2.    August 28, 2003 Loan Note ...............................................................................6

D.    The Termination of Plaintiff's Relationship with AXA Network and AXA Advisory ................................................................................................................6

E.    Plaintiff's Claims Against AXA Advisors and AXA Network .........................................7

    1.    Plaintiff's FINRA Proceeding Against AXA Advisors ..........................................7

    2.    Plaintiff's Court Action Against AXA Network ....................................................8

ARGUMENT ....................................................................................................................10

A.    AXA Network Is Entitled To Have The Claims Asserted Against It By Plaintiff Dismissed Because Plaintiff Is Estopped From Pursuing His Claims Outside Of FINRA ......................................................................................................10

B.    The Forum Selection Clause in the Note Does Not Preclude the Arbitration of Claims Based on the Loan Notes .................................................................................17

C.    The Insurance Business Exception to NASD Arbitration Does Not Apply in the Instant Case ..............................................................................................................19

D.    Even if the Court Determines that Arbitration Should Not be Compelled on All or a Portion of the Claims, These Proceeding Should be Stayed Pending the Arbitration Proceedings ..............................................................................................20

CONCLUSION .................................................................................................................22

## TABLE OF AUTHORITIES

### CASES

Armijo v. Prudential Ins. Co., 72 F.3d 793 (10th Cir. 1995).........................................19

Carroll v. Leboeuf, Lamb, Greene & MacRae, L.L.P., 374 F. Supp. 2d 375 (S.D.N.Y. 2005) ...............................................................................................................................11, 15

Choctaw Generation Ltd. P'ship. v. American Home Assurance Co., 271 F.3d 403 (2d Cir. 2001)........................................................................................................................12

Cular v. Metropolitan Life Ins. Co., 961 F. Supp. 550 (S.D.N.Y 1995) .......................19

Currency Conversion Fee Antitrust Litig., 361 F. Supp. 2d 237 (S.D.N.Y. 2005) ...............11, 12

Dean Witter Reynolds, Inc. v. Byrd, 470 U.S. 213 (1985).............................................12

Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt. LLC, 371 F. Supp. 2d 571 (S.D.N.Y. 2005) ...............................................................................................................................11, 12

General Textile Printing & Processing Corp. v. Expromtorg Int'l Corp., 891 F. Supp. 946 (S.D.N.Y. 1995) ..............................................................................................................20

Gilmer v. Interstate/Johnson Lane Corp, 500 U.S. 20 (1991) .......................................10

HG Estate, LLC v. Corporatcion Durango S.A. De de C.V., 271 F. Supp. 2d 587 (S.D.N.Y. 2003)................................................................................................................11, 18

Hall v. Met Life Resources, No. 94 Civ. 0358, 1995 WL. 258061 (S.D.N.Y. May 3, 1995) ................................................................................................................................10

IDS Life Ins. Co. v. Sunamerica, Inc., 103 F.3d 524 (7th Cir. 1996)............................21

JLM Indus. v. Stolt-Nielsen, 387 F.3d 163 (2d Cir. 2004) .............................................12

Landis v. North American Co., 299 U.S. 248 (1936) .....................................................10

Merrill Lynch Inv. Managers v. Optibase, Ltd., 337 F.3d 125 (2d Cir. 2003) ..............12

Mouton v. Metropolitan Life Ins. Co., 147 F.3d 453 (5th Cir. 1998).............................19

Nederlandse Erts-Tankersmaatschappij, N.y. v. Isbrandtsen Co., 339 F.2d 440 (2d Cir. 1964) ................................................................................................................................20

In re Prudential Ins. Co. of Am. Sales Practice Litig., 133 F.3d 225 (3rd Cir. 1998) ...................19

Smith/Enron Ltd. P'ship. v. Smith Cogeneration Int'l, Inc., 198 F.3d 88 (2d Cir. 1999) ........11, 12

Spenser-Franklin v. Citigroup/Citibank, N.A., No.  06 Civ. 3475 2007 WL. 521295 (S.D.N.Y. Feb. 21, 2007) ...................................................................................................................10

Thomas James Assocs., Inc. v. Jameson, 102 F.3d 60 (2d Cir. 1996).....................................11, 18

WorldCrisa Corp. v. Armstrong, 129 F.3d 71 (2d Cir. 1998).................................................20, 21

## STATUTES

Federal Arbitration Act, 9 U.S.C. §§ 1-16.....................................................................................10

Federal Arbitration Act, 9 U.S.C. § 3 ............................................................................................20

Rule 12(b)(1) of the Federal Rules of Civil Procedure....................................................................1

AXA Network, LLC ("AXA Network"), respectfully submits this memorandum of law in support of its motion, pursuant to Rule 12(b)(1), the Federal Arbitration Act, 9 U.S.C. §§ 1-16, and the Court's inherent power to control its docket and to stay proceedings when parallel proceedings have been commenced against a related party in arbitration, (1) to dismiss Plaintiff's claims for lack of subject matter jurisdiction and to compel arbitration of claims by plaintiff Steven S. Novick ("Novick") against Defendant pursuant to the rules of the Financial Industry Regulatory Authority ("FINRA"); or alternatively, (2) to stay Plaintiff's action before this Court.

## PRELIMINARY STATEMENT

Plaintiff, a former registered representative with AXA Advisors, LLC ("AXA Advisors"), executed a Form U-4 requiring him to arbitrate any disputes or claims that he had against AXA Advisors before FINRA.  Pursuant to that requirement, he commenced an arbitration proceeding before FINRA.  The crux of that proceeding is that AXA Advisors wrongfully, and in violation of its own policies, terminated his affiliation with it without warning and issued him a "dirty" Form U-5 stating that he had been terminated for "selling away" from the firm so that he would have difficulties obtaining a position with another firm and keeping his "book of business."

