**EXHIBIT B**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| STEVEN S. NOVICK, | : ECF Case |
| Plaintiff, | : |
| | : Docket # |
| -against- | : 07 Civ. 7767 (AKH)(KNF) |
| | : |
| AXA NETWORK, LLC | : **AMENDED** |
| and AXA ADVISORS, LLC, | : **COMPLAINT** |
| | : |
| Defendants. | : (Jury trial demanded) |
| | : |

Plaintiff Steven S. Novick, through undersigned counsel, as and for his first Amended Complaint against defendant AXA Network, LLC and AXA Advisors, LLC, respectfully alleges that:

## PARTIES

Steven S. Novick

1.      Steven S. Novick ("Mr. Novick" or "Plaintiff"), an individual, at all relevant times was domiciled in Connecticut and maintained residence at 87 North Wilton Road, New Canaan, Connecticut 06840.

AXA Network, LLC

2.      AXA Network, LLC ("AXA Network") is a limited liability company organized and existing under the laws of the State of Delaware with its principal place of business at 1290 Avenue of the Americas, New York, New York 10104. AXA Network has been registered with the Division of Corporations of New York's Department of State since October 7, 2002.

- 1 -

AXA Advisors, LLC

3.     AXA Advisors, LLC ("AXA Advisors") is a limited liability company organized and existing under the laws of the State of Delaware with its principal place of business at 1290 Avenue of the Americas, New York, New York 10104.  AXA Advisors has been registered with the Division of Corporations of New York's Department of State since August 18, 1999.

## JURISDICTION AND VENUE

4.     This Court has original jurisdiction over this action under 28 U.S.C. § 1332(a).  The amount in controversy exceeds $75,000, exclusive of interest and costs.

5.     Venue is proper in this district under 28 U.S.C. § 1391(a) as a substantial part of the events giving rise to the claim occurred within this district.  Venue is further proper in this district pursuant to agreement of the parties.

## INTRODUCTORY STATEMENT

6.     AXA Network is in the insurance industry and its affiliate, AXA Advisors (together, the "AXA Companies" or "Defendants"), is a broker/dealer and member of the Financial Industry Regulatory Authority (formerly the National Association of Securities Dealers).  At times relevant to this claim, Mr. Novick was affiliated with AXA Network for insurance business and AXA Advisors for securities business.

7.     Mr. Novick is a successful stockbroker and insurance salesman with a substantial and valuable book of business which he cultivated before joining the AXA Companies in 2002.  He joined the AXA Companies, in large part, because they maintain an "independent" business model.  Its representatives are independent contractors rather than employees and Mr. Novick did business as The New Canaan Group, LLC and New

Canaan Financial Group, LLC. Mr. Novick was responsible for substantially all costs associated with running his business including rent, support-staff salaries, E&O insurance, communications equipment including telephone and computer lines, office furniture, and supplies. In exchange for absorbing those costs, Mr. Novick received a payout of approximately 82% and proprietary "ownership" of his clients' accounts. Nevertheless, as set forth more fully below, Defendants terminated Mr. Novick in a manner violative of their own internal policies, and maliciously conspired to damage Mr. Novick with inaccurate disclosure language on his Form U5 and raid Mr. Novick's client accounts. Following termination, Defendants improperly demanded repayment of monies from Mr. Novick relating to certain "loans."

## FACTS COMMON TO ALL COUNTS

Background Information
Concerning Defendants' Conspiracy

A.    Novick Brings Improprieties
      To the Attention of Senior Management

8.    Mr. Novick's father-in-law, Ronald Lorch ("Mr. Lorch"), was also, at all relevant times, a representative registered with Defendants. Although Mr. Lorch primarily sold insurance products, he also managed approximately $20 million of clients' securities under a joint-rep agreement with Larry Pasaretti ("Mr. Pasaretti"), a veteran broker who received preferential treatment from the AXA Companies' senior management.[1] Mr. Lorch, who was nearing retirement, intended to transition his entire securities and insurance business over to Mr. Novick.

---

[1] Upon information and belief, Mr. Pasaretti received an override from all persons registered with AXA Advisors and effectively served as national sales manager.

9.      In or around 2004, it was discovered that Mr. Pasaretti was surreptitiously moving Mr. Lorch's accounts out of the joint-rep number and into Mr. Pasaretti's individual rep number. By doing so, Mr. Pasaretti was depriving Mr. Lorch of income and depriving Mr. Novick of accounts which were supposed to transition to him. At or about that time, it was also discovered that Mr. Pasaretti had committed sales practice violations by "selling away" limited partnership interests in Gemini I, L.P. to various customers who were introduced by Mr. Lorch.

