# EXHIBIT E

1B7FNOVC

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

STEVEN NOVICK,

                Plaintiff,

          v.                          07 CV 7767 (AKH)

AXA NETWORK, LLC, et al,

                Defendants.

------------------------------x
                                      New York, N.Y.
                                      November 7, 2011
                                      11:15 a.m.

Before:

                HON. ALVIN K. HELLERSTEIN,

                                      District Judge

                        APPEARANCES

FINKELSTEIN & FEIL
     Attorneys for Plaintiff
MICHAEL FINKELSTEIN
CRAIG RIHA


EPSTEIN BECKER & GREEN, P.C.
     Attorneys for Defendant
AIME DEMPSEY
MICHAEL KALISH

1B7FNOVC

1          (Case called)

2          (In open court)

3          THE DEPUTY CLERK:  Steven S. Novick v. AXA Network,

4     LLC.  Counsel, state your names for the record.

5          MR. FINKELSTEIN:  For the plaintiff, Steven Novick,

6     Michael Finkelstein of Finkelstein and Feil.  Mr. Novick.

7          THE COURT:  You're missing a tie, Mr. Novick.

8          MR. NOVICK:  I'm sorry?

9          THE COURT:  A tie in court.

10         MR. NOVICK:  I apologize.

11         MR. RIHA:  Craig Riha with Finkelstein and Feil.

12         MS. DEMPSEY:  Amy Dempsey with Epstein, Becker & Green

13    with Michael Kalish for defendants.

14         THE COURT:  Very good.  Be seated.  Ms. Dempsey, why

15    did you make a 12(b)(6) motion and not a 56 motion?

16         MS. DEMPSEY:  The 12(b)(6) was because we were making

17    a renewed motion to dismiss from the Court's prior order.

18         THE COURT:  What makes you think I'd change my mind?

19         MS. DEMPSEY:  Pardon me?

20         THE COURT:  What makes you think I'd change my mind?

21         MS. DEMPSEY:  I don't know what you would have changed

22    your mind from.

23         THE COURT:  I dismissed your motion earlier, didn't I?

24         MS. DEMPSEY:  Not that I'm aware of.

25         THE COURT:  Didn't I?  You said a renewed motion.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

Case 1:07-cv-07767-AKH   Document 136-2   Filed 06/02/12   Page 4 of 76
Case 1:07-cv-07767-AKH   Document 122   Filed 11/17/11   Page 3 of 47          3
1B7FNOVC

1          MS. DEMPSEY:  Yes, we made a motion at the end of 2009

2    to dismiss the entire second amended complaint.  The Court

3    granted most of that motion at the end of January of this year

4    and gave us leave to renew that motion.

5          THE COURT:  Why didn't you finish discovery before you

6    made the motion and make a Rule 46 motion?

7          MS. DEMPSEY:  Because the Court ordered we would do

8    limited discovery and then we would have the opportunity to

9    renew the motion.  A schedule was set for that, which we

10   complied with and it got stretched out some when plaintiff

11   requested more time for their opposition.

12         THE COURT:  Plaintiff alleges that the compliance

13   manual having been referred to by the contract affects that

14   contract to some degree.  To what degree is something I can't

15   decide on motion.

16         MS. DEMPSEY:  I don't think that's so, your Honor.

17         THE COURT:  Tell me why not.

18         MS. DEMPSEY:  The compliance manual in and of itself

19   states that it's not a contract, and nothing in the contract,

20   either of the two contracts applicable here, the agent's

21   agreement or the --

22         THE COURT:  So what purpose does it serve if it's not

23   a contract, if it's not binding in some fashion?  What is it

24   that you're telling me?  It actually takes a large manual,

25   takes hours and hours of time to prepare it, gives it to all

1B7FNOVC

1   the employees and then they decide each time whether they will

2   follow it or not?  Is that what you're telling me?

3           MS. DEMPSEY:  With respect to the particular things at

4   issue here, the referral to the NDAC and the MDAC, they're

5   guidelines.

6           THE COURT:  The reporter won't know what that is.

7   Neither will I.

8           MS. DEMPSEY:  National disciplinary action committee

9   and management disciplinary action committee.  The guidelines

10  are stated in the compliance manual.  It is the party's

11  position, it is defendant's position that the guidelines stated

12  in the compliance manual were followed.  It's not a situation

13  where AXA in this case --

14          THE COURT:  So if they were followed, then it means

15  there has to be a full discovery whether they were followed or

16  not.  The discovery didn't get into that.

17          MS. DEMPSEY:  That's correct -- it did to some extent,

18  first of all, it did, and --

19          THE COURT:  But the parties are not finished.

20          MS. DEMPSEY:  The parties took the limited discovery

21  that the Court ordered to renew its motion and plaintiffs took

22  the depositions of three of the AXA management that he

23  selected, and he still cannot show that the guidelines were not

24  followed.

25          THE COURT:  But if you show that they were --

Case 1:07-cv-07767-AKH   Document 136-2   Filed 06/02/12   Page 6 of 76
Case 1:07-cv-07767-AKH   Document 122   Filed 11/17/11   Page 5 of 47      5
1B7FNOVC

1           MS. DEMPSEY:  The violation was referred -- I'm sorry,

2      your Honor.

3           THE COURT:  Have you shown that they were followed?

4           MS. DEMPSEY:  Have we showed that they were followed?

5           THE COURT:  Yes.

6           MS. DEMPSEY:  I think we have, your Honor.  The

7      violation was referred to the --

8           THE COURT:  So why didn't you make a Rule 56 motion?

9           MS. DEMPSEY:  Because I don't think we need to show

10     that they were followed in order to get a motion to dismiss

11     granted on breach of contract.  There's no breach of contract

12     here.  That's the remaining claim.

13          THE COURT:  Novick claims that we had a compliance

14     manual that had to be followed.  He's got some rights in the

15     process.  I understand that you're saying that it doesn't form

16     a contract, but on the other hand it's not completely

17     discretionary either.  Otherwise it's not a compliance manual.

18     So I don't know how to deal with this on a 12(b)(6) motion.

19          MS. DEMPSEY:  We also move in the alternative to Rule

20     56 pursuant to our motion again --

21          THE COURT:  There hasn't been enough discovery.

22          MS. DEMPSEY:  I respectfully disagree, your Honor, I

23     think there's been a fair amount of discovery.

24          THE COURT:  Fair amount yes, but not complete.

25          MS. DEMPSEY:  That plaintiff has not been able to show

1B7FNOVC

```
1    and cannot show and will not be able to show that anything

2    related to his termination constitutes a breach of either of

3    his contracts.

4            THE COURT:  I suspect they will not be able to show

5    it, but up to now I don't think he has been given enough chance

6    because of the limited nature of the issues to show it or not

7    and I think having been once reversed by the Court of Appeals

8    I'll be reversed a second time.  I'll do you no favor, I'll do

9    him no favor, I'll do myself no favor.  I think this procedural

10   posture does not suit well to what we're doing now and I went

11   along with your suggestion that I'm at fault.  I don't think it

12   was wise to limit the discovery.  The case is now four years

13   old and still hanging around and I think I can't dispose of it

14   now.

15           I don't believe that Mr. Novick is going to be able to

16   show that he was damaged in any respect under the contract.

17   I'm not even sure he can show that there was a breach of

18   contract, but he has more of a chance than we've given him to

19   try that if he wants to.

20           MS. DEMPSEY:  I hear what you're saying, your Honor,

21   but he still has had numerous opportunities including this

22   being his second amended complaint to even plead a breach of

23   contract under Twombly and Iqbal --

24           THE COURT:  I cut him out of his original theories, so

25   he's trying to stay in with contract plus.  But all he has is
```

1B7FNOVC

1    breach of practice.

2            MS. DEMPSEY:  I understand, and I think contract plus

3    doesn't get him to survive a motion to dismiss either.

4            THE COURT:  That may be, but it will not be a motion

5    to dismiss.  It will be a motion for summary judgment that his

6    breach which really was in your opinion a breach by being

7    disloyal by doing contract investments elsewhere, that was an

8    act of disloyalty which entitles him to be terminated.

9            MS. DEMPSEY:  Right.

10           THE COURT:  But the trouble with a motion to dismiss,

11   it requires me as a matter of law to rule that there was no

12   effect to the compliance manual if the company chose to

13   disregard it.  I can't do that.  That would not really be right

14   from AXA's point of view or the case point of view.  Clearly it

15   doesn't state a contract, but it does in a sense that it

16   changes an employment at will to something else, but clearly

17   also it does restrict AXA in some respect, and it's not good on

18   a Rule 12 motion to try to figure out just how the restriction

19   will work.

20           MS. DEMPSEY:  Two things.  One is Mr. Novick was not

21   an employee of either AXA entity.  His only relationship was an

22   affiliated relationship through the two contracts.

23           THE COURT:  But didn't the compliance manual apply to

24   him also?

25           MS. DEMPSEY:  It did.

Case 1:07-cv-07767-AKH   Document 136-2   Filed 06/02/12   Page 9 of 76
Case 1:07-cv-07767-AKH   Document 122   Filed 11/17/11   Page 8 of 47          8
1B7FNOVC

 1          THE COURT:  So it's the same point.

 2          MS. DEMPSEY:  And second, I think since defendants

 3   have moved in the alternative for summary judgment, I do

 4   respectfully submit that the discovery on the issue of whether

 5   his termination was properly conducted under the compliance

 6   manual was sufficiently dealt with in the limited discovery.

 7          THE COURT:  Remind me now what did he do, what

 8   compliance was had and what was not had?

 9          MS. DEMPSEY:  What he did do was he sold away which is

10   an industry term for offering securities that are not approved

11   by the firm, so he offered, he sent well over 30 e-mails to

12   clients, friends, prospective clients, past clients over a

13   period of about two weeks, the 27th of September to the 6th of

14   October.

15          THE COURT:  And what was he offering?

16          MS. DEMPSEY:  Regarding, he was offering to talk about

17   and to put forth a buying interest in a company called Nau, I

18   think it's pronounced, N-A-U and was clearly in the e-mail

19   soliciting interest in that company.  He with respect to the --

20   principals of the companies --

21          THE COURT:  And what was the rule in effect?

22          MS. DEMPSEY:  What was the rule in effect?

23          THE COURT:  What was AXA's ruling?  That he could only

24   solicit sales to approved companies?

25          MS. DEMPSEY:  Right.  He could only solicit -- whether

1B7FNOVC

1   or not he earned any income from such solicitation, whether or

2   not such solicitation came to fruition, he was not entitled to

3   solicit interest in securities that were not approved by AXA.

4          THE COURT:   And that was a very important policy

5   because AXA was potentially liable for suitability issues and

6   if a salesman was offering securities in a non-approved entity,

7   the company was potentially liable should anything bad happen

8   to those investments.

9          MS. DEMPSEY:   Absolutely, your Honor.

10          THE COURT:   So the solicitation would involve the

11   company in something that was potentially illegal.

12          MS. DEMPSEY:   That's correct.

13          THE COURT:   And so you limit your salesmen to solicit

14   interest only in companies that are approved by your research

15   department.

16          MS. DEMPSEY:   But AXA Advisers in this case, the

17   securities company has to have knowledge and understanding of

18   what securities are being offered under its name.

19          THE COURT:   So this was a clearly material issue?

20          MS. DEMPSEY:   Absolutely.   And indeed --

21          THE COURT:   And what did you do when you found out

22   about it?

23          MS. DEMPSEY:   We asked him for his version of events.

24   We went to -- had meetings --

25          THE COURT:   What did he tell you?

1B7FNOVC

1          MS. DEMPSEY:  He denied selling away.

2          THE COURT:  Now, has this been explored?

3          MS. DEMPSEY:  But admitted sending the e-mails that

4    were sent, indicated that he meant no harm and tried to get

5    approval of the securities thereafter.

6          THE COURT:  And failed or succeeded?

7          MS. DEMPSEY:  He did, he did receive approval after

8    the fact.  But he had -- first of all, there's no dispute that

9    he did in fact sell away.  FINRA found that he did when they

10   did their investigation --

11         THE COURT:  Yes, but you eventually approved those

12   companies as suitable investments.

13         MS. DEMPSEY:  Nothing happened with it after his

14   termination.

15         THE COURT:  Has this been explored in depositions?

16         MS. DEMPSEY:  Has which part been explored in

17   depositions?

18         THE COURT:  What we're talking about now.

19         MS. DEMPSEY:  Certainly what happened at the time

20   around, the time of his termination has been explored in

21   depositions, yes.

