# EXHIBIT N

1

2                    UNITED STATES DISTRICT COURT

3                   SOUTHERN DISTRICT OF NEW YORK

4    ------------------------------)

     STEVEN S. NOVICK,                )

5                                     )

                     Plaintiff,       ) Case No.

6                                     ) 07 Civ. 7767

     vs.                             ) (AKH)(KNF)

7                                     )

     AXA NETWORK, LLC, and,           )

8    AXA ADVISORS, LLC,               )

                                      )

9                     Defendants.     )

     ------------------------------)

10

11

12

13              DEPOSITION OF STEVEN NOVICK

14                   New York, New York

15                 Tuesday, March 29, 2011

16

17

18

19

20

21

22

23

24   Reported by:

     JOMANNA DeROSA, CSR

25   JOB NO. 37585

Page 12

NOVICK

1

2      correct that there's no --

3              MR. FINKELSTEIN:   We can discuss

4      anything that we'd like if there's no question

5      pending.  So the fact that I pointed at the

6      document has no relevance to anything unless

7      you have a question pending, at which point in

8      time I have no right to speak to my client.

9          A.    Okay.

10         Q.    Can you identify this exhibit for

11     me.

12         A.    It's an e-mail from originally

13 Chris Van Dyke to Michael Zimmerman.  Michael

14 Zimmerman was asked by Chris Van Dyke if he knew

15 anybody that may be interested in meeting with

16 him.  And then it was forwarded to me on

17 September 27th.

18         Q.    Is that it?

19         A.    Yes.

20         Q.    Didn't you also respond to this

21 e-mail on September 27th?

22         A.    Yeah.

23         Q.    Okay.  That's why I was asking if

24 it was it, because you were describing that it was

25 Van Dyke to Zimmerman, Zimmerman to you.

1               NOVICK
2          A.    Forwarded to me.  Okay.
3          Q.    And then you responding to the
4    e-mail that Zimmerman sent you.  Am I correct?
5          A.    Yes.
6          Q.    Okay.  Who is Chris Van Dyke?
7          A.    Dick Van Dyke's son, former
8    employee of Nike, creator of the water shoe or
9    whatever they called it, and I believe CEO and
10   president of NAU.
11         Q.    Okay.  Was he affiliated in any
12   capacity with Prentice Capital Management?
13         A.    To the best of my knowledge, no.
14         Q.    So Exhibit A reflects, Mr. Novick,
15   that you responded to Mr. Zimmerman initially at
16   8:42 a.m.
17              Mr. Zimmerman then advised you that
18   he could fax you certain attachments, if you'd
19   like.
20              And then you responded, also on
21   September 27, that you'd appreciate any info that
22   Mr. Zimmerman could send?
23              MR. FINKELSTEIN:  Just note my
24         objection to form.  It's a compound question.
25         Q.    If you don't understand the

Page 98

1                          NOVICK

2      FYI."

3               A.     Okay.

4               Q.     The language that I just read to

5      you from the subject line was your language from

6      an earlier e-mail to Michael Finkelstein.  Am I

7      correct?

8               A.     Is this language from a previous

9      e-mail?  I don't know.

10              Q.     The reference, though, to "my NAU

11     idea," is that Michael Finkelstein's word choice

12     or Steven Novick's word choice or somebody else's

13     word choice; if you know?

14              A.     I don't know.  I would assume it's

15     part of an e-mail.  I have no clue.

16                     (Defendants' Exhibit CC marked for

17         identification.)

18                     MR. KALISH:  You've been handed

19         what's been marked Exhibit CC.

20              Q.     If you could take a look at that,

21     and look up at me when you're done.

22                     (Discussion off the record.)

23              Q.     What is Defendants' Exhibit CC?

24              A.     Are you asking me?  It's a

25     cease-and-desist.

1                    NOVICK

2          Q.    Okay.  How did you receive this?

3          A.    It says "Hand Delivered."

4          Q.    Yes, I know what it says.

5                I'm asking what your recollections

6     are as to how you received it?

7          A.    It was hand-delivered.

8          Q.    By whom?

9          A.    I believe Georgette Geller.

10         Q.    Where were you when it was

11    hand-delivered to you by Georgette Geller?

12         A.    In my office.

13         Q.    Was anybody else in your office

14    with you?

15         A.    Yes.

16         Q.    Who?

17         A.    Joe Pirrone.

18         Q.    Was anybody with Georgette Geller

19    when she hand-delivered it to you?

20         A.    Not to my recollection.

21         Q.    What, if anything, did she say to

22    you when she hand-delivered it to you?

23         A.    She handed it to me.  She said that

24    she would like for me to write a letter and give

25    her a copy of the letter, outlining what

1                          NOVICK

2       transpired with this.

