UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
STEVEN S. NOVICK,

                Plaintiff,

- against -

AXA NETWORK, LLC and
AXA ADVISORS, LLC,

                Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**ECF Case**

Case No.:
07 Civ. 7767 (AKH)(KNF)

**STATEMENT OF UNDISPUTED
MATERIAL FACTS**

       Defendants-Counterclaim Plaintiffs AXA Network, LLC ("AXA Network") and AXA Advisors, LLC ("AXA Advisors") (collectively, "AXA"), by their attorneys, Epstein Becker & Green, P.C., pursuant to Local Civil Rule 56.1 of the United States District Court, Southern District of New York, hereby submit the following statement of undisputed material facts as to which there is no genuine issue to be tried.

       1.     From December 2002 through October 12, 2006, Plaintiff-Counterclaim Defendant Steven S. Novick ("Novick") was an independent contractor affiliated with AXA Network, as an agent authorized to offer life insurance and annuity products of AXA Equitable Life Insurance Company, and with AXA Advisors, as a registered representative of AXA Advisors.  (See Declaration of Aime Dempsey in Support of Defendants-Counterclaim Plaintiffs' Motion for Summary Judgment ("Dempsey Decl.") Exh. A:  Second Amended Complaint ("SAC") at ¶¶ 6, 13, 31(g); Exh. B to SAC (the Agreements) at Agent's Agreement[1] ¶ XVII).

---

[1] Herein, "Agent's Agreement" refers to the Agreement between AXA Network, LLC and Steven Novick, referred to therein as the "Associate" dated November 12, 2002, and annexed as part of Exhibit "B" to the SAC.  Similarly, "Registered Representative's Agreement refers to the Agreement between AXA Advisors, LLC and Steven Novick, referred to therein as the "Representative," dated November 12, 2002 and annexed as part of Exhibit B to the SAC.

2. On November 12, 2002, Novick entered into an agreement with AXA Network known as the 14th Edition Agent's Agreement (the "Agent's Agreement") and an agreement with AXA Advisors (the "Registered Representative's Agreement") (collectively, the "Agreements").  (Dempsey Decl. Exh. A:  SAC at Exh. B to the SAC).

3. The Agreements set out basic terms and conditions of Novick's association with AXA Network and AXA Advisors.  (*Id.*).

4. Novick was affiliated with AXA Network for insurance business and AXA Advisors for securities business.  (Dempsey Decl. Exh. A: SAC at ¶ 6; Exh. Q; Deposition Transcript of Edward H. Dane dated April 15, 2011 ("Dane Tr.") at pp. 19-20).

5. The Agent's Agreement has provisions allowing Novick to offer insurance policies and annuity contracts to be issued by The Equitable Life Assurance Society of the United States, (n/k/a AXA Equitable Life Insurance Co.), and discussing compensation, vesting of commissions, and limitations of authority, among other matters.  (Dempsey Decl., Exh. A: SAC at Exh. B, Agents Agreement at ¶¶ I., III., IV., VI.)

6. The Registered Representative's Agreement contains analogous terms governing the securities side of Novick's business.  (Dempsey Decl. Exh. A:  SAC at Exh. B, Registered Representatives Agreement at ¶¶ I, III.)

7. Both the Agent's Agreement and the Registered Representative's Agreement contain provisions regarding termination of each Agreement.  (Dempsey Decl. Exh. A:  SAC at Exh. B, Agent's Agreement at ¶ XIII; Registered Representative's Agreement at ¶ X).

8. Both Agreements permit termination without cause, upon thirty (30) days' notice. (*Id.* at Agent's Agreement ¶ XIII(D); Registered Representative's Agreement at ¶ X(B))).

9. Before he became affiliated with AXA, Novick discussed the potential affiliation with AXA personnel for many months, beginning in at least October 2011. (Dempsey Decl., A: SAC at ¶ 7; Exh. S: Deposition Transcript of David Karr, dated March 1, 2012 ("Karr Tr.") at 35-36).

