# TABLE OF CONTENTS

NOTICE OF MOTION ............................................................................................................. i

TABLE OF CONTENTS ......................................................................................................... ii

TABLE OF AUTHORITIES ................................................................................................... iii

MEMORANDUM OF LAW ...................................................................................................... 1

    PRELIMINARY STATEMENT .......................................................................................... 1

    ARGUMENT ......................................................................................................................... 3

        I. THIS COURT SHOULD VACATE ITS ORDER FINDING THAT AXA DID NOT VIOLATE THE REPRESENTATIVE AGREEMENT-CLARIFYING DOCUMENT .................................................................................................. 3

            A: This court misread the Representative Agreement- Clarifying Document. ....... 3

            B: The Paragraph Refers to People, Not Mere Lists of Names ............................... 6

            C: If Ambiguous, The Clarifying Document Must be Construed Against AXA ..................................................................................................................... 7

            D: The Reading the Court Wishes to Give the Representative Agreement-Clarifying Document Leads to an Absurd Result .................................... 9

            E: Georgette Geller Testified As To the Meaning of The Clarifying Document. .................................................................................................................. 9

            F: Judge Hellerstein Already Ruled That Mr. Novick's Claims Regarding AXA's Triaging and Theft of His Book Of Business Constitutes a Breach of Contract Claim .......................................................................................... 10

            G: Judge Hellerstein Impermissibly Made a Factual Ruling Without Reviewing Any Facts ........................................................................................... 11

            H: Mr. Novick's "Equity Letter" Evidences His Propriety Right in His Book of Business, including testimony of David Karr .................................... 12

        II: THIS COURT SHOULD GRANT RECONSIDERATION AND REARGUMENT PERMITTING THE EXPANSION OF DISCOVERY ............... 15

        III: THIS COURT SHOULD FIND DEFENDANTS IN CONTEMPT OF ITS ORDER TO PRODUCE AN ACCOUNTING ......................................................... 21

    CONCLUSION ................................................................................................................... 26

## TABLE OF AUTHORITIES

**Cases**

*Bonnant v. Merrill Lynch, Pierce, Fenner, and Smith*, 2012 WL 739363 at *3 (2d Cir.) .................8

*Int'l Multifoods Corp. v. Commercial Union Ins. Co.,* 309 F.3d 76 (2d Cir. 2002)............................8

*Law Debenture Trust Co. v. Maverick Tube Corp.,* 595 F.3d 458 (2d Cir.2010)...............................8

*Leser v. U.S. National Bank Assn.* 2011 WL 1004708 (E.D.N.Y)....................................................21

*Newman & Schwartz v. Asplundh Tree Expert Co., Inc.,* 102 F.3d 660 (2d Cir.1996) .......................7

**Statutes**

Fed.R.Civ.P. 26(b)(1)......................................................................................................................16

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------X     Case No. 07-CV-7767(AKH)(KNF)

STEVEN S. NOVICK

                      Plaintiff,     **MEMORANDUM OF LAW**

      -against-

AXA NETWORK LLC,
and AXA ADVISORS LLC
                    Defendants.
-------------------------------------------------------X

Plaintiff STEVEN S. NOVICK submits this memorandum of law in support of his motion for vacatur of Judge Hellerstein's ruling making it the "law of the case" that Mr. Novick did not have a propriety interest in his book of business, and that Defendant AXA NETWORK LLC's actions were therefore proper, during the November 7, 2011 Oral Argument on Defendant's Renewed Motion to Dismiss; for expansion of discovery; and to hold Defendants in contempt of this Court's Order directing them to produce an accounting.[1]

## PRELIMINARY STATEMENT

Plaintiff seeks vacatur and/or reargument or reconsideration of two related rulings made by Judge Hellerstein during the November 7, 2011 oral argument on Defendants' Renewed Motion to Dismiss. Judge Hellerstein stated: "I hold that [AXA] did not improperly solicit [Novick's] clients. They had a right to." Thereafter, Judge Hellerstein stated: "So the rule in the case is that those clients which Novick turned over to AXA and before the time that Novick had the opportunity to solicit them, are clients which pertain to Novick. After that period the clients are entitled to go where they want and Novick does not have any further right on someone who

---

[1] Although Local Civil Rule 6.3 directs a "motion for reconsideration or reargument of a court order determining a motion shall be served within fourteen (14) days after the entry of the Court's determination of the original motion…;" this is not a motion for reconsideration or reargument, there was no motion that resulted in Judge Hellerstein's order (it was *sua sponte*), and it was never entered (as it was done only on the record at oral argument). Rule 6.3's time limitation of fourteen days therefore is inapplicable. Furthermore, new evidence has only recently come to light which necessitates that this motion be made.

enjoys that clientele."[2] Moreover, it is important to note that this issue was not before this Court on November 7, 2011 and Judge Hellerstein's decision was clearly not based upon all the evidence. Judge Hellerstein failed to take into consideration that Mr. Novick had an "Equity Letter" which gave him ownership rights to his own book of business, nor did his Honor take into consideration AXA's actions from the inception of Mr. Novick's affiliation through his termination, including why AXA would loan Mr. Novick $1,500,000.00 if his book of business was not his. It makes no sense that Mr. Novick could bring to AXA a book of business worth over $100,000,000 with the possibility of being fired the next day and AXA having the right to keep his book of business. Based upon the totality of the evidence, Mr. Novick's book of business was clearly his and he should have been free to leave with it without AXA purposely and deliberately interfering in an attempt to retain the clients.

