UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

STEVEN S. NOVICK,

        Plaintiff/Counterclaim Defendant,

        - against -

AXA NETWORK, LLC,
and AXA ADVISORS, LLC,

        Defendants/Counterclaim Plaintiffs.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

**ECF Case**

Case No.: 07-CV-7767 (AKH)(KNF)

 

 

**DEFENDANTS/COUNTERCLAIM PLAINTIFFS'
MEMORANDUM OF LAW IN SUPPORT OF
MOTION TO PRECLUDE**

 

**EPSTEIN BECKER & GREEN, P.C.**
250 Park Avenue
New York, New York 10177
(212) 351-4500

*Attorneys for Defendants/Counterclaim Plaintiffs*

## TABLE OF CONTENTS

PAGE(S)

PRELIMINARY STATEMENT ....................................................................................1

STATEMENT OF FACTS .........................................................................................3

ARGUMENT.............................................................................................................6

I.  NOVICK SHOULD BE PRECLUDED FROM SUBMITTING AS EVIDENCE
    NUMEROUS EXTRANEOUS AND IRRELEVANT DOCUMENTS THAT
    CONSTITUTE NEITHER AN AGREEMENT BETWEEN NOVICK AND AXA
    NOR A DOCUMENT PROVIDING FOR COMPENSATION TO NOVICK
    THAT IS REFERENCED IN THE ACTUAL AGREEMENTS BETWEEN
    NOVICK AND AXA ............................................................................................6

    A.  The October 16, 2001 Email From Bryan Tutor  Is Not A Contract
        Between AXA And Novick ........................................................................7

    B.  The October 30, 2001 Email From Bryan Tutor  Is Not A Contract
        Between AXA And Novick ........................................................................8

    C.  The June 5, 2002 (or July 2, 2002) Offer Letter Was Superseded By Other
        Contracts Between AXA And Novick.........................................................9

    D.  The "Morgan Stanley Ideas" Document Is  Not A Contract Between AXA
        And Novick.............................................................................................12

    E.  The "Recognition Clubs" Document Is Not A Contract Between AXA
        And Novick.............................................................................................13

    F.  The October 30, 2001 Offer Letter Is Not A Contract Between AXA And
        Novick....................................................................................................14

    G.  The W-2 Forms Are Not A Contract Between AXA And Novick......................15

    H.  The February 23, 2013 Email to Novick Is Not A Contract Between AXA
        and Novick..............................................................................................15

    I.  The April 4, 2014 "Persistency" Letter Is Not A Contract Between AXA
        and Novick..............................................................................................17

    J.  The April 9, 2015 "Persistency" Letter Is Not A Contract Between AXA
        and Novick..............................................................................................17

    K.  The 2001 and 2002 Schedules Do Not Govern Novick's Compensation .............18

L.   The List Regarding Support for Novick's Business  Is Not A Contract Between AXA and Novick ................................................................ 18

M.   The Deposition Transcript From The Connecticut  Action Is Not A Contract Between AXA And Novick ................................................ 19

N.   The October 29, 2001 Internal AXA Emails Do Not  Constitute A Contract Between AXA And Novick ................................................ 20

II.   NOVICK'S SUBMITTED CATEGORY 2 DOCUMENTS SHOULD BE PRECLUDED BECAUSE THEY ARE UNRELIABLE AND MISLEADING ............. 21

A.   The Insurance List .................................................................................. 22

B.   The Advisory List .................................................................................. 22

III.   NOVICK'S OVERVIEW OF HIS DAMAGES AND HIS CATEGORY 3 DOCUMENTS SHOULD BE PRECLUDED ............................................... 24

A.   Novick Has Failed To Provide The Calculations Ordered By The Court ............. 24

B.   Novick Has Made No Demonstration That He Is Entitled To Lifetime Payments From AXA, And Therefore Should Be Precluded From Seeking Such Damages At Trial ................................................................................ 28

1.   Novick's "Additional Information" Overview Document Does Not Entitle Him To Lifetime Compensation From AXA And He Should  Be Precluded From Introducing Expert Testimony Or Reports ............................................................................. 29

2.   By Law, Novick's Alleged Wrongful Termination Damages Would be Limited to 30 Days After His Termination, And He Should Be Precluded  From Presenting Evidence Of Damages Beyond Such 30 Day Period ................................................... 31

3.   Novick Has Failed To Offer Any Evidence In  Support of Other Bases for Lifetime Compensation ................................................ 33

a)   Novick's Claimed Inability To Sell His Book of Business  Does Not Entitle Him To Lifetime Compensation From AXA ......................... 34

b)   The Clarifying Document Does Not Entitle  Novick to AXA Compensation For Life ............................................ 35

c)   Novick's Cross-Selling Document Does Not  Entitle Him To Lifetime Compensation From AXA ................................. 38

C.    Novick Provided No 30-Day Damages Calculations So Any Future Evidence of 30 Days of Damages Should Be Precluded ........................................ 39

D.    Novick's Refusal To Calculate His Damages Through October 13, 2006 Should Preclude Him From Presenting Evidence Of Such Damages ................. 40

IV.    NOVICK HAS PRODUCED NO EVIDENCE THAT HE IS  ENTITLED TO COMPENSATION BASED ON GDCS, AND   SO HE SHOULD BE PRECLUDED FROM ARGUING OR  INTRODUCING EVIDENCE REGARDING SUCH CLAIM AT TRIAL ................................................................. 42

V.    NOVICK IS NOT ENTITLED TO ATTORNEYS' FEES ............................................. 44

CONCLUSION ............................................................................................................... 45

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*A.G. Ship Maint. Corp. v. Lezak*,
  69 N.Y.2d 1 (1986).................................................................................44

*Burg v. ARCS Indus. Inc.*,
  36 A.D.2d 695 (1st Dep't 1971).............................................................33

*De Graffenriedt v. Neighborhood Health Ctr. of Provident Clinical Soc'y*,
  42 A.D.2d 773, 346 N.Y.S.2d 469 (2d Dep't 1973)..........................32, 33

*Fed. Hous. Fin. Agency v. Merrill Lynch & Co.*,
  No. 11 Civ. 6202 (DLC), 2014 U.S. Dist. LEXIS 26130
  (S.D.N.Y. Feb. 28, 2014)........................................................................19

*Galet v. Carolace Embroidery Prods. Co.*, No. 91 Civ. 7991 (SS),
  1994 U.S. Dist. LEXIS 14060 (S.D.N.Y. Sept. 30, 1994),
  *aff'd*, 122 F.3d 1056 (2d Cir. 1995).......................................................32

*In re Green*,
  51 N.Y.2d 627 (1980).............................................................................45

*Hart v. RCI Hospitality Holdings, Inc.*, No. 09 Civ. 3043 (PAE),
  2015 U.S. Dist. LEXIS 29955 (S.D.N.Y. Mar. 11, 2015).....................21

*Hooper Assocs., Ltd. v. AGS Computers, Inc.*,
  74 N.Y.2d 487 (1989).............................................................................44

*Legacy Group of Am., Inc. v. N. Am. Co. for Life & Health Ins.*,
  336 F. App'x 87 (2d Cir. 2009)..............................................................37

*National Trends v. Krimson Corp.*, No. 91 Civ. 3178 (KMW) (LB),
  1994 U.S. Dist. LEXIS 3476 (S.D.N.Y. Mar. 23, 1994).........................6

*O'Brien v. City of Yonkers*, No. 07-CV-3974 (KMK)(LMS),
  2013 U.S. Dist. LEXIS 43551 (S.D.N.Y. Mar. 22, 2013)......................19

*Polycast Tech. Corp. v. Uniroyal, Inc.*, No. 87 Civ. 3297 (CSH),
  1992 U.S. Dist. LEXIS 7903 (S.D.N.Y. May 28, 1992).........................33

*Rozsa v. May Davis Grp., Inc.*,
  152 F. Supp. 2d 526 (S.D.N.Y. 2001)......................................................6

*Schron v. Troutman Sanders LLP*,
   20 N.Y.3d 430 (2013).................................................................................7

*Tendler v. Bais Knesses of New Hempstead, Inc.*,
   112 A.D.3d 911 (2d Dep't 2013)...............................................................32

*Thompson v. Naval Acad. Athletic Ass'n*,
   No. RDB-12-2676, 2014 U.S. Dist. LEXIS 175274 (D. Md. Dec. 19, 2014)....................33

*United States v. Gupta*,
   747 F.3d 111 (2d. Cir. 2014) ....................................................................21

*W.W.W. Assocs. v. Giancontieri*,
   77 N.Y.2d 157 (1990)................................................................................7

**Rules**

Fed. R. Civ. P. 32(a) .......................................................................................19

Fed. R. Evid. 401 ............................................................................................42

Fed. R. Evid. 403 ....................................................................................20, 21, 42

FINRA Rule 2140...........................................................................................35, 37

Defendants/counterclaim plaintiffs AXA Network, LLC ("AXA Network") and AXA Advisors, LLC ("AXA Advisors") (collectively "defendants" or "AXA") through their attorneys Epstein Becker & Green, P.C., and in accordance with the Court's directions at the September 9, 2015 conference and in the September 11, 2015 Order Regulating Pending Motions (Docket No. 302), respectfully submit this memorandum of law in support of their motion to preclude plaintiff/counterclaim defendant Steven S. Novick ("plaintiff" or "Novick") from offering certain types of proof with respect to three subject matter categories outlined by the Court.

## PRELIMINARY STATEMENT

Steven Novick has proven over and over in this litigation and otherwise that he will claim entitlement to any and all commissions, fees and other compensation that might come to his mind, no matter the thinness or complete lack of support for such claims.

As this action draws close to trial, however, the Court rightfully has put Novick to task to: (1) (jointly with AXA) identify and submit the actual agreements between Novick and AXA and all documents referenced in those agreements governing his compensation; (2) list the clients and their investments for which he claims compensation is owed; and (3) calculate his claimed damages under three assumptions.

Now that the time has come for Novick to lay bare his proofs underlying his claims for myriad forms of compensation from AXA, the paucity of support for his claims is plain to see. (Of course, whether AXA faces any liability at all to Novick that would enable him to collect any damages is yet to be determined at trial). Rather than complying with the Court's directions and providing what was required by the Court's September 11, 2015 Order Regulating Pending Motions, Novick has provided a rag-tag collection of non-controlling documents and more unsupported conclusory claims of damages.

Novick reiterates the baseless arguments which he has been promoting for years, including that he should have been paid based on Gross Dealer Concessions ("GDCs") or percentages of all money paid or taken into AXA by reason of the total accounts under management he allegedly had, and that he should have been paid by AXA according to terms on which he was paid by prior institutions. There is no evidence to support these arguments. AXA simply never agreed to compensate Novick in these ways.