Notwithstanding that proceeding, he has commenced the instant lawsuit against AXA Network, an affiliate of AXA Advisors, in which he brings the very same claims that he has brought against AXA Advisors alleging that AXA Advisors and AXA Network conspired to do the allegedly unlawful acts being challenged in arbitration.  The only additional claims asserted in this proceeding are claims seeking a declaratory judgment that he does not owe any

money on (1) a promissory note jointly issued by AXA Advisors and AXA Network on the grounds that it was not really a loan and that he earned sufficient "production credits" at AXA Advisors to achieve milestones that allowed for the forgiveness of the loan, and (2) another promissory note because the damages that he allegedly suffered at the hands of AXA Advisors and AXA Network exceed the amount owed on the loan. The commencement of this lawsuit is nothing more than a transparent, and impermissible attempt to make an "end run" around the pending arbitration proceedings against AXA Advisors.

As explained in detail below, it is well settled that a plaintiff is estopped from commencing a related lawsuit against a party closely related to another party with whom it is required to arbitrate even though the party against whom the suit is brought is not a party to the underlying agreement to arbitrate. Given the nature of the relationship between AXA Network and AXA Advisors and the similarity of Plaintiff's claims against both AXA entities, the relevant authorities require Plaintiff to bring the claims against AXA Network in the same proceedings in which he is asserting the claims against AXA Advisors.

Accordingly, the Court should dismiss Plaintiff's claims for lack of subject matter jurisdiction and enter an order compelling Plaintiff to arbitrate those claims, or alternatively, to stay this action pending the resolution of the arbitration matter.

## FACTUAL BACKGROUND

A.      **The Parties**

AXA Network and AXA Advisors are affiliated entities that are headquartered at 1290 Avenue of the Americas, New York, New York. (Complaint, ¶ 2; Statement of Claim

("Stmt. Of Claim"), p. 1).[1]  AXA Network is engaged in the insurance industry.  (Complaint, ¶ 5).  AXA Advisors is a broker-dealer in the securities business and a member of the Financial Industry Regulatory Authority ("FINRA") (formerly National Association of Securities Dealers ("NASD").  (Complaint, ¶ 5).

Plaintiff Steven Novick ("Plaintiff" or "Novick") is a stock broker and insurance salesman who was formerly affiliated as an independent contractor with AXA Advisors in connection with sales of securities and AXA Network in connection with sales of insurance products.  (Complaint, ¶ 5).

**B.      Plaintiff's Agent Agreement, Representative
        Agreement and Form U-4**

Novick's affiliation with both AXA Network and AXA Advisors commenced and ended simultaneously.  Novick's  relationship with both entities began on November 12, 2002, on which date he executed an Associate Agreement with AXA Network (the "Agent Agreement"), (Complaint, ¶ 22, Ex. A), and a Registered Representative Agreement with AXA Advisors (the "Registered Representative Agreement") (Affidavit of Jean Solanto, sworn to October 25, 2007, Ex. C.).  Thereafter, he continued to be affiliated with both entities until October 12, 2006, at which point AXA Advisors and AXA Network simultaneously terminated Plaintiff's affiliation with those entities.  (Complaint, ¶ 14(g); Stmt. Of Claim, p. 6; Solanto Aff. Ex. D).

As a registered representative of AXA Advisors, Novick also executed a NASD Form U-4 that was filed with the NASD, FINRA's predecessor.  (Solanto Aff., Ex. A).  Pursuant to the Form U-4, Plaintiff agreed to arbitrate any dispute that was required to be arbitrated under

---

[1] The Complaint in this matter and the Statement of Claim in the FINRA arbitration commenced by Plaintiff are annexed to the Affidavit of James G. Murphy, Esq., sworn to October 25, 2007. ("Murphy Aff."), as Exhibits E and F, respectively.

the Code.

> I agree to arbitrate any dispute, claim or controversy that may arise between me and my firm, or a customer, or any other person, that is required to be arbitrated under the rules, constitutions, or by-laws of the SROs . . . as may be amended from time to time and that any arbitration award rendered against me may be entered as a judgment in any court of competent jurisdiction.

(Solanto Aff., Ex. A, § 15A, ¶ 5).

The current NASD Code of Arbitration ("NASD Code"), applicable to Plaintiff's FINRA arbitration, in turn, requires arbitration of any dispute Novick has "if the dispute arises out of the business activities of a member or an associated person and is between or among: Members; Members and Associated Persons; or Associated Persons."  (See NASD Code § 13200(a) (annexed as Ex. G to Murphy Aff.)).  Given that AXA Advisors is a member organization and Plaintiff is a "person associated with a member" there is no question raised regarding Novick's requirement that he arbitrate disputes or claims he has with AXA Advisors.[2] (In fact, as noted above, he has commenced an arbitration proceeding against AXA Advisors).

## C.    Plaintiff's Promissory Notes

### 1.    January 15, 2003 Promissory Note:  Transition Loan

On January 15, 2003, Plaintiff executed a Promissory Note a/k/a Proven Producer Transition Allowance Loan (the "January 15, 2003 Note") for the payment of $500,000 to AXA Network or the holder. (Complaint, ¶ 24; Ex. B).  The January 15, 2003 Note was subject to