10.     To prevent further improprieties by Mr. Pasaretti, Mr. Novick brought written proof of same to various members of Defendants' management and others, including, Bob Jones (President of AXA Distribution Holding Corp.), Ned Dane (President of AXA Advisors), Rich Ferone (compliance officer), Chris Aguele (compliance officer), William DeMatteo (compliance officer), Joe Colombo (VP and Regional Manager), Barry Salzhauer (compensation department) and Mike Rynicker (SROP). Although Defendants chose not to discipline Mr. Pasaretti for selling away, senior management had disdain for Mr. Novick for reporting on "one of their own." At that time, however, senior managements' contempt for Mr. Novick was outweighed by their business interests in retaining Mr. Novick's substantial production.[2]

B.      AXA Advisors Decides to
        Exit the Securities Brokerage Industry

11.     In recent years, AXA Advisors' sole member (AXA Holding Distribution Corp.) was forced to make substantial capital contributions to fund AXA Advisors' operating losses to ensure AXA Advisors had sufficient operating resources. For

---

[2] Mr. Novick brought other improprieties to the attention of senior management which they similarly ignored. Defendants' internal policies required representatives to report instances of misconduct, and promised protection "against retaliation," yet afforded Mr. Novick no such protection.

example, AXA Holding made a capital contribution of $11,500,000 in 2004, $13,321,000 in 2005, and $22,600,000 in 2006.

12.     Since securities brokerage was a money-loser and insignificant to the core business of AXA Advisors' direct and indirect parents (i.e., insurance), AXA Advisors crafted an exit strategy in 2006 by agreeing to "outsource" its securities business. On December 15, 2006, AXA Advisors entered into agreements with Linsco/Private Ledger Corp. ("LPL"), whereby LPL agreed to provide brokerage, clearing, and custody services on a fully disclosed basis; offer LPL investment advisory programs and platforms for AXA Advisors' customers; and provide technology and additional processing and related services to AXA Advisors' representatives and customers. The terms of the agreements are five years, subject to additional 24-month extensions.

13.     Throughout 2006, AXA Advisors' intended "outsource" to LPL was widely discussed. Agents, including Mr. Novick, wanted a voice in this process, particularly because a new platform would be imposed on them and their customers would be burdened with LPLs new account documents. Being vocal, however, served to further alienate Mr. Novick from senior management. Given the obvious uncertainties accompanying the intended "outsource", Mr. Novick explored the possibility of leaving the AXA Companies in 2006, which was known by Defendants.

C.     Defendants Terminate Mr. Novick

14.     Mr. Novick's assertive personality annoyed certain members of Defendants' senior management and they were only too happy to repay Mr. Novick for "whistle blowing" when the opportunity presented itself. That opportunity arose in

October 2006, just when AXA Advisors was negotiating with LPL to exit the securities business.

15.    Defendants conspired to fire Mr. Novick and file a Form U5 falsely describing the basis for termination as: "Solicited interest in a private securities transaction without the approval of the firm."[3]  As demonstrated by the chronological timeline below, the lightning-fast Form U5 disclosure was outrageous and part of Defendants' intentional scheme with to damage Mr. Novick:

(a) September 27, 2006 – On or about this date Mr. Novick received an unsolicited email from Michael Zimmerman, the managing member of Prentice Capital Management, LP, a private investment limited partnership.  Mr. Zimmerman's email concerned NAU, Inc., an outdoor apparel company that Prentice Capital had financed.  NAU's management was planning a "road show"-type visit to New York in contemplation of a $17 million financing and Mr. Zimmerman was notifying people of same.

(b) October 4-5, 2006 – Mr. Novick forwarded Mr. Zimmerman's email to certain people, including Ned Dane, AXA Advisors' President, whom Mr. Novick frequently communicated with.  When forwarding the email, Mr. Novick wrote that: "This is a venture opportunity that, on paper looks to be great. ... I would like to invite you to come meet and discuss this unique situation with NAU's management ... to discuss how we may benefit from investing."

---

[3] The Form U5 is the Uniform Termination Notice for Securities Industry Registration.  Broker/dealers, investment advisors, or issuers of securities must use this form to terminate the registration of an individual in the appropriate jurisdictions and/or self-regulatory organizations.