22         THE COURT:  And so what happened after that?

23         MS. DEMPSEY:  AXA executives met and discussed the

24   situation, including a meeting that he participated in, and he

25   was then terminated from his two contracts affiliating him with

1B7FNOVC

1     AXA Advisers and AXA Network.

2              THE COURT:  By notice?

3              MS. DEMPSEY:  Pardon?

4              THE COURT:  By notice.  He was told what, you're

5     fired, in effect?

6              MS. DEMPSEY:  He was told that his contract would be

7     terminated, yes.

8              THE COURT:  So in effect he was fired.

9              MS. DEMPSEY:  Well, he was never an employee, but yes.

10    I mean, he was never an employee to be fired.  He had an

11    affiliated independent contract relationship.

12             THE COURT:  So that was terminated.  His relationship

13    is terminated.

14             MS. DEMPSEY:  His relationship was terminated.

15             THE COURT:  Then what was the next step under the

16    compliance manual?

17             MS. DEMPSEY:  He could have appealed.

18             THE COURT:  Did he?

19             MS. DEMPSEY:  No.

20             THE COURT:  He contends you have to go through some

21    kind of procedure before you terminate the relationship, is

22    that right?

23             MS. DEMPSEY:  No, that's not correct.

24             THE COURT:  What's his allegation?

25             MS. DEMPSEY:  I'm sorry?

1B7FNOVC

1          THE COURT:   What is his allegation?

2          MS. DEMPSEY:   I believe his allegation, if I

3     understand it correctly, was we were required to go to the MDAC

4     and the NDAC, the national disciplinary action committee and/or

5     the management disciplinary action committee.

6          THE COURT:   Either one?

7          MS. DEMPSEY:   He doesn't specify which would have been

8     the correct one or what would have come out of it or how

9     anything would have been different.

10          THE COURT:   If the compliance manual were in effect

11     and binding, what would you have had to do?

12          MS. DEMPSEY:   We would have had to do what we did.   We

13     referred the matter to the national compliance office, which

14     then determines whether or not it's an appropriate matter for

15     the NDAC or the MDAC.   In this case they did not forward it to

16     the NDAC or MDAC, but --

17          THE COURT:   What did they do?

18          MS. DEMPSEY:   They discussed it on a national level in

19     New York.

20          THE COURT:   And did they resolve the matter?

21          MS. DEMPSEY:   They did.   They terminated him.

22          THE COURT:   So in effect ratified the termination.

23          MS. DEMPSEY:   They decided on the termination.

24          THE COURT:   Is there an appeal from that?

25          MS. DEMPSEY:   He could have appealed.

1B7FNOVC

 1              THE COURT:  To where?

 2              MS. DEMPSEY:  To the NDAC or the MDAC.

 3              THE COURT:  So it was his option.  Did he?

 4              MS. DEMPSEY:  No.

 5              THE COURT:  So that's why you argue that all

 6     procedures under the compliance manual were satisfied.

 7              MS. DEMPSEY:  That's correct.

 8              THE COURT:  And is that part of this motion?

 9              MS. DEMPSEY:  Yes.

10              THE COURT:  So let me hear now from the plaintiff, Mr.

11     Finkelstein.

12              MR. FINKELSTEIN:  Thank you, your Honor.  Your Honor,

13     I think you stated it correctly from the beginning.  This was

14     never a motion to dismiss, this was a motion for summary

15     judgment.  If we look back --

16              THE COURT:  Yes, but if we have everything on the

17     table, I have the right, since both sides have put in

18     affidavits -- am I right, both sides put in affidavits?

19              MR. FINKELSTEIN:  Yes, both sides put in papers, yes.

20              THE COURT:  I have the right to treat it as a Rule 56

21     motion.

22              MR. FINKELSTEIN:  You could, your Honor, and I think

23     that's the way they crafted it.  But the problem here is if we

24     look back from the very beginning, there are clearly questions

25     of fact from the inception.  Our contention is that he was

Case 1:07-cv-07767-AKH   Document 136-2   Filed 06/02/12   Page 15 of 76
Case 1:07-cv-07767-AKH   Document 122   Filed 11/17/11   Page 14 of 47       14
1B7FNOVC

1   fired for whistle blowing.  Their contention was he was fired

2   for selling away.  It's a question of fact.

3           THE COURT:  But if they have a complete right to fire

4   him for selling away, what difference does it make that there

5   might also have been in your eyes a retaliation?

6           MR. FINKELSTEIN:  That's correct, Judge, it's our

7   contention there was a retaliation.

8           THE COURT:  Let's say you were right.  But if they

9   also had a right to terminate him for something that he did

10  that was violative of his relationship, you have no damage.

11          MR. FINKELSTEIN:  I don't agree, your Honor.  We're

12  clearly damaged.  Because not only was there, the second

13  component to this which I was going to get to which deals with

14  the monies that he was lent and why he came over and his book

15  of business and everything else, which now they claim he owes

16  them close to a million dollars on, so he was clearly damaged

17  because they wrongfully terminated him and now want him to pay

18  it back, so he's clearly damaged.  On top of that, they also

19  took his book of business, improperly, which is also a question

20  of fact.  They say he didn't, we say he did.  Also talking

21  about the termination and his appeal and procedures, we've had

22  limited depositions but meanwhile no one has told us what

23  occurred during these procedures.  What happened at this

24  alleged personal meeting in New York City?  What happened

25  thereafter?

Case 1:07-cv-07767-AKH   Document 136-2   Filed 06/02/12   Page 16 of 76
Case 1:07-cv-07767-AKH   Document 122   Filed 11/17/11   Page 15 of 47          15
1B7FNOVC

1          Oh, by the way, your Honor, just to be clear about

2     this appeal process, Mr. Novick couldn't appeal because he got

3     terminated on the 12th.  They dropped his U5 license on the

4     13th.  If you look at his U5, it clearly indicates, was he

5     under the -- I just want to quote this properly.  Question 7B.

6     Indicated.  Currently is or at the termination was the

7     individual under internal review for fraud or wrongful taking

8     of property or violating investment-related statutes,

9     regulations, rules of industry standard or conduct.  The answer

10    was no.

11         How could they in one breath accuse him of selling

12    away, which is clearly a violation of those, and the next day

13    taking his license away and saying he wasn't under review for

14    that.  He couldn't appeal.  There was nothing to appeal from,

15    they already took his license away.

16         THE COURT:  Let me take it step by step.  First you

17    say that you don't know what happened at the national

18    disciplinary level.

19         MR. FINKELSTEIN:  That's correct, Judge.

20         THE COURT:  Ms. Dempsey, was the national disciplinary

21    action recorded in some fashion?

22         MS. DEMPSEY:  Not that I'm aware of, no.

23         THE COURT:  Did it end up with some kind of result

24    that was in writing?

25         MS. DEMPSEY:  It wasn't strictly a national

Case 1:07-cv-07767-AKH   Document 136-2   Filed 06/02/12   Page 17 of 76
Case 1:07-cv-07767-AKH   Document 122   Filed 11/17/11   Page 16 of 47      16
1B7FNOVC

 1    disciplinary action review.  It was on a national level, his

 2    termination was decided on as opposed to just the local level

 3    in Connecticut.  Both local and national were involved.

 4            THE COURT:  So Mr. Finkelstein's comment was there

 5    really wasn't a pursuit of the procedure as set out in the

 6    manual.  He's right, then.

 7            MS. DEMPSEY:  No, he's not, because the national

 8    disciplinary action is not required in the manual.  The

 9    reference to the national compliance office was required and

10    did happen.

11            THE COURT:  All right.  I asked you before if the

12    compliance manual were in effect, what did you have to do.

13            MS. DEMPSEY:  What did we have to do?

14            THE COURT:  What did you have to do.

15            MS. DEMPSEY:  We had to refer to the national

16    compliance office and that we did.

17            THE COURT:  And what did they do, the national

18    compliance office?

19            MS. DEMPSEY:  They convened executives at both the

20    national and the local level to discuss the situation and

21    determine whether Mr. Novick's termination from his

22    affiliations was appropriate.

23            THE COURT:  Was there some kind of record made of the

24    proceeding?

25            MS. DEMPSEY:  Not that I'm aware of.

1B7FNOVC

1           THE COURT:  Was there some kind of summary?

2           MS. DEMPSEY:  Not that I'm aware of.

3           THE COURT:  Nobody wrote a memorandum about it?

4           MS. DEMPSEY:  The end result was termination was

5      decided.

6           THE COURT:  Nobody wrote a memo about it?

7           MS. DEMPSEY:  Not that I'm aware of.

8           THE COURT:  Have you looked?

9           MS. DEMPSEY:  Yes.

10          THE COURT:  Couldn't find anything?

11          MS. DEMPSEY:  That's correct.

12          THE COURT:  Have the people you interviewed indicated

13     there was anything in writing?

14          MS. DEMPSEY:  They did not indicate they had anything

15     in writing.

16          THE COURT:  Did you ask the question?

17          MS. DEMPSEY:  I personally did not ask the question.

18     The question was asked of at least several of the people we

19     talked with about this.

20          THE COURT:  But you didn't ask anyone in that meeting?

21          MS. DEMPSEY:  I --

22          THE COURT:  You yourself.

23          MS. DEMPSEY:  No, I've not been on the case.

24          THE COURT:  Do you know who was in the meeting?

25          MS. DEMPSEY:  I know several people who were in the

1B7FNOVC

1  meeting, yes.

2           THE COURT:  Did you interview any of them?

3           MS. DEMPSEY:  I personally did not.  I'm newer to the

4  case.

5           THE COURT:  Did someone in your staff do so?

6           MS. DEMPSEY:  Can I let Mr. Kalish speak to that?

7           THE COURT:  Yes.

8           MR. KALISH:  I spoke with, as did Mr. Finkelstein, at

9  least one of the participants in the meetings that resulted in

10 the termination of the two contracts at issue.

11          THE COURT:  Is that in a deposition?

12          MR. KALISH:  Absolutely.  It's in the deposition that

13 Mr. Finkelstein spoke with her.  I spoke with her prior to the

14 deposition and on other occasions.

15          THE COURT:  Of course.  So was there some kind of

16 record made of what was going on?

17          MR. KALISH:  Again, there was a record that was made,

18 your Honor.  The record was the notice of termination that was

19 sent to Mr. Novick as well as the prior notice of cease and

20 desist that had been sent to Mr. Novick in anticipation of

21 having Mr. Novick have the opportunity to set forth in detail

22 what he did and why he did it and when he did it.  So, yeah,

23 there were notices that were given, but what I understood, your

24 Honor--

25          THE COURT:  That's okay.  So the national compliance

Case 1:07-cv-07767-AKH  Document 136-2  Filed 06/02/12  Page 20 of 76
Case 1:07-cv-07767-AKH  Document 122  Filed 11/17/11  Page 19 of 47     19
1B7FNOVC

1   office met before those notices or after?

2           MR. KALISH:  The national compliance office did what

3   they did along with senior management both before the cease and

4   desist notice as well as the final termination decision was the

5   final notice that went out, which was after all of the meetings

6   and discussions, including the opportunity to give Mr. Novick

7   an opportunity to put in writing his version of events.

8           THE COURT:  So Mr. Finkelstein, what did they do that

9   was wrong?

10          MR. FINKELSTEIN:  Judge, the problem is not what they

11  did.  The question is what did they do.  In fact, during this

12  limited deposition we had with Ms. Geller, who Mr. Kalish is

13  referring to, she said she didn't know.  She was one person of

14  I believe 11 people there, but meanwhile she was the only one

15  we had a chance to speak to and she didn't even know what was

16  going on.  In fact, she was only working with Mr. Novick two

17  weeks and she specifically said in her deposition they took it

18  out of her hands because she didn't have enough background to

19  deal with this situation.

20          Judge, you have to understand --

21          THE COURT:  Did Mr. Novick avail himself of the right

22  to set out his position before the national compliance meeting?

23          MR. FINKELSTEIN:  I don't think so, Judge.  In fact --

24          THE COURT:  Did he submit anything?

25          MR. FINKELSTEIN:  He submitted a letter three days

Case 1:07-cv-07767-AKH   Document 136-2   Filed 06/02/12   Page 21 of 76
Case 1:07-cv-07767-AKH   Document 122   Filed 11/17/11   Page 20 of 47     20
1B7FNOVC

1    before and that was it.  He sat in the meeting, wasn't really

2    able to speak during that meeting my understanding was and then

3    he was terminated.  The procedures are set out in the

4    compliance manual, your Honor, and we keep going back to that.