3              Q.    Did she say when she wanted you to

4       do that?

5              A.    The sooner the better.

6              Q.    And did you do that?

7              A.    Yes, I did.

8              Q.    Anything else that she said to you

9       when she hand-delivered this letter to you?

10             A.    At this point?  No, I don't recall.

11      I don't recall.

12             Q.    Do you recall what, if anything,

13      you said to her?

14             A.    At that time?

15             Q.    Yes.

16             A.    No, I don't recall.

17             Q.    What, if anything, did you do as

18      a -- withdrawn.

19                   If you'd turn to the second page of

20      Exhibit CC.

21                   Your signature and date are at the

22      bottom there?

23             A.    Yes.

24             Q.    Did you read this, sign this,

25      return it to Georgette Geller in that one meeting,

1                          NOVICK

2    or did you hold on to this and then return it to

3    her later with your signature on it; if you

4    recall?

5             A.    I believe I read it and signed it

6    right there.

7             Q.    Did you make a copy of it right

8    then and there?

9             A.    I think she made a copy for me.

10            Q.    What, if anything, did you do as a

11   result of your receipt of this Exhibit CC?

12            A.    Started on a letter that I was

13   asked to write.

14            Q.    Anything else?

15            A.    Maybe was infuriated and called

16   Ned.  I don't know.  Most certainly I contacted a

17   broker-dealer and pressed for an approval on the

18   pending NAU so we could get a CUSIP for it.  But

19   that's basically it.

20            Q.    When you say "an approval on the

21   pending NAU," could you explain to me what it is

22   that you're referring to.

23            A.    To my knowledge, okay, I went about

24   the sending of an e-mail incorrectly regarding

25   NAU.

```
1                    NOVICK
2              When Georgette came in, I believe
3    Georgette explained to me that irrespective of
4    what my intent was, that I needed to write a
5    letter explaining how we went from A to Z where we
6    were.
7                    In that, I also learned that there
8    was a "process" in which I should have followed,
9    which evidently I have not.
10                   To make certain that I followed the
11   process to the T, I reacted by immediately sending
12   whatever was required to other people other than
13   Ned Dane to get the approval because Ned was not
14   responding to me.  Okay.
15                   That's basically it.
16                   (Defendants' Exhibit DD marked for
17       identification.)
18                   MR. KALISH:  You've been handed DD.
19        Q.    I believe the only thing that's new
20   is the top few lines.
21        A.    Okay.
22        Q.    Is this what you were referring to
23   about seeking approval?
24        A.    The answer is I don't recall.  But
25   most certainly, Rocco was the head of the trading
```

1                    NOVICK

2         A.    I don't recall he did, no.

3         Q.    The person whose name you're not

4    recalling that Patricia Boylan introduced during

5    the call, did that person say anything?

6         A.    I don't recall.

7         Q.    Did you take notes during that

8    call?

9         A.    No.

10        Q.    Did you tape-record that call?

11        A.    I might have.

12        Q.    But you're not sure one way or the

13   other?

14        A.    Look, in my compliance file Chris

15   Aguelle (phonetic) had noted that Steven Novick

16   tapes his calls.  I had tape-recordings of a lot

17   of conversations.  I have not had any transcribed.

18   I don't even possess the majority of them.  They

19   were lost with Dreier.  What they contained, I

20   don't know.

21             The things that I may have in my

22   drawers, I have never had transcribed, so I don't

23   know.

24        Q.    Okay.  There was a followup

25   downtown the next day?

# EXHIBIT O

2-6-12 - novick - novick  2/6/2012  12:00:00 PM

1

2          UNITED STATES DISTRICT COURT

3          SOUTHERN DISTRICT OF NEW YORK

4    STEVEN S. NOVICK,            )

                                  )

5              Plaintiff,    ) Case No.

                             ) 07 Civ. 7767

6    vs.                  ) (AKH)(KNF)

                             )

7    AXA NETWORK, LLC, and,      )

     AXA ADVISORS, LLC,        )

8                        )

               Defendants.    )

9    ------------------------------)

10

11

12          CONTINUED DEPOSITION OF STEVEN NOVICK

13              New York, New York

14              Monday, February 6, 2012

15

16

17

18

19

20

21

22

23

24    Reported by:

      JOMANNA DeROSA, CSR

25    JOB NO. 45839

1          S. NOVICK

2     Passaretti did or didn't do, that I

3     understand, but to direct him to answer the

4     question only as it pertains to Passaretti, I

5     just don't think is fair.

6          MR. KALISH:  I mean, I'll try

7     again.  That was exactly what my attempt was,

8     but it probably wasn't phrased as well as it

9     could have been.

10         A.    When I confronted Larry Passaretti

11    and the broker-dealer about compensation issues as

12    recently as February 2003, my discovery was that

13    Ronnie Lorch, my father-in-law, was removed from

14    many of his relationships.