10. Both Novick and his counsel reviewed the Agent Agreements and the Registered Representative's Agreement before he signed them. Novick's counsel expressed reservations about whether certain aspects of the proposed affiliation would be beneficial enough to Novick. (Dempsey Decl., Exh. J: Letter to Novick from Hochberg).

11. Novick and AXA discussed whether Novick would continue to do certain kinds of business he had been doing at his previous broker-dealer. (Dempsey Decl., Exh. S: Karr Tr. at pp. 93-94).

12. Prior to Novick becoming affiliated with AXA, Novick and AXA discussed Novick's potential compensation. *(Id.)*

13. Prior to Novick becoming affiliated with AXA, David Karr ("Karr"), then branch manager of a branch Novick considered joining, opined to Novick that AXA, which emphasized insurance business, might not be a good fit for Novick, whose experience was primarily at "wire houses," geared to securities products. Karr testified, *inter alia,* "I expressed my concern multiple times to Steve beforehand that it may not be a good match for him." (Dempsey Decl. Exh. S: Karr Tr. at pp. 11-12, 17, 25, 27-29, 36, 93-94).

FIRM:18750474v1

14. No revisions were made to the standard Agreements Novick signed. (Dempsey Decl. Exh. A: SAC at Exh. B to SAC).

15. The Agent's Agreement and the Registered Representative's Agreement, together with the Addenda annexed thereto, constitute the only contracts between Novick and AXA. (Dempsey Decl. Exh. A)

16. By its terms, the Agent's Agreement supersedes any prior negotiations or oral agreements. (Dempsey Declaration Exh. A: SAC at Exh. B to SAC at Agent's Agreement ¶ XX.)

17. In relation to the Registered Representative's Agreement, Novick and AXA Advisors also executed a "Clarifying Document" regarding disposition of files and customer lists upon termination of the affiliation. (Dempsey Decl. Exh. A: SAC at Exh. C to SAC).

18. In relation to the Agent's Agreement, Novick and AXA Network also executed an "Amendment to 14th Edition Agent's Agreement" concerning accelerated vesting of insurance commissions, waiver of" certain fees and right to sell vested commissions. (Dempsey Decl. Exh. B: "Amendment to 14th Edition Agent's Agreement").

19. During his affiliation with AXA, Novick complained regularly about various issues, including his compensation. On an ongoing basis, he identified specific perceived errors in the calculation of his commissions, or his POP, which AXA personnel then worked with him to resolve. (See, e.g., Dempsey Decl. Exh. T: Deposition Transcript of Barry Salzhauer dated March 5, 2012 ("Salzhauer Tr.") at pp. 152, 170; Exh. O: 2d Novick Tr. at 210).

20. Passaretti had several joint accounts with Novick's father-in-law Ronald Lorch ("Lorch"). (Dempsey Decl. Exh. O: 2d Novick Tr. at p. 205).

21. Novick exchanged numerous communications with AXA personnel, who gave Novick the information necessary to address the issue of commission splits with Passaretti. (Dempsey Decl. Exh. O: 2d Novick Tr. at pp. 210-211).

22. Novick claimed that certain accounts were improperly assigned to Passaretti alone instead of Passaretti and Lorch, but he has not adduced evidence to show that any payment discrepancy would belong to him, as opposed to Lorch. (Dempsey Decl. Exh. O: 2d Novick Tr. at p. 216).

23. Novick does not claim to be privy to any communications between AXA and Passaretti on the subject of Passaretti allegedly "selling away." (Dempsey Decl. Exh. P: 3d Novick Tr. at p. 439).

24. In late September 2006, Novick apparently learned of an opportunity to invest in a company known as NAU, Inc. ("NAU"). (Dempsey Decl., Exh. N: Novick 2011 Tr. at pp. 12-13).

25. The company was seeking high net-worth investors to help it raise approximately $17 million in capital. (Dempsey Decl., Exh. I: Emails transmitted by Novick).