The provision at issue regarding the solicitation of Mr. Novick's clients is governed by Mr. Novick's Representative Agreement-Clarifying Document[3], which was executed contemporaneously with his Agent Agreement and Registered Representative Agreement upon his employment on November 12, 2002. The final paragraph (the "Paragraph") reads as follows:

> Any customer lists provided to an Associate by AXA Advisors or its affiliates or developed in connection with AXA Advisors' or its affiliates' business are and remain the property of AXA Advisors or its affiliates and all originals and copies of such lists must be returned to AXA Advisors should the Associate terminate from AXA Advisors. Customer lists provided by an Associate to AXA Advisors as part of the Associate's initial hiring or contracting with AXA Advisors or any of its affiliates, or developed by an Associate during the Associate's affiliation with AXA Advisors or any if its affiliates which do not pertain to the business of AXA Advisors or its affiliates, are and remain the property of the Associate and do not need to be turned over to AXA Advisors should the Associate terminate from AXA Advisors.

---

[2] A copy of the oral argument transcript is attached hereto as Exhibit A. See pp. 37-38.
[3] A copy of which is attached hereto as Exhibit B.

For the reasons that follow, the only conclusion that can be reached is that Judge Hellerstein's ruling was incorrect, and Mr. Novick must be allowed to assert a claim against AXA for their attempts to prevent his clientele from following him elsewhere subsequent to his termination.

Judge Hellerstein noted that Mr. Novick's clients still could have followed him to another firm after his termination[4]. Although true, this is not the issue. The question is not whether Mr. Novick's *clients had a right* to stay with AXA or whether to follow him elsewhere. The clients are of course always free to choose where to obtain their investment services. The question is whether *AXA's actions* in attempting to retain Mr. Novick's clients were violative of this clause in the Clarifying Document[5]. They unquestionably were.

## ARGUMENT

## I: THIS COURT SHOULD VACATE ITS ORDER FINDING THAT AXA DID NOT VIOLATE THE REPRESENTATIVE AGREEMENT-CLARIFYING DOCUMENT

### A. This Court Misread The Representative Agreement- Clarifying Document

At the heart of the matter is this Court's simple misreading of the Paragraph, which, as previously stated herein, was not even at issue before the Court. Judge Hellerstein, at oral argument, stated the following:

> THE COURT: You have a right to keep only those customers whose business does not pertain to the business of AXA Advisers or its affiliates...
> As I read that clause...
> You forgot the sentence that qualifies it. The whole sentence is, "Customer lists provided by the associate to AXA Advisers as part of the associate's initial hiring or contracting with AXA Advisers or developed by an associate during the associate's affiliations with AXA Advisers," and here's the key part, "which do not pertain to the business of AXA Advisers." It's only that aspect of the business

---

[4] See Exhibit A, p. 39.

[5] The Court may recall that Mr. Novick's allegations include the fact that AXA's employees sent threatening letters, appeared at a client's place of business uninvited to smear Mr. Novick's reputation; and even for months afterwards, were sending "I told you so" e-mails to his clients that did agree to follow Mr. Novick to a new firm.

which do not pertain to the business. Obviously, the customers that remained with AXA pertain to AXA's business.

Based upon this reading, the Court held that only customers whom Mr. Novick serviced at AXA which do not pertain to AXA's business may be taken by Mr. Novick. Which begs the question, which of AXA's clients was Mr. Novick servicing that didn't pertain to AXA's business. According to the Court's ruling, all customers Mr. Novick serviced while at AXA which pertain to AXA's business were AXA's clients regardless of whether Mr. Novick brought them to AXA or not. Part of the problem is clearly that, although he chided Plaintiff's Counsel for not reading the entire sentence at issue, Judge Hellerstein did not read the entire sentence either. The whole sentence at issue here reads:

> Customer lists provided by an Associate to AXA Advisors as part of the Associate's initial hiring or contracting with AXA Advisors or any of its affiliates, or developed by an Associate during the Associate's affiliation with AXA Advisors or any if its affiliates which do not pertain to the business of AXA Advisors or its affiliates, are and remain the property of the Associate and do not need to be turned over to AXA Advisors should the Associate terminate from AXA Advisors.

The problem here is simply the Court's reading of the sentence. The Court reads the phrase "which do not pertain to the business of AXA Advisers" to modify the *entire* sentence. This is simply incorrect. These words are set off by commas with the rest of the phrase that they intend to modify: ",...or developed by an Associate during the Associate's affiliation with AXA Advisors or any if its affiliates which do not pertain to the business of AXA Advisors or its affiliates,..." Clearly, the phrase "which do not pertain to the business of AXA Advisers" applies only to customers developed while at AXA, and not customers brought by Mr. Novick *to* AXA. This again begs the question why Mr. Novick would bring clients to AXA that do not pertain to AXA business. Customers brought by Mr. Novick are not subject to this restriction.

4

The remainder of the sentence is clear: "Customer lists provided by an Associate to AXA Advisors as part of the Associate's initial hiring or contracting with AXA Advisors or any of its affiliates... are and remain the property of the Associate..."

In short, there are two types of clientele that the Clarifying Document envisions Mr. Novick (or any associate) will be allowed to keep upon his termination with AXA: 1) those clients be provided to AXA upon his hiring; and 2) those clients he developed at AXA who do not pertain to AXA's business[6]. The way that the Paragraph is written only allows for this conclusion.

This result is logical. Clients Mr. Novick brought with him to AXA were not developed through AXA's efforts or services, and AXA should not be able to benefit from his efforts upon his departure. Similarly, clients developed while at AXA (which pertain to AXA's business) would have been developed through AXA's efforts or services, and thus Mr. Novick should not be able to benefit from AXA's efforts upon his departure.