Instead of limiting his submission to actual agreements between AXA and Novick as directed by the Court, he has provided internal AXA emails, unsigned and superseded offer letters, and irrelevant deposition testimony from another action. Instead of providing the required list of clients, by name and dollar amounts of such clients' investments, for which he claims AXA owes him compensation, Novick has provided two spreadsheets whose contents and origins he refuses to explain. Instead of providing calculations of his claimed damages under the three applicable time periods set forth by the Court, Novick has provided more extraneous documents and a three-page "overview" of conclusory damages claims that does not satisfy the Court's Order, is not evidence, and is not based on evidence or viable theories for compensation.

If allowed into evidence, the documents provided by Novick will undoubtedly confuse the jury as to what terms and conditions were agreed upon between Novick and AXA regarding his compensation. Novick's documents go well beyond the written agreements he had with AXA, and beyond the schedules and rules published by AXA, which AXA had discretion to change or revise. Novick's purported calculations and client lists go even farther afield, and appear to be limited only by Novick's imagination. Admission of such "proofs" offered by Novick would present real danger of unfair prejudice, confusion of the issues, misleading the jury, undue delay, and waste of time.

Finally, along with this collection of documents that Novick produced on September 30, 2015, Novick purported to reserve his right to supplement them with further materials at trial. This reservation should be disallowed, as it makes a mockery of the Court's September 30, 2015 Order, which explicitly stated it was intended to narrow and clarify the triable issues remaining in the case, not leave Novick's damages claims open-ended and ambiguous. Novick should not be permitted to introduce at trial or otherwise any more documents or evidence in support of his damages claims in relation to the three categories outlined in the Court's Order.

As discussed below, Novick should be precluded from introducing or relying on most if not all of his purported evidence relating to agreements he had with AXA and his damages.

## STATEMENT OF FACTS

Pursuant to the Court's September 11, 2015 Order Regulating Pending Motions, the parties were directed to file "joint submissions intended to narrow and clarify the triable issues remaining in this case according to the following schedule:"

A. On or before September 30, 2015, Novick will produce to AXA:

1. All writings that constitute the agreement between Novick and AXA Network, and between Novick and AXA Advisors including agreements for sales of insurance contracts and securities and copies of all referenced documents that provide for compensation to plaintiff, issued by AXA between Nov. 12, 2002 and Oct. 13, 2006, and if such documents were produced in discovery, their respective production numbers [hereinafter, "Category 1 documents"].

2. A list of his clients, by name and dollar amounts of such clients' investments, for which he claims AXA owes him compensation [hereinafter, "Category 2 documents"].

3. Calculations of sums that he claims are owed to him under three assumptions: (i) the applicable period of damages extends only to 30 days after termination; (ii) the applicable period of damages extends only to the expiration of his contract with AXA, on October 13, 2006; and (iii) the applicable period of damages extends indefinitely for the life of Novick,

without right of termination by AXA [hereinafter, "Category 3 documents"].

B. AXA will file any motion to preclude proof regarding any of the above categories by October 16, 2015. Novick's reply will be due November 13, 2015.

*See* Exh. F to the accompanying Declaration of Aime Dempsey in support of AXA's motion to preclude, dated October 23, 2015 (the "Dempsey Decl."). The filing and briefing schedule for the motion to preclude was subsequently adjourned to later dates.

By a joint submission letter, dated October 16, 2015, with regard to the Category 1 documents, the parties filed with the Court (Docket No. 306):

(a) writings which they agree constitute the agreements between Novick and AXA, including agreements for sales of insurance contracts and securities, and

(b) copies of the schedules and rules referenced in paragraph III of the Agreement Between AXA Advisors and Novick, executed on November 12, 2002 (the "Registered Representative's Agreement," governing securities business; *see* Dempsey Decl. Exh. M) and the Agreement Between AXA Network and Novick, executed on November 12, 2002 (the "Agent's Agreement," governing insurance business; *see* Dempsey Decl. Exh. N), that determine plaintiff's compensation, and were issued by AXA between November 12, 2002 and October 13, 2006.

A copy of the October 16, 2015 joint submission letter, without its voluminous attachments, is annexed to the Dempsey Decl. as Exh. L.

As the Court pointed out during the September 9, 2015 conference, two of the parties' undisputed agreements, the Registered Representative's Agreement (*see* Dempsey Decl. Exh. M) and the Agent's Agreement (*see* Dempsey Decl. Exh. N), each contain a paragraph entitled "III.

Commissions and Service Fees."  In the Registered Representative's Agreement, that paragraph states:

> **III. Commissions and Service Fees.**  The Representative shall be paid such commissions, service fees and other compensation <u>as may be provided for by schedules and rules published from time to time by or on behalf of AXA Advisors</u>.  Such rules may include provisions governing the timing of payment, the recovery of commissions for business that does not persist, and all other aspects of the Representative's entitlement to compensation. Unless expressly provided by such rules, there will be no vesting of renewal commissions or other continuing compensation, if any such renewal commission or other continuing compensation is payable with respect to any products or services offered through the Representative under this Agreement.  Any compensation due and payable by AXA Advisors hereunder may be paid by AXA Network, LLC ("AXA Network") or such other paymaster as AXA Advisors may designate from time to time.

(Emphasis added).

In the Agent's Agreement, that paragraph states:

> **III. Commissions and Service Fees.**  The Associate shall be allowed commissions, service fees and additional compensation on premiums, and considerations for insurance policies and annuity contracts secured under this Agreement <u>in accordance with the Schedules of Commissions (used by AXA Network with notice to the Associate) in force on the date of the application for the policy or contract</u>, as such premiums and considerations become due and are paid.  If the Associate held an Equitable agent's agreement immediately prior to entering into this Agreement, the Associate shall continue to be allowed commissions, services fees and additional compensation on premiums, and considerations for insurance policies and annuity contracts secured under such prior agent's agreement in accordance with the applicable schedules of commissions in force on the date of the application for the policy or contract, as such premiums and considerations become due and are paid.  Upon termination of the Agreement, however, service fees and additional compensation, if any, shall no longer be allowed, and renewal commissions shall be allowed only as provided in the Vesting Provisions of Paragraph IV below.

(Emphasis added).

Beyond the agreements and schedules jointly submitted by the parties, Novick improperly insists that a number of other documents also constitute agreements between AXA and him, and/or govern his compensation. Those documents are listed in the parties' joint submission October 16, 2015 letter, and/or were produced to AXA on September 30, 2015. The additional documents are attached to the Dempsey Decl. as Exhs. S-FF.

## ARGUMENT

**I.   NOVICK SHOULD BE PRECLUDED FROM SUBMITTING AS EVIDENCE NUMEROUS EXTRANEOUS AND IRRELEVANT DOCUMENTS THAT CONSTITUTE NEITHER AN AGREEMENT BETWEEN NOVICK AND AXA NOR A DOCUMENT PROVIDING FOR COMPENSATION TO NOVICK THAT IS REFERENCED IN THE ACTUAL AGREEMENTS BETWEEN NOVICK AND AXA**

As discussed *seriatim* below, AXA objects to, and hereby moves to preclude, a number of Novick's submitted documents which he asserts to be agreements or compensation schedules or rules. The motion to preclude these documents is based on various grounds, including that they lack the hallmarks of a contract, they were superseded, and/or they do not reflect AXA's agreement to pay Novick in the manner that he apparently claims that they do. In large part, they reflect (at best) only Novick's subjective intent with respect to his compensation or (more likely) his disingenuous attempts to get more money out of AXA. "What is looked to in determining whether an agreement has been reached is not the parties' after the fact professed subjective intent but their objective intent as manifested by their expressed words and deeds at the time." *National Trends v. Krimson Corp.*, No. 91 Civ. 3178 (KMW) (LB), 1994 U.S. Dist. LEXIS 3476, at *40 (S.D.N.Y. Mar. 23, 1994) (citation omitted).

It is black letter law that "[t]o establish the existence of a contract under New York law, a plaintiff must [demonstrate] an offer, acceptance, consideration, mutual assent, and an intent to be bound." *Rozsa v. May Davis Grp., Inc.*, 152 F. Supp. 2d 526, 533 (S.D.N.Y. 2001) (citation

omitted). These elements are largely absent from each of the following documents that Novick included in his Category 1 production. Further, most of these documents date from well before Novick became affiliated with AXA in November 2002 and have no effect on the actual written agreements into which AXA and Novick entered. *See W.W.W. Assocs. v. Giancontieri*, 77 N.Y.2d 157, 163 (1990) ("'extrinsic and parol evidence are not admissible to create an ambiguity in a written agreement which is complete and clear and unambiguous on its face.'") (citations omitted); *Schron v. Troutman Sanders LLP*, 20 N.Y.3d 430, 436 (2013) ("'a written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms....' As a general rule, extrinsic evidence is inadmissible to alter or add a provision to a written agreement.") (citation omitted).

Furthermore, none of the Category 1 documents discussed below (except for certain W-2 statements, which are not contracts) fall within the date range (November 12, 2002 and October 13, 2006) specified by the Court's Order.

A. The October 16, 2001 Email From Bryan Tutor
   Is Not A Contract Between AXA And Novick

On October 16, 2001, over one year prior to Novick becoming affiliated with AXA, Bryan Tutor sent an internal email to seven persons at AXA providing an "Update on Steve Novick." (Joint Submission Exh. P1); (Dempsey Decl. Exh. S). This email merely summarizes what up-front loan money AXA might be willing to offer plaintiff at that time. It clearly reflects that negotiations with Novick were ongoing at the time and no final terms had been reached. The non-final nature of any discussions reflected in the email is clear: "I have communicated the basics of what I have laid above to [Novick]. He is still looking for more up-front,...."

The email does not suggest any promises were made to Novick, and the discussion of his potential payout under the proposed arrangement indicates that his payout would be *lowered* to accommodate the loan amortization, he would be responsible for his own expenses, and that adding the proposed payout to the loan amortization would approximately equal a *normal* payout. Notably, in his discussion of Novick's desire for more of an up-front loan than AXA was willing to offer, Tutor notes "whatever 'The Street' is offering is not relevant to us at AXA. We do not value his book of business the same as the large brokerage houses. We are not in the position to match that type of offer and I have told him that several times." (Dempsey Decl. Exh. S).

In any case, this email was not sent to Novick, and so cannot constitute an offer to him, nor can Novick argue that he accepted it or that it is a contract between him and AXA. Thus, it should be precluded if offered as evidence of a contract between Novick and AXA, or of an agreement regarding his compensation from AXA.