---

[2] The NASD Code defines a "member" as "any broker or dealer admitted to membership in NASD, whether or not the membership has been terminated or cancelled.  NASD Code §13100 (o).  (Murphy Aff., Ex. G).  The NASD Code defines a "person associated with the member" or an "associated person of a member" as: "(1) A natural person registered under the Rules of NASD; or (2) . . . a natural person engaged in the investment banking or securities business who is directly or indirectly controlling or controlled by a member, whether  or not any such person is registered or exempt from registration with NASD under the By-Laws or the Rules of NASD."  For purposes of the NASD Code, a person formerly associated with a member is a person associated with a member. Code §13100 (r).  See generally Marcus v. Masucci, 118 F. Supp.2d 453 (S.D.N.Y. 2000)

forgiveness in $100,000 increments during the course of Novick's "association with AXA Advisors, LLC and AXA Network, LLC" subject to Novick achieving specific milestones based on the amount of "Gross Dealer Concessions" that he achieved.  (Complaint, ¶ 26(a); Ex. B, § c).  These milestones were set forth in document titled "Schedule 1 to Promissory Note, The Proven Producer Transition Allowance Loan, (Jointly issued by AXA Network, LLC and AXA Advisors, LLC)." (Complaint, Ex. B, Schedule 1, p.1).  The "Gross Dealer concessions were based upon "transaction-based revenue received by AXA Advisors in connection with transactions in all investment products and services" with certain exclusions, such as life insurance and annuity products. (Complaint, ¶ 27, Ex. B, Schedule 1, p.1; n. 1).

By letter agreement dated May 22, 2006 executed by Novick and Alvaro Escobar, Senior Vice President of AXA Network and AXA Advisors, "the Promissory Note between AXA Network, LLC/AXA Advisors, LLC and [Novick], dated January 15, 2003" was amended to alter the forgiveness provisions of the loan.  (Complaint, Ex. C).  Under the amendment to the January 15, 2003 Note, Plaintiff was to be forgiven amounts owed by him in $100,000 increments based on his achievement of specified levels of "production credits" as opposed to the levels of "gross dealer concessions" set forth in the original loan note.  (Complaint, Ex. C).

Pursuant to the terms of the January 15, 2003 Promissory Note, termination by either party of the agreements with AXA Network or AXA Advisors constituted an "Event of Default."  (Complaint, ¶ 26(e); Ex. B, § g).  The January 15, 2003 Promissory Note further provided in this regard, that "[u]pon the occurrence and during the continuation of any Event of Default hereunder, the Payee may declare this Note to be due and payable and this Note shall become immediately due and payable without notice of any kind."  (Complaint, Ex. B, § g)  The note also provided that, Novick consented "to the sole and exclusive jurisdiction" of the federal

or state courts in New York in connection with any action or proceeding on the note. (Complaint, ¶ 26(b); Ex. B, § h).

### 2.    August 28, 2003 Loan Note

On August 28, 2003, Plaintiff executed a loan note for $1 Million (the "Loan Note"). (Complaint, ¶ 31, Ex. D). The Loan Note provided that if Plaintiff's "affiliation with AXA [defined broadly to include affiliates] is terminated for any reason, the entire amount owed under this note shall automatically become immediately due and payable." (Complaint, Ex. D, pp. 1-2). The note also provided that Novick consented "to the sole and exclusive jurisdiction" of the federal or state courts in New York in connection with any action or proceeding on the note. (Complaint, ¶31(c), Ex. D, p 2).

### D.    The Termination of Plaintiff's Relationship with AXA Network and AXA Advisory

Plaintiff's claims in this matter all have their genesis in connection with his termination for violation of policies regulating securities transactions concerning "selling away."[3] By letter dated October 12, 2006, Georgette Geller, a Divisional Executive Vice President with AXA Advisors, notified Novick that his affiliation with AXA Network and AXA Advisors was being terminated under Article XIII ¶ A of the Agent Agreement and Article X ¶ A of the Registered Representative Agreement based Novick's soliciting securities away from the firm. (Complaint, ¶ 13(g); Stmt. Of Claim, p. 6; Solanto Aff., Ex. D). Thereafter, on October 13, 2006, AXA Advisors filed a Form U-5 with the NASD. (Complaint, ¶ 14(h)). The required

---

[3] "Selling away" refers to a registered representative engaging in the sale of securities without prior approval from his or her member firm. (See NASD Notice to Members 01-79, "Selling Away and Outside Business Activities" (December 2001; annexed to Murphy Aff. at Ex. I). Selling away is prohibited by the NASD and it includes "not only making the sale, but referring customers, introducing customers to the issue, arranging and/or participating in the meetings between the customer and the issuer, or receiving a referral or finder's fee from the issuer." (Id. at n. 7).

"Termination Disclosure" section of the Form U-5 stated that the reason for the termination was: "Solicited interest in a private security transaction without the approval of the firm." (Complaint, ¶ 14; Stmt. Of Claim, p. 5).[4]

As noted above, the termination of Plaintiff's affiliation with AXA Advisors and AXA Network constituted an event of default under his promissory notes. As such, by letter dated November 21, 2006, AXA Financial, Inc. demanded repayment of the January 12, 2003 Promissory Note in the amount of $400,000 and repayment of the August 28, 2003 Promissory Note in the amount of the loan's then outstanding balance of $460,491.78. (Complaint, ¶ 28, 32).

E.    **Plaintiff's Claims Against AXA Advisors and AXA Network**

In August 2007, Plaintiff mounted a two-pronged attack to the termination of his affiliation with AXA Advisors and AXA Network. First he commenced an arbitration proceeding before FINRA against AXA Advisors only. Second, he then commenced the instant action separately against AXA Network only. The proceedings are virtually identical with the exception that (1) he seeks expungement of his U-5 in addition to the other remedies in the FINRA proceeding; and (2) he seeks declaratory relief with regard to the promissory notes in this court action.