(c) October 6, 2006 – Georgette Geller of AXA Advisors notified Mr. Novick in writing that he must "cease and desist [from] soliciting or recommending this, or any other, non-AXA Advisors investment to anyone. Your conduct in this matter may be deemed by the Firm to be 'selling away.'" Mr. Novick willingly accepted AXA Advisors' mandate of heightened supervision, taking comfort knowing that he did not solicit, recommend or sell any non-approved security to any customer. Mr. Novick took further comfort believing that Defendants would ultimately conclude that he simply invited people, including AXA Advisors' President, to attend NAU's "road show" meeting.

(d) October 6-10, 2006 – Ned Dane purposefully avoided all communications with Mr. Novick on the advice of "Law and Compliance."

(e) October 10, 2006 – AXA Advisors approved Mr. Novick to purchase NAU in his personal account.

(f) October 11, 2006 – Mr. Novick asked an AXA Advisors' employee (Edward Lantigua) how to get NAU approved to present to clients.

(g) October 12, 2006 – Defendants fired Mr. Novick without warning.

(h) October 13, 2006 – AXA Advisors filed a Form U5 without seeking any input from Mr. Novick.

Defendants Violated their Own Policies

A.    Disciplinary Action Program

16.    Defendants maintained a Disciplinary Action Program, the goal of which "[wa]s to maintain uniform, fair and beneficial disciplinary processes for Representatives

and supervisors." Defendants also maintained a National Disciplinary Action Committee to review allegations of selling away, improper sales practices, and use of unapproved sales materials. If the National Disciplinary Action Committee recommended a termination, the registered representative had a right to appeal that recommendation to the Management Disciplinary Action Committee.

17.    Mr. Novick's termination was not reviewed by the National Disciplinary Action Committee nor was he afforded appellate review by the Management Disciplinary Action Committee. Mr. Novick was thus wrongfully terminated and deprived of the Disciplinary Action Program's stated objectives of uniformity and fairness. Instead, as will be proven, Mr. Novick's termination was arbitrary, malicious and driven by personality conflict and greed, rather than the reason disclosed on the Form U5.

B.    Required Reporting of Misconduct

18.    Defendants required that agents report instances of misconduct and promised "protect[ion] against retaliation" for any such reporting. Mr. Novick received no such protection and, upon information and belief, his termination was directly linked to his reports of personnel misconduct.

Defendants' Conspiracy to Attack Novick's Book

19.    The culmination of Defendants' scheme required that Defendants keep Mr. Novick's business as AXA Advisors' relationship with LPL, upon information and belief, required AXA Advisors to retain a customer base of business. Knowing that Mr. Novick was seeking to leave the AXA Companies, Defendants conspired to disable Mr. Novick with a "dirty" Form U5 while simultaneously attacking Mr. Novick's book of

business. By filing a "dirty" Form U5, Defendants believed they would impair Mr. Novick's ability to defend his book of business.

20.    The damaging information contained on the Form U5 caused various broker/dealers to refrain from extending offers of employment to Mr. Novick. Firms that would previously hire Mr. Novick – with a seven figure up-front check – would no longer do so. As Mr. Novick was scrambling to register with a new broker/dealer, AXA Advisors instructed Georgette Geller to mass mail letters in an effort to retain Mr. Novick's clients. Defendants also "assigned" Mr. Novick's book to two registered representatives, Joseph Miller and Joel Miller, who further solicited Mr. Novick's clients. Defendants had absolutely no right to raid the accounts of an independent contractor and Mr. Novick has been substantially damaged by this conduct.

21.    Defendants' malicious conduct toward Mr. Novick remains ongoing as evidenced by Defendants' refusal to provide an accounting of renewal compensation, service fees, and asset based compensation earned by Mr. Novick.

### FIRST CAUSE OF ACTION

(Declaratory Relief – 28 U.S.C. § 2201)

22.    The allegations above are repeated as if fully set forth herein.

### Written Agreements Among Parties

A.    Agent Agreement

23.    On November 12, 2002, Mr. Novick executed an agreement with AXA Network (the "Agent Agreement") (Exhibit A) which, among other things:

(a)    incorporates by reference AXA Network's internal "rules and regulations" (Ex. A § VII);

(b)    disclaims Mr. Novick from workers' compensation benefits (Ex. A §
XVI); and

(c)    designates Mr. Novick an independent contractor (Ex. A § XVII).

24.    AXA Network unilaterally terminated the Agent Agreement on October
12, 2006, purportedly in reliance upon Section XIII(a).