5              THE COURT:  What were those procedures?

6              MR. FINKELSTEIN:  On page 123 and 124 of the

7    compliance manual, which was given to us by defendants, which

8    is our Exhibit I in our papers, it's called the disciplinary

9    action program.  The company had a disciplinary action program

10   that is designed to provide a structure for remedial and

11   disciplinary action to be taken in response to violations of

12   laws, regulations and company policies.  The disciplinary

13   action program is developed with the objective of fulfilling

14   the company's obligations under insurance and security laws to

15   adequately supervise its representatives and to detect or

16   prevent insofar as possible violations of these laws.  The goal

17   is to maintain a uniform, fair and beneficial disciplinary

18   process for representatives and supervisors.

19             Review of the alleged violations was conducted on two

20   levels, local and national.  Field supervisors conduct the

21   local reviews of the alleged violations and when appropriate

22   impose sanctions after consultations with division counsel.  At

23   the national level, the national disciplinary action committee,

24   the NDAC, and the management disciplinary action committee, the

25   MDAC, review alleged violations and when appropriate recommend

Case 1:07-cv-07767-AKH   Document 136-2   Filed 06/02/12   Page 22 of 76
Case 1:07-cv-07767-AKH   Document 122   Filed 11/17/11   Page 21 of 47      21
1B7FNOVC

1    sanctions.  Sanctions include but are not limited to letters of

2    caution, reprimand, fines, enhanced supervision and

3    termination.

4              THE COURT:  So your position is that the letter of

5    termination of relationship was issued too early, too late,

6    without hearing, what?

7              MR. FINKELSTEIN:  Without having proper due process,

8    without him having a chance to, one, appeal, without -- I don't

9    even know if it went to the MDAC because nobody ever discussed

10   that at all.

11             THE COURT:  Where are you reading from?

12             MR. FINKELSTEIN:  Your Honor, I'm reading from our

13   Exhibit I, it's the compliance manual.

14             THE COURT:  Exhibit I to the --

15             MR. FINKELSTEIN:  2005 AXA Advisers compliance manual.

16             THE COURT:  What section?

17             MR. FINKELSTEIN:  Section E, disciplinary action

18   program.  And, your Honor, it goes on to tell you what are the

19   NDAC and the MDAC and what the function is and how it's set up

20   and who sets it up, and there's a whole litany of things that

21   they had to do.  There's been absolutely no proof in this case

22   that any of these things were done.

23             THE COURT:  You don't deny that Mr. Novick issued the

24   solicitation e-mails that are at the heart of this, do you?

25             MR. FINKELSTEIN:  Your Honor, it's not a

1B7FNOVC

1    straightforward question.  I understand the question, your

2    Honor, because Mr. Novick did issue these e-mails --

3              THE COURT:  And he solicited interest in a

4    non-approved company, didn't he?

5              MR. FINKELSTEIN:  I'm sorry, Judge?

6              THE COURT:  He solicited investor interest in a

7    non-approved company.

8              MR. FINKELSTEIN:  In our opinion, your Honor, the

9    e-mails were not a solicitation at all.  In fact, they were an

10   invitation to go to a meeting.

11             THE COURT:  Well, the meeting was to inform people

12   about the company for the purpose not of giving them academic

13   education but of interesting them in becoming investors.

14             MR. FINKELSTEIN:  Judge, it was a little bit of both.

15             THE COURT:  It's a multistep process to interest

16   investors in a particular company, and it was a company that

17   was not approved for investment by AXA.

18             MR. FINKELSTEIN:  At that time when Mr. Novick, when

19   the e-mail was sent out -- I don't want to say Mr. Novick sent

20   out the e-mail -- at the time the e-mail was sent out, it was

21   not approved.  However, shortly thereafter, Mr. Novick did get

22   approved by Mr. Dane to do this, which was ironically the day

23   before he was terminated.

24             MS. DEMPSEY:  If I could just correct that, your

25   Honor.

1B7FNOVC

1          THE COURT:  You may.

2          MS. DEMPSEY:  The approval that Mr. Novick received on

3    the company was for his own account only, not for soliciting

4    for other potential customers.

5          THE COURT:  Do you agree, Mr. Finkelstein?

6          MR. FINKELSTEIN:  No, your Honor.

7          THE COURT:  Is the approval in writing?

8          MR. FINKELSTEIN:  Not that I'm aware of, Judge.

9          THE COURT:  Ms. Dempsey?

10          MS. DEMPSEY:  I thought that there was an e-mail to

11    that effect.

12          MR. FINKELSTEIN:  Judge, his --

13          THE COURT:  One minute, Mr. Finkelstein.  Let her find

14    it.  It's a rather important point.

15          MR. KALISH:  If I might ever so briefly.  There is an

16    e-mail to that effect, your Honor.

17          THE COURT:  Is it part of the record?

18          MR. KALISH:  I don't recall whether either side used

19    it as an exhibit to the motion.

20          MS. DEMPSEY:  I don't think so.

21          MR. FINKELSTEIN:  Judge --

22          THE COURT:  Look, I think this motion is premature.

23    It's geared on a theory of right, whether or not an employee

24    who was terminated for activities that were improper was

25    entitled to the procedures set out in the compliance manual.

Case 1:07-cv-07767-AKH   Document 136-2   Filed 06/02/12   Page 25 of 76
Case 1:07-cv-07767-AKH   Document 122   Filed 11/17/11   Page 24 of 47          24
1B7FNOVC

1    Given the fact that the compliance manual is not a contract,

2    but given also the fact that it had to have some kind of a

3    status, and that the contract made reference to it, it is not

4    an issue that I will deal with on a Rule 12 motion.  I need a

5    full set of facts in relationship to what the plaintiff did,

6    what was the relationship of any ratification by Mr. Dane, and

7    the scope of it and the extent of it, and I think you folks

8    need to do some work at discovery.

9             The problem in the management of this case, and I take

10   fault in that, is that I've gone along too much with delays and

11   limitations on discovery.  I think you need to finish, and I

12   think you've gone on a piecemeal basis.

13            MS. DEMPSEY:  Your Honor, may I finish?  First of all,

14   the compliance manual is not part of either contract.  It's not

15   referred to in them, it's not part of the contract.

16            THE COURT:  But it was in effect in the company.

17            MS. DEMPSEY:  It was in effect in the company,

18   correct.  Second, on the same page, 124, that Mr. Finkelstein

19   was reading from in terms of the general paragraph setting out

20   the national disciplinary action program, it goes on to say

21   what are the NDAC and the MDAC, that's where if you read that

22   first paragraph indicating what the NDAC is, and then it goes

23   in the fourth line, examples of violations which should be

24   referred to the national compliance office, which is what

25   occurred here for possible referral to the NDAC include, but

1B7FNOVC

```
 1   are not limited to, and then go on giving some examples.  That

 2   is where it is clear that the referral beyond the national

 3   compliance office was in the crediting of AXA.  Not only that,

 4   though, Mr. Novick received --

 5            THE COURT:  Where are you reading from?

 6            MS. DEMPSEY:  On page 124 of, it's also in defendant's

 7   Exhibit A, but it's in plaintiff's Exhibit I, that I think

 8   you've been handed.

 9            THE COURT:  I have it right in front of me.  Stick

10   with me.

11            MS. DEMPSEY:  Right after subheading 1.

12            THE COURT:  What are the NDAC and MDAC?

13            MS. DEMPSEY:  Correct.  The fourth paragraph down from

14   that is where I began reading.  I'm sorry, yes.

15            THE COURT:  So it says examples of violations which

16   should be referred to the national compliance office for

17   possible referral to the NDAC include, but are not limited to,

18   allegations of improper sales practices.  All right, so that

19   means there's discretion of whether --

20            MS. DEMPSEY:  That's right.

21            THE COURT:  To refer or not.

22            MS. DEMPSEY:  Discretion, that's right.  And not only

23   is there discretion, but Mr. Novick received without dispute

24   the functional equivalent of an NDAC review in the sense that

25   he received review by senior management on a national level
```

1B7FNOVC

1    with the participation of senior management on the branch level

2    and the participation of Bob Jones, who selects the members of

3    the NDAC.

4              THE COURT:  What are DP's?  The NDAC is a five-member

5    committee composed of DP's and BRM's.

6              MS. DEMPSEY:  Divisional president.

7              THE COURT:  And what are BRM's?

8              MS. DEMPSEY:  It's branch managers.  It's branch

9    manager, BR is for branch.

10             THE COURT:  So what's the problem, Mr. Finkelstein?

11             MR. FINKELSTEIN:  Your Honor, first of all, we don't

12   even know who these five members were, whether or not that

13   actually occurred.  All we know is that we sat at one meeting

14   on the 11th in a room with a bunch of people, weren't able to

15   say anything and next day we're getting terminated.  By the

16   way, Judge, just to go back to your prior point --

17             THE COURT:  Stick with this one.  Stick with this

18   point.  I'll let you go --

19             MR. FINKELSTEIN:  If you look at --

20             THE COURT:  One minute, Mr. Finkelstein --

21             MR. FINKELSTEIN:  If you look at --

22             THE COURT:  One minute.

23             MR. FINKELSTEIN:  Oh, I'm sorry, Judge.

24             THE COURT:  Ms. Dempsey, I'm looking at paragraph 2 at

25   the bottom of page 124 which reads, "When a matter is referred

1    to the MDAC the representative involved should submit a written

2    response to the allegations."  Was he invited to do so?

3              MS. DEMPSEY:  He was.

4              THE COURT:  Is that by a letter?

5              MS. DEMPSEY:  Yes.

6              THE COURT:  And did he?

7              MS. DEMPSEY:  He did.

8              THE COURT:  And that was part of the matter that was

9    reviewed at the conference or hearing that Mr. Finkelstein is

10   referring to?

11             MS. DEMPSEY:  It was.

12             THE COURT:  And what was the result of that?

13             MS. DEMPSEY:  Per se of the review?  I don't know.  I

14   wasn't at the meeting, but the entire result was his

15   termination.

16             THE COURT:  "The BRM," it says in the second sentence,

17   "supervising the representative should also submit a written

18   statement providing relevant information regarding the

19   allegations."  Was that done?

20             MS. DEMPSEY:  I believe it was.  I don't think it's

21   part of this record, but I'm fairly certain.

22             THE COURT:  I'm just not going to deal with a record

23   that's not full.  The motion is denied.  Where do you want to

24   go next?

25             MR. FINKELSTEIN:  Your Honor, we'd like to continue

Case 1:07-cv-07767-AKH   Document 136-2   Filed 06/02/12   Page 29 of 76
Case 1:07-cv-07767-AKH   Document 122   Filed 11/17/11   Page 28 of 47      28
1B7FNOVC

1    with discovery.  As your Honor is aware --

2              THE COURT:  What discovery do you want?

3              MR. FINKELSTEIN:  We want further e-mails, we want

4    audiotapes.

5              THE COURT:  Just start.  You asked for e-mails didn't

6    you?

7              MR. FINKELSTEIN:  Prior counsel asked for e-mails.

8              THE COURT:  Were they supplied?

9              MS. DEMPSEY:  Yes.  15,000 e-mails have been supplied

10   two and a half years ago.

11             THE COURT:  You're not getting more, Mr. Finkelstein.

12             MR. FINKELSTEIN:  I'm sorry, Judge?

13             THE COURT:  You're not getting more.

14             MR. FINKELSTEIN:  Judge, the problem is the e-mails

15   that were supplied, the people they allegedly searched as the

16   search terms and the search, have nothing to do with this

17   matter.

18             THE COURT:  Doesn't make any difference?

19             MR. FINKELSTEIN:  Judge, with all due respect --

20             THE COURT:  This was done when?

21             MR. FINKELSTEIN:  Prior counsel did all this.

22             THE COURT:  How many years ago?

23             MR. FINKELSTEIN:  We've only been involved in this

24   case for less than a year, so it was before that.  I think two

25   years ago.

1B7FNOVC

1            THE COURT:  We're not redoing it.

2            MR. FINKELSTEIN:  Judge, if we're not going to -- the

3    e-mails that we received, okay, were limited in stature.  We

4    want to expand the search.

5            THE COURT:  What was the limitation?

6            MR. FINKELSTEIN:  The people that they searched have

7    nothing to do with this matter.  I don't even know why prior

8    counsel agreed to the search terms.