15             The purpose of me going to AXA in

16    the first place was to create a succession plan

17    for my father-in-law, whereby I was going to

18    handle all of his asset business.

19             When I demanded the asset business,

20    A, Larry Passaretti said it was not possible.  Why

21    wasn't it possible, I asked.  It wasn't possible

22    because many of his clients had illiquid

23    investments in a limited partnership, which he had

24    sold them.

25             Well, I said that's your problem.

1           S. NOVICK

2    He said, well, it's really not.  It's Ronnie's

3    problem as well.  Ronnie was compensated for the

4    sale of these limited partnerships as well.

5           The broker-dealer was notified.

6    There was many, many correspondences between Barry

7    Salzsour (phonetic) and the broker-dealer relating

8    to this issue as well.

9           And as recent as 2006, I believe,

10   January/February of 2006, when the issue arose

11   where Larry, again, was repapering clients of mine

12   and stealing compensation and commissions of mine,

13   I believe there are e-mails to the effect that I

14   threatened him that, again, I would go to

15   management regarding his selling away issues, and

16   he reminded me that Ronnie was involved, and I

17   would be hurting my family as well.

18       Q.    Did Passaretti share with you how

19   much compensation he had received in connection?

20       A.    No.

21       Q.    Tell me what it is that you are

22   referring to by his "repapering" your clients.

23       A.    It has always been my assertion

24   that Larry Passaretti, claiming to do joint work,

25   if you will, with people, would establish a

```
 1              S. NOVICK
 2   relationship where he was the financial advisor,
 3   and whoever the other individual was, was the
 4   participating advisor.  And Larry would resend
 5   paperwork, updating his files, and consistently
 6   removing the primary broker off of the account so
 7   he can benefit economically.
 8        Q.   And you brought that to the
 9   attention of AXA?
10        A.   I absolutely did.
11        Q.   And AXA resolved that.  Am I
12   correct?
13        A.   They did not.
14        Q.   Tell about your bringing that to
15   the attention of AXA, who you had discussions
16   with, what they said, as best you can recall.
17            MR. FINKLESTEIN:  Note my objection
18      to form.
19        A.   In 2003, when I brought it to the
20   broker-dealer's attention, okay, and the
21   broker-dealer being -- at the time I believe it
22   was Tom Wirtshafter -- the compensation person
23   contacted him would change, that was Barry
24   Salzsour.  I believe Mike Higgins, Mike Ryniker,
25   and I'm going to say others because I can't
```

1          S. NOVICK

2      recall, were involved in looking at forensically

3      what Ronnie Lorch was owed, based off the fact

4      that Larry had removed Ronnie from over 20 some

5      odd million dollars of asset business for many

6      years.

7          Q.   How did this come to their

8      attention that Passaretti had removed Lorch from

9      $20 million worth of asset business?

10         A.   I brought it to their attention.

11         Q.   How do you know that Passaretti had

12     removed Lorch from $20 million worth of asset

13     business?

14         A.   Because I was supposed to take over

15     Larry's portion of that book.  When I asked to do

16     it, I was met with much resistance.  I believe I

17     explained that to you.  With that, Barry Salzsour

18     was asked to create, forensically, what the

19     accounts had paid and how much would be owed, and

20     it was never paid, and it was never rectified.

21         Q.   What you're describing right now,

22     Mr. Novick, is money that Passaretti owes to

23     Lorch.  Am I correct?

24         A.   No.  It's what money was owed to

25     Lorch initially and to Steven Novick thereafter.

1            S. NOVICK

2     Q.    Whereabouts?

3     A.    I believe in your records.

4     Q.    Could you describe which records?

5     A.    I believe there is correspondence

6  from Barry Salzsour, talking about this.  I

7  believe that Barry Salzsour actually responded

8  when I caught Passaretti again doing it, that it

9  was supposed to be retroactively, and also it

10  occurred in 2004 and in 2006.

11     Q.    What's the "it" that you're

12  referring to having occurred?

13     A.    Misappropriation of funds,

14  stealing, I don't know.  What would you call it?

15     Q.    Okay.  Was there some point in time

16  where AXA agreed to provide compensation to you

17  and look into pulling it back from Passaretti?

18     A.    In 2006 they were responding to a

19  matter from the previous year, and I believe that

20  included $53,000 of income that Larry stole from

21  me, but the additional 120,000 or thereabouts

22  which was stolen from Ronnie Lorch and me has

23  never been paid, nor did they ever compensate me

24  for that, no.

25     Q.    Okay.  But the 53,000 they did

1            S. NOVICK

2    compensate you for?

3        A.   The 53,000 they compensated me in

4    May of 2006 or thereabouts.

5        Q.   Did you ever have a direct

6    conversation with Passaretti about the $120,000

7    that you just referred to?