26. The NAU investment was not known to, or approved by, AXA Advisors. Hence, Novick was not authorized to offer the NAU investment to potential or existing customers under the auspices of AXA. (Dempsey Decl., Exh. G: Cease and desist letter).

27. Solicitation of investments in a security not approved by the registered broker-dealer with which a stockbroker is affiliated is known in the securities industry as

"selling away," and is prohibited by most broker-dealers and by FINRA rules. (Dempsey Decl., Exh. F: Compliance Manual at pp. 31-32).

28. AXA indisputably bans selling away, whether or not the security in question is ever actually "offered" and whether or not the stockbroker in question enjoys any monetary benefit from the improper solicitation. *Id.*

29. Between approximately September 27 and October 6, 2006, Novick transmitted emails regarding the NAU investment to more than 25 individuals. (Dempsey Decl. Exh. G: Emails transmitted by Novick).

30. Ultimately, Novick admitted that these activities were improper. (Dempsey Decl. Exh. N: Novick 2011 Tr. at p. 153).

31. On October 5, 2006, Novick sent Dane, then President of AXA Advisors, two emails regarding the NAU investment opportunity. (Dempsey Decl., Exh. A: SAC at ¶31(b); Exh. N: Novick 2011 Tr. at pp. 77, 83, 87).

32. After forwarding a copy of this email to AXA's National Compliance Office ("NCO") for review, Dane advised Novick that Dane was instructed not to speak to him on the advice of "Law and Compliance." (Dempsey Decl. Exh. A: SAC at ¶ 31(d); Exh. Q: (Dane Dep.) at p. 226).

33. The next day, Georgette Geller ("Geller"), Novick's Branch Manager and Divisional Executive Vice President with AXA Advisors, notified Novick in writing that he "must immediately **Cease and Desist** [from] soliciting or recommending this, or any other, non-AXA Advisors investment to anyone. (Dempsey Decl., Exh. G: Cease and desist letter).

34. Novick was then given an opportunity to explain himself both in writing and in person. (Dempsey Decl. Exh. R: Geller Dep. at pp. 110-112; Exh. N: Novick 2011 Dep. at pp. 99-101, 135-36).

35. AXA's National Compliance Office investigated and determined that Novick had committed the violation of "selling away." (Dempsey Decl., Exh. K: Boylan notes).

36. Jones, then Head of the Broker-Dealer Business for AXA Advisors and its affiliates, made the decision to terminate Novick's affiliations with AXA. (Dempsey Decl., Exh. U: Jones Tr. at p. 107). He did not consider it a close call. (*Id.*) Novick's affiliation with AXA was terminated on October 12, 2006 for "solicit[ing] interest in a private securities transaction without the approval of the firm." (Dempsey Decl., Exh. A: SAC at ¶31.)

37. FINRA, the entity with regulatory oversight over broker-dealers such as AXA Advisors and financial advisors such as Novick, then conducted its own investigation and came to the same conclusion. (Dempsey Decl., Exh. H: FINRA letter).

38. On August 3, 2007, FINRA issued a Letter of Caution to Novick, noting that he had violated NASD Conduct Rule 2110. The Letter of Caution stated, in pertinent part,

> [b]ased upon or review of [Novick's] conduct, [Novick] attempted to solicit a number of prospective and/or existing customers between September 27, 2006 and October 4, 2006 to participate in transactions to purchase NAU Incorporated, Series-C Preferred Stock: *[sic]*
> [Novick's] involvement with the attempted solicitation of a non-firm approved security is violative of [Novick's] firm's [e.g. AXA Advisors'] written supervisory procedures, Chapter 3, Section D. Violation of [AXA Advisors'] written supervisory procedures is also a violation of NASD Conduct Rule 2110.
>
> (*Id.*)

39. By its own terms, AXA Advisors' Compliance Manual is not a contract. (Dempsey Decl., Exh. F; Compliance Manual at p. 10).