Furthermore, to interpret the phrase "which do not pertain to the business of AXA Advisors or its affiliates" to refer to customers Mr. Novick brought to AXA necessarily implies that Mr. Novick (or any associate) would bring clients to AXA which do not pertain to AXA's business. This is simply nonsensical. The question remains as to what would not be considered AXA business? Why would Mr. Novick contact these clients and in fact, if he did and did not disclose it to AXA it would be considered an outside business activity which would be in violation of FINRA rules. The simple answer is that all of Mr. Novick's clients pertain to the business of AXA. Furthermore, Mr. Novick executed two (2) loan notes when he originally affiliated with AXA. One of these notes was required to be repaid and the other was forgivable

---

[6] Perhaps, if Mr. Novick were also an accountant, someone he contacted through AXA may need tax services. Such a client, though developed while at AXA, would be Mr. Novick's because AXA does not do taxes.

based upon certain terms. AXA clearly lent Mr. Novick these monies based upon not only him bringing over $100,000,000 book of business but also his ability to repay same due to the revenues that his business would generate. Defendant's entire case is based upon the premise that even though Mr. Novick was terminated he is still required to repay the monies. Using this Court's interpretation and assuming arguendo that AXA was allowed to take all of Mr. Novick's clients, how would it be possible for him to repay the notes? Moreover, this interpretation would allow AXA to totally take away Mr. Novick's livelihood, which clearly was never the intention of either of the parties.

Finally, this is a rather standard contractual arrangement in the securities industry. As the affidavit of Mr. Novick states[7], it is common practice for independent contractors (as opposed to employees of a firm) in the securities business to be allowed to transfer their business from one firm to another unimpeded, though firms often try to retain clients which were developed at their own expense rather than that of the independent contractor. Additionally, as the attached affidavit also indicates, this is precisely what Mr. Novick (and AXA) understood the agreement to mean.

## B: The Paragraph Refers To People, Not Mere Lists Of Names

Contrary to what Defense Counsel has argued in the past, the reference to customer lists can only imply actual clients are at issue here, and not mere pieces of paper. It is true that the Paragraph makes reference to "originals and copies." But one must ask why the associate must return all "originals and copies" of customer lists he was provided or developed with AXA.

AXA most certainly does not provide their only copy of a customer's information to an associate when an account is assigned. In fact, the recordkeeping rules of Financial Industry

---

[7] A copy of which is attached hereto as Exhibit C.

Regulatory Authority (FINRA) require AXA to keep originals of same on premises and retain same for a period of years after the closure of the account.

AXA obviously does not need the information on the list returned upon the associate's departure. Also, AXA does not request back "a copy" of the information, but "all" copies. The reason this information is demanded back is clear: so the associate cannot retain customer information in an attempt to contact AXA's client and solicit the client after his departure. In essence, possession of the lists indicates ownership of the clients. When an associate must turn the list over, it is indicative of his inability to take the client with him.

Conversely, when an associate *is* permitted to retain his client lists, it is indicative of his ownership of the client's account, and provides acknowledgement that those clients are free to be transferred to another firm upon an associates' departure (assuming of course that the client wants to follow him. The client is free to go wherever he chooses).

Finally, Mr. Novick was never provided or received any customers, client lists, support for any of his clients or information to further any relationships or which would be at issue if he tried to take same when he was terminated from AXA.

Therefore, it is clear that the agreement bars AXA from interfering with customers that were Mr. Novick's and bars Mr. Novick from taking customers that were AXA's.

**C: If Ambiguous, The Clarifying Document Must Be Construed Against AXA.**

It is well settled law that if ambiguous, a contract must be construed against the drafter. *See, e.g., Newman & Schwartz v. Asplundh Tree Expert Co., Inc.,* 102 F.3d 660, 663 (2d Cir.1996). "An ambiguity exists where the terms of the contract could suggest more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages

7

and terminology as generally understood in the particular trade or business." *Law Debenture Trust Co. v. Maverick Tube Corp.,* 595 F.3d 458, 466 (2d Cir.2010) (internal citations omitted).

Although Mr. Novick asserts that there is only one reasonable interpretation, if this Court disagrees based upon its own reading that the contract could be read so the phrase "which do not pertain to the business of AXA Advisors or its affiliates" applies to all customers or only those developed while at AXA, then the clause must be construed against AXA, who drafted the Clarifying Document. Therefore, even if the contract could be read either way, it must be construed against AXA, as the drafter.

Additionally, the case law takes into account the "customs, practices, usages and terminology as generally understood in the particular trade or business" to determine if a contract is ambiguous. *See, e.g., Bonnant v. Merrill Lynch, Pierce, Fenner, and Smith,* 2012 WL 739363 at *3 (2d Cir.) *quoting Int'l Multifoods Corp. v. Commercial Union Ins. Co.,* 309 F.3d 76, 83 (2d Cir. 2002). As stated in the affidavit of Steven Novick, it is common practice in the securities business for an independent contractor to be allowed to take with him, unobstructed, his own book of business when changing firms. This is simply what Mr. Novick believed was to occur, and was his intention signing the contract.

Furthermore, AXA, by lending him the $1.5 Million to begin with, impliedly recognized that he owned his book of business, because the monies were loaned on the belief that Mr. Novick was able to take with him his clientele from his prior employer, Morgan Stanley, to AXA. It is clear by the pre-hiring emails that AXA would never have lent Mr. Novick the money had he not had the ability to bring over a substantial book of business to AXA. Attached hereto as Exhibit D is an excerpt of the deposition of Robert Jones the President and Vice Chairman of AXA Advisors. He states:

8

> MR. FINKELSTEIN: Why do people get up front monies to affiliate with broker-dealers?
> MS. JONES: The premise is they will bring **their book of business over.**

(Emphasis added)

AXA cannot "have their cake and eat it too" by, on the one hand, recognizing Mr. Novick's ability to take his clients to AXA, and at the same time, assert that they were not his clients immediately after he affiliated with AXA.

## D: The Reading The Court Wishes To Give The Representative Agreement-Clarifying Document Leads To An Absurd Result

If the Court's reading of the Paragraph was correct, it could lead to absurd results. Mr. Novick (or any potential affiliate) could bring a substantial book of business upon his or her affiliation with AXA. Because the contract was terminable at will, AXA could simply terminate the affiliation right after hiring, and the terminated associate would have no recourse. AXA would then have "stolen" the affiliate's business.

This is an absurd proposition, and the parties certainly did not intend to leave this as a legitimate possibility. Mr. Novick never would have signed the agreements and affiliated with AXA if this scenario was possible, particularly if it was possible that he would be stuck with a loan he could not repay in addition to the loss of his interest in his book of business. This would be the equivalent of Financial Suicide.