> B. The October 30, 2001 Email From Bryan Tutor
> <u>Is Not A Contract Between AXA And Novick</u>

Novick includes another internal AXA email in his submission. The October 30, 2001 email from Bryan Tutor to numerous other AXA personnel provides "a little background concerning the proposed loans to Steve Novick." (Joint Submission Exh. P2); (Dempsey Decl. Exh. T). On its face, the email is not proof of anything and merely summarizes what Mr. Tutor believed might be appropriate to offer plaintiff at that time, two weeks after the October 16, 2001 email discussed above and more than a year prior to Novick becoming affiliated with AXA.

Like the earlier email, this Tutor email merely addresses "how much [AXA] would be able to loan [Novick] and the basics for repayment." Like the earlier email, it discusses a *lower* than normal payout, and Novick paying his own expenses.

Novick was not a recipient of the email, and so it cannot constitute an offer to him, nor can Novick argue that he accepted it or relied upon it, nor that it is a contract between him and AXA. Indeed, the email itself notes: "Steve Novick has not accepted the offer at this time." Thus, it should be precluded if offered as evidence of a contract between Novick and AXA, or of an agreement regarding his compensation from AXA.

### C. The June 5, 2002 (or July 2, 2002) Offer Letter Was Superseded By Other Contracts Between AXA And Novick

Novick seeks to submit, as an agreement at issue in this litigation, an offer letter from Donald H. Ogilvie of AXA to Novick (the "offer letter"). (Joint Submission Exh. P3); (Dempsey Decl. Exh. U). The offer letter contains a typewritten date of June 5, 2002, which is crossed out and replaced with a handwritten date of July 2, 2002. It appears to be signed by Novick, alongside a date of "6/02/02." It contains three attachments – a sample Agent's Agreement, a sample Registered Representative's Agreement, and an Authorization and Release signed by Novick for AXA to run a background check on him.

The offer letter and its attachments should be precluded as evidence of a continuing agreement between AXA and Novick, or as documents specifying Novick's compensation, because the offer letter was superseded by the later, undisputed agreements between the parties. To wit, the offer letter contains the following language on its second and third pages (*see* Dempsey Decl. Exh. U):

> Upon satisfactory completion of the above conditions, we will enter into the agreements defining the terms and conditions of our

9

> relationship as stated in the attached sample Associate
> Agreements.
>
> \*      \*      \*
>
> [...] This offer letter is not a contract of employment for any
> period of time and is not intended to alter or modify the terms of
> any Associate Agreements into which you may enter in the future.

The sample Associate Agreements referenced in and attached to the offer letter have identical language to the Agent's Agreement and Registered Representative's Agreement that Novick signed. As discussed above, the Agent's Agreement and Registered Representative's Agreement (each signed on November 12, 2002) each contain controlling provisions governing "Commissions and service fees" in their respective paragraph IIIs. These provisions, not the offer letter, govern Novick's compensation from AXA. Furthermore, the offer letter contains no terms regarding the method or level by which Novick would be compensated. It only discusses the up-front loans being considered and how they would be repaid.

There could have been no surprises for Novick as to the operation of AXA's businesses or as to how Novick would be compensated, despite his attempt to rewrite the contracts after the fact. Before he became affiliated with AXA, Novick discussed the potential affiliation with AXA personnel for many months. He was represented by counsel, and both he and his counsel reviewed the agreements before he signed them. Novick's counsel even expressed reservations about whether certain aspects of the proposed affiliation would be beneficial enough to Novick. (Dempsey Decl, Exhs. RR and PP at p. 185). After all of the discussion and review, Novick signed the standard Agreements, without revisions. (Compare Dempsey Decl. Exh. U to Exhs. M and N).

Even to the extent that Novick would argue that the offer letter contains the terms of the two loans that he received from AXA, the offer letter does not control and was superseded by (a)

the actual $500,000 Promissory Note in favor of AXA Network executed by Novick on January 15, 2003, as amended (the "January Promissory Note") (Dempsey Decl. Exh. O), and (b) the detailed $1 million Loan Note in favor of AXA Network executed by Novick on August 28, 2003 (the "August Loan Note") (Dempsey Decl. Exh. P).

The January Promissory Note, in its paragraph "m," titled "Exclusivity," provides "The provisions herein and in the attached Schedule 1, which is incorporated herein by reference, are the exclusive terms of the agreement between the parties and are controlling as to the terms and conditions of this loan and its repayment." (*See* Dempsey Decl. Exh. O). Similarly, the August Loan Note contains an "Exclusivity" paragraph providing "The provisions herein and in the attached Schedule A are the exclusive terms of the agreement between the parties and are controlling as to the terms and conditions of this Note." (*See* Dempsey Decl. Exh. P). These two provisions (and other agreements between AXA and Novick) leave the offer letter with no continuing effect. Thus, both the offer letter itself and the subsequently-signed, ultimately controlling agreements provide that the terms of the offer letter were no longer in effect when Novick executed those later agreements.

Moreover, the offer letter does not reflect the terms that the parties later agreed upon in the January Promissory Note and the August Loan Note. In particular, with respect to the August Loan Note, the "EAP" referenced in the offer letter was no longer in effect at AXA when the August Loan Note was signed. EAP stood for "Expense Allowance Program" and it was replaced by the Production Opportunity Payment ("POP") Program in January 2003. (Dempsey Decl. Exh. TT). Thus the references to EAP in the offer letter, which were made in connection with the $1 million up-front loan that was ultimately secured by the August Loan Note, had no

11

meaning when the August Loan Note was signed and, indeed, those references are not repeated in the August Loan Note. (Dempsey Decl. Exh. P).

In addition, the January Promissory Note was amended by a May 22, 2006 letter from AXA and signed by Novick, which amended the repayment obligations such that the production milestones leading to each $100,000 of forgiveness were no longer based upon Gross Dealer Concession production amounts (as was proposed in the offer letter), but rather were based on Production Credit amounts. (*Compare* Dempsey Decl. Exhs. U and O).[1]

Because the offer letter specifically states it is not a contract, and even if it were a contract, it was superseded by the Agent's Agreement, the Registered Representative's Agreement, the August Loan Note and the January Promissory Note (and other actual agreements between AXA and Novick), Novick should be precluded from introducing the offer letter as a contract between him and AXA or as evidence of any binding or continuing agreement as to Novick's compensation.

   D.   The "Morgan Stanley Ideas" Document Is
        Not A Contract Between AXA And Novick

The document entitled "Morgan Stanley Ideas" also should be precluded. (Joint Submission Exh. P4); (Dempsey Decl. Exh. V). That document appears to have been faxed from Novick to David Karr of AXA on January 7, 2002 – ten months before Novick became affiliated with AXA or signed the Agent's Agreement or Registered Representative's Agreement (both signed on November 12, 2002). Although unclear on its face and unexplained by Novick as to

---

[1] The GDC reference in the original January Promissory Note, however, does not have the meaning Novick now urges on the Court as a basis for the lion's share of his claimed damages. The January Promissory Note explicitly defines and limits GDCs as follows: "GDC includes *transaction-based* revenue received by AXA Advisors in connection with transactions in all investment products and services,…excluding life insurance and annuity products. GDC does *not* include certain types of revenues received by AXA Advisors *which do not result in commission payments to representatives*, such as expense sharing payments received from product sponsors." (Dempsey Decl. Exh. O) (emphasis added).

what it is supposed to prove, the document may reflect Novick's Year to Date Production / Rankings from January 1 through November 1, 2001 at Morgan Stanley.  Novick's counsel argues in his October 7, 2015 letter, that Novick was not compensated properly, including "in accordance with his former firm's commission runs that his compensation was to mirror." (Dempsey Decl. Exh. K).

The "Morgan Stanley Ideas" document is not a contract, nor is it a schedule or rule referenced in the Agent's Agreement or Registered Representative's Agreement.  At best, it is evidence of Novick proposing, ten months before he became affiliated with AXA, that AXA compensate him in a manner like he was compensated at Morgan Stanley.

The document contains no hallmarks of a contract.  It does not demonstrate that AXA agreed, assented or intended to compensate Novick according to his compensation at Morgan Stanley.  Indeed, there is not a shred of evidence demonstrating that AXA ever agreed to compensate Novick according to some other brokerage or insurance company's method of compensation.  Novick's repetition of his belief that AXA would pay him in a manner like he had been paid in his prior jobs does not create a contract with AXA.  The "Morgan Stanley Ideas" document does not even show Novick's assent to work for AXA under those terms. Accordingly, the document should be precluded.

E. The "Recognition Clubs" Document Is Not A Contract Between AXA And Novick

Novick also curiously provides as a Category 1 document an apparently previously unproduced document entitled "Recognition Clubs," which may reflect his production and assets under management in 2000 at another (non-AXA) brokerage house -- PaineWebber.  (Joint Submission Exh. P5); (Dempsey Decl. Exh. W).

As with the "Morgan Stanley Ideas" document, there are no hallmarks of a contract evident with respect to the "Recognition Clubs" document.   There are no indications that AXA agreed, assented or intended to compensate Novick according to his compensation elsewhere, or even that Novick assented to work for AXA under the terms, if any, reflected in the "Recognition Clubs" document.  In addition, Novick did not produce this document in discovery, which ended months ago.  Accordingly, the document should be precluded.

F.  The October 30, 2001 Offer Letter Is Not A Contract Between AXA And Novick

Novick's next submitted document, an October 30, 2001 offer letter to Novick, appears to be an earlier version of the mid-2002 offer letter discussed above.  (Joint Submission Exh. P6); (Dempsey Decl. Exh. X).  It is unsigned by Novick.  It proves nothing.  It is not a contract.

The October 30, 2001 letter also contains the same limiting language as the mid-2002 offer letter: "Upon satisfactory completion of the above conditions, we will enter into the agreements defining the terms and conditions of our relationship as stated in the attached sample Associate Agreements," and "This offer letter is not a contract of employment for any period of time and is not intended to alter or modify the terms of any Associate Agreements into which you may enter in the future."  It was thus, at best, an offer to Novick to agree to enter into future agreements.  Also, like the mid-2002 offer letter, this October 30, 2001 document sets forth no terms governing what Novick's compensation would be in terms of calculating commissions, service fees, etc.

Because there is no indication that Novick accepted the terms offered in this October 30, 2001 offer letter, which dates from over one year prior to his affiliation with AXA, and because it even states itself that it is not an agreement and will not modify later actual agreements, it

should be precluded as evidence of a contract between AXA and Novick, or of any agreement as to Novick's compensation.