1.    **Plaintiff's FINRA Proceeding Against AXA Advisors**

On or about August 24, 2007, Plaintiff commenced a proceeding before FINRA against AXA Advisors. (Murphy Aff., Ex. F). In that proceeding he acknowledged that the proper jurisdiction for his claims against AXA Advisors is FINRA; namely, he acknowledged that "[t]his dispute is properly submitted for arbitration (NASD Code Rule 13200) ...." (Stmt. Of Claim, p. 2). Plaintiff also executed a Uniform Submission Agreement in that proceeding

---

[4] The Form U-5 is the Uniform Termination Notice for Securities Industry Registration. Broker/Dealers are required to use this form to terminate the registrations of individuals. (Complaint, ¶ 14, n.3).

where he agreed to submit "the present matter in controversy, as set forth in the attached Statement of Claim, Answers, all related Counterclaims and/or Third Party claims which may be asserted, to arbitration in accordance with the Constitution, By-Laws, Rules, Regulations and/or Code of Arbitration Procedure of the sponsoring organization." (Murphy Aff., Ex. H).

The crux of his Statement of Claim in that proceeding is that AXA Advisors wrongfully terminated his relationship in retaliation for his complaining about another representative having "sold away" and in order to "raid" his "book of business." (Stmt. of Claim, pp. 2-8). AXA Advisors set about doing this, he contends, by wrongfully, and in violation of its own policies, terminating his affiliation with it without warning and by issuing a "dirty U-5" that would make it difficult for him to obtain a position with another employer. (Stmt. of Claim, pp. 4-8).

Based on his underlying factual assertions, the Statement of Claim contends that Plaintiff is entitled to proceed with claims for breach of contract, unlawful termination, tortiuous interference with contractual relations and tortiuous interference with prospective contractual relations. (Stmt. of Claim, p. 8). Plaintiff also contends he is entitled to, among other remedies, compensatory damages, punitive damages and expungement of the reasons for his termination set forth in his Form U-5. (Stmt. of Claim, p. 9).

2.    **Plaintiff's Court Action Against AXA Network**

On August 31, 2007, Plaintiff commenced the instant action against AXA Network. (Murphy Aff., Ex. E). As with the arbitration proceedings, the crux of Plaintiff's claims stem from AXA Network and AXA Advisors' termination of their relationship with Plaintiff. Plaintiff advances his conspiracy theory with allegations that "AXA [Network] conspired with AXA Advisors to fire [Plaintiff] and falsely file a Form U5 describing the basis

for termination as: 'Solicited interest in a private securities transaction without the approval of the firm.'" (Complaint, ¶ 14). Plaintiff characterizes the alleged "lightening-fast Form U5 disclosure" as "outrageous and part of AXA [Network's] intentional scheme with AXA Advisors to damage Mr. Novick." (Complaint ¶ 14). According to Plaintiff, "[b]y filing a 'dirty' Form U5 AXA believed it would impair Mr. Novick's ability to defend his book of business." (Complaint, ¶ 18). Plaintiff further alleges that following the termination of his relationship, AXA Network improperly demanded repayment of money from Plaintiff "relating to certain 'loans.'" (Complaint, ¶ 6).

There are six counts in the Complaint. In Count One, Plaintiff seeks declaratory relief from this Court in connection with repayment of the January 15, 2003 Note and August 28, 2003 Note. (Complaint ¶¶ 21-33). Plaintiff contends that he should not have to repay the January 15, 2003 Note because, among other things, (1) it was allegedly not a loan but a payment intended to defray costs associated with his leaving his prior firm and (2) that he has earned enough production credits to offset most, if not all, of the amounts owed by him. (Complaint, ¶ 28). As to the August 28, 2003 loan, he contends that he should not have to repay the loan because he has allegedly been damaged by "AXA" in an amount exceeding the outstanding loan balance. (Complaint, ¶ 32).

In Count Two, Plaintiff alleges that his termination was in retaliation for his reporting of misconduct to various members of AXA Advisors' management in 2004. (Complaint, ¶¶ 9, 39). The alleged misconduct involved the purported "selling away" of limited partnership interests by an AXA Advisors broker. (Complaint, ¶¶ 7-8). Plaintiff also alleges that AXA "Network" failed to implement its Disciplinary Action Program before terminating him and sanctioned him without prior review by the National Compliance Office or National

Disciplinary Action Committee or appellate review.  (Complaint, ¶ 40). The Disciplinary Action Program is contained in the AXA Advisors Compliance Manual.  (Solanto Aff., Ex. B).

The four remaining counts in the complaint each allege that AXA Network conspired with AXA Advisors to harm him.  These are: Count Three (Unfair Business Practices); Count Four (Tortious Interference With Prospective Business Relations); Count Five (Aiding and Abetting Unfair Business Practices); and Count Six (Aiding and Betting Tortious Interference With Prospective Business Relations).  (Complaint, ¶¶ 42-57).  These counts arise from two basic allegations: (1) that AXA Network conspired with AXA Advisors, its broker/dealer affiliate, to inter alia, damage Mr. Novick with inaccurate disclosure language on his Form U-5 ; and (2) AXA Network conspired with AXA Advisors to raid Mr. Novick's client accounts.  (Complaint, ¶¶ 43-44, 47-48, 51-52, 55-56).