B.    Representative Agreement

25.    On November 12, 2002, Mr. Novick executed an agreement with AXA
Advisors (the "Representative Agreement") (Exhibit B) which, among other things,
incorporates by reference AXA Advisor's internal "rules and regulations", inclusive of
compliance guides and manuals (Ex. B § V).

26.    AXA Advisors unilaterally terminated the Representative Agreement on
October 12, 2006, purportedly in reliance upon Section X.

C.    Proven Producer Transition Allowance Loan

27.    On January 15, 2003, Mr. Novick executed a Promissory Note for
payment of $500,000 to AXA Network (Exhibit C) which was retroactively amended by
letter dated May 22, 2006. (Exhibit D). The Promissory Note, named a Proven Producer
Transition Allowance Loan, stated that its purpose was to pay Mr. Novick for some of the
costs he incurred when leaving his employer to affiliate with Defendants.

28.    Mr. Novick incurred costs of approximately $1 million resulting from
vacating his employment-related agreements with Morgan Stanley DW, Inc. to affiliate
with Defendants. Such costs included paying Morgan Stanley DW, Inc. approximately
$600,000 of a forgivable loan.

29.     The Proven Producer Transition Allowance Loan, as amended, contained the following terms among others:

(a)     $100,000 reduction of principal and interest owing for every $1 million of "production credits" generated by Mr. Novick (Ex. D);

(b)     sole and exclusive jurisdiction in the state or federal courts of New York in connection with any action arising out of the Note (Ex. C, Section H);

(c)     AXA's review of all "production credits" achieved at the earlier of sixty (60) months after execution or termination of the Agent Agreement (Ex. C, Schedule 1, pg. 4);

(d)     designation of Mr. Novick as an independent contractor (Ex. C, Schedule 1, pg. 4); and

(e)     termination of the Agent Agreement or Representative Agreements are default events (Ex. C, Section G).

30.     Production credits, upon information and belief, included all transaction-based revenues received by Defendants or its affiliates in connection with transactions in all products and services, including fee-based asset management products and services, equity and fixed income products, mutual funds, and other investment products and services offered by AXA Advisors, including life insurance and annuity products.

31.     By letter dated November 21, 2006, AXA Financial, Inc. demanded repayment of the Proven Producer Transition Allowance Loan in the amount of $400,000. Mr. Novick disputes the repayment demand for various reasons, including (a) the "loan" was in fact a payment to Mr. Novick to defray costs associated with leaving

Morgan Stanley DW, Inc., and (b) in any event, Mr. Novick generated sufficient "production credits", upon information and belief, to offset most, if not the entire, "loan."

32.    Since terminating the Agent Agreement, Defendants have refused Mr. Novick's requests for an accounting of various revenues generated by him.

33.    By reason of the foregoing, an actual controversy exists within the meaning of 28 U.S.C. § 2201 with regard to monies due, if any, under the Proven Producer Transition Allowance Loan. This Court is vested with the power in the instant case to declare and adjudicate the rights and other legal relationships of the parties to this action with reference to the issues raised by this amended complaint.

D.    Loan Note

34.    On August 28, 2003, Mr. Novick executed a loan note with AXA Network (Exhibit E) pursuant to which he received $1 million. The loan note contained the following terms among others:

(a)    repayment upon termination of the Agent Agreement but no later than October 1, 2008;

(b)    AXA Network's security interest in the renewal commissions of a third-party (Ronald Lorch); and

(c)    sole and exclusive jurisdiction in the state or federal courts of New York in connection with any action arising out of the Note.

35.    By letter dated November 21, 2006, AXA Financial, Inc. demanded repayment of $460,491.78, representing the loan note's outstanding balance. Mr. Novick disputes the repayment demand for various reasons, including the fact that AXA's conduct has damaged Mr. Novick in an amount in excess of $460,491.78.

36.    By reason of the foregoing, an actual controversy exists within the meaning of 28 U.S.C. § 2201 with regard to monies due, if any, under the $1 million Loan Note. This Court is vested with the power in the instant case to declare and adjudicate the rights and other legal relationships of the parties to this action with reference to the issues raised by this amended complaint.

## SECOND CAUSE OF ACTION

### (Breach of Contract)

Against AXA Network

37.    The allegations above are repeated as if fully set forth herein.

38.    The Agent Agreement was a contract drafted by AXA Network and signed by Plaintiff.

39.    The terms and conditions in the Agent Agreement were material to Plaintiff and Plaintiff relied upon same in expectation that said terms and conditions would govern Plaintiff's affiliation with AXA Network.