9            THE COURT:  But he did.

10           MR. FINKELSTEIN:  I can't speak to that.

11           THE COURT:  He did and I'm not redoing it.

12           MR. FINKELSTEIN:  Judge, we also need further

13   depositions, obviously.

14           THE COURT:  Which depositions do you need?

15           MR. FINKELSTEIN:  First of all, we'd like to know who

16   the five members of the NDAC were.  We still have never been

17   told that.

18           THE COURT:  Weren't they revealed in the discovery

19   that you received?

20           MR. FINKELSTEIN:  Absolutely not, Judge, and in fact

21   Ms. Geller who was there never gave us specifics as to who was

22   there.  We'd like to take those people's depositions.

23           THE COURT:  Ms. Dempsey, do you know who was there?

24           MS. DEMPSEY:  At the meeting, we have a record of who

25   was at the meeting.  To be clear, it is not precisely an NDAC

1B7FNOVC

1    meeting which defendant's position is was not required.   It was

2    senior management that gave him every benefit and possibly more

3    of an NDAC meeting.   We certainly can look at who was there.

4             MR. FINKELSTEIN:   Judge, this is my problem.

5             THE COURT:   Just a minute, Mr. Finkelstein.

6             MR. FINKELSTEIN:   I'm sorry, Judge.

7             THE COURT:   With regard to the record of who was there

8    and who functioned as the, you say equivalent, was that a

9    record that was turned over to Mr. Finkelstein or prior

10   counsel?

11            MS. DEMPSEY:   He took a deposition on someone who was

12   there who named several or all of the people who were there as

13   well.

14            THE COURT:   You didn't answer my question.   You said

15   there was a writing that said who was there.   Was that writing

16   turned over to plaintiff's lawyers?

17            MS. DEMPSEY:   I don't believe there was a writing

18   which said who was there.   I would ask people who were there,

19   Ms. Geller, for one, as he did at his deposition.

20            THE COURT:   I find it very hard to believe that no one

21   wrote a memorandum of what happened.

22            MR. FINKELSTEIN:   Judge, I can tell you --

23            THE COURT:   One minute, Mr. Finkelstein.

24            MR. FINKELSTEIN:   I'm sorry.

25            MS. DEMPSEY:   I can't speak to why someone may not

Case 1:07-cv-07767-AKH   Document 136-2   Filed 06/02/12   Page 32 of 76
Case 1:07-cv-07767-AKH   Document 122   Filed 11/17/11   Page 31 of 47       31
1B7FNOVC

1    have written a memorandum.

2             THE COURT:  Mr. Kalish, do you know?

3             MR. KALISH:  I can't speak either.  I will say a

4    couple of things that are responsive to what your Honor is

5    inquiring into.  Number one, I'm relatively certain there was

6    never any interrogatory that asked for the identification of

7    the people who were present there.  Number two, I do believe

8    that there were note takers among the participants at the

9    meeting, and that the notes are likely privileged notes, since

10   it was lawyers who were involved --

11            THE COURT:  No, they weren't.  Not privileged.  Not

12   privileged.

13            MR. KALISH:  Again, it depends on the context of what

14   the notes say.

15            THE COURT:  I hold they're not privileged.  If there's

16   a request for advice, legal advice, then I will consider

17   privilege.  Otherwise they're not privileged.

18            MR. KALISH:  Again, we need to take a look at whether

19   the notes are response to legal advice or just a litany of who

20   said what at meetings.

21            THE COURT:  I want you to turn it over.

22            MR. KALISH:  I believe that's why there's no memo,

23   your Honor, is that the people participating in the meeting and

24   making decisions in connection with the meeting know what

25   happened at the meeting.

1B7FNOVC

1          THE COURT:  I want you or Ms. Dempsey to look for and

2     produce to Mr. Finkelstein all records that refer or relate to

3     that meeting.

4          MR. KALISH:  Your Honor, we will make a production

5     and/or log and/or reiterate what previously was logged.

6          THE COURT:  I tell you now, do not hold back summaries

7     and notes that were taken.  You can redact any legal -- any

8     question to a lawyer for legal advice and response, but only

9     that.  And that should be done within two weeks.  This case is

10    going to move.  And following that, Mr. Finkelstein, you have a

11    month to take any depositions you want of those who were in

12    that room.

13         MR. FINKELSTEIN:  Judge, I understand that, but we

14    also want depositions of other people as well.

15         THE COURT:  What other people?

16         MR. FINKELSTEIN:  Compliance officers who were there

17    when Mr. Novick was there.  After deposing Mr. Dometti or

18    Ms. Geller who were only there for a short period of time --

19         THE COURT:  No.  They're not relevant.  The compliance

20    manual I can read myself, but you can ask about what happened

21    at the meeting.

22         MR. FINKELSTEIN:  Judge, by the way, just to get back

23    to your question that I was alluding to before, Mr. Novick's

24    agreement, his AXA Advisers agreement, registered rep agreement

25    on page 5, by the way, does mention a compliance manual, AXA

1B7FNOVC

1    Advisers, as it is formally known in the form of compliance

2    guides or manuals.  So it's actually a contract.

3              THE COURT:  We're past the point, Mr. Finkelstein,

4    I've denied the motion, right?

5              MR. FINKELSTEIN:  Yes, Judge.

6              THE COURT:  So you don't need to bring that up.  Any

7    other deposition that either side wants?

8              MS. DEMPSEY:  We would take the deposition of Mr.

9    Novick regarding our counterclaim, our outstanding

10   counterclaim.

11             THE COURT:  What is the counterclaim?  Remind me.

12             MS. DEMPSEY:  For unpaid note, an outstanding note.

13             THE COURT:  Why do you need the counterclaim?  You

14   have the note.  I already gave you summary judgment on it.

15             MS. DEMPSEY:  We had summary judgment on one of two

16   notes, your Honor.

17             THE COURT:  And the second note?

18             MS. DEMPSEY:  The second note was partly a forgivable

19   loan.  Yes, was a forgivable loan.

20             THE COURT:  You didn't forgive it?

21             MS. DEMPSEY:  I think part of it was forgiven,

22   actually.

23             THE COURT:  So what's the need for the note?

24             MS. DEMPSEY:  For the deposition?

25             THE COURT:  Right.

Case 1:07-cv-07767-AKH   Document 136-2   Filed 06/02/12   Page 35 of 76
Case 1:07-cv-07767-AKH   Document 122   Filed 11/17/11   Page 34 of 47          34
1B7FNOVC

1    MS. DEMPSEY:  Well, when we took his deposition prior

2    we only focused it on what we understood the Court's limited

3    discovery was.

4    THE COURT:  All right, you can take his deposition on

5    what happened at the meeting.  I don't think there's anything

6    in the note that's really of interest.  You can take his

7    deposition about what happened at the meeting.

8    MR. FINKELSTEIN:  Judge, along the same lines there's

9    the contention about the accounting, as your Honor is aware.

10   They provided an accounting and this is our contention about

11   this second note.  The reason why they haven't sued on this

12   second note in the five years is because, as they stated, it's

13   a forgivable note and in order to figure out what is forgiven

14   they also have to figure out what Mr. Novick was paid.

15   THE COURT:  Let's suppose, Mr. Finkelstein, that he

16   was terminated properly.  Do you have any right to get any

17   money?

18   MR. FINKELSTEIN:  Yes, your Honor.

19   THE COURT:  Why?

20   MR. FINKELSTEIN:  Because they also raided his book of

21   business and took his clients to the tune of $70 million.

22   THE COURT:  What's the law, Ms. Dempsey?  If you

23   terminated him properly for improper sales conduct, does he

24   still have an entitlement to commissions?

25   MS. DEMPSEY:  He has an entitlement to the commissions

Case 1:07-cv-07767-AKH   Document 136-2   Filed 06/02/12   Page 36 of 76
Case 1:07-cv-07767-AKH   Document 122   Filed 11/17/11   Page 35 of 47     35
1B7FNOVC

1   that he earned and he was paid those.

2          THE COURT:  He says he wasn't.  I think this has to do

3   not so much with whether he was paid on a current basis, but

4   whether the customers stayed with AXA, right, Mr. Finkelstein?

5          MR. FINKELSTEIN:  Yes, your Honor.  Along the same

6   lines --

7          THE COURT:  So let me ask you this, Mr. Finkelstein.

8   When he left AXA, where did he go?  He lost his license, you

9   said.

10         MR. FINKELSTEIN:  Within a month, your Honor, he found

11  a new home, and he started his business up again.

12         THE COURT:  So I assume he gave notice to each of his

13  customers?

14         MR. FINKELSTEIN:  No, he didn't, Judge.  In fact they

15  gave notice to each of his customers that said he left and said

16  specifically --

17         THE COURT:  He could have given notice to all his

18  customers?

19         MR. FINKELSTEIN:  He could have.  He didn't have his

20  clients, they took his personal stuff, they never gave it back.

21  There's a lot of issues, Judge, and he had a contract, as you

22  stated, to keep his book of business.  They summarily went

23  after his book of business.  They sent people to his clients'

24  homes, wrote letters.  It's all attached to the records, Judge.

25  Not to belabor this point, but going back to the accounting --

Case 1:07-cv-07767-AKH   Document 136-2   Filed 06/02/12   Page 37 of 76
Case 1:07-cv-07767-AKH   Document 122   Filed 11/17/11   Page 36 of 47          36
1B7FNOVC

1    THE COURT:  I'll tell you what, both of you can take

2    those depositions also with regard to that second counterclaim

3    and the accounting.

4    MS. DEMPSEY:  Okay.  But, your Honor, if I may, we did

5    brief the issue as to his book of business when he -- and there

6    is no contractual entitlement that AXA not contact his

7    customers after he leaves.  As a matter of fact, if they

8    didn't --

9    THE COURT:  I didn't say there was.  I didn't say

10   there was.

11   MS. DEMPSEY:  Okay.  I just --

12   THE COURT:  I would think that the law is that if

13   Mr. Novick has a right to go after his clients and you have the

14   right to go after the clients that he gave to AXA, the clients

15   have the right to decide what they wish to do.

16   MS. DEMPSEY:  Exactly, your Honor.

17   THE COURT:  And when they have the right to decide

18   what to do, and both AXA and Novick are competing for the same

19   clients, the continuation of business, of one client or another

20   is not the business of the other company.  So in other words,

21   if clients decide to go to AXA at a time when Novick is or has

22   the right to solicit them, to solicit them or has the right to

23   solicit them, Novick is no longer entitled to commissions.

24   MS. DEMPSEY:  Correct, he's entitled to the

25   commissions --

1B7FNOVC

1        THE COURT:  That's the rule in the case, he's entitled

2     to commissions up to that.  I take it that's a month.  So

3     that's the rule.  You're entitled to commissions up to a month

4     after termination but not after.

5        MR. FINKELSTEIN:  Judge, I understand that, but that's

6     not the issue.  The issue is whether or not they improperly

7     solicited his clients.

8        THE COURT:  I hold they did not improperly solicit his

9     clients.  They had a right to.  But this would be following the

10    propriety of the termination.  If he engaged in an improper

11    conduct of this nature, it seems to me that the company's got

12    the right to terminate him.

13       MR. FINKELSTEIN:  Judge, but one has nothing to do

14    with the other.

15       THE COURT:  I disagree.  I hold it does.

16       MR. FINKELSTEIN:  I understand, Judge, but here's my

17    concern.  Let's assume that Mr. Novick wasn't wrongfully

18    terminated and just left, then they tried to solicit his

19    business, would we have the same issue?  He had a contractual

20    right to keep his clients, that's why he went there.

21       THE COURT:  That's not the case here.  Where do you

22    see that contractual right?

23       MR. FINKELSTEIN:  Attached to our papers, Judge.

24       THE COURT:  What exhibit?

25       MR. FINKELSTEIN:  I'll show you the exhibit.  Judge,

1B7FNOVC

1      just one second.  Exhibit K.

2              THE COURT:  That's not a contract, is it?

3              MR. FINKELSTEIN:  It's a clarifying document, your

4      Honor.

5              THE COURT:  Signed by both sides?

6              MR. FINKELSTEIN:  Yes.

7              THE COURT:  What paragraph?

8              MR. FINKELSTEIN:  The last paragraph.  Any customer

9      list provided to --

10             THE COURT:  I'll read it.  One moment.

11             MR. FINKELSTEIN:  Thank you, Judge.

12             (Pause)

13             THE COURT:  You have a right to keep only those

14     customers whose business does not pertain to the business of

15     AXA Advisers or its affiliates.

16             MS. DEMPSEY:  Your Honor --

17             THE COURT:  As I read that clause.

18             MR. FINKELSTEIN:  Looking at the last line, it says

19     are and remain the property of the associate and need not be

20     turned over to AXA Advisers should the associate be terminated

21     by AXA Advisers.