8        A.   Absolutely.

9        Q.   Tell me what you said to him and

10   what he said to you.

11       A.   He was not pleased.  He told me --

12   he told me to take it up with the broker-dealer

13   and they would rectify it.  The broker-dealer

14   never rectified it.

15       Q.   Okay.  Did Ronnie Lorch ever share

16   with you whether he took it up directly with

17   Passaretti the fact that $120,000 had been stolen?

18       A.   Ronnie Lorch and I, and Barry

19   Salzsour, had been on the phone with, I believe,

20   Ron Benevento from Larry's office, as well as Gus

21   Catanzaro, as well as Larry Passaretti, regarding

22   that issue.

23       Q.   Okay.  And what was said among all

24   the participants in the call on that occasion?

25       A.   They were sincerely apologetic, and

1              S. NOVICK

2              (The requested portion of the

3       record was read.)

4         A.    From Day 1 my assertion is Larry

5    Passaretti is AXA, Larry Passaretti works at AXA,

6    Larry Passaretti is management at AXA.  When I

7    wrote my business plan to join AXA, it was joining

8    Larry Passaretti and his -- whatever special group

9    it was.

10             My beef is not with Larry

11   Passaretti.  My beef is with the policing

12   capabilities and the knowledge that AXA possessed,

13   and their desire not to police Larry Passaretti

14   for all his misgivings, if you will.

15        Q.    Did any management official at AXA

16   ever share with you, in words or substance, that

17   if you have a gripe with Larry Passaretti, resolve

18   it between you and Larry Passaretti, we don't get

19   involved with financial advisors' gripes that they

20   have with one another?

21        A.    I received a one-sentence e-mail

22   from Bob Jones, saying we don't comment on

23   commission split issues.

24        Q.    How did you calculate the $120,000

25   that you've referred to as having been taken by

1          S. NOVICK

2    owed.

3          Q.   So, is the $120,000 that you claim

4    to be owed the $120,000 that Ronnie was owed?

5          A.   You defined earlier that a portion

6    is mine and a portion is his.

7          Q.   What portion is his and what

8    portion is yours?

9          A.   I don't have an answer.

10         Q.   Other than a portion of the

11   $120,000 that you've just described what it is

12   that that $120,000 relates to, is there any other

13   money that you're claiming in this lawsuit that

14   AXA owes you?

15         A.   Without calling you ridiculous, you

16   know the response.  Yes, I am suing for a lot more

17   money than $100,000 because, yes, I believe that

18   the firm has not provided an accounting, as the

19   Judge, I believe, said of everything that goes

20   into creating commissions, gross dealer

21   concessions, which I believe Margery Hall and

22   William Mills had already described.

23         I believe there is a significant

24   amount of money that's owed me, as well as the

25   money that people had stolen my book of business

# EXHIBIT P

1

2        UNITED STATES DISTRICT COURT

3        SOUTHERN DISTRICT OF NEW YORK

4

5    ----------------------------X

     STEVEN NOVICK          )

6                 )

         Plaintiff,   )

7                 )

                ) Case No.

8      vs.        ) 07 Civ. 7767 (AKH)(KNF)

                )

9                 )

     AXA NETWORK LLC, and      )

10    AXA ADVISORS LLC,       )

                )

11         Defendants. )

   ----------------------------X

12

13

14

15     CONTINUED DEPOSITION OF STEVEN NOVICK

16       New York, New York

17       Friday, April 13, 2012

18

19

20

21

22

23   Reported by:

24   ASHLEY SHUGAR

25   JOB NO. 48075

```
 1                S. NOVICK

 2   Jones do during these couple of minutes that you

 3   chatted with him?

 4       A.  Absolutely nothing.

 5       Q.  Any words emanate from his mouth?

 6       A.  Nothing that was meaningful enough

 7   for me to remember, no.  When he dismissed me,

 8   which you reiterated numerous times, which were

 9   memorialized in e-mails that we talked about, he

10   dismissed me and yes, he did say that I've known

11   Larry Passaretti significantly longer than I've

12   known you and therefore, he's incapable of doing

13   what you're accusing him of.  And with that, I

14   was discarded and dismissed from his office

15   without a handshake, yes.  I drove 42 miles to go

16   to that meeting which lasted six minutes.

17       Q.  Did he take notes at that meeting?

18       A.  He took my -- whatever I had with me,

19   he contemplated it for about a nanosecond.  He

20   didn't look at my folders.  He didn't look at

21   anything.  Just took me for what I was and left.

22   And that was it.  And yeah, I haven't seen any

23   e-mails to the effect, but I know that Larry

24   Passaretti called me personally.  So therefore,

25   management must have alerted him to the fact that
```