40. The Compliance Manual discusses a Disciplinary Action Program ("DAP"), which provides, *inter alia*, for referral of possible violations to the national Compliance Office ("NCO"), and for possible referral to the National Disciplinary Action Committee ("NDAC"). (Dempsey Decl., Exh. F: Compliance Manual at p. 123.)

41. The NDAC typically issues recommendations to the NCO or other decision-makers when asked to do so, and does not make final decisions. (Dempsey Decl. Exh. S: Karr Tr. at pp. 140, 144).

42. Further, representatives may appeal recommendations for suspension or termination to the Management Disciplinary Action Committee ("MDAC"). (Dempsey Decl., Exh. F: Compliance Manual at p. 124.)

43. Novick does not allege that he attempted, in any manner, to appeal his termination to the NDAC or MDAC. (Dempsey Decl. Exh. A).

44. The members of the NDAC are appointed by Robert Jones. (Dempsey Decl. Exh. U).

45. Jones is the individual who actually decided to terminate Novick's affiliations. (Dempsey Decl., Exh. U: Jones Tr. at 107.)

46. Defendants have provided hundreds of pages to plaintiff concerning Novick's compensation, Gross Dealer Concessions ("GDC's"), Production Credits ("PCs") and POP payments. (Dempsey Decl. Exh. M: Discovery cover letters).

47. GDCs are the revenues of commissions that the broker-dealer receives from a customer securities transaction. (Dempsey Decl. Exh. U: Jones Tr. at 37)

48. PCs are a measure of what individual AXA Advisor financial representatives receive as commissions. (Dempsey Decl. Exh. U: Jones Tr. at 43)

49. The magnitude of PCs received by a financial representative largely depends upon the particular product giving rise to the commission; though PCs are often equal to half of the GDCs for a particular transaction. (Dempsey Decl. Exh. U: Jones Tr. at 43)

50. On January 15, 2003, Novick executed a Promissory Note to AXA Network in the amount of $500,000 ("Promissory Note"). (Dempsey Decl. Exh. A: SAC at Exhibit A to the SAC).

51. According to its terms, the maturity date of the Promissory Note was January 2008. (*Id.*)

52. Interest on the Promissory Note accrued at the applicable short-term rate in effect. (*Id.*)

53. Pursuant to the Promissory Note, an event of default, which allowed AXA Network to declare the Promissory Note due and payable, included termination of the Affiliation agreements with AXA Network and AXA Advisors, by either party. (*Id.*)

54. The Promissory Note includes a provision that, in the event of a successful collection action on the part of AXA Network, Novick must pay costs and expenses to AXA Network, including reasonable attorneys' fees. (*Id.*)

55. The Promissory Note provides for potential forgiveness of the principal amount, depending upon Novick's production. (Dempsey Decl. Exh. A: SAC at Exhibit A to SAC, Schedule 1 to Promissory Note).

56. Initially, forgiveness was based upon the GDC's received by Novick, whereby $200,000 of principal was to be forgiven for every $2,000,000 GDCs credited to Novick. (*Id.*)  In 2006, but made retroactive to the date of the Promissory Note, the forgiveness schedule was amended to reflect PCs, whereby $100,000 was forgiven for every $1,000,000 PCs credited to Novick  (Dempsey Decl. Exh. A: SAC at Exhibit F to SAC).

57. A total of $100,000 has been forgiven from the Promissory Note leaving a principal balance of $400,000.  (Dempsey Decl. Exh. A).

58. AXA Network has demanded repayment of the outstanding balance. (Dempsey Decl. Exh. C).

59. Novick has not repaid any part of the Promissory Note. (Dempsey Decl. Exh. A).

Dated: New York, New York
       June 1, 2012

EPSTEIN BECKER & GREEN, P.C.

 *s/ Michael Kalish*
  Michael Kalish
  Aime Dempsey
250 Park Avenue
New York, New York 10177
(212) 351-4500