## E: Georgette Geller Testified As To The Meaning Of The Clarifying Document.

Attached hereto as Exhibit E is an excerpt of the deposition of Georgette Geller, Mr. Novick's branch manager at the time of his termination. She states:

> MR. FINKELSTEIN: Isn't it true that really wasn't the case, that Mr. Novick had his own book of business and the Millers were not on a joint account?
> MS. GELLER: That's not my recollection.
> Q: Well, if that was the case, okay, would you consider it Steven's book of business?

MR. KALISH: Object to the form of the question. You can answer.
A: On the accounts where the Millers weren't? Yes, I would consider that Steve's book of business.
Q: And would you consider that Steve would have the right or the opportunity to take his book of business with him when he left?
A: Yes, I would.

As is clearly seen, according to Ms. Geller, (who was not only AXA management but also Mr. Novick's branch manager at the time of his termination) Mr. Novick "would have the right or opportunity to take his book of business with him when he left." She states that this would include *all* of the clients, whom Mr. Novick had, that was not joint with Mr. Miller.

## F: Judge Hellerstein Already Ruled That Mr. Novick's Claims Regarding AXA's Triaging And Theft Of His Book Of Business Constitutes A Breach Of Contract Claim.

In oral argument on January 31, 2011, regarding AXA's original motion to dismiss, Judge Hellerstein consolidated Mr. Novick's claims for unfair business practices and tortious interference under the rubric of Breach of Contract. As Judge Hellerstein then stated[8]:

THE COURT: I will deny this motion which raises an issue of fact as to whether or not there was a breach of contract...The allegations of declaratory relief are redundant to a breach of contract. The same thing with unfair business practices. And the same thing with regard to tortious interference with business relations. Everything follows from the breach of contract...So I am going to confine this complaint to [an equitable] accounting and breach of contract, Counts One and Three. Everything else is stricken.

...

MR. FINKELSTEIN: Your Honor, with all due respect, the fifth cause of action [tortious interference] cannot be part of the breach of contract. They are talking about two completely separate things. We're talking about his book of business, how they specifically triaged his book of business and stole it.
THE COURT: You are saying that they have a contractual obligation not to do this?
MR. FINKELSTEIN: Yes.
THE COURT: And that is a breach of contract.

Mr. Novick has always alleged (and still maintains) that AXA's conduct constitutes the torts of tortious interference and unfair business practices. However, without ever determining

---

[8] A copy of this transcript is attached hereto as Exhibit F.

the validity of Mr. Novick's tort claims, the Court, based on the Paragraph, turned the tort claims into a Breach of Contract (which the Court referred to in the November 7, 2011 oral argument as "breach of contract plus") based upon Mr. Novick's allegations that AXA tried to steal his clientele based on intimidation and scare tactics.

In January 2011, the Court *sua sponte* turned Mr. Novick's tort claims into a breach of contract claim, and then in November 2011, *sua sponte* ruled that AXA had a right to do essentially whatever they wanted because the contract did not prevent them from doing so. The Court essentially has contradicted itself: either AXA's conduct is not governed by the Registered Representative Agreement- Clarifying Document (in which case Mr. Novick's various tort claims should be allowed to proceed), or it is (in which case the Court-invented Breach of Contract claim should be allowed to proceed).

As it stands now, Mr. Novick is left without the ability to argue either tort or breach of contract because (as stated more fully below) the Court took it upon itself to *sua sponte* determine that AXA committed no wrong doing without hearing factual argument on the matter, nor having all of the pertinent documents before the Court to properly render a decision. This is an unconscionable result, particularly in light of the fact that this Court not once, but twice, *denied* Defendant's Motions to Dismiss/for Summary Judgment.

Therefore, Mr. Novick should be allowed to present all of the facts to the trier of fact regarding AXA's actions subsequent to his termination, and allow them to determine the validity of his claims.

## G: Judge Hellerstein Impermissibly Made A Factual Finding Without Reviewing Any Facts.

In the November 7, 2011 oral argument, Judge Hellerstein stated "I hold that [AXA] did not improperly solicit [Novick's] clients. They had a right to." Judge Hellerstein, without making

any factual determination of what AXA did, stated that AXA had a right to do what they did. This leads only to the conclusion that Judge Hellerstein ruled that *anything* AXA did was permissible. Clearly, if a company could do whatever it wanted under such a circumstance, the torts of unfair business practices and tortuous interference would not exist. The fact that these torts *do* exist demonstrates that a company cannot do whatever it wishes with regards to a terminated employee's clientele.

Therefore, Judge Hellerstein was incorrect in making a determination that *whatever* AXA did was proper (as opposed to what AXA *actually did* was proper). To do so renders these torts meaningless.

## H. Mr. Novick's "Equity Letter" Evidences His Propriety Right in His Book of Business

Mr. Novick's "equity letter," dated December 16, 2002, officially an "Amendment to AXA Network's 14th Edition Agent's Agreement," vests Mr. Novick's renewal compensation, services fee's and/or asset based compensation and gives him the right to sell same[9]. It states:

> In the event the Agent desires to sell his or her vested renewal compensation, service fees and/or asset based compensation, the Agent shall notify AXA Network of such decision when the Agent first begins soliciting or negotiating such offers. Upon the negotiation of a firm purchase offer, the Agent shall deliver to AXA Network written notice identifying the proposed purchaser and a copy of such offer to purchase, including all proposed terms and conditions and draft documentation. AXA Network shall have the right to approve the purchase which approval shall not be unreasonably withheld, provided the purchaser satisfies AXA Network's criteria for entering into an AXA Network agent's agreement and/or a selling agreement with AXA Network and AXA Advisors, LLC.

It is clear that those with equity letters had the right to sell their interest in the income generated by their books of business. As the excerpts of David Karr's transcript indicates, the parties herein stipulated that Mr. Novick had an Equity Letter.