G. The W-2 Forms Are Not A Contract Between AXA And Novick

Another part of Novick's Category 1 submission of purported agreements between himself and AXA is a collection of his W-2 statements showing payments he received from AXA from 2003 through 2009. (Joint Submission Exh. P7); (Dempsey Decl. Exh. Y). These are obviously not writings constituting the agreements between AXA and Novick, nor documents referenced therein that provide for compensation to plaintiff. They are merely records of the compensation amounts that AXA paid Novick during those years.

Accordingly, Novick should be precluded from offering the W-2 forms as agreements between AXA and him, or as documents that are referenced in the Agent's Agreement and Registered Representative's Agreement.

H. The February 23, 2013 Email to Novick Is Not A Contract Between AXA and Novick

Exhibit P8 submitted by Novick is a chain of two emails between Novick and Nina Badalova, a senior business analyst at AXA, in which Novick inquired how long he might be receiving certain payments from AXA, and Ms. Badalova replied that he would continue to receive benefits under his equity letter if certain conditions were met. (Dempsey Decl. Exh. Z).

Relative to the AXA proprietary insurance business, Novick was provided with an amendment to the Agent's Agreement, entitled Amendment to AXA Network's 14th Edition Agent's Agreement, commonly referred to at AXA as an "equity letter," which he signed on August 4, 2005. (*See* Dempsey Decl. Exh. Q). The equity letter provides for vesting of renewal commissions, and allows recipients to receive service fees after leaving AXA, among other things. Declaration of Jeanne Kondracke, dated October 23, 2015 ("Kondracke Decl.") at ¶¶4-5.

It also describes terms under which Novick could sell his "vested renewal compensation, service fees and/or asset based compensation" with respect to his proprietary insurance business. (Kondracke Decl. ¶7, Exh. D; Dempsey Decl. Exh. Q).  Novick has represented to the Court, through counsel, that he has received and continues to receive his renewal compensation connected with the insurance business.  (Dempsey Decl. Exh. E at 20).

It is pursuant to the equity letter that AXA has continued to pay renewal commissions, service fees and asset based compensation to Novick after his date of termination, based upon AXA proprietary life insurance and annuity products only on which Novick was the servicing agent of record.  (Kondracke Decl. ¶11).  Typically a vested agent, or agent with an equity letter must enter an agreement to continue to service the clients for whom the agent acts as servicing agent, such that the servicing fees are generally paid to the servicing agent's new firm, which then pays the agent.  In its discretion, and to Novick's benefit, AXA did not require Novick to enter into any service agreements, but continued to pay his renewals and service fees on that insurance business as though he had.  (Kondracke Decl. ¶11).

The equity letter does not apply to, nor entitle Novick to, payments for brokerage business at AXA Advisors or AXA Network non-proprietary insurance business.  (Kondracke Decl. ¶12).  It is designed for the limited purpose of encouraging clients to keep proprietary insurance products at AXA after their agent leaves the company by providing an incentive to the agent to leave that business in place.  (Kondracke Decl. ¶¶3-4).  Proprietary insurance products differ from securities products and from non-proprietary insurance products in that AXA can still receive the premiums (and is still liable for paying on the policies) for proprietary insurance even if the bulk of a client's account is transferred elsewhere.  (Kondracke Decl. ¶4).  In contrast, when a securities account is transferred, any commissions and management and other fees are

paid to the new company, and there is no continuing income on the account from which AXA could pay. (Kondracke Decl. ¶4).

These two February 2013 emails do not make a contract between AXA and Novick, nor do they comprise schedules or rules referenced in the Agent's Agreement or the Registered Representative's Agreement in force within the dates of Novick's employment with AXA. Any arguable relevance they may have to the facts of the case is related to the equity letter, which has a limited purpose and has been honored. (Kondracke Decl. ¶¶4, 6, 13). Accordingly, these emails should be precluded.

I.   The April 4, 2014 "Persistency" Letter Is Not A Contract Between AXA and Novick

Like the February 23, 2013 email just discussed, the April 4, 2014 "persistency" letter from AXA to Novick, is not a contract between those two parties, nor a schedule or rule from the time of his affiliation governing his compensation. (Joint Submission Exh. P9); (Dempsey Decl. Exh. AA). Rather, it is merely a notification that because the persistency rate for 2013 remained over 90% for fixed and variable proprietary life and annuity business on which Novick was the servicing agent of record, he would continue to receive benefits pursuant to his equity letter. This letter does not meet the criteria set by the Court's Order, not least because it dates from outside of the November 12, 2002 through October 13, 2006 time period. Moreover, it is not evidence of Novick's entitlement to anything. It merely provides information regarding his equity letter status. It should be precluded otherwise.

J.   The April 9, 2015 "Persistency" Letter Is Not A Contract Between AXA and Novick

Novick's Exhibit P10 is merely the next year's "persistency" letter (and three enclosures). (Dempsey Decl. Exh. BB). For the same reasons that apply to his Exhibits P8 and P9, this April 9, 2015 letter is an improper submission pursuant to the Court's Order, as it dates

from outside of the November 12, 2002 through October 13, 2006 time period, it does not constitute an agreement between AXA and Novick, and it is neither a schedule or rule governing Novick's compensation.  It should be precluded as evidence of such.

K.  The 2001 and 2002 Schedules Do Not Govern Novick's Compensation

The 2001 and 2002 schedules that Novick submits are not part of any contract between Novick and AXA, nor are they referenced in the agreements between AXA and Novick as governing Novick's compensation.  (Joint Submission Exh. P11); (Dempsey Decl. Exh. CC). They are all dated many months before Novick started his affiliations with AXA, were superseded by subsequent schedules that appear as joint exhibits, and, in any case, are outside the time frame set forth by the Court.

L.  The List Regarding Support for Novick's Business
    Is Not A Contract Between AXA and Novick

Novick also submits two pages, titled "AXA Advisors Ability to Support Steve Novick's Business."  (Joint Submission Exh. P12); (Dempsey Decl. Exh. DD).  This document is undated, but given that it discusses what AXA or Novick "can do," it appears to pre-date his affiliations with AXA.  It is not clear, by any means, what it is, to whom it was sent, what it was used for, or even if the two pages are a draft or some kind of final document.  Bearing no hallmarks of a contract, and seeming to be an informal list of thoughts compiled by an unknown author, rather than a schedule or rule referenced in the Agent's Agreement or the Registered Representative's Agreement, this document proves nothing and should be precluded as evidence of any kind in this action.

M. The Deposition Transcript From The Connecticut
   Action Is Not A Contract Between AXA And Novick

Novick submitted to AXA (although not to the Court), among his Category 1 documents,

excerpts from a November 30, 2007 deposition of Joseph H. Miller, III from a lawsuit in

Connecticut entitled <u>Steven S. Novick v. New Canaan Group, LLC</u>. (Dempsey Decl. Exh. EE).

These excerpts of purported testimony certainly are not an agreement between AXA and

Novick, and they do not reflect any agreed terms of Novick's compensation.

Moreover, as neither AXA defendant herein was a party to that Connecticut litigation,

that deposition testimony cannot be used in any way against defendants here, as Novick attempts

to do. *See Fed. Hous. Fin. Agency v. Merrill Lynch & Co.*, No. 11 Civ. 6202 (DLC), 2014 U.S.

Dist. LEXIS 26130, at *2 (S.D.N.Y. Feb. 28, 2014) (citing Fed. R. Civ. P. 32(a)(1)(A), 32(a)(8));

*see also O'Brien v. City of Yonkers*, No. 07-CV-3974 (KMK)(LMS), 2013 U.S. Dist. LEXIS

43551 (S.D.N.Y. Mar. 22, 2013).   Furthermore, the depositions took place after this litigation

was commenced, and defendants' counsel sought to attend them.   Novick's counsel refused that

request.   (*See* Dempsey Decl., Exh. NN: correspondence between counsel regarding defendants'

request to be present at the Miller depositions).   While the testimony does not demonstrate

anything relevant in any event -- as it only states the deponent's spotty and hearsay recollection

of a telephone conversation his father may have had with an AXA in-house attorney regarding

Novick's loans, and of allegedly disparaging remarks made about Novick -- it does not constitute

admissible evidence, has nothing to do with the actual contracts at issue, and should be precluded

from use in this action.

In these circumstances, Novick should be precluded from introducing any portions of this

deposition transcript for <u>any</u> purpose in this litigation.   But he should certainly be precluded from

offering the excerpt he provided as evidence of any agreement he had with AXA or as evidence of the terms of his compensation from AXA.

### N. The October 29, 2001 Internal AXA Emails Do Not Constitute A Contract Between AXA And Novick

Novick also submitted to AXA (although not to the Court) an October 29, 2001 email chain between a few AXA personnel regarding a "new agent loan" for $1 million. (Bates number D 3052). (*See* Dempsey Decl. Exh. FF). That document merely reflects that some AXA personnel were being informed about a possible $1 million loan to a "particular proven producer" (presumably Novick, but he is not mentioned by name), and that proper accounting of the loan would need to be done.

Like the October 31, 2001 Bryan Tutor email, this document was not sent to Novick, and so cannot constitute an offer to him, nor can Novick argue that he accepted it or that it is a contract between him and AXA. It does not even contain any terms of the potential $1 million loan, and therefore is not evidence of any agreement by AXA. Thus, it should be precluded if offered as evidence of a contract between Novick and AXA, or of an agreement regarding Novick's compensation from AXA.

For all of these reasons, Novick should be precluded from introducing the documents discussed above in Points I(A) through I(N) either as agreements between Novick and AXA, or as documents governing Novick's compensation referenced in the Agent's Agreement or Registered Representative's Agreement.

Moreover, given that these documents have negligible, if any, probative value, Novick should be precluded from introducing them for any purpose. Under Federal Rule of Evidence 403, the Court may exclude relevant evidence "if its probative value is substantially outweighed

by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403; *see generally United States v. Gupta*, 747 F.3d 111, 131-32 (2d. Cir. 2014); *Hart v. RCI Hospitality Holdings, Inc.*, No. 09 Civ. 3043 (PAE), 2015 U.S. Dist. LEXIS 29955, at *3-4 (S.D.N.Y. Mar. 11, 2015). The likelihood that these non-controlling documents will confuse or mislead the jury far outweighs any probative value they offer.

## II. NOVICK'S SUBMITTED CATEGORY 2 DOCUMENTS SHOULD BE PRECLUDED BECAUSE THEY ARE UNRELIABLE AND MISLEADING

For his Category 2 documents -- which as directed in the Court's September 11, 2015 Order are supposed to be simply "a list of his clients, by name and the dollar amounts of such clients' investments, for which he claims AXA owes him compensation" -- Novick provided AXA with two lists, one he called "insurance" business and one he called "advisory" business. (*See* Declaration of Joel H. Miller III, dated October 23, 2015 ("Miller Decl.") Exhs. A and B).