## ARGUMENT

## A.    AXA NETWORK IS ENTITLED TO HAVE THE CLAIMS ASSERTED AGAINST IT BY PLAINTIFF DISMISSED BECAUSE PLAINTIFF IS ESTOPPED FROM PURSUING HIS CLAIMS OUTSIDE OF FINRA

There is, and cannot be, any dispute that Plaintiff's claims against AXA Advisors must be heard in the arbitration proceedings before FINRA.  It is well settled that the arbitration provisions contained in a Form U-4 are governed by the Federal Arbitration Act, 9 U.S.C. §§ 1-16.  See Gilmer v. Interstate/Johnson Lane Corp 500 U.S. 20, 21-26 (1991); Hall v. Met Life Resources, No. 94 Civ. 0358, 1995 WL 258061, at * 2 (S.D.N.Y. May 3, 1995) ("the agreement to arbitrate encompassed in Form U-4 is governed by the Federal Arbitration Act.").  Further, § 2 of the FAA "leaves no place for the exercise of discretion by a district court, but instead mandates that district court shall direct the parties to proceed to arbitration on issues as to which the arbitration agreement has been signed." Dean Witter Reynolds, Inc. v. Byrd, 470 U.S. 213,

218 (1985)(emphasis in original).    In addition, to the extent arbitration is compelled, it is appropriate for the court to dismiss the action.  Spenser-Franklin v. Citigroup/Citibank, N.A. No. 06 Civ. 3475 2007 WL 521295 (S.D.N.Y. Feb. 21, 2007) (collecting cases), report and recommendation adopted by, 2007 WL 1052451 (S.D.N.Y. Apr. 5, 2007).

Plaintiff, as he must, acknowledged before FINRA that his claims against AXA Advisors had to be brought in that forum.  See Thomas James Assocs., Inc. v. Jameson 102 F.3d 60, 65 n.2 (2d Cir. 1996) ("[The employee] is bound by the Form U-4 because his signature manifests his assent.    [The employer] is bound by the Form U-4's provisions including the arbitration provision, because of its membership in the NASD.") (citations omitted). Nonetheless, by pursuing his claims against AXA Network in this case, Plaintiff seeks to avoid that very same commitment to arbitrate and render the policy strongly favoring arbitration to be rendered a nullity.  Such attempted "end runs" around a party's arbitration obligation are not looked on with favor by the Courts.  See Smith/Enron Ltd. P'ship. v. Smith Cogeneration Int'l, Inc., 198 F.3d 88, 99 (2d Cir. 1999).

Although Defendant AXA Network was not a member of FINRA, it is well settled in this circuit that a non-party to an arbitration agreement may compel a signatory to that agreement, in this case Plaintiff, to arbitrate a dispute. See Carroll v. Leboeuf, Lamb, Greene & MacRae, L.L.P., 374 F. Supp. 2d 375, 377-79 (S.D.N.Y. 2005); Fraternity Fund Ltd. V. Beacon Hill Asset Mgmt. LLC, 371 F. Supp. 2d 571, 577-78 (S.D.N.Y. 2005).  In re Currency Conversion Fee Antitrust Litig., 361 F. Supp. 2d 237, 263-67 (S.D.N.Y. 2005); HG Estate, LLC v. Corporatcion Durango S.A. De de C.V., 271 F. Supp. 2d 587, 593-95 (S.D.N.Y. 2003).  A signatory may be compelled to arbitration under a number of theories, including: (1) incorporation by reference; (2) assumption; (3) agency; (4) veil-piercing/alter ego; and (5)

estoppel.  See Smith/Enron Congeneration Ltd. P'ship., Inc., 198 F.3d at 97 (2d Cir. 1999).

Here, AXA Network, a willing non-signatory who will consent to arbitration before FINRA,[5] may compel Plaintiff to arbitrate his claims under what has been called an alternative estoppel or estoppel theory.  See Merrill Lynch Inv. Managers v. Optibase, Ltd., 337 F.3d 125, 131 (2d Cir. 2003); Fraternity Fund, 371 F. Supp. 2d at 577-78.  A signatory "is estopped from avoiding arbitration with a non-signatory 'when the issues the non-signatory is seeking to resolve in arbitration are intertwined with the agreement that the estopped party has signed.'" Choctaw Generation Ltd. P'ship. v. American Home Assurance Co., 271 F.3d 403, 404 (2d Cir. 2001) (quoting Smith/Enron Cogeneration Ltd. P'ship., Inc.,198 F.3d at 98).  This theory takes into consideration the relationships of persons, wrongs and issues and requires a district court to compel arbitration if it finds that the plaintiff's claims are intertwined with the underlying contract and that there is a close relationship between the non-signatory and the plaintiff's actual counter-signatory.  See In re Currency Conversion Fee Antitrust Litigation, 361 F. Supp. 2d at 260-61.

In this regard, the Second Circuit's decision in JLM Indus. v. Stolt-Nielsen, 387 F.3d 163 (2d Cir. 2004), is instructive.  JLM involved a group of chemical traders who contended that shipping companies with whom they contracted had engaged in an conspiracy to fix the rates they charged for transporting chemicals. Id. at 167-68. In each of its transactions with the various shipping companies, the plaintiffs signed the same standard-form charter under which the parties agreed to arbitrate "[a]ny and all differences and disputes of whatsoever nature arising out of this Charter." Id. at 167.  Among the defendants who moved to compel arbitration,

---

[5] AXA Network notes that, under appropriate circumstances in the past, it has consented to the submission of a claim in proceedings before NASD Dispute Resolution, Inc (FINRA's predecessor) and such dispute has proceeded before that entity.

however, were parties who were not signatories to the shipping charters, but rather where the parent corporations of the signatories. Id. at 177-78.

        The Court of Appeals held that the plaintiffs were estopped from avoiding arbitration based on the agreements it entered into with the defendants' subsidiaries because "it is the fact of [plaintiffs'] entry into the charters containing allegedly inflated price terms that gives rise to the claimed injury." Id. at 178 (citations omitted). In particular, the Second Circuit found that the plaintiffs were estopped from arguing against arbitration because "[t]he questions the Owners seek to arbitrate are undeniably intertwined with the charters." Id. In addition, the Court of Appeals held that the doctrine of estoppel required the Plaintiff to arbitrate its claims of joint and several liability against Owners alleged to have conspired with the parent corporation of each charter countersignatory. Id. at 178 n.7. The Second Circuit noted that the doctrine of estoppel is "not limited to relations among corporate parents and their signatory subsidiaries." Id. Relying on plaintiffs' factual allegations and legal claims, the Second Circuit reasoned that estoppel was appropriate:

> Because, as JLM asserts in its amended complaint, all of the Owners conspired, each with the others, to inflate the freight terms of any one such contract, any claim against an Owner jointly liable for the injury caused by that contract is inextricably intertwined with the arbitrable claim against the Owner liable under that contract.