40.    The Agent Agreement specifically incorporated by reference AXA Network's internal rules and regulations.

41.    AXA Network's internal rules and regulations were embodied in its Compliance Manual among other places.

42.    AXA Network's Compliance Manual promised Plaintiff that he would be free from retaliation in connection with reporting of misconduct. Plaintiff relied upon said promise when reporting misconduct. AXA Network dishonored said promise by terminating Plaintiff for reporting misconduct. AXA Network breached the Agent

Agreement by failing to protect Plaintiff against retaliation. Plaintiff has been damaged by said breach, in an amount to be proven at trial, but believed to exceed $10 million.

43.    AXA Network's Compliance Manual further promised Plaintiff that AXA Network maintained a Disciplinary Action Program designed to provide a structure for remedial and disciplinary actions taken in response to alleged violations of laws, regulations and company policy.    AXA Network did not implement the Disciplinary Action Program before terminating Plaintiff.    AXA Network sanctioned Plaintiff (termination) without prior review by the National Compliance Office or National Disciplinary Action Committee and Plaintiff was not afforded appellate review by the Management Disciplinary Action Committee.

44.    AXA Network breached the Agent Agreement by failing implement the Disciplinary Action Program. Plaintiff has been damaged by said breach, in an amount to be proven at trial, but believed to exceed $10 million.

Against AXA Advisors

45.    The allegations above are repeated as if fully set forth herein.

46.    The Representative Agreement was a contract drafted by AXA Advisors and signed by Plaintiff.

47.    The terms and conditions in the Representative Agreement were material to Plaintiff and Plaintiff relied upon same in expectation that said terms and conditions would govern Plaintiff's affiliation with AXA Advisors.

48.    The Representative Agreement specifically incorporated by reference AXA Advisors' internal rules and regulations.

49.    AXA Advisors' internal rules and regulations were embodied in its Compliance Manual among other places.

50.    AXA Advisors' Compliance Manual promised Plaintiff that he would be free from retaliation in connection with reporting of misconduct. Plaintiff relied upon said promise when reporting misconduct. AXA Advisors dishonored said promise by terminating Plaintiff for reporting misconduct. AXA Advisors breached the Representative Agreement by failing to protect Plaintiff against retaliation. Plaintiff has been damaged by said breach, in an amount to be proven at trial, but believed to exceed $10 million.

51.    AXA Advisors' Compliance Manual further promised Plaintiff that AXA Advisors maintained a Disciplinary Action Program designed to provide a structure for remedial and disciplinary actions taken in response to alleged violations of laws, regulations and company policy. AXA Advisors did not implement the Disciplinary Action Program before terminating Plaintiff. AXA Advisors sanctioned Plaintiff (termination) without prior review by the National Compliance Office or National Disciplinary Action Committee and Plaintiff was not afforded appellate review by the Management Disciplinary Action Committee.

52.    AXA Advisors breached the Agent Agreement by failing implement the Disciplinary Action Program. Plaintiff has been damaged by said breach, in an amount to be proven at trial, but believed to exceed $10 million.

### THIRD CAUSE OF ACTION

(Unfair Business Practice)

53.    The allegations above are repeated as if fully set forth herein.

54.    Defendants conspired to falsely report information on Plaintiff's Form U5. Defendants did so to make Plaintiff unattractive to potential employers, to render Plaintiff unable to receive an up-front check, and to cause Plaintiff loss of clientele. Due directly to such unfair business practice, Plaintiff was unable to receive an up-front check of at least $1 million from broker/dealers and did lose clientele.

55.    Defendants further conspired to attack Plaintiff's client accounts by mass mailing letters to said clients and transferring Plaintiff's clients to a team of agents (Joseph Miller and Joel Miller). Defendants did so to disrupt Plaintiff's ability to move his book of business and to cause Plaintiff loss of clientele. Due directly to such unfair business practice, Plaintiff has lost a substantial percentage of his customers and all fees that have been and will be generated by such customers' accounts.

56.    Plaintiff has been damaged by said unfair business practices, in an amount to be proven at trial, but believed to exceed $10 million.