22             THE COURT:  You forgot the sentence that qualifies it.

23     The whole sentence is, "Customer lists provided by the

24     associate to AXA Advisers as part of the associate's initial

25     hiring or contracting with AXA Advisers or developed by an

1B7FNOVC

1    associate during the associate's affiliations with AXA

2    Advisers," and here's the key part, "which do not pertain to

3    the business of AXA Advisers."  It's only those that aspect of

4    the business which do not pertain to the business.  Obviously,

5    the customers that remained with AXA pertain to AXA's business.

6    So I disagree with you, Mr. Finkelstein.

7            MR. FINKELSTEIN:  Judge, I don't read it that way.

8            THE COURT:  That's the way I read it.

9            MR. FINKELSTEIN:  Judge, I understand, but here's my

10   concern.  Mr. Novick came over with a $100 million book of

11   business.  So reading it the way the Court would like to

12   interpret the language, it means that I can fire you at any

13   time and I can keep your book of business.  Oh, on top of that,

14   we also gave you a million and a half dollars because you are a

15   large producer and based upon your book of business you're

16   going to be able to repay all this money because of the amount

17   of monies that your book of business will generate.

18           THE COURT:  I read the contract, Mr. Finkelstein for

19   what the contract says and the contract clause is "which do not

20   pertain to the business of AXA Advisers."  I'm not saying that

21   Novick is precluded from dealing with these clients.  If

22   they're his clients, they'll go with him, but neither is AXA

23   precluded from dealing with them.  So the rule in the case is

24   that those clients which Novick turned over to AXA and before

25   the time that Novick had the opportunity to solicit them, are

1B7FNOVC

```
 1    clients which pertain to Novick.  After that period the clients

 2    are entitled to go where they want and Novick does not have any

 3    further right on someone who enjoys that clientele.  Anything

 4    else?

 5              MR. FINKELSTEIN:  Judge, I'd just like to clarify

 6    that.  He came over with $100 million --

 7              THE COURT:  You're not looking to clarify.  You're

 8    looking to reargue.

 9              MR. FINKELSTEIN:  No, I'm not.  I want to be clear

10    about this one point.  He came over with $100 million of

11    clients.  Are you saying that once he came over the clients are

12    no longer his?

13              THE COURT:  That's reargument, Mr. Finkelstein.  You

14    heard my rule.  If you can't remember it, you can buy the

15    transcript.

16              How much time would it take you to do all this

17    discovery?  By January 31, 2012 all discovery should close is

18    my feeling.

19              MS. DEMPSEY:  If we could extend it for about two

20    weeks?

21              THE COURT:  Because why?

22              MS. DEMPSEY:  Another trial I have right now.

23              THE COURT:  No.  Get someone else in your office to do

24    it.  Epstein Becker is a big firm.

25              MR. FINKELSTEIN:  Judge, I understand your ruling,
```

1B7FNOVC

1    going back to the accounting, it was our contention that the

2    accounting that was provided is just a recapitulation of what

3    Mr. Novick was paid and not what his business generated.

4        THE COURT:  You have to extend it out to the period of

5    the notice.  When would you say Mr. Novick had the opportunity

6    to solicit his clients, Ms. Dempsey?

7        MS. DEMPSEY:  I would say he had the opportunity to

8    solicit his clients as soon as he left AXA.

9        THE COURT:  No, he had to get to another company.

10       MS. DEMPSEY:  Then he said he was with another company

11   within a month.  I think it was less than a month, but I don't

12   have it in front of me.

13       THE COURT:  Take 30 days after he's terminated.  Is

14   that okay, Mr. Finkelstein?

15       MR. FINKELSTEIN:  Judge, I have to talk to Mr. Novick.

16       THE COURT:  Talk to him.  He's right there.

17       MR. FINKELSTEIN:  I understand the Court's position, I

18   don't agree with it.

19       THE COURT:  I understand you don't agree with it, you

20   object to it.  If I'm wrong I'll be reversed, but that's the

21   ruling.

22       MR. FINKELSTEIN:  Judge, the answer to your question

23   is Mr. Novick found a home within 30 days, but it's our

24   contention, as I stated before, that the business he brought

25   there was his business, he contracted for it.

1B7FNOVC

1    THE COURT:  I know you did.  I've already rejected

2    that.  It's 30 days, Ms. Dempsey.

3    MS. DEMPSEY:  I understand.

4    THE COURT:  Extend your accounting out to 30 days.

5    MS. DEMPSEY:  30 days past his termination.

6    THE COURT:  What was his termination, what date?

7    MS. DEMPSEY:  His termination was October 12, 2006.

8    MR. FINKELSTEIN:  Judge, that's not the --

9    THE COURT:  October 12, 2006?

10   MR. KALISH:  Your Honor, if I could be heard

11   momentarily.  His accounting actually that we already provided

12   is through, if I remember correctly, May 31 of 2011.  We did

13   the accounting to the present date because the reality is, is

14   that there's an entitlement to certain small amounts of money

15   that continues to the present time.  And therefore the

16   accounting that we provided to Mr. Novick not only covers one

17   month after his termination but to today's date.

18   THE COURT:  Write him a letter that describes what

19   you've set out and what your position is, Mr. Kalish, but I

20   hold that the clients that were given by Mr. Novick to AXA

21   Advisers resulting in business to AXA entitle Mr. Novick to

22   commissions through December 31, 2006.  That's over 30 days,

23   about 45 days.  Okay.  Anything else?

24   MR. FINKELSTEIN:  Judge, I understand what the Court

25   is requesting, but that's not what we're asking.  What we're

1B7FNOVC

1    asking for is not what his book of business, what he earned off

2    of his book of business.  We're trying to find out what his

3    book of business generated, what revenues were generated by his

4    book of business.

5                THE COURT:  That's part of the accounting.

6                MR. FINKELSTEIN:  Right, but it was never given.

7    That's what the problem is here.

8                THE COURT:  Mr. Kalish?

9                MR. FINKELSTEIN:  Judge, what I could have done --

10               THE COURT:  Mr. Kalish, what kind of information did

11   you give Mr. Finkelstein?

12               MR. KALISH:  We gave Mr. Finkelstein and his prior

13   counsel information concerning every nickel that Mr. Novick got

14   paid and every --

15               THE COURT:  Were the records sufficient to allow his

16   accountant to go over with him and either agree or disagree

17   with what you've done?

18               MR. KALISH:  Absolutely, your Honor.

19               THE COURT:  Which means you gave him revenues as well

20   as final figures?

21               MR. KALISH:  Well, we gave the information with regard

22   to his own earnings that related from his business.  We did not

23   provide individual records from each and every client, each and

24   every month, each and every --

25               THE COURT:  I think he's entitled to see all that goes

Case 1:07-cv-07767-AKH   Document 136-2   Filed 06/02/12   Page 45 of 76
Case 1:07-cv-07767-AKH   Document 122   Filed 11/17/11   Page 44 of 47      44
1B7FNOVC

1    into the creation of the commission figure.

2              MR. KALISH:  But it doesn't, your Honor, that's the

3    point here.  And ironically, and this is one of the frustrating

4    things, is that that was a debate that was had in 2009 in the

5    first part of the year with Mr. Finkelstein's predecessor.

6    There's no linkage between the amount of revenues generated by

7    his quote-unquote book of business and the amount of

8    commissions and other payments that Mr. Novick was entitled to

9    get.  We gave all of the schedules --

10             THE COURT:  How do you figure out his commissions?

11             MR. KALISH:  The details of it are in the documents

12   we've already produced and that's what the accountant could be

13   useful to take a look at.  I can't answer that.

14             THE COURT:  I would think that commissions are a

15   factor of total revenues produced by the book of business.

16             MR. KALISH:  They are not, your Honor.  As the two

17   contracts that are part of this record reflect, Mr. Novick will

18   be paid under the insurance contract as follows, will be paid

19   under the AXA -- the brokerage firm's, AXA Advisers contract as

20   follows.  Neither of them uses as a factor the gross revenues

21   that were generated on behalf of AXA that were attributable to

22   his book of business.

23             THE COURT:  What do they use?

24             MR. KALISH:  They use different schedules.  In fact,

25   why don't you read, Aime, what it says they used.  It's right

1B7FNOVC

1    in the contracts.

2            THE COURT:  What exhibit is it again?

3            MS. DEMPSEY:  It's Exhibit A to the second amended

4    complaint.  It's also found I think in --

5            THE COURT:  How about Finkelstein's papers?

6            MS. DEMPSEY:  In Finkelstein, it's F as in Frank --

7    I'm sorry, G -- one is at F, one is at G.  The advisor's

8    agreement is at Finkelstein's F.

9            THE COURT:  So where do you want me to look, Mr.

10   Kalish?

11           MS. DEMPSEY:  For the advisor's agreement --

12           THE COURT:  Just tell me one place to look.  What

13   exhibit?

14           MR. KALISH:  Exhibit F at paragraph 3, your Honor, on

15   the first page of Exhibit F, where it's called commissions and

16   service fees.

17           THE COURT:  I see it.  All right.  It doesn't help me

18   because it refers to schedules and rules published from time to

19   time by or on behalf of AXA Advisers.

20           MR. KALISH:  Exactly, your Honor, and that's what I

21   was referring to to materials that have been produced in

22   discovery.

23           THE COURT:  You make sure, Mr. Kalish, you go over

24   these very carefully.  You make sure that every document that

25   will be used by an accountant to determine what his commission

1B7FNOVC

1   should have been are given to Mr. Finkelstein or were given to

2   Mr. Finkelstein.  If they were given to Mr. Finkelstein, you

3   can be excused from production by making reference to a

4   specific production number.

5         MR. FINKELSTEIN:  Judge, all we're asking for is what

6   the book of business generated, the revenues generated, not

7   what was he paid.  That's not what was given to us.

8         THE COURT:  If Mr. Kalish is telling you that's not

9   relevant -- I don't understand how that can be so, but if Mr.

10  Kalish goes over the documents referred to in this paragraph

11  and can show to Mr. Finkelstein what are the bases other than

12  revenues, he can do that.  Whatever is the basis for

13  commissions in the ordinary course of business will be the rule

14  of this case.

15        All right, fact discovery closes January 31, 2012.  No

16  enlargements, no excuses.  I will then see you January 13 at

17  10:00, it's a Friday, to discuss where we go from here.

18  Presumably it will be motion practice and if either side wants

19  to make a motion before the meeting, that party will elicit a

20  schedule to be given to me at the meeting.  All motions will

21  have to be made at one particular point in time and a schedule

22  should go accordingly so that there will be only three rounds

23  of submissions of memorandum and other papers.  Any motion must

24  be a dispositive motion.  Let's get rid of all or substantially

25  all of the case.

1B7FNOVC

1     MR. FINKELSTEIN: Judge, just to clarify something.

2   We're having -- you said that no enlargements, no excuses, all

3   discovery will be complete by January 31, correct?

4     THE COURT: Don't do that to me.

5     MR. FINKELSTEIN: Judge, the only reason why I'm

6   asking is because you just set a conference on January 13,

7   prior to the cutoff date.

8     THE COURT: That's a good point.

9     MR. FINKELSTEIN: That's why, Judge. I just, you

10  know --

11    THE COURT: Yes, yes, you got me.

12    MR. FINKELSTEIN: I don't mean to, but --

13    THE COURT: You got me cold. All right, we'll do it

14  on February 10. That's a Friday. The same rules apply about

15  motions. All right?

16    MR. FINKELSTEIN: Thank you, Judge.

17    THE COURT: Okay.

18    MS. DEMPSEY: Thank you.

19    MR. KALISH: Thank you, your Honor.

20    THE COURT: We'll issue a summary order reflecting our

21  discussions here and whatever rules were put down.