---

[9] A copy of which is attached hereto as Exhibit G.

Both Mr. David Karr, an AXA Manager and Mr. Bob Jones, the President and Vice Chairman of AXA Advisors (the Broker/Dealer branch of AXA), testified during their depositions which were taken since the November 7, 2011 oral argument, that <u>those with equity letters owned their books of business and had the right to take them with them upon their termination</u>[10]:

> MICHAEL FINKELSTEIN: Mr. Karr, a short time ago you mentioned the word equity letter. What is an equity letter?
> DAVID KARR: An equity letter gives an advisor the ability to transfer their book of business if they leave AXA
>
> …
>
> Q: If Mr. Novick was one of the top five producers of these 6,000 5,000 6,000 affiliates, did you think he would be entitled to an equity letter?
> A: It would be likely.
>
> …
>
> Q: Were you aware that Mr. Novick had an equity letter?
> A: I think my testimony before was that I wouldn't have been surprised if he did. I don't know the answer.
> Q: Michael, you've seen it, will you stipulate to the fact that he had an equity letter?
> MR. KALISH: I'll stipulate to the fact that he had an equity letter…
> Q: Mr. Karr, now that you're aware of the fact that Mr. Novick had an equity letter, okay, is it your testimony that his book of business belonged to Mr. Novick, belonged to him?
> A: Yeah.

> MR. FINKELSTEIN: Mr. Jones, what are equity letters?
> MR. JONES: An equity letter was given to top producers that basically said if they left, they could take their book of business[11].

Additionally, as demonstrated by the fact that the equity letter references both AXA Networks and AXA Advisors, there was only a single equity letter for both AXA Advisors and AXA Networks[12]:

> MR. FINKELSTEIN: Are there different types of equity letters?
> MR. JONES: Not that I recall.

---

[10] A copy of which is attached hereto as Exhibit H.
[11] See Exhibit D, p. 50.
[12] See Exhibit D, p. 51.

This makes sense because Mr. Novick had virtually no insurance business through AXA Networks, only securities business through AXA Advisors. He would have no need for an equity letter that applied only for AXA Networks. It is clear that Mr. Novick had the contractual right to take his clients with him to another broker/dealer without interference upon his departure from AXA, and that this Court was incorrect in its ruling that AXA had a right to do what they did.

Additionally, according to Mr. Louis Polce, AXA's Vice President of Field Operations upon retirement, AXA's agents had the opportunity to sell their business to another AXA agent[13]:

> MR. FINKELSTEIN: Looking at page 3, looking down to the third one, it says, "Contract buyouts."
> MR. POLCE: Right.
> Q: "By far the largest category and relatively new. Retail distributions will assist an associate to help them purchase another associate's book of business." What does that mean?
> A: It means if I have a retired associate who is still on the records as servicing a book of business and are receiving service fees for that and they no longer want to service it, they have the option of selling that book to another associate.
> Q: If Mr. Novick was still affiliated at AXA and he wanted to sell his book of business, could he do that?
> A: This was a – not that I know of, no.
> Q: Why not, based upon this definition?
> A: This definition was basically – the program was being administrated only to retired agents.
> Q: Where does it say that in this definition?
> A: It doesn't say that, but it was only being administered to retired agents.
> Q: It doesn't say that in this definition?
> A: No, it does not.
> Q: Can you point to me or show me any other documentation that would indicate that this contract buyout was only for those that retired?
> A: I can't, but there may be information available, because it was a program.

Whether or not Mr. Novick could have sold his book of business at anytime is irrelevant. What matters is that AXA recognized an ownership interest in an associate's book of business. One cannot sell something he doesn't own. Finally, when Mr. Jones was asked if the equity letter

---

[13] A copy of the relevant portion of Mr. Polce's transcript is attached hereto as Exhibit I.

had no carve out for termination (which Mr. Novick's did not) would Mr. Novick be able to take

his book of business, he answered affirmatively[14].

> MR. FINKELSTEIN: Mr. Novick's equity letter had language that said, no matter
> whether or not he's terminated for cause or leaves voluntarily, his book of
> business is his. Would that change your answer as to earlier that if he was
> terminated, he couldn't take his book of business with him?
> MR. JONES: Yes.

Mr. Novick's equity language did not have any such language, his departure either voluntary or

by termination did not affect his book of business. It was his to take.

Mr. Novick had an ownership interest in his book of business, which AXA impermissibly

attempted to abscond with whereby AXA clearly violated Mr. Novick's contractual rights.

## II: THIS COURT SHOULD GRANT RECONSIDERATION
## AND REARGUMENT PERMITTING THE EXPANSION OF DISCOVERY

A second issue at the November 7, 2011 Oral Argument on Defendants' Motion to

Dismiss was in relation to the production of emails in discovery[15]:

> THE COURT: What discovery do you want?
> MR. FINKELSTEIN: We want further e-mails, we want audiotapes.
> THE COURT: Just start. You asked for e-mails, didn't you?
> MR. FINKELSTEIN: Prior counsel asked for e-mails.
> THE COURT: Were they supplied?
> MS. DEMPSEY: Yes. 15,000 e-mails have been supplied two and a half years
> ago.
> THE COURT: You're not getting more, Mr. Finkelstein.
> MR. FINKELSTEIN: I'm sorry, Judge?
> THE COURT: You're not getting more.
> MR. FINKELSTEIN: Judge, the problem is the e-mails that were supplied, the
> people they allegedly searched as the search terms and the search, have nothing to
> do with this matter.
> THE COURT: Doesn't make any difference.

---

[14] See Exhibit D, p.147.
[15] See Exhibit A, p. 28.

In this instance, the Court is denying access to relevant discovery in the form of e-mails and audio tapes of the trading desk, on the apparent basis that the Court believes that Plaintiff has received enough discovery.

The breadth of permissible discovery is intentionally wide under the Federal Rules of Civil Procedure. Fed.R.Civ.P. 26(b)(1) states, "Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense." While a court may limit electronic discovery if it is not reasonably accessible or at undue cost, this is not the case here. Defendants have already provided 15,000 emails from discovery requests similar to what Plaintiff seeks. All that is required are different search terms.