Novick should be precluded from using these documents as evidence relating to his alleged damages, because they are unexplained, lack any indicia of reliability, and lack discovery production numbers making their origins unidentifiable. They were simply provided without further information by Novick on September 30, 2015.

In a letter of October 7, 2015, responding to AXA's counsel's October 2, 2015 letter raising Novick's non-compliance with the Court's order and seeking clarification of the documents provided, Novick's counsel unhelpfully stated with regard to these two Category 2 documents: "This was provided under Category 2 and is self-explanatory." (*See* Dempsey Decl. Exh. K).

21

A.   The Insurance List

As shown in the accompanying Miller Declaration. the names on the "insurance" lists do not represent only "Novick's" clients, and the lists do not show clients or client transactions for which Novick is owed compensation.  Many of the clients listed were introduced to AXA by Miller or his father; they are not clients brought to AXA by Novick.  (Miller Decl. ¶7).  The "insurance" pages provided by Novick appear to be portions of tracking sheets that Novick, Joel Miller and Joe Miller used, as part of their d/b/a New Canaan Group with respect to the customers that they shared in some way.  They do not come from AXA commission or other AXA systems.  (Miller Decl. ¶6). More importantly, though, the clients on those tracking sheets represent business on which the agents – including Novick – were already paid.  (Miller Decl. ¶8).  Thus Novick's claim to any business owed from the "insurance" lists, obscure as such claim may be, is utterly specious.

The "insurance" lists suffer from numerous other infirmities, calling into question their reliability and inviting jury confusion.  These particular spreadsheets do not say what time period they cover, and many of the pages are missing some columns with additional information, such as estimated compensation to agents for those policies and accounts, and estimated PCs and POP to be awarded, as seen on the last few pages here, and on other, similar spreadsheets used by New Canaan Group.  Further, the information on these spreadsheets may have been modified by Novick, as the "Steve Sales Tracking 2003 & 2004" footer on the spreadsheets indicates; that is not something that came from New Canaan Group.  (Miller Decl. ¶6) .

B.   The Advisory List

The undated, unexplained "value" column in the "Advisory" list has a number at the bottom that appears to be a total of $85,586,128.  This appears to coincide with Novick's claim,

in his "additional information" document (Dempsey Decl. Exh. JJ), for "lost advisory fees on assets of $84,000,000 (though Novick does not explicitly tie the two numbers). The "additional information" document states "[t]his $84,000,000 in advisory business belong [*sic*] to Mr. Novick, he brought the business to AXA, he solely managed and serviced same during his tenure." (Dempsey Decl. Exh. JJ, fn. 1).

To the contrary, with respect to the "advisory" spreadsheet produced, Miller attests that the document contains the names of some clients that Novick brought to AXA, some clients that Miller, his father, and/or their assistant George Carter brought to AXA, and some clients that Novick and Millers jointly developed while Novick was at AXA. (Miller Decl. ¶¶10-11). The "advisory" spreadsheet also does not show which clients may or may not have stayed with AXA after Novick's termination. (Miller Decl. ¶12). Nor does it show where its "value" column came from, or what it represents; the column does not identify a time frame or include any account types. (Miller Decl. ¶9). The Miller Declaration thus undercuts Novick's unsupported claims in footnote 1 of his "Additional Information" overview document that he brought $84,000,000 in business to AXA, and solely managed and serviced same. (Dempsey Decl. Exh. JJ).

The "advisory" list therefore is not what it purports to be, is not what the Court ordered, and does not support Novick's purported damages claims and is at best, unreliable and unclear. It should be precluded.

In summary, Novick's two Category 2 documents are merely lists of names and numbers. As the documents do not appear to support, or even identify, Novick's purported damages claims, and because Novick refuses to provide any explanation of them, the Category 2 documents do not constitute "[a] list of his clients, by name and dollar amounts of such clients' investments, for which he claims AXA owes him compensation," as ordered by the Court. AXA

respectfully submits that the intent of the Order was not for Novick to provide unexplained documents whose meaning AXA would have to guess, and which would surely be confusing to a jury. Novick should be precluded from using these unsupported and nonsensical "advisory" and "insurance" lists at trial as evidence of his purported damages.

### III. NOVICK'S OVERVIEW OF HIS DAMAGES AND HIS CATEGORY 3 DOCUMENTS SHOULD BE PRECLUDED

A. <u>Novick Has Failed To Provide The Calculations Ordered By The Court</u>

Regarding Category 3, the Court's Order directed Novick to provide:

> Calculations of sums that he claims are owed to him under three assumptions: (i) the applicable period of damages extends only to 30 days after termination; (ii) the applicable period of damages extends only to the expiration of his contract with AXA, on October 13, 2006; and (iii) the applicable period of damages extends indefinitely for the life of Novick, without right of termination by AXA.

(Dempsey Decl. Exh. F).

Instead of providing such calculations, Novick produced three groups of documents that contained no calculations, entitled "Category 3 Commission Documents showing Novick still receiving payments" (*see* Dempsey Decl. Exh. GG); "Payouts Commissions and GDCs" (*see* Dempsey Decl. Exh. HH); and "Cross Sales and Taken Business" (*see* Dempsey Decl. Exh. II).

Novick also submitted a three-page "overview" document, entitled "Additional Information" which appears to be a wish-list hodge-podge collection of Novick's thoughts on monies he hopes to extract from AXA in this litigation. (*See* Dempsey Decl. Exh. JJ). While this document arguably contains calculations, it does not contain the calculations ordered by the Court. Furthermore, the origins of the numbers in the "overview document" are unsupported, without basis, and inadmissible.

Given Novick's at best cryptic production with regard to Category 3 of the Court's September 11, 2015 Order, AXA asked him the following questions, in an October 2, 2015 letter:

> With respect to the .pdf labeled "Category 3," please explain the following: (i) where are the calculations of sums that plaintiff "claims are owed to him" under the three assumptions listed in numbered paragraph 3 of the Court's order? If those calculations are in another part of plaintiff's submission please identify where they are. If plaintiff has not provided such calculations, please provide them. (ii) Please identify which of the sub-categories of Category 3 each of the documents in that pdf relate to, if any. (iii) What is the significance of the inclusion of the persistency rate documents? Does plaintiff contend that he has not received payments pursuant to the equity letter? If so, what are those contentions? (iv) Several of the documents in this group (and elsewhere throughout plaintiff's submission) do not have Bates numbers. As to each of those documents, please identify (by Bates no.) where, if at all, it was produced in discovery. (v) Please withdraw the document bearing Bates no. D696415-16, and replace it with a redacted copy of that document, provided to you with my January 7, 2014 letter advising that it is a privileged document and was inadvertently produced. (vi) Please provide unredacted copies of the documents that have black lines through them (throughout the submission).
>
> With respect to the other pdfs labeled "Payouts, Commissions and GDCs" and "Cross Sales and Taken Business," please explain what they relate to in the Court's order and what plaintiff suggests they represent in terms of the agreements, schedules or his alleged damages.
>
> With respect to the document labeled "Novick Overview," please explain the following. (A) the basis for plaintiff's contention that he "should have received" an additional $1,938,604 while at AXA. I understand the arithmetic, but what provides for an 82% calculation and how does it relate to what plaintiff was paid while he was affiliated with AXA. Is plaintiff contending that another 82% of what he was paid is due to him? If not, what is he contending? (B) Where does the $84,000,000 come from? Is it related to the document called "Advisory?" If so, how? (C) On what basis is plaintiff claiming that additional monies are due to him from his alleged Tremont, ING Annuities, Charter Brokerage and Gridiron Capital business? Where do the numbers assigned to

25

each of those categories of business come from?  (D) On what does plaintiff base his contention that "the advisor receives 1% trail for life"?  What is the basis for his assertion that he is owed "1% trails for life, and 10% bonus payout on asset business for life"?  (E) What is the basis for plaintiff's assertion that he was unable "to ever sell his book of business since his termination?"  Where does the 350% come from?  (F) What does the line "Deferred Compensation lost" refer to?  (G) What does "Monies misappropriated with AXA's consent and help" refer to?

Finally, what are the total damages plaintiff is claiming, and which parts of those damages relate to each of the three sub-categories of assumptions in the Court's order?

(*See* Dempsey Decl. Exh. H).

Novick responded to AXA's October 2, 2015 letter in an October 7, 2015 letter, but did little to clarify things and, to the extent counsel's letter one week after the production date attempted to include the calculations ordered by the Court, such calculations are deficient and without admissible basis.  Regarding Category 3, and the three assumptions under which Novick was to provide calculations of his damages, Novick's counsel asserted the following in the October 7 letter:

> 3.      Calculations of sums that he claims are owed to him under three assumptions:
>
> The scenarios outlined below, in accordance with the Judge's request, is being provided in conjunction with the additional information sheet provided on September 30, 2015, setting forth the damages alleged herein.
>
> (iii) the applicable period of damages extends indefinitely for the life of Novick, without right of termination by AXA.
>
> Please see "Additional Information" sheet which spells out the total damages claimed herein to be conservatively in excess of $21,000,000.00.  These were calculations that this law firm compiled with the assistance of our potential expert witness necessitating the need for his testimony about same.  In addition,

26

interest for the last ten years must be considered in order to ascertain the real damages herein.

AXA clearly stole $85 million dollars of AUM, which alone totals $850,000.00 a year in fees to him, plus the money he did not receive from the portion of the GDC calculations which AXA kept (and continues to keep), which this firm calculated to be an additional $347,000.00 per year which Novick is owed.

Additionally, due to the wrongful termination, Mr. Novick can no longer sell his book of business, which has been valued at six times annual revenues. As his annual revenues were approximately $1.9 million, the inability to sell his book of business equates to approximately $11.4 million in damages, which was conservatively stated in the "Additional Information" sheet to be $6,562,500.

As Lou Polce stated when questioned about the accounting, a person would need the insurance policy details to determine all of the monies generated. Based upon the foregoing, there in no way to ascertain the exact damages from that portion of Mr. Novick's insurance business without having the policies to determine same (although we can state with certainty that the value of the business impermissibly retained by AXA exceeds $10 million), which were not provided in discovery even though they were demanded. However, as the documents provided clearly indicate, Mr. Novick was entitled to payments on the business he wrote, sold, originated, oversaw either solely or jointly while at AXA. Finally, as previously stated, AXA's Cross-Selling programs provided that advisors would receive higher payouts which would continue for the next ten (10) years.