Id. (emphasis in original).

        Under the above authorities, it is difficult to conceive of a more clear cut case of estoppel than that presented in this case. Plaintiff's U-4 contains an extremely broad arbitration clause requiring it to arbitrate any disputes or claims that it has against AXA Advisors arising out of AXA Advisors or his business activities. AXA Network, the non-signatory, and AXA Advisors, have a close corporate relationship. They are affiliated entities headquartered at the

same location and Novick's relationship with one entity was contingent upon his relationship with the other entity. Plaintiff's Registered Representative Agreement with AXA Advisors and his Agent Agreement with AXA Network were executed contemporaneously and his affiliation with both entities was terminated on the same day in connection with the same incident by the same person. (Complaint, ¶ 2; Stmt. of Claim, p.1). In addition, Plaintiff contends that AXA Network and AXA Advisors acted as agents of one another as conspirators.

Plaintiff's claims asserted in this matter, moreover, are inextricably intertwined with his disputes and claims against AXA Advisors that he is contractually obligated to arbitrate. Indeed, other than the loan notes, it is difficult to find any claims dealing with AXA Network as opposed to what are plainly securities issues involving AXA Advisors. Count Two alleges that the termination of the Agent Agreement was in retaliation for his reporting misconduct to AXA Advisors about another registered representative involving "selling away" and AXA Advisors management's unhappiness with his allegedly vocal attempts to have a say in outsourcing of certain brokerage operations. He was wronged, he claims, by "AXA" terminating him, allegedly improperly, for inappropriately "soliciting away" from the firm and that it did so in violation of the "Compliance Manual." The Compliance Manual is the <u>AXA Advisors</u> Compliance Manual. (<u>See</u> Complaint, ¶¶7-9, 39; Solanto Aff., Ex. B). The allegations in this claim are also identical to the claims asserted in the Statement of Claim against AXA Advisors.

Plaintiff's allegations in Counts Three through Six are also identical to the claims asserted against AXA Advisors in the Statement of Claim and they also present the same situation where (1) the claims against AXA Network are inextricably intertwined with the claims against AXA Network and (2) the claims rest on securities related, not insurance related, issues. Indeed, all of these causes of action arise from Plaintiff's allegations that: (1) AXA Network

conspired with AXA Advisors, its broker/dealer affiliate, to inter alia, damage Mr. Novick with inaccurate disclosure language on his Form U-5 submitted by AXA Advisors; and (2) AXA Network conspired with AXA Advisors to raid Mr. Novick's client accounts.

As Plaintiff alleges numerous identical claims against the AXA entities, he cannot deny that the claims are connected. See Carroll, 374 F. Supp. 2d at 377 ("[n]or can plaintiffs deny the connectedness of the claims asserted against [defendants] … [s]ix of the claims against movants are identical to claims against [the other defendants]."). Additionally, as all of these claims are clearly intertwined with Plaintiff's activities as a registered representative of AXA Advisors and therefore arise under the subject matter of Form U-4 and the arbitration agreement between Plaintiff and AXA Advisors.

The declaratory relief sought by Plaintiff in Count One involving the promissory notes are likewise intertwined with the claims against AXA Advisors. In this regard, (1) Plaintiff's January 15, 2003 Note was conditioned upon his continued association with AXA Advisors and AXA Network, (2) the Note was jointly issued by AXA Network and AXA Advisors (Complaint; Ex. B, Schedule 1, p.1); (3) the terms of the note were amended by a letter executed by Alvaro Escobar, Senior Vice President of AXA Network and AXA Advisors (Complaint, Ex. B); (4) Plaintiff received the loan upon his signing of Agreements with both AXA Advisors and AXA Network. Id. at p.2; (4) forgiveness of the loan could be triggered by reaching certain milestones, which included "transaction-based revenue received by AXA Advisors in connection with transaction in all investment products and services" with certain exclusions, such as life insurance and annuity products (Complaint, ¶27; Ex. B, Schedule 1, p.1; Ex. C); and (6) termination by either party of the agreements with AXA Network or AXA Advisors constituted an "Event of Default." (Complaint, ¶ 26(e); Ex. B, Sec. (g)).

Further, when AXA Network and AXA Advisors terminated its affiliation with him, Plaintiff alleges that he generated sufficient "production credits" to offset most, if not the entire, January 15, 2003 Note. (Complaint, ¶ 28). According to Plaintiff's assertions, as well as the terms of the Promissory Note, production credits include revenue in connection with transactions involving investment projects and services offered by AXA Advisors, an issue disputed by the parties. (Complaint, ¶ 27; Ex. B; Ex. C). Thus, to determine whether to grant declaratory relief, the Court would need to examine Plaintiff's transactions with AXA Advisors.