## FOURTH CAUSE OF ACTION

(Tortious Interference With Prospective Business Relations)

57.    The allegations above are repeated as if fully set forth herein.

58.    Defendants conspired to falsely report information on Plaintiff's Form U5 in violation of the duty to accurately report such information. Defendants did so to make Plaintiff unattractive to potential employers, to render Plaintiff unable to receive an up-front check, and to cause Plaintiff loss of clientele. Due directly to such false information, Plaintiff was unable to receive an up-front check of at least $1 million from broker/dealers and has lost clientele.

59.     Defendants further conspired to attack Plaintiff's client accounts by mass mailing letters to said clients and transferring Plaintiff's clients to a team of agents (Joseph Miller and Joel Miller). Defendants did so to disrupt Plaintiff's ability to move his book of business and to cause Plaintiff loss of clientele. Due directly to such actions, Plaintiff has lost a substantial percentage of his customers and all fees that have been and will be generated by such customers' accounts.

60.     Plaintiff has been damaged by said interference with prospective business relations, in an amount to be proven at trial, but believed to exceed $10 million.

### FIFTH CAUSE OF ACTION

(Aiding and Abetting Unfair Business Practice)

61.     The allegations above are repeated as if fully set forth herein.

62.     Defendants conspired to falsely report information on Plaintiff's Form U5 in violation of the duty to accurately report such information. The object of said conspiracy was to make Plaintiff unattractive to potential employers, to render Plaintiff unable to receive an up-front check, and to cause Plaintiff loss of clientele. Due directly to said conspiracy, Plaintiff was unable to receive an up-front check of at least $1 million from broker/dealers and did lose clientele.

63.     Defendants further conspired to attack Plaintiff's client accounts by mass mailing letters to said clients and transferring Plaintiff's clients to a team of agents (Joseph Miller and Joel Miller). The object of said conspiracy was to disrupt Plaintiff's ability to move his book of business and cause Plaintiff loss of clientele. As a direct result of said conspiracy, Plaintiff has lost a substantial percentage of his customers and all fees that have been and will be generated by such customers' accounts.

- 17 -

64.     AXA Network aided and abetted AXA Advisors in its unfair business practice and vice versa.

65.     Plaintiff has been damaged by said unfair business practice, in an amount to be proven at trial, but believed to exceed $10 million.

## SIXTH CAUSE OF ACTION

(Aiding and Abetting Tortious Interference With Prospective Business Relations)

66.     The allegations above are repeated as if fully set forth herein.

67.     Defendants conspired to falsely report information on Plaintiff's Form U5 in violation of the duty to accurately report such information.  The object of said conspiracy was to make Plaintiff unattractive to potential employers, to render Plaintiff unable to receive an up-front check, and to cause Plaintiff loss of clientele.  As a direct result of said conspiracy, Plaintiff was unable to receive an up-front check of at least $1 million from broker/dealers and did lose clientele.

68.     Defendants further conspired to attack Plaintiff's client accounts by mass mailing letters to said clients and transferring Plaintiff's clients to a team of agents (Joseph Miller and Joel Miller).  The object of said conspiracy was to disrupt Plaintiff's ability to move his book of business and cause Plaintiff loss of clientele.  As a direct result of said conspiracy, Plaintiff has lost a substantial percentage of his customers and all fees that have been and will be generated by such customers' accounts.

69.     AXA Network aided and abetted AXA Advisors in its tortious conduct and vice versa.

70.     Plaintiff has been damaged by said tortious interference with contractual relations, in an amount to be proven at trial, but believed to exceed $10 million.

## JURY TRIAL DEMAND

71.    Plaintiff demands a jury trial.


WHEREFORE, Plaintiff prays judgment as follows:

(a) compensatory damages of at least $10,000,000.00, with the exact amount to
be proven at trial;

(b) that the Court declare that Plaintiff is relieved of any financial obligation
created pursuant to either the Proven Producer Transition Allowance Loan or
the $1 million Loan Note;

(c) punitive damages;

(d) all costs and fees associated with this action including attorneys' fees; and

(e) all other and further relief that this Court deems just and proper.

Dated: December 18, 2007

Respectfully submitted,

GUSRAE, KAPLAN, BRUNO & NUSBAUM PLLC
*Attorneys for Steven S. Novick*

By: _____
Martin H. Kaplan, Esq. (MK 6258)
Robert L. Herskovits, Esq. (RH 2586)
Gusrae, Kaplan, Bruno & Nusbaum PLLC
120 Wall Street
New York, NY 10005
(212) 269-1400
(212) 809-5779 – facsimile
mkaplan@gkblaw.com
rherskovits@gkblaw.com