22    (Adjourned)

23

24

25

# EXHIBIT F

## 2005 AXA ADVISORS COMPLIANCE MANUAL

### Table of Contents

**Chapter 1: Introduction**

A. Topics Covered & Key Terms — 6

B. Reporting Violations — 10

C. Insurance Marketplace Standards Association ("IMSA") — 10

**Chapter 2: Licensing & Securities Registration**

A Representatives' Qualifications — 12

B. Supervisors' Qualifications — 15

C. Securities Registration Applications: Proper Disclosures & Procedures — 17

D. Procedures for Renewal of Licenses & Securities Registrations — 18

E. Revisions to Form U-4 Applications — 19

F. Continuing Education — 20

G. Termination Procedures — 23

**Chapter 3: Representatives' Disclosures, Notifications & Prohibited Activities**

A. Outside Business Activities — 26

B. Practice Enhancement Program — 28

C. Personal Accounts with Other Broker/Dealers — 29

D. Private Securities Transactions/Selling Away — 31

E. Initial Public Offerings — 33

1

CONFIDENTIAL

D 0588

## 2005 AXA ADVISORS COMPLIANCE MANUAL

| | |
|---|---|
| F. Insider Trading | 33 |
| G. Unauthorized Trading: Discretionary Accounts, Powers of Attorney & Trustees | 34 |
| H. Interest in Client Matters: Sharing Ownership & Profits | 35 |
| I. Commingling and Misappropriation of Client Funds | 35 |
| J. Excessive Trading in Client Accounts | 36 |
| K. Market Timing Services | 36 |
| L. Recommending Independent Investment Advisors | 36 |
| M. Viatical Settlements | 37 |
| N. Privacy, Authenticity & Accuracy of Client Information, Documentation and Accounts | 37 |
| O. Client Address of Record | 40 |
| P. Fair Competition | 40 |

**Chapter 4: Sales & Business Practices**

| | |
|---|---|
| A. Prospecting | 43 |
| B. Sales Presentations | 46 |
| C. Suitability | 47 |
| D. Replacements | 52 |
| E. Insurance Sales Disclosures and Delivery | 55 |
| F. Annuity Sales Disclosures and Delivery | 58 |
| G. Approved Insurance Applications & Forms | 58 |
| H. Prospectuses | 59 |
| I. Sample Documents | 60 |

2

CONFIDENTIAL

D 0589

## 2005 AXA ADVISORS COMPLIANCE MANUAL

J. Mutual Fund Sales     60

K. Brokerage Services     64

L. Investment Advisory Activities     67

### Chapter 5: Commissions, Payments & Gifts

A. Gifts, Gratuities & Promotional Items     75

B. Cash/Non-Cash Compensation     77

C. Client Payments     78

D. Commission Sharing     80

E. Anti-Money Laundering Policy     81

F. International Business Transactions     84

### Chapter 6: Communications

A. Stationery & Business Cards     86

B. Titles & Designations     87

C. D/B/A Names     90

D. Company Signage     93

E. Unauthorized Use of Company Name and Logo     94

F. Advertising & Sales Materials     94

G. Outgoing Correspondence     102

H. Incoming Correspondence     103

I. Internet Policy: Electronic Correspondence, Advertising & Sales
Materials     107

J. Compliance-Related Field Communications     110

CONFIDENTIAL        D 0590

## 2005 AXA ADVISORS COMPLIANCE MANUAL

K. Other Communications ........................................... 110

**Chapter 7: Additional Compliance & Supervisory Requirements**

A. Supervision of Representatives ................................. 112

B. Branch Manager Delegations .................................... 117

C. Manager's Fund ................................................ 119

D. Client Complaints ............................................. 120

E. Disciplinary Action Program ................................... 123

F. Annual Compliance Meetings .................................... 125

G. Annual Compliance Notification Forms .......................... 127

H. Annual Compliance Interviews .................................. 127

I. Compliance Examinations & The Regional Compliance Officer ...... 128
   Program

**Chapter 8: Record Keeping and Contact with Regulators**

A. Required Documentation ........................................ 131

B. Documentation Retention Periods ............................... 152

C. Contact with Regulators ....................................... 154

**APPENDIX** ...................................................... 156

NASD Notice to Members 98-38

4

2005 AXA ADVISORS COMPLIANCE MANUAL

# Chapter 1

## Introduction

|  | Page |
|---|---|
| A. Topics Covered & Key Terms | 6 |
| B. Reporting Violations | 10 |
| C. Insurance Marketplace Standards Association ("IMSA") | 10 |

CONFIDENTIAL

D 0592

## 2005 AXA ADVISORS COMPLIANCE MANUAL

AXA Advisors, LLC, The Equitable Life Assurance Society of the United States, AXA Network, LLC and affiliated companies ("the Company") are committed to conducting business according to the highest standards of honesty and fairness. The Company's compliance program is designed to support its sales force and other personnel (together, our "Representatives") in meeting these standards through careful adherence to all applicable laws, rules, regulations and Company policies and procedures. The compliance program is routinely updated to enable the Company and its Representatives to keep pace with changing client needs, market conduct standards and regulatory developments. This revised Manual incorporates many recent compliance program developments. Changes to the Company's compliance program are generally communicated through Company-approved field communications marked as "compliance-related." See Section on Compliance-Related Field Communications.

This Manual is not an exhaustive review of all Representatives' obligations. Rather, it is an overview of important responsibilities and procedures designed to help Representatives and supervisors fulfill those responsibilities. The Company's compliance policies require that Representatives comply with all Company guidelines (such as the Policy Statement on Ethics) and applicable local, state and federal laws (such as the NASD Inc.'s Rules ("NASD Rules")) whether or not they are specifically addressed in this Manual.

### A.  Topics Covered and Key Terms

#### 1. Who Does This Manual Apply To?

Unless specifically stated otherwise, the following personnel are considered "Representatives" and must adhere to the provisions of this Manual:

- Associates, including pre-contract, dual professional and corporate agents, whether or not they are registered with the NASD;

- Supervisors, including Divisional Presidents ("DPs"), Branch Managers ("BRMs"), District Managers ("DMs") and other functional directors;

- Employees who are registered with the NASD, such as those in the Operations Centers or the National Headquarters. Although this Manual will typically refer to field representatives and supervisors, securities registered employees must be aware of and comply with all relevant requirements contained in this Manual; and

- All other AXA Advisors securities registered or investment advisory representatives.

6

D 0593

CONFIDENTIAL

## 2005 AXA ADVISORS COMPLIANCE MANUAL

Except where the context otherwise requires, the provisions of this Manual also apply to insurance brokers who are contracted with AXA Network under agency-sponsored brokerage arrangements (i.e., brokers who are associated with an AXA Network agency), in the context of their solicitation, sale or servicing of Equitable or AXA Advisors products and services. In general, however, the provisions of this Manual shall not apply to brokers who are registered with another broker/dealer and whose solicitation, sale or servicing of our products is conducted pursuant to a selling agreement between the Company and such broker/dealer.

2. What Terms Are Used In This Manual?

The following references are frequently used in this Manual:

- "The Company" refers to Equitable Life, AXA Network, LLC, Equitable of Colorado, Inc. and AXA Advisors, LLC and their successors. To the extent that certain provisions apply only to one specific company, a reference will be made to the company name;

- The term "insurance" refers to all insurance and annuity contracts; and

- Below is a brief summary of abbreviations used throughout this Manual.

| | |
|---|---|
| ABA | AXA Brokerage Account |
| ACU | Advertising Compliance Unit |
| AAM | AXA Advanced Markets Group (formerly ASG) |
| ALC | Advisors Learning Center |
| AHCA | Associate Hiring and Contract Administration |
| AXA Advisors | AXA Advisors, LLC |
| AXA Network | AXA Network, LLC |
| B/D | Broker/Dealer |
| BCM | Branch Controls Manager |
| BCS | Branch Controls Specialist |

7

CONFIDENTIAL

D 0594

## 2005 AXA ADVISORS COMPLIANCE MANUAL

| | |
|---|---|
| BRM | Branch Manager |
| CBT | Computer-based training (NASD) |
| CRO | The Customer Relations Office |
| CV | Capital Visions |
| DBP | Director of Business Practices, a member of the Divisional staff |
| DCOO | Divisional Chief Operating Officer |
| DP | Divisional President |
| DM | District Manager |
| EOC | Equitable of Colorado, Inc. |
| Equitable or Equitable Life | The Equitable Life Assurance Society of the United States |
| FPC | Financial Planning Center |
| Form U-4 | Uniform Application for Securities Industry Registration or Transfer |
| Form U-5 | Uniform Termination Notice for Securities Industry Registration |
| IAR | Investment Advisory Representative of AXA Advisors |
| IMCG | Integrated Marketing and Communications Group |
| MDAC | The Management Disciplinary Action Committee |
| NAIC | National Association of Insurance Commissioners |
| NCO | National Compliance Office |
| NDAC | The National Disciplinary Action Committee |

8

CONFIDENTIAL

D 0595

## 2005 AXA ADVISORS COMPLIANCE MANUAL

| | |
|---|---|
| OBA | Outside Business Activity |
| OM | Operations Manager |
| OSJ | Office of Supervisory Jurisdiction |
| RBG | Retirement Benefits Group |
| RCO | Regional Compliance Officer, a member of the National Compliance Office |
| Regulator | Any official representing a federal, state or local governmental/regulatory authority |
| RIA | Registered Investment Advisor |
| RR | Registered Representative, including securities registered brokers, associated persons and principals |
| SEC | Securities and Exchange Commission |
| VRU | Licensing Voice Response Unit |

9

CONFIDENTIAL

## 2005 AXA ADVISORS COMPLIANCE MANUAL

### 3. How Does This Manual Affect Representatives?

Representatives are required to carefully adhere to the policies and procedures described in this Manual and any revisions to this Manual posted on the Intranet and on eDOX. This Manual will be updated from time to time by field communications identified as "compliance-related." Representatives are responsible for promptly reviewing and adhering to all such changes and additions to our compliance policies and procedures. See Section regarding Compliance-Related Field Communications. Failure to adhere to compliance policies and procedures may result in disciplinary action by the Company and/or industry regulators, and/or civil or criminal penalties by law enforcement or other authorities.

Representatives should contact their supervisor, the Director of Business Practices ("DBP") or other compliance personnel if they have any compliance questions. Questions which cannot be answered by a supervisor, the DBP or other compliance personnel should be referred to the National Compliance Office.

The provisions of this Manual are not intended to create any contractual commitments or obligations on the part of the Company to any of its Representatives or employees. None of the provisions of this Manual are intended to alter any existing at-will relationships between the Company and any of its Representatives.

### B.      Reporting Violations

The Company's *Policy Statement on Ethics* requires that Representatives and employees report instances of misconduct to the Company. There are several alternatives for reporting misconduct. Representatives are encouraged to discuss such issues with their immediate supervisor. If circumstances warrant further action, or if a discussion with a supervisor is not appropriate, Representatives should contact either the National Compliance Office, the Employment Law Division of the Law Department, the Chief Executive's Office or the Ethics Hot Line, a toll-free telephone number at 800-554-1503. Anyone reporting misconduct to any of these sources will be protected against retaliation.

### C.      Insurance Marketplace Standards Association ("IMSA")

The Company is committed to earning and keeping the continued trust of its clients, shareholders and business associates by participating in the insurance industry's market conduct compliance programs. One example of this commitment is Equitable Life's and EOC's membership in the Insurance Marketplace Standards Association ("IMSA"). As members of IMSA, Equitable Life and EOC have agreed to abide by IMSA's Principles and Code of Ethical Market Conduct and to ensure that the concepts of the Principles and Code are reflected in compliance policies and practices. The Company's Policy Statement on Ethics formally includes IMSA's Principles and Code. Similarly, the Company's compliance program, as summarized in this Manual, reflects the concepts addressed in IMSA's Principles and Code.

10

CONFIDENTIAL

D 0597

## 2005 AXA ADVISORS COMPLIANCE MANUAL

Copies of the Notification Forms must be maintained in Representatives' individual compliance files.

Representatives must immediately advise AXA Advisors of the existence of any unreported securities accounts and comply with the above procedures relating to transaction reporting (unless the accounts involve securities exempt from this policy such as variable contracts, open-end mutual funds and unit investment trusts).

### 3. When Must Representatives Disclose Other Personal Securities Transactions?

Any Representative who personally wishes to purchase a security outside any B/D (such as a private placement) must provide written notice to Divisional Counsel through his or her BRM. The transaction may not take place until the Representative receives a written acknowledgment of the notice and approval from the Divisional Counsel.