Prior counsel, Rachel Rosenberg of Drier LLP, agreed to an email search proposed by Defendants of various AXA employees[16]. However, many of the names on this search are simply irrelevant. For example, Robert Barth and Michael Martin had left AXA before Mr. Novick was first hired. Mr. Novick does not even know who Raymond Barry *is*. William DeMatteo and Mr. Novick only had a brief time period in which their employment overlapped. Moreover, both counsels, based upon the language therein, clearly intended that additional discovery was to be contemplated: "After we receive the results from this search we will then determine whether there is a need to place further search terms." Unfortunately, this never occurred due to the Drier Firm imploding and obviously no fault of Mr. Novick.

Since the date of the oral argument (November 7, 2011), the parties have conducted numerous depositions in an attempt to clarify many of the outstanding questions specifically pertaining to Mr. Novick's hiring, employment, pay issues, and his ultimate termination and what transpired thereafter. What has become glaringly apparent is that the person who was in charge of the broker/dealer and who ultimately terminated Mr. Novick has absolutely no

---

[16] Attached hereto as Exhibit J is an e-mail between Ms. Rosenberg and Jim Murphy regarding the search terms.

recollection of any of these events. On April 18, 2012, both parties with counsel attended the deposition of Mr. Robert Jones, the President and Vice Chairman of AXA Advisors, in Stuart, Florida. As his brazen testimony indicated, Mr. Jones stated, "I'm the top" as he was the man who made all final decisions including the termination of Mr. Novick. His cavalier testimony unfortunately left so much to be desired and his answers of "I cannot recall" or "I have no recollection" got quite boring and tiresome. Though his answers may have been responsive in accordance with the FRCP, it is clear that Mr. Jones was completely unresponsive. It is very difficult to comprehend, as his testimony indicates, Mr. Jones could not remember anything leading up to Mr. Novick's termination. He could not recall anyone he spoke to, any documents he received and/or reviewed, what procedures if any that were followed in accordance with defendants compliance manual[17] or ultimately what led up to his determination to fire Mr. Novick. Ironically, the things he did remember (that he spoke to Ned Dane, the President of AXA Advisors) completely contradicted the testimony of Mr. Dane. Mr. Dane who did answer responsively and who didn't suffer from selective amnesia stated that he received an email from Mr. Novick on or about October 6, 2006 and after giving it to corporate counsel had no other involvement with the entire process.  Furthermore, Mr. Jones testified that AXA's written rules and procedures *required* Mr. Novick's termination[18]. However, when further questioned on this issue at length, he could not point to a single document or rule that would require Mr. Novick's termination.[19] It is blatantly obvious that Mr. Jones made this up and took it upon himself as "the

---

[17] In fact, counsel for defendant Aime Dempsey stated in open Court on November 7, 2011, "to be clear it is not precisely an NDAC meeting which defendants position is was not required.

[18] James Kaplan another affiliate of AXA in 2005.–2006 was unequivocally selling away, but was never terminated and is currently still employed by AXA. Plaintiff's request a copy of Mr. Kaplan's compliance folder along with the compliance folder of Lawrence Passaretti who Mr. Novick notified management of his Selling away violation and continued to work at AXA until 2010 and was allowed to take his entire book of business when he voluntarily left AXA, who also did not mark his license in any manner.

[19] Plaintiff request that Defendants be required to produce any such documents that are in existence that stand for the proposition that it was firm policy that Mr. Novick had to be terminated.

top" to fire Mr. Novick without any regard for the circumstances surrounding his alleged wrongful actions. Mr. Jones' failure to recollect anything is just another example of AXA's stonewalling Mr. Novick, which is completely in dereliction of court rules and procedures. If the person who ultimately fired Mr. Novick has absolutely no recollection of anything, then this Court must give Mr. Novick the opportunity to ascertain the information he is entitled to, which the parties herein know exists. Multi-billion dollar companies like AXA do not terminate its #2 affiliate without any written correspondence between its members. Mr. Novick is entitled to exhaust all possibilities to ascertain what transpired leading up to his termination and thereafter the improper treatment of his book of business. For this Court to not allow Mr. Novick the additional e-mail discovery and audiotapes is setting up another unnecessary trip to the Second Circuit.

People who absolutely should have been included in this search were Mr. Joseph Miller and Mr. Joel Miller, the AXA employees who specifically requested to be assigned Mr. Novick's accounts upon his termination; and also those who helped "triage" Mr. Novick's book of business. Any e-mails between the Millers and AXA would be highly relevant to the "triaging" and theft of Mr. Novick's book of business subsequent to his termination, and the conversations leading up to his termination. This would help shed light on conversations between the Millers and various administrators of AXA, conspiring to steal Mr. Novick's book of business prior to his departure, which obviously must have taken place. While some e-mails regarding the Millers have been provided through these other e-mail searches, they reference other conversations regarding requests for compensation and re-papering of Mr. Novick's accounts in the names of the Millers.

Also not searched was the email of Max Haspel, another broker who, along with the Millers, divided up Mr. Novick's book of business and received the lion's share of the revenues from Mr. Novick's clients. As a reminder, Mr. Novick worked out of the Stanford branch of AXA. When Mr. Novick was terminated and his book of business was being triaged, AXA specifically requested and made an exception to allow Mr. Haspel, a Long Island broker, service Mr. Novick's accounts, in furtherance of their scheme to retain Mr. Novick's book of business.

Robert Jones in his deposition even testified to this fact. He stated[20]:

MR. FINKELSTEIN: So this is not out of the ordinary to bring somebody 90 miles from Long Island to represent clients out of the Stamford branch?
MR. JONES: It's excepted -- that's an exception
Q: That's an exception?
A: Yep
Q: So it's out of the ordinary?
A: Out of the ordinary.