(i)      the applicable period of damages extends only to 30 days after termination; -

This scenario is not plausible since it is clear that Mr. Novick is still receiving money from AXA as of today. However, to answer the Court's question, you are referred to the "Additional Information" sheet previously provided. Mr. Novick would be entitled to one-twelfth of one year's damages, not including the money he was not paid on.

(ii)      the applicable period of damages extends only to the expiration of his contract with AXA, on October 13, 2006; and

27

> For the same reason, this scenario also is not plausible since
> it is clear that Mr. Novick is still receiving money from AXA as of
> today.

(*See* Dempsey Decl. Exh. K).

Novick should be barred from presenting evidence of damages under <u>any</u> of the three assumptions: (1) the applicable period of damages extends indefinitely for the life of Novick, without right of termination by AXA; (2) the applicable period of damages extends only to 30 days after termination; and (3) the applicable period of damages extends only to the expiration of his contract with AXA, on October 13, 2006. [2]  Novick either has willfully disobeyed the Court's September 11, 2015 Order or is unable to demonstrate any fact-based calculations of his alleged damages.

B. Novick Has Made No Demonstration That He Is Entitled To Lifetime Payments From <u>AXA, And Therefore Should Be Precluded From Seeking Such Damages At Trial</u>

Novick should be precluded from arguing or presenting evidence at trial that he is entitled to damages from AXA extending indefinitely for the life of Novick.  Neither the "Additional Information" overview document, nor any of the Category 3 documents Novick provided, nor the reasons Novick puts forth in his October 7, 2015 letter support such an outlandish proposition.  (*See* Dempsey Decl. Exhs. K, GG-JJ).  Allowing Novick to pursue such an argument in front of the jury would therefore not be probative, would be confusing to the jury, and prejudicial to AXA.

---

[2] Because in counsel's October 7, 2015 letter – the only place Novick references the Category 3 calculations, ordered by the Court -- Novick sets forth his "calculations" in reverse order, AXA also begins with his claim of damages for life.  (Dempsey Decl. Exh. K).

28

1. Novick's "Additional Information" Overview Document Does Not
   Entitle Him To Lifetime Compensation From AXA And He Should
   <u>Be Precluded From Introducing Expert Testimony Or Reports</u>

Novick claims that the stream-of-consciousness "Additional Information" overview document that he provided "spells out the total damages claimed herein to be conservatively in excess of $21,000,000.00" and that these calculations were "compiled with the assistance of our potential expert witness necessitating the need for his testimony about same." (Dempsey Decl. Exh. K).

Novick should be precluded from relying on his "Additional Information" overview document (Dempsey Decl. Exh. JJ) to support his claim for damages.  This document was not produced in discovery, makes little sense, and to the extent it is understandable includes only conclusory statements of dozens of unsubstantiated amounts that Novick claims he is owed.

Novick returns to a couple of his familiar but completely unsupported themes in this document: (a) that he should have been paid based on GDCs, including a percentage of "all money paid or taken into the broker dealer" and (b) that he should have been paid according to what he was paid by prior and/or subsequent institutions with which he has been affiliated, such as Charles Schwab.  There are absolutely no contracts or writings in which AXA undertakes to pay Novick compensation in these ways.   They are figments of Novick's ever hopeful imagination.

With regard to Novick's argument that he should have been paid on all monies collected by AXA, he has made that argument before, and it was refuted then by Margaret Hall, who is the Lead Director-Compensation, Analysis and Design for AXA Equitable Life Insurance Company:

> Novick had no special arrangements that might have entitled him
> to receive "selling arrangements," "soft dollar arrangements,"
> "mutual fund trails" or "annuity trails" as those terms appear to be
> defined by his counsel in the memorandum of law for the Motion
> for Accounting, and any such arrangements that affected the

29

compensation to which Novick was entitled, were included in The Accounting.

(Dempsey Decl. Exh. SS ¶ 3). Moreover, the Court had previously shot down that argument in 2012, when it stated during the conference on June 27, 2012 that such a "macro institutional arrangement" was not relevant to the issue of the accounting.[3] (Dempsey Decl. Exh. QQ (June 27, 2012 Tr.) at 27-28).

Novick also should be precluded from introducing any expert witness testimony or report in support of his claim that he is entitled to lifetime compensation from AXA. This Court has already stated that experts are not needed in this action, in the September 11, 2015 Order:

> Plaintiff's application to identify an expert and to conduct experts' discovery is denied. The issues of compensation and damages appear to be factual. The issues in this case do not merit or require the testimony of expert witnesses.

(*See* Dempsey Decl. Exh. F). Further, Novick has never provided Fed.R.Civ.P. expert disclosures for any expert he may have retained or worked with, either in his Rule 26(a) disclosures or otherwise. His counsel mentioned the name of a purported expert in a letter faxed to the Court right before the September 9 status conference (and rejected by the Court because it was non-compliant with the Court's rules[4]). At the status conference, plaintiff's counsel agreed with the Court that expert testimony is likely unnecessary in this case. (*See* Dempsey Decl. ¶27, Exh. E pp. 26-27).

---

[3] The Court also denied Novick's subsequent motion to compel an accounting (Docket No. 199), and his motion for reconsideration of that order (Docket No. 224), in which Novick made virtually the same arguments. The Court also granted summary judgment to AXA on Novick's accounting claim. (Docket No. 300).
[4] The first two, italicized paragraphs of the "additional information" document (Dempsey Decl. Exh. JJ) are a quote from that non-compliant letter, by the purported, but undesignated, expert. Those paragraphs are improper, add nothing to answer the Court's directives, and should be ignored.

> 2. By Law, Novick's Alleged Wrongful Termination Damages Would be Limited to 30 Days After His Termination, And He Should Be Precluded From Presenting Evidence Of Damages Beyond Such 30 Day Period

One of Novick's theories of damages is for wrongful termination. To the extent the damages numbers in the "additional information" document and counsel's October 7 letter can be deciphered, some of the lifetime damages he seeks appear to be attributable to his claim of wrongful termination. For example, in the "additional information" document, he describes alleged damages of $3,426,141 and $398,810,[5] representing fees he alleges he would have received but for his alleged wrongful termination.

The Court should preclude Novick from presenting any proof of damages extending beyond November 11, 2006, which is 30 days after the termination of his affiliations with AXA on October 12, 2006. The statements and documents Novick has produced to support his contention that the applicable period of damages extends indefinitely do nothing of the kind. Novick has shown no basis for any damages beyond thirty days after his termination (assuming, *arguendo*, that he is able to prove any of his theories of liability at trial) because no such basis exists.

Pursuant to its contracts with Novick, AXA had the right to terminate its affiliations with Novick, for any reason or no reason, on thirty days' notice. The Agent's Agreement (paragraph XIII.D.) states, "Unless otherwise terminated, this Agreement may be terminated by either party with or without cause, by a notice in writing delivered personally, or mailed to the other party at the last known address, at least thirty days before the date therein fixed for such termination." (*See* Dempsey Decl. Exh. N). The Registered Representative's Agreement (paragraph X.B.)

---

[5] The $398,810 is represented to be ten years of 1% of his "Tremont" business, which he shows totaling $3,981,000. AXA disputes entitlement to any such monies, but the total of the "Tremont" business listed is $3,451,000 and Novick has been gone for nine years, not ten.

states, "Unless otherwise terminated, this Agreement may be terminated by either party by a notice in writing delivered personally, or mailed to the other party at the last known address, at least thirty days before the date therein fixed for such termination." (*See* Dempsey Decl. Exh. M).

Novick's potential damages arising from any insufficient compensation or wrongful termination theories thus are limited to what his compensation would have been over the thirty days after his AXA affiliations were terminated (on October 12, 2006), and accordingly he should be precluded from introducing evidence of such damages extending beyond that period. *Galet v. Carolace Embroidery Prods. Co.*, No. 91 Civ. 7991 (SS), 1994 U.S. Dist. LEXIS 14060 (S.D.N.Y. Sept. 30, 1994), *aff'd*, 122 F.3d 1056 (2d Cir. 1995). In the *Galet* case, a consultant entered into a June 1986 consulting agreement of 12 months' duration which allowed for termination by either party upon one month written notice. He was terminated just a couple of months later in August 1986, and later brought a lawsuit asserting breach of contract and seeking damages of 12 months' pay plus additional compensatory damages. Holding that damages can be awarded only until the time the contract would have been terminated if notice had been given, the District Court held that the consultant was not entitled to compensatory damages or payments through the 12 months but only to his rate of pay had notice been given (*i.e.*, one month's pay).

See also *Tendler v. Bais Knesses of New Hempstead, Inc.*, 112 A.D.3d 911, 912 (2d Dep't 2013) ("the plaintiff was only entitled to recover for damages he sustained between the date of the improper termination of employment and the date that his employment was terminated in accordance with the terms of the employment contract") (citation omitted); *De Graffenriedt v. Neighborhood Health Ctr. of Provident Clinical Soc'y*, 42 A.D.2d 773, 346 N.Y.S.2d 469, 471 (2d Dep't 1973) ("The rule is well established that a party who maintains an action for wrongful

discharge under a contract of employment which contains a right of termination is limited to the salary to which he would have been entitled had notice of termination been given.") (citations omitted).

The principle is clear that Novick cannot recover damages beyond his compensation and benefits covering the thirty days after October 12, 2006. *See Polycast Tech. Corp. v. Uniroyal, Inc.*, No. 87 Civ. 3297 (CSH), 1992 U.S. Dist. LEXIS 7903 (S.D.N.Y. May 28, 1992) (limiting plaintiff's damages where agreement provided that employer could terminate employee on 90 days' notice provided that employer paid base salary to date of termination, vested benefits, and severance pay); *Burg v. ARCS Indus. Inc.*, 36 A.D.2d 695 (1st Dep't 1971) (limiting plaintiff's damages where employment agreement was terminable at will by either party at any time, but employer agreed to pay 12 months' salary if it terminated the agreement). This principle is also followed in other jurisdictions. *See Thompson v. Naval Acad. Athletic Ass'n*, No. RDB-12-2676, 2014 U.S. Dist. LEXIS 175274, at *14 n.10 (D. Md. Dec. 19, 2014) (collecting cases from Fourth and Tenth Circuits, and Oklahoma).