Plaintiff's August 28, 2003 Note also provided that if Plaintiff's "affiliation with AXA [defined to include AXA Network and any affiliated entities] is terminated for any reason, the entire amount owed under this note shall automatically become immediately due and payable." (Complaint, Ex. D). Upon termination of his relationship with AXA Advisors and AXA Network, Plaintiff was required to repay $460,491.78, representing the loan note's outstanding balance. (Complaint, ¶32). Plaintiff now disputes the repayment demand because he alleges he has been damaged by AXA Network and AXA Advisors in an amount in excess of the demand. In the context of the rest of his Complaint, it is apparent that Plaintiff is alluding to his alleged damages from the termination of his relationship with AXA Network and AXA Advisors, as well as what Plaintiff characterizes as AXA Advisors having filed a "dirty" Form U-5 which he alleges was "outrageous and part of AXA [Network's] intentional scheme with AXA Advisors to damage Mr. Novick." (Complaint, ¶14). Thus, to determine whether to grant declaratory relief in connection with the August 28, 2003 Note, the Court would need to examine the statements in the U-5 prepared by AXA Advisors and, ultimately, Plaintiff's actions while a registered representative of AXA Advisors.

In view of the above, Plaintiff cannot seriously argue that his claims can be

maintained in the action. The assertion of his claims in the matter are an attempt to achieve an "end run" around the FINRA proceeding and appear to be nothing less than to seek to gain certain advantages that he may believe are not available to him in the FINRA proceeding such as broader discovery that may be available or ruling that may affect the arbitration. Given that he has agreed to submit to FINRA arbitration for all disputes, there is simply no basis upon which he can argue that his dispute with AXA Network, is not, at a minimum, inextricably intertwined with his dispute against AXA Advisors. Indeed, given that the nature of the dispute is primarily focused on securities, the fact that he is seeking to bring the instant claims will only serve to frustrate FINRA's very substantial interests in overseeing securities transactions. This is particularly true where so much of his dispute focuses on his termination for "selling away" and the Form U-5 that he is seeking to have expunged in the arbitration proceeding while at the same time seeking what will be in effect rulings on the very same issues from this Court.

Accordingly, Plaintiff should be compelled to arbitrate his claims against AXA Network in the FINRA proceedings currently pending against AXA Advisors and his complaint in this action dismissed.

**B.      The Forum Selection Clause in the Note Does Not Preclude
the Arbitration of Claims Based on the Loan Notes**

As noted above, Plaintiff admits that the proper jurisdiction for his claims against AXA Advisors is FINRA and Plaintiff's allegations in connection with the notes are intertwined with his relationship as a registered representative with AXA Advisors. Plaintiff's complaint, however, asserts that the claims based on the January 15, 2003 Note and the August 28, 2003 Note are properly before the Court because he has consented in those notes to the jurisdiction of the state or federal courts of New York for resolution of disputes arising out of the notes. (Complaint, ¶¶ 26(b), 31(c)). These clauses do not preclude Plaintiff from being compelled to

arbitrate his claims based on those notes.

Although plaintiff may argue that there may be some inconsistency between the forum selection clause under which Plaintiff consents to the "sole and exclusive jurisdiction of the court in New York" and his arbitration obligations, any such inconsistency is irrelevant. To the extent that he is required to arbitrate his claims under the Form U-4, any waiver of that obligation would be unenforceable. See Thomas James Assocs., Inc., 102 F.3d at 66. In addition, even aside from the Form U-4 issues, this court has held in HG Estate, LLC, 271 F. Supp. 2d 587, that any such dispute must be resolved in favor of arbitration. In HG Estate, LLC the parties each attempted to enforce two separate contracts containing forum selection clauses, one providing for arbitration and one providing for litigation. The District Court noted that although the primacy of such clauses appeared to be a question of first impression, primacy should go to the arbitration clause for two reasons: one grounded in public policy, and the other in consideration of judicial economy. Id. at 595.

The court noted in this regard, that "the public policy favoring arbitration enjoys a greater degree of gravitas than judicial expressions approving of forum selection clauses for litigation." Id. at 595-96. The court also found that enforcing the arbitration agreement and staying the litigation pending arbitration is a more efficient way of resolving all the interrelated disputes. Id. at 596. The court further stated that it expected that an arbitration award accepting or rejecting the claims "will be reached sooner than litigating the claim…with the more extensive discovery available in litigation. Moreover, the preclusive effects of arbitration upon litigation are more certain than the reverse." Id.

Accordingly, the Court should compel Plaintiff to arbitrate the promissory note claims, or alternatively, stay Plaintiff's claims pending the outcome of the FINRA arbitration.

**C.    The Insurance Business Exception to NASD**
**Arbitration Does Not Apply in the Instant Case**

Plaintiff also may not seek to avoid the arbitration of his claims based on the insurance business activities exception contained in Rule 13200(b) of the NASD Code under which "disputes arising out of the insurance business activities of a member that is also an insurance company are not required to be arbitrated under the Code." (Murphy Aff., Ex. G). Even assuming that AXA Network falls within the definition of an insurance company, this exception would have no applicability to this case.

The insurance business exception only applies to disputes that intrinsically involve the business of insurance, not to claims that are brought against a company that happens to be in the insurance business. See In re Prudential Ins. Co. of Am. Sales Practice Litig., 133 F.3d 225, 232-34, (3rd Cir. 1998). See also Mouton v. Metropolitan Life Ins. Co., 147 F.3d 453, 457 (5th Cir. 1998) (Plaintiff's "claims involve Metropolitan's obligations as an employer rather than an insurer .... [W]ere we to conclude otherwise we would render virtually meaningless any arbitration agreements between companies involved in the insurance business and their NASD-licensed employees.") Armijo v. Prudential Ins. Co., 72 F.3d 793, 800 (10th Cir. 1995) ("Although Prudential is an insurance company, there is nothing unique about these discrimination claims by Plaintiffs that involve the 'insurance business' of Prudential."). Further, any doubts as to whether this exception applies must be resolved in favor of arbitration. See Cular v. Metropolitan Life Ins. Co., 961 F. Supp. 550, 558 (S.D.N.Y 1995) ("Because this case is primarily a 'garden variety' employment dispute, the Court cannot say 'with positive assurance' that the insurance law components of this case bar arbitration of the underlying employment disputes.")(citations omitted).