**D.      Private Securities Transactions/Selling Away**

1.   What Is AXA Advisors' Policy Regarding Private Securities Transactions And Selling Away?

A "private securities transaction" is any securities transaction (with a few exceptions) outside the regular course or scope of a registered representative's association with his or her broker/dealer. Private securities transactions include transactions on behalf of a client or non-client and personal purchases or sales by a Representative.

Examples of the type of securities typically involved in private securities transactions outside of a Representative's association with AXA Advisors are:

- mutual funds or variable contracts that are not offered by or through AXA Advisors or its affiliates, such as AXA Network;

- stocks not sold in the secondary market;

- private placements and shares or participation in oil well drilling and similar ventures;

- promissory notes; and

- certificates of participation.

Private securities transactions also include, but are not limited to, any involvement with new offerings of securities whether registered or not with the SEC, variable annuities, group variable annuities, coins, investments in any entity owning real estate, limited partnerships, and certificates of deposit. They may also involve certain types of loans by clients to or from the Representative, which are also prohibited. See Section on Prohibited Interest in Client Policies or Investments.

31

## 2005 AXA ADVISORS COMPLIANCE MANUAL

"Selling away" is a term used in the securities industry to describe those private securities transactions that are:

- outside the regular course or scope of a registered representative's association with his or her broker/dealer, *and*
- the broker/dealer has not given written approval for the transaction, *and*
- the transaction is one in which a registered representative participates with, or on behalf of, another person (who is not necessarily a client of his or her broker/dealer).

Selling away includes any manner of involvement in the securities transaction and is not limited to the sale of securities. *Further, it includes involvement without receipt of compensation.* Thus, uncompensated referrals and client introductions may be considered selling away in some circumstances. Selling away is strictly prohibited by AXA Advisors as well as by NASD Conduct Rules.

Representatives are prohibited from any involvement in private securities transactions in any capacity and at any level of involvement unless they have provided prior written notice to AXA Advisors and they have received written permission from AXA Advisors *prior to any involvement* in the transaction. If a Representative would like to be involved in a private securities transaction, either personally or on behalf of a client, the Representative must first provide detailed written notice of the proposed transaction. The notice must include a description of the Representative's proposed role and must state whether the Representative has or will receive selling compensation in connection with the transaction. Selling compensation is any compensation paid directly or indirectly in connection with, or as a result of, the purchase or sale of security. Thus, selling compensation includes, but is not limited to, finder's fees, commissions, rights to acquire securities and expense reimbursements. If AXA Advisors approves participation by the Representative, AXA Advisors is responsible for supervising the Representative's activities. Therefore, Representatives must abide by any conditions AXA Advisors may place upon the Representative's activities.

Representatives should also note that persons who the Representative solicits, refers or introduces to investments offered privately may erroneously believe that AXA Advisors has researched and recommended the investments, even if the person is not a client of AXA Advisors. This may lead to litigation and/or regulatory investigation and action. However, AXA Advisors will not permit its Representatives to offer any security without appropriate due diligence and approval by the Company. Representatives must consult with their BRM or DBP, who must then consult with Divisional Counsel, prior to engaging in any outside securities transaction for any purpose.

## 2005 AXA ADVISORS COMPLIANCE MANUAL

Violation of company policy regarding private securities transactions, including selling away, will subject Representatives to significant disciplinary action by the Company and by regulatory authorities.

**E.      Initial Public Offerings**

In most cases, it is a violation of NASD rules for a broker/dealer to sell an initial public offering (a newly issued security) to a registered representative. Representatives may not purchase initial public offerings. However, they *may* purchase shares of the stock when trading commences on the secondary market.

Other broker/dealers' representatives occasionally do not realize that Representatives are registered representatives and may offer IPO shares to them. Representatives must decline any such offer. If purchased, the NASD will fine and sanction both the selling broker/dealer and the registered representative who is the purchaser.

**F.      Insider Trading**

1. What Is Insider Trading?

Insider trading is trading securities based on material non-public information ("inside information") or passing along such information to others who may act on it. Generally, information is "material" if it is likely to affect the price of a security or if it is likely to be relevant to a reasonable investor making a decision about whether to buy, hold or sell the security. Information is not considered "public" unless it has been reported in the news media, disclosed in a public filing, submitted to a regulatory body or widely disseminated outside the Company by some other means. "Inside" information may include corporate information such as sales, the number of surrenders, mortality experience, earnings, dividend changes, projections, new products, acquisitions, new stock or debt issues or other significant developments.

2. What Is The Company's Insider Trading Policy?

The AXA Financial Insider Trading Policy ("Insider Trading Policy") sets forth the policy of AXA Financial with respect to trading in securities of AXA and Alliance Capital (including options and other related derivative products) while in possession of material nonpublic information about the issuer. The Insider Trading Policy applies to all directors, officers, employees and associates of AXA Financial. All Representatives must familiarize themselves with the Insider Trading Policy and comply with the rules and procedures it describes. In addition, Representatives acknowledge on their Annual Compliance Notification Form that they will comply with the terms of the Insider Trading Policy. See Sections regarding Annual Compliance Notification Form and Record Keeping. Questions regarding the Insider Trading Policy should be directed to the DBP or

33

## 2005 AXA ADVISORS COMPLIANCE MANUAL

4     BRM must decide whether he or she wants to retain or terminate the Representative; if the decision is to retain, the BRM must seek approval of the DP and show the recommendation is reasonably supported by the facts. The BRM must continue the plan of enhanced supervision, as described directly above, augmented by the following:

- BRM must pre-approve all the Representative's transactions;

- BRM must increase frequency of on-site visits to monthly, and

- The BRM must suspend the Representative's entitlement to receive express commissions and notify the appropriate Operations Center(s).

5     Representative is terminated subject to the DP's determination to appeal a decision to terminate to the President of Retail Distribution. If the Representative is not terminated, the enhanced supervision shall be augmented as the President of Retail Distribution, in consultation with Divisional Counsel, shall determine.

Prior to taking any action to terminate a Representative, a BRM must consult with Divisional Counsel or employment counsel in the Law Department. See Section regarding Termination Procedures.

### 4. Which Files Must Be Maintained?

The branch must maintain a chronological log of client complaints as well as an individual file for each matter. See Section regarding Record Keeping. The log and files should include copies of all complaints and any responses to the complaints. Questions regarding complaint files should be directed to the appropriate RCO.

### E.    Disciplinary Action Program

The Company has a Disciplinary Action Program that is designed to provide a structure for remedial and disciplinary actions to be taken in response to violations of laws, regulations and company policies. The Disciplinary Action Program was developed with the

123

## 2005 AXA ADVISORS COMPLIANCE MANUAL

objective of fulfilling the Company's obligations under insurance and securities laws to adequately supervise its Representatives and to detect and prevent, insofar as possible, violations of those laws. The goal is to maintain uniform, fair and beneficial disciplinary processes for Representatives and supervisors. Review of alleged violations is conducted on two levels: local and national. Field supervisors conduct local review of alleged violations and, when appropriate, impose sanctions after consultation with Divisional Counsel. At the national level, the National Disciplinary Action Committee ("NDAC") and the Management Disciplinary Action Committee ("MDAC"), review alleged violations and, when appropriate, recommend sanctions. Sanctions include, but are not limited to, letters of caution or reprimand, fines, enhanced supervision and termination.

1.     What Are the NDAC and The MDAC?

The NDAC is a five member committee comprised of DPs and BRMs. The NDAC reviews cases involving alleged violations of the Company's compliance policies or regulatory requirements by Representatives and DMs when branch level discipline is not appropriate. Examples of violations which should be referred to the National Compliance Office for possible referral to the NDAC include, but are not limited to, allegations of improper sales practices, unadmitted replacements, selling away, repeated violation of a compliance policy or regulatory requirement or use of unapproved sales materials.

The NDAC recommends measures to prevent any recurrence of improper conduct; the Committee may recommend sanctions ranging from a warning to termination. Representatives and DMs may not appeal recommendations for a reprimand or monetary fine. However, they may appeal, to the MDAC, recommendations for a suspension or termination.

The MDAC reviews cases involving appeals of the NDAC recommendations for suspension or termination and disciplinary matters involving DPs' or BRMs' sales practices and/or supervisory responsibilities. The MDAC is comprised of members of corporate management.

In addition to fulfilling the Company's regulatory obligations, the program, in certain cases, may effectively preempt similar or possibly more severe sanctions from being imposed by the NASD or state regulators against a Representative.

2.     How Does the NDAC Determine Which Recommendations Are
Appropriate?

When a matter is referred to the NDAC, the Representative involved should submit a written response to the allegations. The BRM supervising the Representative should also submit a written statement providing relevant information regarding the allegations. Once the NDAC receives the statements and supporting documentation, its members will weigh a number of

## 2005 AXA ADVISORS COMPLIANCE MANUAL

factors to determine an appropriate recommendation. Some of the factors the NDAC considers are as follows:

- The manner in which the Company learned about the violation (i.e., admitted or discovered via a customer complaint, regulatory inquiry or RCO examination);

- The Representative's tenure with the Company and disciplinary history;

- The intention associated with the violation (i.e., was the violation inadvertent, negligent or purposeful);

- The Representative's experience and level of training; and

- The level of supervisory knowledge, oversight and involvement in the matter.

3.       What Disciplinary Action May Be Taken By Field Supervisors?

Effective supervision includes taking appropriate disciplinary measures to correct conduct that is inconsistent with company guidelines and/or regulatory requirements. BRMs review most alleged compliance violations by Representatives and DMs and impose discipline when appropriate. BRMs should fully investigate each alleged violation of compliance policy or procedure and should consult with Divisional Counsel prior to imposition of a sanction. Divisional Counsel will assist the BRM in determining what sanction, if any, is appropriate for the violation and is consistent with prior local and national disciplinary actions.

F.       Annual Compliance Meetings

1. What Are the Requirements for Attending and Documenting Annual Compliance Meetings?

All active Representatives (including retired, Senior Sales Force (SSF) and precontract Representatives) must attend an annual compliance meeting. Active Representatives are Representatives who are licensed and registered to sell insurance and/or securities. Representatives who are disabled pursuant to the Company's disability program and are not soliciting new business, and retired Representatives who are no longer NASD registered or state insurance appointed are not required to attend an annual compliance meeting. Nonsecurities registered brokers and sub-producers under a selling agreement are also exempt from the meeting requirement.

The annual compliance meeting may be held in conjunction with other branch meetings or as an independent compliance meeting. An attendance list, meeting agenda

125

# Annual Compliance Notification Form

Please Print

From: [Name of Associate] _Steven S. Novick_

To:    [Name of Manager] _J. Colombo_

Name of Branch: _Stamford_

|  |  | YES | NO* |
|---|---|---|---|
| 1. | I am a securities Registered Representative of AXA Advisors (the "Company") only. | ☑ | ☐ |
| 2. | I am properly licensed, appointed and registered in all states where I conduct business. | ☑ | ☐ |
| 3. | I read, understand and am in compliance with the policies and procedures stated in the Compliance Manual ("*Manual*") and Investment Advisory Compliance Guide and subsequently issued compliance-related communications (collectively "Compliance Communications"). | ☑ | ☐ |
| 4. | I read, understand and am in compliance with the policies and procedures regarding Outside Business Activities ("OBAs"). In addition, I disclosed ALL of my OBAs on my OBA Form, and, if necessary, on my NASD Form U-4. I have received Company approval to engage in the disclosed OBAs according to the policies set forth in the Manual. | ☑ | ☐ |
| 5. | I understand and am in compliance with my obligation to amend my NASD Form U-4 and disclose reportable events, including, but not limited to, outside business activities, changes of address, bankruptcies, felony charges, misdemeanor charges involving investments, investment-related business, fraud, false statement or omissions, wrongful taking of property, bribery, perjury, forgery, counterfeiting, extortion, or a conspiracy to commit any of these offenses. | ☑ | ☐ |
| 6. | I read, understand and am in compliance with the policies and procedures set forth in the Compliance Communications regarding viatical settlements. | ☑ | ☐ |
| 7. | I read, understand and am in compliance with the policies and procedures set forth in the Compliance Communications regarding private securities transactions (including "selling away"). | ☑ | ☐ |
| 8. | I read, understand and am in compliance with the policies and procedures regarding "doing business as" ("DBA") activities. I reported ALL my DBA activities on my OBA Form and received approval for these activities, and to use the DBA, from my Branch Manager and the Company. | ☑ | ☐ |
| 9. | I read, understand and am in compliance with the policies regarding ethics, insider trading, anti-money laundering and fair competition. | ☑ | ☐ |
| 10. | My personal securities accounts, if any, are maintained at AXA Advisors, or reported to the Company, pursuant to the policies set forth in the Manual. | ☑ | ☐ |
| 11. | My financial planning and/or investment advisory activities conform to those authorized by the Company's investment advisory programs and referenced in the Compliance Communications. I am not an investment advisor representative, solicitor or investment advisor for any investment Advisor except AXA Advisors, unless disclosed to, and approved by, my Branch Manager and the Company. | ☑ | ☐ |

|  | YES | NO* |
|---|---|---|

12. All of my advertising, sales materials, stationery and business cards are approved by my Branch Manager and, if applicable, the Advertising Compliance Unit, and they are accurate and current.   ☑ ☐