As previously stated, the e-mail from Ms. Rosenberg contemplated additional discovery, by stating, it was also decided that based upon the production that a further e-mail search may be necessary[21]. It is clear that such a search is not only permissible but required. The following is a list of person whose email's are absolutely discoverable and relevant based upon the deposition testimony gleaned herein: James Kaplan, Lawrence Passeratti, Ron Benevento, Gus Catanzaro, Don Ogilvie, Brian Tudor, Tracey Gray-Walker, Tracy Self, Maureen Springsteen, Michael Rynicker, Edward Stein, Rich Ferrone, Thomas Mangone, Michael Brzozowski and Diana Mulligan. Additionally, the following search terms must be used in order to obtain the necessary emails: "Steve," "Novick," "New Canaan," Mr. Novick's broker ID number 048493 and Gemini. All of these search terms need to be implemented in order for a complete and comprehensive search to take place of all of the people set forth herein including the Millers and Max Haspel.

---

[20] See Exhibit D, p. 151.
[21] See Exhibit J.

The Federal Rules also permit limitation of discovery if the information requested is cumulative, if the party has had ample opportunity to obtain the documents, or if the burden of obtaining them outweighs their benefit. As described above, what is sought now is *different* from what was previously provided, which was not relevant because of the search terms employed. Therefore, what is sought now would also not be cumulative to what was already produced. Additionally, as AXA maintains these records in a searchable format, and has indeed provided many e-mails this way in the past, it is clear that the burden to obtain them should not be overly burdensome.

Not obtaining these documents would have a chilling effect in the Plaintiff causing severe prejudice against him and his ability to fully prosecute this case. Vital information is still outstanding, including what actually transpired at the meeting where Mr. Novick's termination was decided, what procedures if any were followed prior to Mr. Novicks termination and what communications were had between the brokers who received Mr. Novick's accounts and AXA. These are and have always been central aspects of Mr. Novick's case and questions that this Court has asked to be clarified since the initial round of limited depositions.

Moreover, this Firm also requests that, "any and all audiotapes" that contain any conversations with or about Mr. Novick be immediately turned over to Plaintiff. In fact, prior to the inception of this matter, Plaintiff's prior counsel Mr. Marty Kaplan requested that all such tapes be preserved. These audio tapes would certainly explain that Mr. Novick went to management regarding Lawrence Passeratti and the many issues surrounding him including repapering accounts and selling away, that Mr. Novick consistently was having issues with his compensation, that Mr. Novick had complained to management about other brokers selling away and the treatment of other brokers and finally the tapes would indicate that AXA was aware that

Mr. Novick was looking to leave AXA and that his termination and triaging his book of business was completely conspired and calculated.

For these reasons, this court should reconsider its ruling regarding discovery and permit the discovery of the emails, audio tapes and any additional discovery that stems directly from the depositions taken herein.

### III: THIS COURT SHOULD FIND DEFENDANTS IN CONTEMPT OF ITS ORDER TO PRODUCE AN ACCOUNTING

"Generally, a contemnor may be held in civil contempt for failure to comply with a court order if: (1) the court's order is clear and unambiguous; (2) the evidence of the contemner's noncompliance is clear and convincing; and (3) the contemnor did not diligently attempt to comply in a reasonable manner. It is not necessary to establish that the contemnor's noncompliance was willful." *Leser v. U.S. National Bank Assn.* 2011 WL 1004708 (E.D.N.Y).

In the present case, Plaintiff has been requesting an accounting, since even before this action was commenced, that accounts for the total revenues Mr. Novick's book of business generated during his tenure with AXA[22]. It is noteworthy that Mr. Novick's request does NOT entail what he was paid: which can be easily ascertained with nothing more than his 1099s and/or W2s for the time he was affiliated with AXA. Rather, what is at issue is what he *should have been paid* based upon the total revenues his book of business generated.

On January 31, 2011, at oral argument on their original Motion to Dismiss, Judge Hellerstein ordered Defendants to produce an accounting[23]:

> With regard to Count One, equitable accounting, it seems to me that Mr. Novick is entitled to an accounting of what commissions he may have earned during the time he was an employee, but anything beyond that must await my judgment on the breach of contract. So if you can figure out some way of doing that fairly and efficiently, that is the way you should do it.

---

[22] Attached hereto as Exhibit K are various requests of Plaintiff seeking an accounting.
[23] See Exhibit F, p. 21.

Thereafter, on or about June 10, 2011, Defendants produced a 3 inch binder purporting to be an accounting containing hundreds of pages of documents, including POP Worksheets, Statement Support Documents, Annual Statements of Earnings, 1099s, pay stubs, and other documentation. Additionally, a 600-plus-page Excel spreadsheet which purportedly demonstrates every securities transaction Mr. Novick engaged in was also produced.

This accounting fails to take into account what Plaintiff has always been seeking. It may well go into great depth as to what Mr. Novick *was* paid, but as previously stated, all that is needed to determine what he *was* paid is his 1099s and W-2s (in fact, the documents produced cannot even be reconciled against Mr. Novicks W-2 and 1099s). This has never been at issue. What is at issue was what Mr. Novick was *supposed to have been* paid based on what his book of business generated. This is not addressed in the accounting. The fundamental problem is that Defendants only want to produce documents that show what Mr. Novick was paid, not what the total revenues his book of business generated.

Mr. Novick, as a financial advisor, received compensation from two sources: from his clients who paid him for their services, and from AXA who paid him for the business that he brought them. Mr. Novick was hired under the rubric of Gross Dealer Concessions (GDCs), whereby he was to be paid a percentage of *all* of the *total* revenues his book of business generated while at AXA. Robert Jones in his deposition even testified to this fact. He stated[24]:

> MR. FINKELSTEIN: What is a GDC?
> MR. JONES: It's the amount that's paid to the broker-dealer.
> Q: GDC is an acronym for gross dealer concession; is that correct?
> A: Yes
> Q: And as you just testified gross dealer concession is the amount paid to a broker-dealer
> A: Yes.