3.   Novick Has Failed To Offer Any Evidence In
     Support of Other Bases for Lifetime Compensation

In Novick's counsel's October 7, 2015 letter (Dempsey Decl. Exh. K), he claims lifetime damages to be "conservatively in excess of $21,000,000.00" based on "calculations [his counsel] compiled with the assistance of our potential expert witness." Those purported "calculations" appear to arise from his contention that AXA "stole" $85 million of assets under management ("AUM"), based on his misreading of the clarifying document and/or the equity letter, and his contention that his errant interpretation of GDCs should continue in perpetuity. (*See* discussion of GDCs in Point IV, below). He also claims, "AXA's Cross-Selling programs provided that advisors would receive higher payouts which would continue for the next ten (10) years."

33

Further, Novick nakedly alleges "due to the wrongful termination Novick can no longer sell his book of business." None of these documents or theories provide any support for Novick's claim of lifetime compensation from AXA and evidence as to each of them should be precluded.

a) Novick's Claimed Inability To Sell His Book of Business
Does Not Entitle Him To Lifetime Compensation From AXA

Novick should be precluded from arguing or introducing evidence that he is entitled to lifetime compensation from AXA because he is unable to sell his book of business due to wrongful termination by AXA, as he argues in his overview document and counsel's October 7, 2015 letter. (Dempsey Decl. Exhs. K; JJ).

As a matter of law, AXA had sufficient legal grounds to terminate Novick's AXA affiliations when it did so. It is undisputed that the Agent's Agreement and the Registered Representative's Agreement "shall be terminable forthwith" if Novick "shall fail to comply with any of the provisions or conditions of this Agreement." (Dempsey Decl. Exhs. M and N).[6] On October 12, 2006, AXA terminated Novick's affiliations, on the basis that he was "solicit[ing] interest in a private securities transaction without the approval of the firm." (Dempsey Decl. Exh. LL: Termination Letter). Novick's actions are also known as "selling away."

Indeed, on August 3, 2007, FINRA issued a Letter of Caution to Novick, stating, in pertinent part:

> [b]ased upon our review of [Novick's] conduct, [Novick] attempted to solicit a number of prospective and/or existing customers between September 27, 2006 and October 4, 2006 to participate in transactions to purchase NAU Incorporated, Series-C Preferred Stock: *[sic]*

> [Novick's] involvement with the attempted solicitation of a non-firm approved security is violative of [Novick's] firm's [*i.e.*, AXA Advisors'] written supervisory procedures, Chapter 3, Section D.

---

[6] It is also undisputed that the Registered Representative's Agreement terminates automatically upon the termination of the Agent Agreement. (Dempsey Decl. Exh. M, ¶X.C.).

> Violation of [AXA Advisors'] written supervisory procedures is also a violation of NASD Conduct Rule 2110.

(*See* Dempsey Decl. Exh. MM).

Neither Novick's conduct, nor the plain language of the termination provisions of the Agreements are in dispute.   Selling away thus, standing alone, constituted independent, legitimate grounds for termination of Novick's contractual affiliations with AXA, as the Court has previously recognized.  (Dempsey Decl. Exh. OO (Nov. 7, 2011 Tr.) at 14).

If Novick's termination from his AXA affiliations has harmed his ability to sell his book of business, that is a problem of Novick's own making.  However, Novick has not even offered any evidence that he has ever tried to "sell his book of business" but has been unable to do so. Nor has Novick ever explained what is meant by "selling his book of business" in the first place. Clients of course are free to maintain their accounts wherever and with whichever broker they choose, and a broker such as Novick cannot sell "his clients" wholesale to another institution or broker without their consent.  *See* FINRA Rule 2140.

There is more than ample basis for the Court to preclude Novick from arguing or introducing evidence that he is entitled to lifetime compensation from AXA on the basis of alleged wrongful termination preventing him from selling his book of business.

> b)   The Clarifying Document Does Not Entitle
> <u>Novick to AXA Compensation For Life</u>

Contrary to another Novick argument for lifetime compensation, AXA did not steal $85 million of assets under management from Novick, or any other amount, and was not barred from servicing its own clients by the Clarifying Document.  (Dempsey Decl. Exh. K).  Novick should be precluded from introducing testimony or evidence in support of such a baseless assertion, and

from arguing that he is entitled to lifetime (or any) damages on the basis of AXA "stealing his business."

In relation to his Registered Representative's Agreement with AXA Advisors, Novick and AXA Advisors executed a "Clarifying Document," dated November 12, 2002, regarding disposition of files and customer lists upon termination of the affiliation.  It provides in pertinent part:

> Should an Associate terminate from AXA Advisors, the Associate is expected to return all originals of any *AXA Advisors and its affiliates' files*.  Such an Associate may, however, retain a copy of those files for his/her records provided that the Associate may not retain or make a copy of any confidential, trade secret or copyrighted documents of AXA Advisors or its affiliates or any documents which the Associate is prohibited from copying or retaining under applicable privacy or other laws or regulations.
>
> Any *customer lists* provided to an Associate by AXA Advisors or its affiliates or developed in connection with AXA Advisors' or its affiliates' business are and remain the property of AXA Advisors or its affiliates and all originals and copies of such lists must be returned to AXA Advisors should the Associate terminate from AXA Advisors.  *Customer lists* provided by an Associate to AXA Advisors as part of the Associate's initial hiring or contracting with AXA Advisors or any of its affiliates, or developed by an Associate during the Associate's affiliation with AXA Advisors or any of its affiliates which do not pertain to the business of AXA Advisors or its affiliates, are and remain the property of the Associate and need not be turned over to AXA Advisors should the Associate terminate from AXA Advisors.

(Dempsey Decl. Exh. R) (emphasis added).

Novick's theory that he had the unchallengeable right after being terminated to take with him all of the clients and business that he serviced at AXA, and that AXA had no right to

continue to service those clients and business, is based on a fundamental misreading of the "Clarifying Document."[7]

The Clarifying Document does not prevent AXA from seeking to continue to service the customers Novick serviced while affiliated with AXA.   Instead, it distinguishes between scenarios in which: (a) a registered representative [Associate] develops his or her customers at AXA and in connection with the business of AXA, and (b) the registered representative brings his entire customer list to AXA, and/or develops customers that do not pertain to the business of AXA.   In the former case, the registered representative must return all originals and all copies of the customer list to AXA upon termination.   In the latter situation, the registered representative need not turn over all originals and copies of whatever portion of the customer list the registered representative brought to AXA.   The Clarifying Document restricts what the registered representative can take with him upon termination – and presumably, the extent to which that registered representative could effectively solicit business from those customers whose details are not committed to memory – when the customer list was provided by, or developed in connection with, AXA.   That restriction does not apply to customer lists developed prior to, or entirely separate from, the registered representative's AXA affiliation.   The Clarifying Document does not discuss the status of customer *accounts* upon termination of a registered representative.

Customers, of course, choose of their own free will whether they want their accounts to stay at a particular institution when their broker leaves that institution, or if they want to transfer their accounts to follow the departing broker.   *See* FINRA Rule 2140 ("No member or person associated with a member shall interfere with a customer's request to transfer his or her account

---

[7] The idea that Novick has proprietary rights in AXA's clients that prevent AXA from continuing to service or assign those clients to other brokers after the termination of Novick's affiliation with AXA is equally contrary to law in the insurance context. *See Legacy Group of Am., Inc. v. N. Am. Co. for Life & Health Ins.*, 336 F. App'x 87, 91-92 (2d Cir. 2009) (holding defendant insurance company was entitled to assign policies "and [that plaintiffs] had no proprietary interest in policies beyond receiving commissions.").

in connection with the change in employment of the customer's registered representative where the account is not subject to any lien for monies owed by the customer or other bona fide claim.").

Plaintiff's alleged interpretation of the Clarifying Document would turn it into a reverse non-competition agreement such that AXA would not be permitted to try to retain customer accounts held at AXA. The Clarifying Document does nothing of the kind. It addresses customer lists, not customer accounts. In addition, AXA has an obligation to service the accounts of all of its customers. AXA Advisors is the broker-dealer of record. If AXA were to be prohibited from contacting customers whose accounts it still held after the termination of the assigned registered representative, those customers' accounts would be subject to neglect, and potentially, to significant market losses. Thus, aside from the unambiguous language of the Clarifying Document which merely allows a registered representative who brought his own customer list to AXA to take such list with him upon departure, the interpretation urged by Novick is untenable because it would expose customers and customer *accounts* to potential damage.

Accordingly, Novick should be precluded from introducing any evidence in support of his baseless theory that he is entitled to damages because AXA stole his clients or assets under management.

c) Novick's Cross-Selling Document Does Not
Entitle Him To Lifetime Compensation From AXA

As to Novick's assertion that "AXA's Cross-Selling Programs provided that advisors would receive higher payouts which would continue for the next ten (10) years" (Dempsey Decl. ¶ K), and his production of a "Daily Processing Status Report" from January 26, 2006 (Dempsey Decl. ¶ II), neither entitles him to lifetime compensation from AXA.

The Daily Processing Status Report is not an additional contract between AXA and Novick that would allow him to be paid compensation after the termination of his affiliations with AXA.  It is merely a schedule of payments applicable while the agreements between AXA and Novick were in force.

Novick should be precluded from introducing or relying upon ambiguous references to "AXA's Cross-Selling Programs" or the Daily Processing Status Report to support his claim that he is entitled to lifetime compensation from AXA.

C.    Novick Provided No 30-Day Damages Calculations So Any
      Future Evidence of 30 Days of Damages Should Be Precluded

Flouting the Court's Order, Novick has provided no calculations of his damages extending over the 30 day period from October 13, 2006 through November 12, 2006.

Instead, when questioned by AXA's counsel, Novick asserted:

> This scenario is not plausible since it is clear that Mr. Novick is still receiving money from AXA as of today.  However, to answer the Court's question, you are referred to the "Additional Information" sheet previously provided.  Mr. Novick would be entitled to one-twelfth of one year's damages, not including the money he was not paid on.

(Dempsey Decl. Exh K).

A review of the "Additional Information" overview sheet, however, does not reveal a calculation of "one year's damages," so a computation of one-twelfth of same is not possible. (Dempsey Decl. Exh JJ).

Further, contrary to Novick's argument, it does not follow that because Novick "is still receiving money from AXA as of today," that he is entitled on an indefinite basis to any and all commissions and other compensation that he demands.  (Dempsey Decl. Exh. K).

As discussed above, the mere fact AXA continues to pay Novick vested renewals and service fees with respect to certain AXA proprietary life insurance and annuity products, pursuant to Novick's equity letter, has absolutely no bearing on Novick's baseless attempt to collect any and all other brokerage or other compensation that he seeks, on an indefinite basis. Kondracke Decl. ¶12.  Novick cites to no agreement with AXA, or any other basis, that would permit such open-ended payments, and the actual contracts between the parties do not allow for such a windfall.