Here, this reasoning applies with even more force under the circumstances of the

present case.  The disputes underlying these claims are in no way unique to the insurance business.  They do have at their heart, however, actions that are subject to regulation by the FINRA.  Plaintiff challenges AXA Network's actions based on his alleged complaint regarding another registered representative "selling away" and his claims that he was improperly terminated for "selling away" and damaged by a "dirty U-5."  As such the insurance business exception  has no applicability and, in any event, the bounds of that exception as applied would be most appropriately addressed in proceeding before FINRA, not in the instant proceeding.

**D.     Even if the Court Determines that Arbitration Should Not be Compelled on All or a Portion of the Claims, These Proceeding Should be Stayed Pending the Arbitration Proceedings**

To the extent that the Court were to determine that this matter, or any portion thereof, should not be the subject of arbitration, Defendant respectfully submits that these proceedings be stayed pending the resolution of the matter.  Under the Federal Arbitration Act, 9 U.S.C. § 3, a district court may order that an action be stayed pending the resolution of an arbitrable matter.  Further, even if all the claims asserted in a court action are not arbitrable, a court may order that the entire action nonetheless be stayed when proceeding with the non-arbitrable claims may impact upon the arbitration.  See General Textile Printing & Processing Corp. v. Expromtorg Int'l Corp., 891 F. Supp. 946, 954-55 (S.D.N.Y. 1995).

Furthermore, separate and apart from the FAA, district courts "may stay a case pursuant to 'the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants." WorldCrisa Corp. v. Armstrong,    129 F.3d 71, 76 (2d    Cir.    1997) (quoting    Nederlandse Erts-Tankersmaatschappij, N.V. v. Isbrandtsen Co., 339 F.2d 440, 441 (2d Cir. 1964), in turn, quoting Landis v. North American Co., 299 U.S. 248, 254 (1936)). In addition, even if the a person is a

non-party to the arbitration, a district court may stay court proceedings related to the dispute being arbitrated. Indeed, in WorldCrisa Corp., the Second Circuit held that it was an abuse of discretion not to do so when there was little showing of prejudice to the non-moving party and the moving party would be subject to significant expense, inconvenience and the possibility of being subject to rulings that could impact on the arbitration. The Court stated in this regard:

> [F]ailure to stay this action would result in substantial prejudice to Armstrong, as litigating the Connecticut Action with Crisa alone would involve significant expense and inconvenience and might adversely affect the outcome of his arbitration against WorldCrisa. In IDS Life Ins. Co. v. Sunamerica, Inc., 103 F.3d 524 (7th Cir. 1996), Chief Judge Posner noted that where a party to an arbitration agreement attempts to avoid that agreement by suing a related party with which it has no arbitration agreement in the hope that the claim will be adjudicated first and have preclusive effect in the arbitration, "such a maneuver should not be allowed to succeed, [and] . . . is blocked . . . by the principles of parallel-proceeding abstention, which . . . require the court to stay the proceedings before it and let the arbitration go forward unimpeded.' Id. at 530. We think the same principle applies in this case, in which a related non-party to an arbitration agreement has apparently brought a suit with the hope of having a similar effect. On this record, failure to grant a stay as to Crisa would be an abuse of discretion.

WorldCrisa Corp., 129 F.3d at 76.

Here, even if the Court were to decline to dismiss Plaintiff's claims in this matter and/or compel Plaintiff to arbitrate all of his claims, Defendant respectfully submits that the entire action should be stayed. As set forth above, Plaintiff's claims, including the claims based on the promissory notes, are interrelated with the claims contained in the Statement of Claim pending before FINRA. There could be no prejudice to Plaintiff attendant to such a stay and to allow any of his claims to proceed will only serve to subvert the arbitration process and cause the Court and the Defendant unnecessary burden and expense in addressing issues that will be decided largely, if not exclusively, in the FINRA proceedings.

Accordingly, in the event that Plaintiff's claims are not dismissed in their entirety, Defendants respectfully submit that the action be stayed pending the resolution of the FINRA arbitration.

## CONCLUSION

For the reasons stated above, Defendant respectfully requests that the Court (1) dismiss Plaintiff's claims for lack of subject matter jurisdiction and compel arbitration of claims by Plaintiff against Defendant pursuant to the rules of the Financial Industry Regulatory Authority; or alternatively, (2) stay Plaintiff's claims before this Court pending the resolution of the FINRA arbitration between Plaintiff and AXA Advisors and/or AXA Network; and (3) award Defendant such other relief it deems just and appropriate.

Dated: New York, New York
        October 25, 2007

EPSTEIN BECKER & GREEN, P.C.

By: _____
        James G. Murphy
        Anna A. Cohen

        250 Park Avenue
        New York, New York  10177-1211
        (212) 351-4500
        E-mail: jmurphy@ebglaw.com
                acohen@ebglaw.com
        *Attorneys for Defendant*

To:    Robert L. Herskovits, Esq.
       Gusrae, Kaplan, Bruno & Nusbaum PLLC
       120 Wall Street
       New York, New York 10005-3977
       Tel (212) 269-1400
       E-mail: rherskovits@gkblaw.com
       *Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

I, James G. Murphy, Esq., hereby certify that on October 25, 2007, I served a true copy of Defendant's Memorandum Of Law In Support Of Motion To Dismiss And Compel Arbitration, Or Alternatively, To Stay Action by ECF and first class mail upon:

Robert L. Herskovits, Esq.
Gusrae, Kaplan, Bruno & Nusbaum PLLC
120 Wall Street
New York, NY 10005

Attorneys for Plaintiff

James G. Murphy
jmurphy@ebglaw.com