13. I understand and am in compliance with my continuing education responsibilities.   ☑ ☐

14. I understand and am in compliance with the NASD's "cash and non-cash" compensation rules, and have not attended or conducted any outside conferences or meetings, or conducted any seminars, or contests without appropriate approval.   ☑ ☐

15. I submit all business-related correspondence – incoming and outgoing, written and electronic— to the designated manager within one (1) week or receiving or sending it, according to the policies and procedures stated in the Compliance Communications.   ☑ ☐

16. According to the policies set forth in the Compliance Communications, I DO NOT conduct business via the internet, except as permitted.   ☑ ☐

17. I understand and am in compliance with my responsibilities to attend an annual compliance meeting and participate in an annual compliance interview.   ☑ ☐

18. I understand an am in compliance with my responsibility to ensure all products, services or transactions I solicit are suitable for the client.  All suitability documentation and information I transmit to the Company is accurate and complete.   ☑ ☐

19. I understand and am in compliance with my responsibilities regarding client recommendations involving mutual funds that trade in share classes (e.g., "A" Shares, "B" shares, etc...), and I comply with Company procedures designed to ensure such recommendations are suitable.   ☑ ☐

20. I read, understand and am in compliance with the policies and procedures set forth in the Compliance Communications regarding replacements.   ☑ ☐

21. I read, understand and am in compliance with the Company's policy on privacy and provided Privacy Policy Notices to each of my new clients.   ☑ ☐

---

I hereby certify that the above information is true.

_Associate's Signature_   April 6ᵗʰ 2005

_Date_

Reviewed by: _____   _____
Name                                        Title (i.e., Branch Manager, BCM, etc...)

- Any negative responses must be explained in an attachment to this form.

December 17, 2004

## Annual Compliance Notification Form

Please Print

From:  [Name of Associate]  _Steven S. Novick_

To:  [Name of Manager]  _Joseph Colombo_

Name of Branch:  _Stanford_

|   |   | YES | NO* |
|---|---|:---:|:---:|
| 1. | I am a securities Registered Representative of AXA Advisors (the "Company") only. | ☑ | ☐ |
| 2. | I am properly licensed, appointed and registered in all states where I conduct business. | ☑ | ☐ |
| 3. | I read, understand and am in compliance with the policies and procedures stated in the Compliance Manual ("*Manual*") and Investment Advisory Compliance Guide and subsequently issued compliance-related communications (collectively "Compliance Communications"). | ☑ | ☐ |
| 4. | For field and home office supervisors and broker-dealer officers only: I read, understand and am in compliance with the policies, procedures and responsibilities pursuant to my position as described in the supervisory procedures manuals. | ☑ | ☐ |
| 5. | I read, understand and am in compliance with the policies and procedures regarding Outside Business Activities ("OBAs"). In addition, I disclosed ALL of my OBAs on my OBA Form, and, if necessary, on my NASD Form U-4. I have received Company approval to engage in the disclosed OBAs according to the policies set forth in the Manual. | ☑ | ☐ |
| 6. | I understand and am in compliance with my obligation to amend my NASD Form U-4 and disclose reportable events, including, but not limited to, outside business activities, changes of address, bankruptcies, felony charges, misdemeanor charges involving investments, investment-related business, fraud, false statement or omissions, wrongful taking of property, bribery, perjury, forgery, counterfeiting, extortion, or a conspiracy to commit any of these offenses. | ☑ | ☐ |
| 7. | I read, understand and am in compliance with the policies and procedures set forth in the Compliance Communications regarding viatical settlements. | ☑ | ☐ |
| 8. | I read, understand and am in compliance with the policies and procedures set forth in the Compliance Communications regarding private securities transactions (including "selling away"). | ☑ | ☐ |
| 9. | I read, understand and am in compliance with the policies and procedures regarding "doing business as" ("DBA") activities. I reported ALL my DBA activities on my OBA Form and received approval for these activities, and to use the DBA, from my Branch Manager and the Company. | ☑ | ☐ |
| 10. | I read, understand and am in compliance with the policies regarding ethics, insider trading, anti-money laundering and fair competition. | ☑ | ☐ |
| 11. | My personal securities accounts, if any, are maintained at AXA Advisors, or reported to the Company, pursuant to the policies set forth in the Manual. | ☑ | ☐ |

|  | YES | NO* |
|---|---|---|

12. My financial planning and/or investment advisory activities conform to those authorized by the Company's investment advisory programs and referenced in the Compliance Communications. I am not an investment advisor representative, solicitor or investment advisor for any investment Advisor except AXA Advisors, unless disclosed to, and approved by, my Branch Manager and the Company.   ☑ ☐

13. All of my advertising, sales materials, stationery and business cards are approved by my Branch Manager and, if applicable, the Advertising Compliance Unit, and they are accurate and current.   ☑ ☐

14. I understand and am in compliance with my continuing education responsibilities.   ☑ ☐

15. I understand and am in compliance with the NASD's "cash and non-cash" compensation rules, and have not attended or conducted any outside conferences or meetings, or conducted any seminars, or contests without appropriate approval.   ☑ ☐

15. I submit all business-related correspondence – incoming and outgoing, written and electronic– to the designated manager within one (1) week or receiving or sending it, according to the policies and procedures stated in the Compliance Communications.   ☑ ☐

17. According to the policies set forth in the Compliance Communications, I DO NOT conduct business via the Internet, except as permitted.   ☑ ☐

18. I understand and am in compliance with my responsibilities to attend an annual compliance meeting and participate in an annual compliance interview.   ☑ ☐

19. I understand an am in compliance with my responsibility to ensure all products, services or transactions I solicit are suitable for the client. All suitability documentation and information I transmit to the Company is accurate and complete.   ☑ ☐

20. I understand and am in compliance with my responsibilities regarding client recommendations involving mutual funds that trade in share classes (e.g., "A" Shares, "B" shares, etc...), and I comply with Company procedures designed to ensure such recommendations are suitable.   ☑ ☐

21. I read, understand and am in compliance with the policies and procedures set forth in the Compliance Communications regarding replacements.   ☑ ☐

22. I read, understand and am in compliance with the Company's policy on privacy and provided Privacy Policy Notices to each of my new clients.   ☑ ☐

I hereby certify that the above information is true.

_____          Date  1/24/06
Associate's Signature

Reviewed by: _____          BCM   1/24/06
                        Name                    Title (i.e., Branch Manager, BCM, etc...)

- Any negative responses must be explained in an attachment to this form.

June 8, 2005

# EXHIBIT G



**AXA Advisors, LLC**
**Northeast Division**

HAND DELIVERED

October 6, 2006

Mr. Steven Novick
AXA Advisors, LLC
1266 East Main Street, 6th Floor
Stamford, CT 06902

Dear Steve,

It has been brought to my attention that you have solicited a non-AXA Advisors product to AXA Advisor clients and others. Specifically, you have sent information about a venture known as NAU, a retail-direct sports apparel entity, which currently is being funded. Further, you have invited AXA Advisors clients and others to come to a meeting to discuss how they may benefit from investing in this venture. You indicated in writing to clients and others that you were interested in raising money for this venture and personally participating in this investment.

You must immediately **Cease and Desist** soliciting or recommending this, or any other, non-AXA Advisors investment to anyone. Your conduct in this matter may be deemed by the Firm to be "selling away."

Registered Representatives are prohibited from any involvement in private securities transactions in any capacity and at any level of involvement unless the Registered Representative has provided prior written notice to AXA Advisors and has received written permission from AXA Advisors prior to any involvement in the transaction. AXA Advisors has no record of written notice of this investment nor was any approval given for you to personally invest in this venture or to solicit investment by others.

Mr. Steven Novick
Page Two
October 6, 2006

As a result of this conduct, please be advised that all of your new business must be
reviewed prior to submission for processing by me or Branch Compliance Manager
William DeMatteo. In addition, all correspondence, including email, must be reviewed
by myself or William prior to being sent. These procedures will be in place at least until
such time as this matter is resolved.

Please sign the attached acknowledgement to indicate that you have received this letter,
and return it to me today.

Sincerely,

Georgette Geller, ChFC, CLU
Executive Vice President

I acknowledge receipt of this letter. In addition, I understand and agree to abide by the
terms set forth in the letter.

Steven Novick                                                Date

cc:    Anthony Sages, Divisional President
       Phil Gullo, Divisional Director of Business Practices
       Patricia A. Boylan, Divisional Counsel
       William DeMatteo, Branch Controls Manger
       Michael Brzozowksi, Regional Compliance Officer

# EXHIBIT H

08/03/2007 11:08 FAX 91732 596 3582          NASD                                              ☒002/003



Financial Industry Regulatory Authority

August 03, 2007

**Via First Class Mail**
Mr. Steven Scott Novick
87 North Wilton Road
New Canaan, Connecticut 06840

Re:    Letter of Caution
       Examination 20060066990

Dear Mr. Novick:

We have completed our investigation of the above-referenced matter. Based upon our review of the information and documentation provided, this Letter of Caution is being issued concerning your violations of NASD Conduct Rule 2110.

**Conduct Rule 2110 states that:**

"A member, in the conduct of his/her business, shall observe high standards of commercial honor and the just and equitable principals of trade."

Based upon our review of your conduct, you attempted to solicit a number of prospective and/or existing customers between September 27, 2006 and October 4, 2006 to participate in transactions to purchase NAU Incorporated, Series-C Preferred Stock.

Your involvement with the attempted solicitation of a non-firm approved security is violative of your firm's written supervisory procedures, Chapter 3, Section D. Violation of your firm's written supervisory procedures is also a violation of NASD Conduct Rule 2110.

Consequently, the staff is issuing you this Letter of Caution.

For your information, a Letter of Caution is not included in the Central Registration Depository nor must it be reported on Form U-4. However, since it is a cautionary action, in accordance with long-standing FINRA practice, it will be taken into consideration in determining any future matter should violations occur.

Investor protection. Market integrity.

581 Main Street      t  732.596.2000
Suite 710            f  732.596.2001
Woodbridge, NJ       www.finra.org
07095-1164

CONFIDENTIAL

NOVICK007559

20060066990, Steven Scott Novick
August 02, 2007, Page 2

Please respond to this letter no later than <u>August 14, 2007</u>, outlining the steps you will take or have taken to avoid a future recurrence of the foregoing.

If you have any questions regarding this matter, please feel free to contact Robert McCarthy, Staff Supervisor, at (732) 596-2033.

Very truly yours,

Gary K. Liebowitz
Senior Vice President / Regional Director

cc: Robert McCarthy, Staff Supervisor
    Robert Herskovits, Esq. (<u>*via facsimile only 212.809.5449*</u>)
    Joseph Tuorto, CCO, Linsco/ Private Ledger (<u>*via facsimile only 858.554.0470*</u>)

CONFIDENTIAL

NOVICK007560

Aug 21 2007 9:03AM   N C  FINANCIAL GROUP      203 594 1313        P.1

STEVEN S. NOVICK
c/o Robert L. Herskovits, Esq.
Gusrae, Kaplan, Bruno & Nusbaum PLLC
120 Wall Street
New York, NY 10005


August 20, 2007


BY FACSIMILE AND MAIL

Gary K. Liebowitz
Senior Vice President / Regional Director
Financial Industry Regulatory Authority
581 Main Street, Suite 710
Woodbridge, NJ 07095-1164

        Re:    Examination 20060066990

Dear Mr. Liebowitz:

        I write as requested and in response to your letter dated August 3, 2007.
Although I respectfully disagree with your "attempted solicitation" characterization, I
will re-review my employer's applicable written supervisory procedures. I will further
consult with a compliance officer or counsel should the meaning of any supervisory
procedure be unclear to me.

                            Yours truly,

                            Steven S. Novick


CONFIDENTIAL

NOVICK007561