---

[24] See Exhibit D, p. 35.

However, despite promises to the contrary, Mr. Novick was paid under a completely different scheme encompassing Production Credits ("PCs") and Production Opportunity Payments ("POP"), of which no has been able to definitively tell Plaintiff what the value of these acronyms are and how they relate to each other.

The accounting, as provided by AXA, takes into account only compensation based on commissions. As Mr. Novick testified in his deposition[25], the accounting as provided does not cover his insurance business, selling arrangements (whereby AXA received a compensation on mutual funds Mr. Novick sold), soft dollar arrangements (Soft dollars are amounts that money managers, including mutual fund managers, pay out of their clients' accounts to a brokerage firm to cover the cost of research the firm provides. Soft dollars also cover transaction fees for executing trades.), or mutual fund trails (compensation paid regularly by the mutual fund companies usually beginning immediately upon the purchase), or annuity trails (which start in the 13th month after the purchase).

In order to clarify the supposed accounting, the parties with Counsel held a meeting with William Mills and Marjorie Hall two AXA employees, who prepared the purported accounting. At this meeting, they were both asked simply if the accounting illustrated all of the revenues Mr. Novick's book of business generated. They answered no.

At Oral Argument on Defendants' Renewed Motion to Dismiss on November 7, 2011, the court again took up the issue of the accounting and its deficiencies[26]:

> THE COURT: How do you figure out [Mr. Novick's] commissions?
> MR. KALISH: The details of it are in the documents we've already produced and that's what the accountant could be useful to take a look at. I can't answer that.
> THE COURT: I would think that commissions are a factor of total revenues produced by the book of business.
> ...

---

[25] A copy of the relevant portion to Mr. Novick's deposition is attached hereto as Exhibit L.
[26] See Exhibit A, pp. 44-46.

23

THE COURT: You make sure, Mr. Kalish, you go over these very carefully. You make sure that every document that will be used by an accountant to determine what his commission should have been are given to Mr. Finkelstein or were given to Mr. Finkelstein. If they were given to Mr. Finkelstein, you can be excused from production by making reference to a specific production number.

MR. FINKELSTEIN: Judge, all we're asking for is what the book of business generated, the revenues generated, not what he was paid. That's not what was given to us.

THE COURT: If Mr. Kalish is telling you that's not relevant – I don't understand how that can be so, but if Mr. Kalish goes over the documents referred to in this paragraph and can show to Mr. Finkelstein what are the bases other than revenues, he can do that. Whatever is the basis for commissions in the ordinary course of business will be the rule of this case.

Thereafter on or about December 22, 2011, Defendants forwarded to Plaintiff a 64,000 line excel spreadsheet purporting to supplement the alleged accounting. Once again Defendants attempts have fallen way short of the mark. It is clear that Defendants are inclined only to produce documents that indicate what Mr. Novick earned not documents indicating the revenues that his book of business generated.

During his deposition on January 5, 2012, Mr. Louis Polce, AXA's Network's head of commissions, testified that based upon what was produced by AXA a proper accounting was not possible[27]:

MR. FINKELSTEIN: In all your years working at AXA, would you say, in your opinion, based upon the documentation generated, that you would be able to do a proper accounting of an agent's book of business?
MR. POLCE: No, not – not at the policy level.
Q: Why not?
A: Because that information is not available to me.
Q: What additional information would you need to make that happen on or for that to occur?
A: I would – I would have to see all the details of every transaction or every case sold by that associate.
Q: You didn't have access to that information?
A: No...
Q: Would Mr. Mills be able to do that?
A: No.

---

[27] See Exhibit I.

24

> Q: If I was to tell you that Mr. Mills, with Ms. Hall, created what the defendants claimed or purported to turn over to the plaintiffs as an accounting, and that's what Plaintiff's Exhibit 1 is, would that change your statement?
> MR. KALISH: I object to the form of the question. You can answer.
> A: No.
> Q: It's your testimony that Mr. Mills could not do a proper accounting?
> MR. KALISH: I object to the form of the question. You can answer.
> A: It's the definition of "accounting." At the level of detail that's in that book, a proper accounting of what was paid to the associate is there, okay, but to your question as to the transaction that generated the amount of the compensation, you would have to go into the commission calculation system and look at every single record, based on those commission schedules, what the commission was calculated at and to determine that, that's the only way you could do that. That's at the detail level, okay…
> Q: Does it show revenues generated?
> A: It shows revenues, but what you need are policy details, and the policy details are not here.

Lastly, Defendants have not diligently attempted to comply in a reasonable manner. For over 5 1/2 years Plaintiff, through various attorneys, has requested an accounting from Defendants outlining what he should have been paid. All that has ever been requested is a simple statement of the total revenues his book of business generated. As an example, such simple statements as produced by Charles Schwab and Morgan Stanley for Mr. Novick are attached hereto as Exhibit M.

In order to comply with this Courts order and provide Plaintiff with a proper accounting Defendants must provide the following; the back up documents to any dollar amounts paid, selling arrangements and selling agreements between funds and AXA, any and all soft dollar arrangements/agreements, accounting of segregated bank account of AXA and Lawrence Passeratti to show monies paid to the firm based upon Mr. Novick's ability to generate revenues for the AXA. It is blatantly obvious that Defendants have not complied with this Court's directive. For the above-stated reasons, it is clear that Defendants have violated this Court's directive.

## **CONCLUSION**

For all of the above-stated reasons, the Court should reverse its *sua sponte* ruling regarding the AXA's right to solicit Mr. Novick's clients after his termination, and the subsequent propriety or impropriety of their actions, grant further discovery, and hold Defendants in contempt for their failure to produce an accounting.

Dated: May 30, 2012
       Garden City, New York

 

Michael S. Finkelstein, Esq.
FINKELSTEIN & FEIL, LLP
*Attorneys for Plaintiff*
666 Old Country Road, Suite 210
Garden City, New York 11530
(516) 280-3660