Given Novick's dodging and weaving with respect to the Court's simple direction to provide a damage calculation for the first 30 days after his termination, Novick should be prohibited from using any of his Category 3 documents or the "Additional Information" overview sheet in support of such damages.

      D.    Novick's Refusal To Calculate His Damages Through October 13, 2006
              <u>Should Preclude Him From Presenting Evidence Of Such Damages</u>

Just as he did with respect to the Court's Order to provide a calculation of damages extending over a 30 day post-termination period, Novick refused to provide a calculation of his claimed damages to the expiration of his contract with AXA on October 13, 2006.  When questioned about this, he replied:

> For the same reason, this scenario also is not plausible since it is clear that Mr. Novick is still receiving money from AXA as of today.

(Dempsey Decl. Exh K).

Again, this logic is faulty, as the mere fact AXA has chosen to continue to pay Novick with respect to certain life insurance and annuity products, pursuant to the equity letter, does not open the door to Novick to collect any and all other brokerage or other compensation that he

seeks, on an indefinite basis.  Novick cites to no agreement with AXA that would permit such open-ended payments.

Given Novick's inability or refusal to obey the Court's simple direction to provide a damage calculation through the expiration of his contract with AXA, Novick should be prohibited from using any of his Category 3 documents or the "Additional Information" overview sheet in support of such damages.

Another point relating to Novick's claimed damages through his date of termination involves Novick's alleged dispute with Larry Passaretti.  Novick's counsel's October 7, 2015 letter also provided, cryptically, regarding Category 2 documents: "Lists of Clients both Annuity and Insurance – Including clients taken and/or repapered by LP." (Dempsey Decl. Exh. K).  It is believed that the "LP" Novick is referring to is Larry Passaretti.  The Category 2 "insurance" and "advisory" lists, however, do not identify which clients Novick alleges were "taken and/or repapered" by Passaretti.  The notion of compensation regarding clients improperly taken by another AXA financial professional would seem to relate to compensation allegedly owed to Novick for the time period prior to the termination of his AXA affiliations.  *See* the Court's Order, section 3(A)(3)(ii).  (Dempsey Decl. Exh. F).

One of Novick's theories has been that Passaretti removed the name of Novick's father-in-law, Ronald Lorch, from certain accounts for which Lorch allegedly should have been credited.  Novick views this as his concern because he was to allegedly inherit Lorch's accounts. In the first place, this dispute should be entirely between Novick, Lorch, and Passaretti, and has no place in this litigation.  Indeed, Bob Jones, Head of the broker-dealer at the relevant time, noted that AXA makes a policy of staying out of disputes between independent brokers. (Dempsey Decl. Exh. PP at 213).  Second, and more importantly, Novick was reimbursed for the

41

monies he can identify as properly assigned to him that were mis-assigned elsewhere.   He complained about $53,000 that was ultimately returned to him. (Dempsey Decl. Exh. PP at 210-11).  While he now apparently points to an additional $120,000, he cannot demonstrate that that money should have been paid to him, or that it was his claim rather than Lorch's.  (*Id.* at 216). There has been no evidence adduced in discovery that indicates Novick was to be a third party beneficiary to any agreement involving Lorch and or Passaretti.  Thus, Novick has no standing to seek compensation for certain accounts for which Lorch, a non-party, allegedly should have been credited.  In addition, these issues relating to Lorch and Passaretti are irrelevant to this litigation and would only cause confusion to the jury.  *See* Fed. R. Evid. 401, 403.  Novick should be precluded from pursuing this at trial.

## IV. NOVICK HAS PRODUCED NO EVIDENCE THAT HE IS ENTITLED TO COMPENSATION BASED ON GDCS, AND SO HE SHOULD BE PRECLUDED FROM ARGUING OR INTRODUCING EVIDENCE REGARDING SUCH CLAIM AT TRIAL

A long-asserted but completely groundless Novick argument that he uses to allege he was not compensated properly while at AXA, and then carries forward to his post-AXA damages claims is that he should have been compensated according to Gross Dealer Concessions, or GDCs, instead of being compensated based upon Production Credits, POP and other methods set forth in the actual agreements between AXA and Novick, and/or the rules and schedules referenced in those agreements.  Novick should be precluded from making this claim at trial, or adducing evidence purportedly related to it as there is no basis for his "paid according to GDCs" contention, and his supposed "evidence" of it would only confuse the jury.

Unsurprisingly, when put to the test in the Court's September 11, 2015 Order of coming forward with "All writings that constitute the agreement between Novick and AXA Network, and between Novick and AXA Advisors including agreements for sales of insurance contracts

and securities and copies of all referenced documents that provide for compensation to plaintiff, issued by AXA between Nov. 12, 2002 and Oct. 13, 2006," Novick put forth no agreement, schedule, rule, or other document that entitles him to compensation based on GDCs. There is a simple explanation for that: no such documents exist.

In his "additional information" document, Novick states "Gross Dealer Concession is the total amount of monies generated from ones' [sic] $100,000,000 book of business." As noted many times previously in this litigation, including in response to plaintiff's motions for an "accounting" which have been denied, there is no basis whatsoever for Novick to claim entitlement to a calculation "generated from his $100,000,000[8] book of business" or to some portion of "additional revenues over and above the stated fee." (Dempsey Decl. Exh. JJ). As explained by Margaret Hall, AXA's Lead Director-Compensation, Analysis and Design, AXA's method of compensation did not include such "additional revenues" and Novick had no special arrangements. (Dempsey Decl. Exh. SS, ¶3). In addition, the only place "GDCs" is used in the controlling contracts is in the first version of his promissory note (later amended) where GDCs is defined to exclude such additional revenues.

There is not a shred of evidence indicating that AXA agreed to Novick's compensation being determined on the basis of GDCs. The references to GDCs in the proposed and later superseded terms of repayment and/or forgiveness with respect to his loans from AXA (Dempsey Decl. Exhs. U, X, O, P), which in any event did not govern how AXA determined his commissions, fees and other non-loan compensation, do not bind AXA to pay Novick according to GDCs. The documents Novick provided as "Payouts Commissions and GDCs" (*see* Dempsey Decl. Exh. HH), which contain a couple of emails mentioning GDCs, non-controlling deposition

---

[8] Novick has also failed to adduce evidence that his "book of business" was worth $100,000,000 while at AXA; he simply frequently repeats that number.

testimony, and an excerpt from a court hearing, do not bind AXA to pay Novick according to GDCs. For example, Novick disingenuously provided in his "Payouts Commissions and GDCs" document pile (*see* Dempsey Decl. Exh. HH) a portion of a document entitled "Platinum Firm Qualifications and Benefits," which does mention 90% and 80% "payout of gross dealer concession." What Novick did not include, of course, was the December 13, 2002 cover email (an internal AXA email not sent to Novick) transmitting that document, in which AXA's Jeanne Kondracke discusses how AXA is deciding whether to make Novick a Platinum producer, and stated "see attached for platinum qualifications  Note: the benefits described are 2002 benefits. Some will need to be revised e.g., compensation, on account of the 2003 compensation/POP changes." (*See* Dempsey Decl. Exh. KK) (emphasis added).

Accordingly, with no agreement by which AXA promised to compensate Novick on the basis of GDCs, Novick should be precluded from arguing that he should have been compensated on that basis.

## V.  NOVICK IS NOT ENTITLED TO ATTORNEYS' FEES

In his "Additional Information" Overview document, Novick sneaks in an entry under "Additional damages" of "Legal expenses in excess of $1,000,000." (Dempsey Decl. Exh. JJ). There is absolutely no basis for Novick to claim he is entitled to recover attorneys' fees from AXA with respect to this lawsuit.

It is well-settled that "[u]nder the general rule, attorneys' fees and disbursements are incidents of litigation and the prevailing party may not collect them from the loser unless an award is authorized by agreement between the parties or by statute or court rule." *A.G. Ship Maint. Corp. v. Lezak*, 69 N.Y.2d 1, 5 (1986) (citations omitted); *Hooper Assocs., Ltd. v. AGS Computers, Inc.*, 74 N.Y.2d 487 (1989). This rule is sometimes referred to as the "American

44

Rule" on attorneys' fees.   In the absence of statutory authority counsel fees "'are merely incidents of litigation and thus are not compensable.'"   *In re Green*, 51 N.Y.2d 627, 630 (1980) (citations omitted).

With no agreement, statute or court rule to rely on, Novick should be precluded from introducing evidence or arguing that he is entitled to attorneys' fees.

## CONCLUSION

The Court has given Novick his chance to put forth his proof of the three categories identified in the Court's September 11, 2015 Order Regulating Pending Motions.  He has failed and/or refused to do so.

As discussed above, so that the issues are appropriately narrowed for the jury and otherwise, Novick should be precluded from submitting as evidence the following deficient documents (or any other documents regarding the categories set forth in the Order that he may attempt to present from now through the trial):

1.      The 14 documents discussed in Points I(A) through I(N);

2.      The "insurance" and "advisory" lists discussed in Point II; and

3.      The "Additional Information" overview document, his counsel's October 7, 2015 letter, and any purported evidence of the damages allegations alluded to therein, including, without limitation:

   a.      The contention that he is owed another 1% (or any amount) on the compensation he already received;

   b.      The contention that he is entitled to one percent (or any percentage) of $85,000,000 in allegedly "stolen" business;

45

      c.     Any evidence of his earnings or "book of business" at other companies as a basis for damages from AXA;

      d.     Evidence of monies allegedly due under "Tremont;"

      e.     Any suggestion that he is entitled to a further "accounting;"

      f.     Any evidence dependent on, or arising from expert analysis, calculations or expected testimony.

4.     The "Category 3 Commission Documents showing Novick still receiving payments," "Payouts Commissions and GDCs," and "Cross Sales and Taken Business" discussed in Point III.

5.     For the reasons discussed in Point IV, Novick should also be precluded from offering purported evidence in support of his contention that AXA agreed to compensate him based upon GDCs.

6.     Novick should also be precluded from introducing evidence or arguing that he is entitled to attorneys' fees, as discussed in Point V.

For all of the foregoing reasons, defendants respectfully request that the Court grant defendants' motion to preclude, and award such other and further relief as the Court deems just and proper.

Dated: New York, New York
          October 23, 2015

EPSTEIN BECKER & GREEN, P.C.

By:   /s/ Aime Dempsey
          Aime Dempsey
          David J. Clark

250 Park Avenue
New York, New York 10177
(212) 351-4500
adempsey@ebglaw.com
*Attorneys for Defendants/Counterclaim Plaintiffs*

47