UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
                     :

STEVEN S. NOVICK,
                     :     **ECF Case**

         Plaintiff,    :

                     :     Case No.: 07-CV-7767 (AKH)(KNF)

     - against -       :

                     :

AXA NETWORK, LLC,
and AXA ADVISORS, LLC,     :

                     :

         Defendants.    :

                     :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

## DEFENDANTS' PRE-TRIAL MEMORANDUM

**EPSTEIN BECKER & GREEN, P.C.**
250 Park Avenue
New York, New York 10177
(212) 351-4500
*Attorneys for Defendants/Counterclaim Plaintiffs*

FIRM:36231500v1

# TABLE OF CONTENTS

                                                                              Page

PRELIMINARY STATEMENT ...........................................................................1

STATEMENT OF FACTS ..................................................................................2

    A.    Novick's Affiliation and Agreements with AXA ....................................2

          1.    Provisions in the Agent's Agreement .........................................3

          2.    Provisions in the Registered Representative's Agreement .........5

    B.    Loans Provided to Novick ...................................................................6

    C.    Novick Was a Compliance Risk ...........................................................7

    D.    Novick Committed a Violation Warranting His Termination ................8

    E.    The Termination of Novick's Affiliation with AXA .............................9

    F.    AXA's Compliance Manual ...............................................................10

    G.    Balances Due on Loans to Novick......................................................11

    H.    Procedural History ............................................................................11

          1.    Plaintiff's Claims ....................................................................11

          2.    Motion for Partial Summary Judgment.....................................12

          3.    First Motion to Dismiss ...........................................................12

          4.    Renewed Motion to Dismiss.....................................................13

          5.    Defendants' Prior Summary Judgment Motion .........................13

          6.    Novick's Motion to Compel Accounting...................................15

          7.    AXA's 2015 Motion For Summary Judgment...........................15

          8.    Issues For Trial And Rulings on Motions In Limine................15

ARGUMENT......................................................................................................17

POINT I AXA'S COUNTERCLAIM: NOVICK HAS BREACHED HIS
        CONTRACT FOR PAYMENT OF A PROMISSORY NOTE..................17

FIRM:36231500v1

POINT II AXA HAS NOT BREACHED ANY CONTRACT WITH NOVICK .........................20

    A.    Novick Was Not Wrongfully Terminated..............................................................21

        1.    Novick Engaged in Selling Away and AXA Was
                Entitled to Terminate His Affiliations for Selling Away ..........................21

        2.    Novick's Termination Was Not Retaliatory .............................................22

        3.    AXA's Agreements With Novick
                Were Terminable on 30 Days' Notice ......................................................24

        4.    AXA Advisors' Compliance Manual is Not a Contract ...........................25

        5.    The Compliance Manual Does Not Impose Contractual
                Requirements Upon AXA and, Therefore, Novick Cannot
                Identify Any Contractual Terms Breached by AXA ................................26

        6.    AXA Has Not Breached the
                Agreements or the Compliance Manual ...................................................29

        7.    Novick's Claim for "New York Law"
                Retaliation Protection is Baseless ...........................................................29

    B.    The Clarifying Document is Not Ambiguous and AXA
        Did Not Improperly Take Novick's "Book of Business" .......................................30

    C.    AXA Did Not Breach The Agreements with
        Regard To Novick's Compensation......................................................................34

CONCLUSION ..................................................................................................................35

FIRM:36231500v1

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Albert v. Losken,*
  No. 96 Civ. 219, 1996 WL 571112 (E.D.N.Y. Sept. 11, 1996)................................29

*Bank of N.Y. v. Vega Tech. United States, LLC,*
  18 A.D.3d 678 (2d Dep't 2005) ................................................................18

*Baron v. Port Auth.,*
  271 F.3d 81 (2d Cir. 2001)................................................................28

*Brady v. Calyon Secs. (USA),*
  No. 05 Civ. 3470, 2007 U.S. Dist. LEXIS 92602 (S.D.N.Y. Dec. 17, 2007)..........................29

*Camferdam v. Ernst & Young Int'l, Inc.,*
  No. 02 Civ. 10100, 2004 U.S. Dist. LEXIS 2284 (S.D.N.Y. Feb. 12, 2004) ..........................26

*Care Travel Co. v. Pan Am. World Airways, Inc.,*
  944 F.2d 983 (2d Cir. 1991)................................................................27

*Cosgrove v. Fed'l Home Loan Bank,*
  No. 90 Civ. 6455, 1999 U.S. Dist. LEXIS 7420 (S.D.N.Y. Mar. 22, 1999)..........................23

*Customers Bank v. Anmi, Inc.,* No. 11 Civ. 07992 (AJN),
  2012 U.S. Dist. LEXIS 180391 (S.D.N.Y. Dec. 20, 2012) ....................................17

*Daniel v. Long Island Hous. P'ship,*
  No. 08 Civ. 01455, 2009 U.S. Dist. LEXIS 20251 (E.D.N.Y. Mar. 13, 2009) ......................28

*Deshpande v. Medisys Health Network, Inc.,*
  No. 07 Civ. 375, 2010 U.S. Dist. LEXIS 37891 (E.D.N.Y. Apr. 16, 2010),
  *aff'd,* 423 F. App'x 31 (2d Cir. 2011)................................................................24

*Fraser v. Fiduciary Trust Co., Int'l,*
  No. 04 Civ. 6958, 2005 U.S. Dist. LEXIS 48059 (S.D.N.Y. June 23, 2005)..........................23

*Gateway State Bank v. Shangri-La Private Club for Women, Inc.,*
  113 A.D.2d 791 (2d Dep't 1985), *aff'd,* 67 N.Y.2d 627 (1986)................................18

*Gorman v. Nat'l Med. Care, Inc.,*
  No. 103604-95, 1998 WL 1050970 (Sup. Ct. N.Y. Cty. Aug. 13, 1998) ................................29

iii

*Gross v. Fruchter*,
    230 A.D.2d 710 (2d Dep't 1996) ........................................................................18

*Harsco Corp. v. Segui*,
    91 F.3d 337 (2d Cir. 1996) ..............................................................................20

*Internet Law Library, Inc. v. Southridge Capital Mgmt., LLC*,
    Nos. 01 Civ. 6600 (RLC), 02 Civ. 0138 (RLC), 2005 U.S. Dist. LEXIS 32299
    (S.D.N.Y. Dec. 8, 2005), *aff'd sub nom., ITIS Holdings, Inc. v. Southridge
    Capital Mgmt., LLC*, 329 F. App'x 299 (2d Cir. 2009) ....................................17, 18

*John Hancock Mut. Life Ins. Co. v. Amerford Int'l Corp.*,
    22 F.3d 458 (2d Cir. 1994) ..............................................................................27

*Joseph v. Marco Polo Network, Inc.*,
    No. 09 Civ. 1597, 2010 U.S. Dist. LEXIS 119713 (S.D.N.Y. Nov. 10, 2010) .......24

*Koeben v. Altchek*, No. 94 Civ. 848 (PKL),
    1997 U.S. Dist. LEXIS 2027 (S.D.N.Y. Feb. 26, 1997) .....................................18

*Lahage v. Batrouni*,
    289 A.D.2d 301 (2d Dep't 2001) .......................................................................18

*LaSalle Bank Nat'l Ass'n v. Nomura Asset Capital Corp.*,
    424 F.3d 195 (2d Cir. 2005)..............................................................................31

*Lawson v. N.Y. Billiards Corp.*,
    331 F. Supp. 2d 121 (E.D.N.Y. 2004) ...............................................................26

*Lobosco v. N.Y.Tel. Co./NYNEX*,
    96 N.Y.2d 312 (2001) ................................................................................26, 28

*Mercury Partners LLC v. Pacific Med. Bldgs., L.P.*,
    No. 02 Civ. 6005, 2007 U.S. Dist. LEXIS 55855 (S.D.N.Y. July 30, 2007) ....20-21

*Metro. Life Ins. Co. v. RJR Nabisco, Inc.*,
    906 F.2d 884 (2d Cir. 1990)..............................................................................31

*Monte v. Ernst & Young LLP*,
    330 F. Supp. 2d 350 (S.D.N.Y. 2004)................................................................23

*Mulder v. Donaldson, Lufkin & Jenrette*,
    208 A.D.2d 301 (1st Dep't 1995) ......................................................................29

*National Union Fire Ins. Co. v. Fremont*,
    760 F. Supp. 334 (S.D.N.Y. 1991) ..............................................................17-18

iv

*New Moon Shipping Co. v. MAN B & W Diesel AG*,
    121 F.3d 24 (2d Cir. 1997) ........................................................................................26

*Pardy v. Gray*,
    No. 07 Civ. 6324, 2008 U.S. Dist. LEXIS 53997 (S.D.N.Y. July 15, 2008) .........................23

*Riel v. Morgan Stanley*,
    No. 06 CV 524 (TPG), 2007 U.S. Dist. LEXIS 11153 (S.D.N.Y. Feb. 16,
    2007), *aff'd*, 299 F. App'x 91 (2d Cir. 2008) ......................................................................26

*Sabetay v. Sterling Drug, Inc.*,
    69 N.Y.2d 329 (1987) ..............................................................................................30

*Schron v. Troutman Sanders LLP*,
    20 N.Y.3d 430 (2013) ..............................................................................................31

*Stroll v. Epstein*,
    818 F. Supp. 640 (S.D.N.Y. 1993), *aff'd*, 9 F.3d 1537 (2d Cir. 1993) ....................................19

*Terwilliger v. Terwilliger*,
    206 F.3d 240 (2d Cir. 2000) ......................................................................................20

*Ubal-Perez v. Delta Air Lines, Inc.*,
    No. 13 Civ. 2872, 2014 U.S. Dist. LEXIS 7398 (E.D.N.Y. Jan. 2, 2014)................................28

*United States v. Broadcast Music, Inc.*,
    275 F.3d 168 (2d Cir. 2001)......................................................................................27

*Waldman v. Riedinger*,
    423 F.3d 145 (2d Cir. 2005).................................................................................27, 31

*WWW Assocs. v. Giancontieri*,
    77 N.Y.2d 157 (1990) ..............................................................................................31

*Yarde v. Good Samaritan Hosp.*,
    360 F. Supp. 2d 552 (S.D.N.Y. 2005)...........................................................................24

FIRM:36231500v1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

STEVEN S. NOVICK,

                   Plaintiff,

        - against -

AXA NETWORK, LLC,
and AXA ADVISORS, LLC,

                Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

**ECF Case**

Case No.: 07-CV-7767 (AKH)(KNF)

Defendants-Counterclaim Plaintiffs AXA Network, LLC ("AXA Network") and AXA Advisors, LLC ("AXA Advisors") (collectively, "defendants" or "AXA"), through their attorneys, Epstein Becker & Green, P.C., respectfully submit this pre-trial memorandum.

## PRELIMINARY STATEMENT

Contrary to Plaintiff-Counterclaim Defendant Steven Novick's ("plaintiff" or "Novick") allegations, there was no breach of contract on the part of defendants, or any other improper conduct by them. The evidence will show that Novick's termination resulted from clear evidence that Novick was "selling away," an undeniable violation of AXA policy and settled industry standards. The decision to terminate Novick was made by the head of retail distribution and chairman of AXA Advisors, and was in full accord with Novick's agreements with AXA. Moreover, defendants had the right to terminate Novick's agreements on thirty days' notice even without cause. There was nothing unlawful or improper about AXA's filing of Novick's Uniform Termination Notice for Securities Industry Registration ("Form U-5"), or its efforts, after Novick's termination, to attempt to retain some of the customers he had serviced at AXA.

Moreover, while he was at AXA, Novick was compensated appropriately, pursuant to AXA's schedules and rules applicable to Novick and all of AXA's affiliated agents.

In contrast, Novick has undeniably failed to abide by his obligations to AXA.  In 2003, AXA Network provided Novick with $1.5 million in loans secured by a $1 million loan note and a $500,000 promissory note.  At the time of his termination, a portion of one note had been repaid by Novick, and a portion of the other had been forgiven according to its terms.  Both notes, however, have outstanding balances which became due, with interest, upon severance of Novick's relationship with AXA.  Those balances have not been paid.  This Court previously granted summary judgment in favor of AXA on the unpaid balance of the $1 million loan note, plus interest.

Plaintiff's remaining breach of contract claim is without merit.  AXA should prevail on its counterclaims for breach of the promissory note and unjust enrichment as Novick continues to owe AXA hundreds of thousands of dollars.

## STATEMENT OF FACTS

A.    Novick's Affiliation and Agreements with AXA

On November 12, 2002, Novick entered into an independent contractor relationship with AXA.  The relationship was memorialized and governed by two separate agreements:  an agreement with AXA Network known as the 14th Edition Agent's Agreement (the "Agent's Agreement") and an agreement with AXA Advisors (the "Registered Representative's Agreement") (collectively, the "Agreements").  The Agent's Agreement governs insurance business and the Registered Representative's Agreement governs securities business.  Like most of AXA's financial advisors and insurance agents, Novick was an independent contractor with AXA, not an employee.  The vast majority of his business was in securities, rather than insurance.

2

FIRM:36231500v1

The Agreements set out basic terms and conditions of Novick's association with AXA Network and AXA Advisors.  For example, the Agent's Agreement has provisions allowing Novick to offer insurance policies and annuity contracts, and discussing compensation, vesting of commissions, and limitations of authority, among other matters.   The Registered Representative's Agreement contains terms governing the securities side of Novick's business, allowing him to solicit customers or clients for products and services on behalf of AXA Advisors, LLC when authorized to do so, and discusses compensation and other matters.  While the two Agreements cover similar territory, they are not identical.

There could be no mystery for Novick as to the operation of AXA's businesses or as to how Novick could anticipate being compensated.  Before he became affiliated with AXA, Novick discussed the potential affiliation with AXA personnel for many months.  Both he and his counsel reviewed the agreements before he signed them.  Novick and AXA discussed whether Novick would continue to do certain kinds of business he had been doing at his previous broker-dealer.  They discussed compensation.  Novick's counsel expressed reservations about whether certain aspects of the proposed affiliation would be beneficial enough to Novick.  In addition, at least one of the individuals at AXA with whom Novick was communicating about joining AXA, David Karr ("Karr"), opined to Novick that AXA, which emphasized insurance business, might not be a good fit for Novick, whose experience was mostly at "wire houses" (firms handling primarily or exclusively broker-dealer products).  After all of the discussion and review, Novick signed the standard Agreements, without revisions.

1.      Provisions in the Agent's Agreement

The Agent's Agreement supersedes any prior negotiations or oral agreements.  Certain relevant sections of the Agreements are set forth below, and they establish AXA's undeniable right to terminate Novick's affiliations with AXA.

3

For example, the Agent's Agreement provides:

> **VII. Regulations.**  This Agreement is subject to such rules and regulations as AXA Network has established or may hereafter establish covering the conduct of its business.

In addition, with respect to termination, the Agent's Agreement states, *inter alia*,

> A. This Agreement shall be terminable forthwith…if the Associate [Novick] shall fail to comply with any of the provisions or conditions of this Agreement, or if [Novick] shall violate any law in force in the territory in which [Novick] is doing business.

\*          \*          \*          \*

> D. Unless otherwise terminated, this Agreement may be terminated by either party with or without cause, by a notice in writing delivered personally, or mailed to the other party at the last known address, at least thirty days before the date therein fixed for such termination.

With respect to compensation, the Agent's Agreement provides:

> **III. Commissions and Service Fees.**  The Associate shall be allowed commissions, services fees and additional compensation on premiums, and considerations for insurance policies and annuity contracts secured under this Agreement in accordance with the Schedule of Commissions (issued by AXA Network with notice to the Associate) in force on the date of the application for the policy or contract, as such premiums and considerations become due and are paid. …

Relative to the AXA Network insurance business, Novick was also provided with an amendment to the Agent's Agreement, entitled Amendment to AXA Network's 14th Edition Agent's Agreement (the "equity letter") and commonly referred to at AXA as an "equity letter," which he signed on August 4, 2005.  The equity letter accelerates the vesting provisions for renewal commissions, service fees and asset based compensation described in the Agent's Agreement, waives certain collective charges, and describes terms under which Novick could sell his "vested renewal compensation, service fees and/or asset based compensation" with

4

respect to his insurance business.  It has no force or effect on customer lists or their disposition, and it does not alter the termination provisions of the Agent's Agreement.

2.    <u>Provisions in the Registered Representative's Agreement</u>

Relevant provisions of the Registered Representative's Agreement include:

> **I. Authority**. The Representative, *when authorized by AXA Advisors to do so* with respect to each product or service *offered or distributed by AXA Advisors*, may solicit customers or clients for such products and services on AXA Advisors' behalf.  The Representative may also perform other functions with respect to such products or services, *when authorized by AXA Advisors to do so.*

(emphasis added).  The Registered Representative's Agreement further provides:

> **III. Commissions and Service Fees.** The Representative shall be paid such commissions, service fees and other compensation as may be provided for by schedules and rules published from time to time by or on behalf of AXA Advisors.  Such rules may include provisions governing the timing of payment, the recovery of commissions for business that does not persist, and all other aspects of the Representative's entitlement to compensation. …

and

> **V. AXA Advisors Rules and Regulations.**  This Agreement is subject to, and the Representative shall adhere to, all rules, regulations, policy guidelines or other instructions that AXA Advisors (or another entity acting on its behalf) may from time to time publish…in the form of compliance guides or manuals, information bulletins, notices or other written communications.  Those rules, regulations, policy guidelines or instructions may place limitations on the authority of the Representative to act on AXA Advisors' behalf with respect to products and services offered or distributed by AXA Advisors.

Regarding termination, the Registered Representative's Agreement provides:

> A.  This Agreement shall be terminable forthwith if the Representative shall fail to comply with any of the provisions or conditions of this Agreement, or if the Representative shall violate any law or regulation in force in any territory in which the Representative is doing business….B.   Unless otherwise terminated, this Agreement may be terminated by either party by a

5

notice in writing delivered personally,…at least thirty days before the date therein fixed for such termination. C. In the event that the [Agent's Agreement] with AXA Network terminates, this Agreement shall automatically terminate as of the same date.

In relation to the Registered Representative's Agreement, Novick and AXA Advisors also executed a "Clarifying Document," dated November 12, 2002, which accompanied an Addendum to the Registered Representative's Agreement. The Clarifying Document concerns disposition of files and customer lists upon termination of the affiliation. It provides in pertinent part:

Should an Associate terminate from AXA Advisors, the Associate is expected to return all originals of any *AXA Advisors and its affiliates' files*. Such an Associate may, however, retain a copy of those files for his/her records provided that the Associate may not retain or make a copy of any confidential, trade secret or copyrighted documents of AXA Advisors or its affiliates or any documents which the Associate is prohibited from copying or retaining under applicable privacy or other laws or regulations.

Any *customer lists* provided to an Associate by AXA Advisors or its affiliates or developed in connection with AXA Advisors' or its affiliates' business are and remain the property of AXA Advisors or its affiliates and all originals and copies of such lists must be returned to AXA Advisors should the Associate terminate from AXA Advisors. *Customer lists* provided by an Associate to AXA Advisors as part of the Associate's initial hiring or contracting with AXA Advisors or any of its affiliates, or developed by an Associate during the Associate's affiliation with AXA Advisors or any of its affiliates which do not pertain to the business of AXA Advisors or its affiliates, are and remain the property of the Associate and need not be turned over to AXA Advisors should the Associate terminate from AXA Advisors.

During the course of discovery in this litigation, Novick produced a customer list, thus demonstrating that he has at least a copy of it, as the Clarifying Document allows.

B.    Loans Provided to Novick

AXA provided Novick with $1.5 million in loans, pursuant to two sets of loan documents. Plaintiff executed a $500,000 Promissory Note in favor of AXA Network on

6

January 15, 2003 (the "January Promissory Note").  As amended, the January Promissory Note was to be forgiven in tranches of $100,000, depending on plaintiff's production as measured by Production Credits.

Plaintiff also executed a $1 million Loan Note in favor of AXA Network on August 28, 2003 (the "August Loan Note").  The August Loan Note was secured by Novick's father-in-law's insurance renewals, and was to be repaid quarterly.

C.    Novick Was a Compliance Risk

Securities and insurance companies are among the most heavily regulated businesses in the national marketplace.  AXA Advisors and AXA Network are bound by such regulations and employ a comprehensive compliance supervisory system to enforce them.  Prior to the "selling away" actions that resulted in his termination, Novick repeatedly flaunted AXA's rules and regulations during his AXA affiliation.  Running afoul of compliance rules was not new or unique for Novick.

For example, on July 25, 2003, AXA issued a letter of reprimand to Novick, which Novick acknowledged, after a routine compliance audit disclosed that nearly all of his files reviewed contained insufficient documentation demonstrating the suitability of underlying sales.

In early 2003, AXA informed Novick that while he may have followed different practices elsewhere, AXA's compliance requirements were more strict and would need to be adhered to. Notwithstanding that, at various times in 2003 and 2004, AXA discovered that Novick had in his files blank forms signed by some of his clients, in contravention of AXA Advisors and NASD policies.  He was warned about this practice.  In the summer of 2004, the branch manager at the Stamford branch of AXA where Novick worked again learned that he had been using blank signed transfer documents.  As a result, in another letter of reprimand, dated June 29, 2004, Novick was placed on enhanced supervision for a period of one year, and was fined $1,500.00.

7

Later in 2004, Novick was expressly warned, in a telephone conversation with Richard Ferrone, that certain actions that Novick was contemplating taking with respect to a real estate investment opportunity, would constitute the prohibited practice of "selling away." In that conversation, Ferrone explained selling away to Novick so that he would understand what it was, and be reminded that it was prohibited at AXA (as well as in the industry).

D.     Novick Committed a Violation Warranting His Termination

In late September 2006, Novick apparently learned of a venture capital opportunity to invest in a company known as NAU, Inc. ("NAU"). The company was seeking high net-worth investors to help it raise approximately $17 million in capital. The NAU investment was not approved by AXA Advisors. Solicitation of investments in a security not approved by the registered broker-dealer with which a registered representative is affiliated is known in the securities industry as "selling away," and is prohibited by most broker-dealers and by FINRA rules.[1] Without such approval in advance, Novick was not authorized to offer the NAU investment to potential or existing customers under the auspices of AXA. AXA indisputably bans selling away, whether or not the security in question is ever actually "offered," whether or not the registered representative in question enjoys any monetary benefit from the improper solicitation, and whether or not the security is later approved.

Between approximately September 27 and October 6, 2006, Novick transmitted emails regarding the NAU investment to more than 25 individuals. Ultimately, Novick admitted that these activities were improper.

---

[1] The Financial Industry Regulatory Authority ("FINRA") was created, effective July 30, 2007, through the consolidation of the National Association of Securities Dealers ("NASD") and certain operations of the New York Stock Exchange. The FINRA rules of conduct adopted the numbering scheme from the NASD rules. For ease of reference, the relevant rules and events will be referenced as "FINRA," though some events occurred prior to the effective date of the consolidation.

FIRM:36231500v1

E.    The Termination of Novick's Affiliation with AXA

On October 5, 2006, Novick sent Edward Dane ("Dane"), then President of AXA Advisors, two emails regarding the NAU investment opportunity.  Dane was concerned that the emails might constitute selling away, and that Novick had likely sent them to other people.  Dane took a copy of these emails to AXA's counsel for review.  AXA's National Compliance Office ("NCO") conducted an investigation, also involving branch management, and the next day, Georgette Geller ("Geller"), Novick's branch manager and Divisional Executive Vice President with AXA Advisors, notified Novick in writing that he "must immediately **Cease and Desist** [from] soliciting or recommending this, or any other, non-AXA Advisors investment to anyone. Your conduct in this matter may be deemed by [AXA] to be 'selling away.'"  (Emphasis in original).

As part of the investigation, Novick was given an opportunity to explain himself both in writing and in person.  Geller asked him to submit a written response to the cease and desist letter, and he did so.  He also participated in a conference call with Geller, branch compliance officer William DeMatteo ("DeMatteo"), Patricia Boylan ("Boylan"), an attorney with the NCO, and Phil Gullo, compliance officer for the region encompassing the Connecticut branch (to whom DeMatteo reported).  Further, he was invited to, and attended, a meeting at AXA's headquarters in New York City, in which Robert Jones (then Chairman of the Broker-Dealer business for AXA Advisors), Geller, and several others heard Novick explain his point of view regarding the NAU correspondence and the allegation of selling away.  The NCO investigated and determined that Novick had committed the violation of selling away.  Jones made the decision to terminate Novick's affiliations with AXA.  He did not consider it a close call. Novick's affiliation with AXA was terminated on October 12, 2006 for "solicit[ing] interest in a

FIRM:36231500v1

private securities transaction without the approval of the firm." After Novick requested a copy of the Form U-5, AXA Advisors duly submitted Novick's Form U-5 noting the reason for his termination as selling away.

FINRA, the entity with regulatory oversight over broker-dealers such as AXA Advisors and financial advisors such as Novick, then conducted its own investigation. FINRA asked questions and collected documents from both AXA and Novick, and came to the same conclusion. On August 3, 2007, FINRA issued a Letter of Caution to Novick, noting that he had violated Conduct Rule 2110. The Letter of Caution stated, in pertinent part,

> [b]ased upon our review of [Novick's] conduct, [Novick] attempted to solicit a number of prospective and/or existing customers between September 27, 2006 and October 4, 2006 to participate in transactions to purchase NAU Incorporated, Series-C Preferred Stock: [sic]

> [Novick's] involvement with the attempted solicitation of a non-firm approved security is violative of [Novick's] firm's [i.e., AXA Advisors'] written supervisory procedures, Chapter 3, Section D. Violation of [AXA Advisors'] written supervisory procedures is also a violation of NASD Conduct Rule 2110.

F.    AXA's Compliance Manual

Novick contends that the termination of his affiliations with AXA Advisors and AXA Network constituted a breach of contract on the part of AXA, alleging that his termination was an improper retaliation for his alleged complaints about the activities of another affiliated agent and registered representative, Lawrence Passaretti ("Passaretti"), a veteran AXA financial professional who, along with Novick, was one of the top securities investment producers at AXA Advisors.

FIRM:36231500v1

In this regard, Novick's contorted breach of contract claim relies on his allegation that AXA Advisors' 2005 Compliance Manual ("Compliance Manual") is incorporated into his Agent's Agreement and Registered Representative's Agreement.

By its own terms, however, the Compliance Manual is not a contract: "The provisions of this Manual are not intended to create any contractual commitments or obligations on the part of [AXA] to any of its Representatives or employees.  None of the provisions of this Manual are intended to alter any existing at-will relationships between [AXA] and any of its Representatives."

G.    Balances Due on Loans to Novick

When Novick's Agent's Agreement and Registered Representative's Agreement were terminated, the unpaid and unforgiven portions of the August Loan Note and the January Promissory Note became due.  There was $450,000, plus interest due on the loan note, and $400,000 unforgiven, and thus due, plus interest on the promissory note.  AXA made demands for these amounts, but Novick has not made any payments whatsoever on these amounts since his termination.

H.    Procedural History

This litigation was initiated in 2007 and there have been multiple amendments to the complaint, along with multiple dispositive motions, court appearances and orders that have shaped the case to this point.  Many issues have already been addressed and decided by the Court.  Only the highlights of that procedural history are set forth here; no attempt is made to describe every issue or event.

1.    Plaintiff's Claims

In 2009, after the parties had exchanged document requests, interrogatories, and numerous documents (including production of over 15,000 emails from defendants to plaintiff),

11

plaintiff sought to file a Second Amended Complaint, in order to add claims for conversion and an accounting. Upon plaintiff's motion, the Court denied leave for plaintiff to bring a conversion claim and allowed the claim for an accounting to be added. The SAC alleged seven denominated "Causes of Action": (i) Accounting; (ii) Declaratory Relief; (iii) Breach of Contract; (iv) Unfair Business Practice; (v) Tortious Interference with Prospective Business Relations; (vi) Aiding and Abetting Unfair Business Practice; and (vii) Aiding and Abetting Tortious Interference with Prospective Business Relations.

2.     <u>Motion for Partial Summary Judgment</u>

In April 2009, after substantial document discovery and before plaintiff sought to file his SAC, defendants moved for partial summary judgment, seeking judgment on the outstanding balance of the August Loan Note, plus interest. At that time, defendants did not take action on the January Promissory Note. In their motion for partial summary judgment, defendants established that plaintiff had executed the August Loan Note, that the outstanding balance had been demanded by AXA, and that Novick had not paid the balance. The Court granted partial summary judgment in favor of defendants on the August Loan Note, including interest and reasonable attorneys' fees and, *sua sponte,* ordered entry of judgment on the order granting summary judgment, pursuant to Fed. R. Civ. P. 54(b). (Docket No. 53).

Plaintiff appealed the interlocutory entry of judgment and the Second Circuit dismissed the appeal for lack of appellate jurisdiction, holding that the entry of judgment did not fall within the Rule 54(b) exception to the general prohibition of piecemeal appeals. This Court's Order granting summary judgment on the August Loan Note remains intact, if interlocutory.

3.     <u>First Motion to Dismiss</u>

Defendants timely filed a motion to dismiss the SAC. The motion was granted in part and denied in part. At oral argument on January 31, 2011, this Court dismissed the claim for a

declaratory judgment, and dismissed all of plaintiff's tort claims as duplicative of the contract claim, leaving only two claims: those for breach of contract and an accounting.

With respect to the breach of contract claim, the Court ordered the parties to take limited discovery regarding the facts leading to the October 12, 2006 termination of plaintiff's affiliations with AXA. The Court then held that "Mr. Novick is entitled to an accounting of what commissions he may have earned during the time he was an employee . . . ." The depositions of Geller, DeMatteo, Dane and Novick followed. On or about June 10, 2011, defendants also provided plaintiff with an accounting of the compensation he received from AXA through approximately April 2011, consisting, *inter alia*, of POP (bonus) documents, a listing of all transactions resulting in production credits, tax documents and reconciliation, organized in a large three ring binder, together with long spreadsheets and commission statements too voluminous to fit in the binder. Defendants then renewed their motion seeking dismissal of the breach of contract and accounting claims.

4.    Renewed Motion to Dismiss

At oral argument of the renewed motion, on November 7, 2011, the Court issued rulings limiting the outstanding issues, ordered additional discovery on any area the parties deemed necessary, and declined to dismiss the entire SAC, without prejudice to defendants bringing a summary judgment motion at the close of discovery. At that conference, the Court held, *inter alia*, that defendants were not precluded from attempting to solicit clients that Novick had worked with at AXA, after Novick's departure. After the November 7, 2011 conference and order, defendants produced additional documents and more depositions followed.

5.    Defendants' Prior Summary Judgment Motion

On June 1, 2012, after the designated close of discovery, AXA filed a motion for summary judgment with respect to Novick's breach of contract and accounting claims, and

13

AXA's remaining counterclaim.  Prior to Novick submitting any opposition to that motion, the Court held a conference on June 27, 2012.  At that conference, the Court indicated that additional pretrial discovery -- of emails and audio recordings -- relating to the Clarifying Document's provisions on the disposition of files and customer lists upon termination of Novick's affiliation with AXA should be explored.  As stated in the Court's July 24, 2012 Order, AXA's "summary judgment motion [was] denied, subject to renewal upon the completion of discovery."

Thereafter, the parties engaged in extensive additional discovery and motion practice regarding emails and audio recordings.

In September 2012, the Court ordered AXA to locate and then, in October 2013, ordered AXA to produce audio recordings from two individuals who previously worked on the trading desk (which had since been outsourced): Rocco Tomesco and Jeff Press, to the extent the recordings contained conversations with any of five other people: Joel Miller, Novick, Joseph Pirrone, Georgette Geller and Ned Dane.  Six out of seven of those individuals were deposed in this action, with the sole exception of Jeff Press, whom plaintiff did not attempt to depose, despite an order that would have required defendants to pay the deposition expenses.

Ultimately, from 2012 through 2014, as a result of the additional discovery orders, AXA produced tens of thousands of pages of emails, as well as audio recordings from the telephone lines of Rocco Tomesco and Jeff Press.  AXA has not been able to locate or produce a portion of the ordered audio recordings, and has been sanctioned with, *inter alia,* an adverse inference (Docket No. 295):

> DESTRUCTION OF EVIDENCE. The defendants had a duty to retain audio recordings containing communications via trading desk telephone lines, for the period August 28-31, 2006, and September 8 - November 5, 2006. The defendants destroyed those audio recordings. You may infer that the information contained in those audio recordings is unfavorable to the defendants.

6.   Novick's Motion to Compel Accounting

On March 5, 2013, Novick professed himself unsatisfied with the accounting AXA produced in 2011 and moved to compel defendants to produce an accounting demonstrating all revenue generated by plaintiff while in defendants' employ.  In particular, plaintiff contended that he was entitled to information on all revenue generated on "his" book of business, whether or not such revenue was identified with particular transactions or clients.[2]  In a September 24, 2013 Memorandum and Order, the Court denied Novick's motion. (Docket No. 199).  Novick then moved for reconsideration of that Memorandum and Order, and in a November 6, 2013 Memorandum and Order, the Court denied the reconsideration motion.  (Docket No. 224).

7.   AXA's 2015 Motion For Summary Judgment

On February 17, 2015, AXA again moved for summary judgment.  By its Order of July 1, 2015, the Court granted summary judgment dismissing Novick's accounting claim, but ruled that trial should go forward on certain issues regarding Novick's breach of contract claim and AXA's counterclaims.

8.   Issues For Trial And Rulings on Motions In Limine

At the final pre-trial conference on June 7, 2016, the Court set forth the following remaining issues to be tried:

1) What are Defendants' damages for Plaintiff's non-payment of the January Note?  Specifically, how much, if any, of the $400,000 balance should have been forgiven under the terms of the affiliation agreement?

---

[2] Plaintiff had made similar requests for "macro" accounting information at Court conferences, at which the Court indicated Novick would need to show something in writing demonstrating that he was entitled to it. (*See* pp. 31-32 of the transcript of the June 27, 2012 conference (Docket No. 148)).  Novick has never done so.

FIRM:36231500v1

2) Were Defendants contractually prohibited from terminating Plaintiff for reporting misconduct by other AXA affiliates?  If so, did Defendants breach that contract?

3) Did Defendants violate any express or implied agreement with Plaintiff by "triaging" his book of business following Plaintiff's termination?

4) If Defendants breached their contracts with Plaintiff, what are Plaintiff's damages?

5) Did Plaintiff receive full compensation prior to the termination of his affiliation with Defendants?  If not, how much is he owed?

On June 7, 2016, the Court also ruled upon five motions in limine brought by AXA, as follows.  With respect to all of its rulings on AXA's motions in limine, the Court explained that the rulings are guides to counsel as to what the Court is likely to do at trial.

The Court granted AXA's first motion in limine to preclude plaintiff from offering evidence of selling away by other AXA affiliates.

Regarding AXA's second motion in limine to limit the use of the adverse inference jury instruction, the Court stated it was likely to give the instruction, but it would depend on what happens at trial.  The Court stated it will not give the jury instruction unless it is relevant.  The Court stated that the matter would be discussed again prior to the Court giving jury instructions.

The Court granted AXA's third motion in limine to preclude plaintiff from offering pre-affiliation documents as evidence of an agreement with AXA regarding compensation.

With regard to AXA's fourth motion in limine to preclude plaintiff from (a) introducing at trial evidence that was not produced in discovery and (b) relying on evidence regarding plaintiff's compensation elsewhere to prove insufficiency of his AXA compensation, the Court

(a) ruled that, subject to specific objections, documents that were not produced in discovery may not be introduced at trial, except in limited circumstances in cross-examination, and (b) tentatively ruled that what Novick made from others is not relevant to what he claims he is entitled to from AXA.

The Court reserved decision on AXA's fifth motion in limine to preclude plaintiff from arguing or offering purported evidence in support of his contention that he is entitled to commissions, fees or other non-loan compensation based on GDCs.

## ARGUMENT

### POINT I

### AXA'S COUNTERCLAIM: NOVICK HAS BREACHED HIS CONTRACT FOR PAYMENT OF A PROMISSORY NOTE

AXA Network was previously awarded summary judgment on its counterclaim for repayment of the outstanding amount of the August Loan Note.[3]

Novick should also be ordered to pay the $400,000 portion of the January Promissory Note that was not forgiven, plus interest.

Under New York law, a holder of a promissory note establishes a *prima facie* case for recovery by proving execution of a promissory note, demand for payment and failure on the part of the promisor to make payment. *See Customers Bank v. Anmi, Inc.*, No. 11 Civ. 07992 (AJN), 2012 U.S. Dist. LEXIS 180391, at *5 (S.D.N.Y. Dec. 20, 2012); *Internet Law Library, Inc. v. Southridge Capital Mgmt., LLC*, Nos. 01 Civ. 6600 (RLC), 02 Civ. 0138 (RLC), 2005 U.S. Dist. LEXIS 32299, at *28-29 (S.D.N.Y. Dec. 8, 2005), *aff'd sub nom., ITIS Holdings, Inc. v. Southridge Capital Mgmt., LLC*, 329 F. App'x 299 (2d Cir. 2009); *National Union Fire Ins. Co.*

---

[3] While the Second Circuit ultimately reversed the Court's entry of judgment on the order granting summary judgment, on the grounds that it did not meet the standards for an interlocutory judgment, the award of summary judgment itself remains intact, awaiting only final determination of the remainder of the parties' claims to be eligible for entry of judgment.

17

*v. Fremont*, 760 F. Supp. 334, 336 (S.D.N.Y. 1991); *Gross v. Fruchter*, 230 A.D.2d 710, 711 (2d

Dep't 1996); *Gateway State Bank v. Shangri-La Private Club for Women, Inc.*, 113 A.D.2d 791,

791-92 (2d Dep't 1985), *aff'd*, 67 N.Y.2d 627 (1986).   Once the holder of the promissory note

establishes a *prima facie* case, it is entitled to judgment as a matter of law.   *See Internet Law*

*Library, Inc.*, 2005 U.S. Dist. LEXIS 32299, at *26-27; *Koeben v. Altchek*, No. 94 Civ. 848

(PKL), 1997 U.S. Dist. LEXIS 2027, at *5-6 (S.D.N.Y. Feb. 26, 1997); *Bank of N.Y. v. Vega*

*Tech. United States, LLC*, 18 A.D.3d 678, 679 (2d Dep't 2005); *Lahage v. Batrouni*, 289 A.D.2d

301, 301 (2d Dep't 2001).

The basic facts of Novick's liability under the January Promissory Note are undisputed.

Novick executed a promissory note to AXA in the amount of $500,000.   Pursuant to its terms,

the unforgiven portions of the January Promissory Note became due and payable on October 12,

2006 when Novick's affiliation with AXA was terminated.   Pursuant to the schedule annexed to

the January Promissory Note, as amended, $100,000 was to be forgiven for each 1,000,000

Production Credits ("PCs") Novick earned while at AXA.   Novick earned more than 1,000,000

PCs but less than 2,000,000 PCs.   Accordingly, $100,000 of the $500,000 has been forgiven.   On

November 21, 2006, AXA demanded payment of the outstanding balance of the January

Promissory Note.   To date, Novick has not repaid any of the outstanding amount or any interest

thereon.   Novick does not suggest that he has made any payments; indeed he admits that he has

not.

Further, according to the terms of the January Promissory Note, if, as here, AXA must

bring an action to enforce collection of the January Promissory Note, and prevails, "there shall

become due and payable from [plaintiff], in addition to the unpaid principal and interest, all costs

and expenses of such action (including reasonable attorneys' fees)."

18

Novick's expected assertions that he should have received more production credits such that potentially another segment of the loan should have been forgiven, or that all of the loan should be treated as satisfied, are unavailing.

As noted in Point II.C, below, there is no genuine issue of material fact regarding plaintiff's compensation. All relevant compensation information was supplied to him in the usual course of affairs while he was at AXA. If he had questions or believed he had been underpaid, he clearly raised such concerns upon seeing the initial reports, and they were resolved. Furthermore, a full accounting was provided to him years ago. He has not identified any further credits to which he might be entitled; he only claims that he should have been paid differently from everyone else and contrary to the compensation schedules referenced in his contracts and periodically issued by AXA. Novick's assertions that he had a special or unique compensation deal with AXA are belied by all relevant documents, by Novick's behavior while at AXA, and by the testimony of Margaret Hall, who is the Lead Director-Compensation, Analysis and Design for AXA Equitable Life Insurance Company.

Nor can Novick claim that he had some other deal that should allow for discounting or eliminating his outstanding loan balance. The law is clear that because the January Promissory Note is a fully integrated document that outlines all relevant terms, any oral promises or representations that would vary its explicit terms must be disregarded. *See Stroll v. Epstein*, 818 F. Supp. 640, 645 (S.D.N.Y. 1993), *aff'd,* 9 F.3d 1537 (2d Cir. 1993). Any prior informal emails and conversations could not possibly supersede the January Promissory Note signed by the parties in January 2003, let alone have any bearing on whether plaintiff still owes AXA $400,000 on that loan today.

Similarly, any argument such as the one raised for the first time by Novick in opposition to AXA's 2015 motion for summary judgment, that Novick was fraudulently induced to sign the January Promissory Note, or did so under duress, is insupportable.  Novick did not assert a fraudulent inducement defense in his answer to the counterclaims, dated February 4, 2008.  Plaintiff did not even file an answer to AXA's Answer to the Second Amended Complaint and Counterclaims, filed by AXA on March 7, 2011.

The inescapable fact is that Novick owes AXA $400,000 under the January Promissory Note, plus interest and attorneys' fees.

POINT II

**AXA HAS NOT BREACHED ANY CONTRACT WITH NOVICK**

In his Second Amended Complaint, the only contracts Novick alleges that AXA breached are the Agent's Agreement and the Registered Representative's Agreement.  AXA breached neither.  Over the course of this litigation, Novick has repeatedly raised certain allegations that he contends constitute breaches of contract on the part of AXA.  These allegations, viewed most generously in plaintiff's favor for argument's sake, can be summarized as follows:  (A) AXA wrongfully terminated Novick's affiliations;  (B) AXA wrongfully "took" Novick's book of business after Novick's termination; and (C) Novick was not sufficiently compensated by AXA.  None of these claims can be sustained.

It is well-settled under New York law that to establish a claim for breach of contract, a plaintiff must prove the following elements: (1) the existence of a contract; (2) plaintiff's performance of the contract; (3) defendant's breach of the contract; and (4) damages suffered as a result of the breach.  *See Terwilliger v. Terwilliger*, 206 F.3d 240, 245-46 (2d Cir. 2000) (citation omitted); *Harsco Corp. v. Segui*, 91 F.3d 337, 348 (2d Cir. 1996).  The burden of proof is on the plaintiff to prove these elements by a preponderance of the evidence.  *See Mercury Partners LLC*

20

*v. Pacific Med. Bldgs., L.P.*, No. 02 Civ. 6005, 2007 U.S. Dist. LEXIS 55855, at *20-21 (S.D.N.Y. July 30, 2007).

## A.    Novick Was Not Wrongfully Terminated

The evidence shows that Novick was properly terminated in accordance with -- and for violating -- AXA policies, and not due to retaliatory animus.

### 1.    Novick Engaged in Selling Away and AXA Was Entitled to Terminate His Affiliations for Selling Away

AXA had sufficient legal grounds to terminate Novick's AXA affiliations when it did so.

First, Novick indisputably took actions that constituted selling away.  He admits that in late September 2006 he learned of an opportunity to invest in a company known as NAU, Inc. ("NAU"), and that prior to October 12, 2006, such investment was not approved by AXA to be offered to potential or existing customers.  Novick does not deny that between September 27 and October 6, 2006, he (or his administrative assistant Joseph Pirrone on his behalf) transmitted emails from the email account "'Steven Novick' <steven.novick@newcanaangroup.com>'" regarding the NAU investment to more than 25 individuals, including to Ned Dane, then President of AXA Advisors.

Second, also as admitted by Novick, selling away violates both FINRA and AXA rules and regulations.  Indeed, on August 3, 2007, FINRA issued a Letter of Caution to him, stating, in pertinent part:

> [b]ased upon our review of [Novick's] conduct, [Novick] attempted to solicit a number of prospective and/or existing customers between September 27, 2006 and October 4, 2006 to participate in transactions to purchase NAU Incorporated, Series-C Preferred Stock: *[sic]*
>
> [Novick's] involvement with the attempted solicitation of a non-firm approved security is violative of [Novick's] firm's [*i.e.*, AXA Advisors'] written supervisory procedures, Chapter 3, Section D.

Violation of [AXA Advisors'] written supervisory procedures is also a violation of NASD Conduct Rule 2110.

Third, it is undisputed that the Agent's Agreement and the Registered Representative Agreement "shall be terminable forthwith" if Novick "shall fail to comply with any of the provisions or conditions of this Agreement." By letter dated October 12, 2006, AXA terminated Novick's affiliations, on the basis that he was "solicit[ing] interest in a private securities transaction without the approval of the firm."

Neither Novick's conduct, nor the plain language of the termination provisions of the Agreements are in dispute.  Thus, selling away, standing alone, constituted independent, legitimate grounds for termination of Novick's contractual affiliations with AXA.

2.    Novick's Termination Was Not Retaliatory

Novick claims that his affiliations were terminated because of his complaints about Passaretti.  There is no competent evidence that termination of Novick's affiliations was in any way related to, or in retaliation for, any such complaints.  Novick alleges that he complained to AXA "management" that Passaretti had committed sales practice violations by "selling away" a limited partnership interest in an entity called Gemini I L.P.  Novick claims that he possessed written proof of Passaretti's alleged misconduct, and that he attempted to share it, in some way, with AXA management.  Such claims are unsupported on several levels.

There is no evidence whatsoever that there was any issue involved in Novick's termination other than Novick's own selling away activities.  There is no evidence, either documentary or testimonial, that anything related to Passaretti, Novick's animus toward him,[4] or

---

[4] Passaretti had several joint client relationships with Novick's father-in-law Ronald Lorch ("Lorch").  Novick had an alleged interest in Lorch's accounts, which were purportedly destined to transition to Novick upon Lorch's retirement, and a few of which did change from Lorch to Novick.  Novick asserted that Passaretti improperly failed to split credit for some accounts, thus setting himself up to retain all, instead of half, of the registered representative portions of the commissions and PCs the accounts generated.  Novick exchanged numerous communications with AXA personnel, who gave Novick the information necessary to address the issue with Passaretti.  To the extent he

22

Novick's alleged complaints about him was in any way considered by Jones or anyone else in the decision to terminate. There is no evidence that Novick himself so much as mentioned any of these issues during the conference call or meetings, or in his own written statement, when the termination of his affiliations for selling away was being considered by AXA. Thus, there is no causal connection between Novick's alleged complaints about Passaretti and the termination of Novick's affiliations with AXA, and no legitimacy to Novick's claim of retaliation. *See Monte v. Ernst & Young LLP*, 330 F. Supp. 2d 350, 364-65 (S.D.N.Y. 2004) (granting summary judgment on retaliatory discharge claim where plaintiff was unable to proffer facts showing retaliatory animus was motivating factor in termination).

Second, there is no competent evidence that Novick provided any support about Passaretti "selling away" to AXA management. He now says that he told people Passaretti was selling away, but most such individuals only recall that he constantly complained that Passaretti, whose production was indisputably greater than Novick's, somehow had things better than Novick.

A claim for retaliation requires that there be a causal connection between the alleged protected activity and the adverse action complained of. *Pardy v. Gray*, No. 07 Civ. 6324, 2008 U.S. Dist. LEXIS 53997, at *12 (S.D.N.Y. July 15, 2008); *Fraser v. Fiduciary Trust Co., Int'l*, No. 04 Civ. 6958, 2005 U.S. Dist. LEXIS 48059, at *24 (S.D.N.Y. June 23, 2005); *Cosgrove v. Fed'l Home Loan Bank*, No. 90 Civ. 6455, 1999 U.S. Dist. LEXIS 7420 (S.D.N.Y. Mar. 22, 1999). Mere suspicion of retaliation is insufficient. *Id.*, at *34. The necessary causal connection

---

appeared to convince Passaretti that some of the commissions and credits should have been shared with Novick, AXA provided the requisite commissions to Novick and took steps to take the credits back from Passaretti. Novick, not Lorch, claims that Passaretti took too much credit on certain accounts on which Passaretti shared the relationship with Lorch, but no evidence suggests that changing such credit would benefit Novick rather than Lorch.

23

between the alleged whistleblowing and the termination of Novick's affiliations is not present here.

Novick simply does not identify anything at all to suggest that such a causal connection exists. There is no evidence that any adverse action whatsoever was taken against him as a result of alleged complaints about Larry Passaretti, ever, and certainly not at the time of his termination. (His speculation that some people at AXA did not like him is no more than speculation and, even if true, he likely earned it through his own efforts. Further, dislike by co-workers is not an adverse action, nor was it tied to complaints about Passaretti).

Even if there could be an inference of a causal connection between the alleged whistleblowing and the termination of the Agreements, such inference would be defeated by the intervening causal event of Novick's selling away. *Joseph v. Marco Polo Network, Inc.*, No. 09 Civ. 1597, 2010 U.S. Dist. LEXIS 119713, at *55 (S.D.N.Y. Nov. 10, 2010) (collecting cases); *Yarde v. Good Samaritan Hosp.*, 360 F. Supp. 2d 552, 562 (S.D.N.Y. 2005); *Deshpande v. Medisys Health Network, Inc.*, No. 07 Civ. 375, 2010 U.S. Dist. LEXIS 37891, at *57-58 (E.D.N.Y. Apr. 16, 2010), *aff'd*, 423 F. App'x 31 (2d Cir. 2011). There is no dispute that plaintiff actually took the actions that constitute selling away.

Novick's only remaining claim is for breach of contract, not statutory retaliation. Nothing in Novick's contracts with AXA prohibits AXA from terminating its affiliations with Novick as a result of Novick committing violations of AXA's rule (and the industry rule) against selling away, just because Novick may have previously complained about Passaretti selling away.

3.    AXA's Agreements With Novick Were Terminable on 30 Days' Notice

Further undercutting Novick's retaliation claim is the simple fact that the Agreements between AXA and Novick were terminable on 30 days' notice for any – or no – reason at all.

24

The Agent's Agreement (¶XIII.D) provides:

> Unless otherwise terminated, this Agreement may be terminated by
> either party with or without cause, by a notice in writing delivered
> personally, or mailed to the other party at the last known address,
> at least thirty days before the date therein fixed for such
> termination.

The Registered Representative's Agreement (¶X.B) provides:

> Unless otherwise terminated, this Agreement may be terminated by
> either party by a notice in writing delivered personally, or mailed
> to the other party at the last known address, at least thirty days
> before the date therein fixed for such termination.

Thus, regardless of AXA's motivation for terminating its contractual affiliations with Novick, the Agreements provide that those affiliations ended – at the very latest – on November 11, 2006 (*i.e.*, 30 days after the October 12, 2006 termination letter).  Novick's claim for damages for improper termination of his contracts, even if it had any merit, is cut off as of that date.

4.     <u>AXA Advisors' Compliance Manual is Not a Contract</u>

In an effort to shoe-horn his retaliation allegations into his remaining breach of contract claim, Novick alleges that, when AXA terminated Novick's affiliations for selling away, it did so in violation of the provision in AXA Advisors' Compliance Manual which states that AXA will not retaliate against its representatives for reporting violations to management.

To the extent Novick claims the Compliance Manual constitutes a contract between AXA and Novick, and AXA breached that contract, the argument is without merit.  In the first place, in a conference on November 7, 2011 and again in its July 1, 2015 summary judgment decision, this Court has already correctly recognized that the Compliance Manual does not constitute a contract.  Indeed, in its first section, the Compliance Manual unequivocally states "[t]he provisions of this Manual are not intended to create any contractual commitments or obligations

FIRM:36231500v1

on the part of [AXA] to any of its Representatives or employees." The disclaimer clause could not be clearer.

Written policies distributed among the workforce are not converted to contracts "upon the mere allegation of reliance upon a particular provision." *Lobosco v. N.Y.Tel. Co./NYNEX*, 96 N.Y.2d 312, 317 (2001). Particularly in light of the definitive language in the document itself stating the opposite, there is no way Novick or other representatives or agents could reasonably misconstrue the Compliance Manual to create a contract governing AXA's conduct. *See also Riel v. Morgan Stanley*, No. 06 CV 524 (TPG), 2007 U.S. Dist. LEXIS 11153, at *19-20 (S.D.N.Y. Feb. 16, 2007) (dismissing breach of contract claim where manual provisions contained no promise or commitment by Morgan Stanley), *aff'd*, 299 F. App'x 91 (2d Cir. 2008); *Lawson v. N.Y. Billiards Corp.*, 331 F. Supp. 2d 121, 127 (E.D.N.Y. 2004).

Moreover, Novick's Second Amended Complaint alleges only breach of the Agent's Agreement and the Registered Representative's Agreement, not the Compliance Manual. There can be no breach of contract claim as to the Compliance Manual standing alone.

5.  The Compliance Manual Does Not Impose Contractual Requirements Upon AXA and, Therefore, Novick Cannot Identify Any Contractual Terms Breached by AXA

Novick's contentions that AXA violated the Agent's and Registered Representative's Agreements because it allegedly terminated him in violation of the "Reporting Violations" clause of the Compliance Manual are unavailing. (SAC at ¶¶ 62, 70). Novick can point to no evidence that the Compliance Manual is incorporated into the Agreements such that it creates any restriction on AXA's right to terminate his Agreements.[5]

---

[5] "Under general principles of contract law, a contract may incorporate another document by making clear reference to it and describing it in such terms that its identity may be ascertained beyond doubt." *New Moon Shipping Co. v. MAN B & W Diesel AG,* 121 F.3d 24, 30 (2d Cir. 1997) (citation omitted); *Camferdam v. Ernst & Young Int'l, Inc.*, No. 02 Civ. 10100, 2004 U.S. Dist. LEXIS 2284, at *12-13 (S.D.N.Y. Feb. 12, 2004).

26

Both the Agent's Agreement and the Registered Representative's Agreement clearly allow AXA to terminate Novick's affiliation for committing violations of AXA's rules and regulations. The plain and unambiguous language of the Registered Representative's Agreement (¶X.A) provides: "[t]his Agreement shall be terminable forthwith if the Representative shall fail to comply with any of the provisions or conditions of this Agreement,...." The Agent's Agreement (¶X.A) similarly provides "[t]his Agreement shall be terminable forthwith if the Associate ... shall fail to comply with any of the provisions or conditions of this Agreement..."

It is well-settled that when parties have entered into an unambiguous contract, the court should look to the terms expressed in the contract itself rather than to "extrinsic evidence as to terms that were not expressed or judicial views as to what terms might be preferable." *Waldman v. Riedinger*, 423 F.3d 145, 149 (2d Cir. 2005) (citations omitted); *John Hancock Mut. Life Ins. Co. v. Amerford Int'l Corp.*, 22 F.3d 458, 462 (2d Cir. 1994). Contract language is unambiguous when it has "a definite and precise meaning, unattended by danger of misconception in the purport of the [contract] itself, and concerning which there is no reasonable basis for a difference of opinion." *Care Travel Co. v. Pan Am. World Airways, Inc.*, 944 F.2d 983, 988 (2d Cir. 1991) (internal quotation marks and citations omitted). In general, courts accord an unambiguous term its ordinary meaning. *United States v. Broadcast Music, Inc.*, 275 F.3d 168, 175 (2d Cir. 2001) (To the extent a term is unambiguous, "deference is to be paid to the plain meaning of the language of a decree and the normal usage of the terms selected.") (internal quotation marks and citations omitted). In the absence of any language to even suggest a limitation on AXA Advisors' right to terminate the Registered Representative's Agreement, its terms do not provide any basis for Novick to recover on an alleged breach by reference to the Compliance Manual.

27

The issue here is not one of fairness or public policy, but interpretation of a contract between sophisticated parties. In that regard, Novick's argument fails and the language of the Agent's and Registered Representative's Agreements prevails, thus requiring dismissal of Novick's breach of contract claim.

Also, even if the "Reporting Violations" clause in the Compliance Manual could be interpreted to suggest a limitation on AXA's right to terminate the Agreements, plaintiff cannot demonstrate detrimental reliance on that clause when he decided to enter the Agreements. To establish that policies in personnel manuals or employee handbooks, including grounds or procedures for termination, could be part of an employment contract[6], the proponent must show "(1) an express written policy limiting the employer's right of discharge exists, (2) the employer (or one of its authorized representatives) made the employee aware of this policy, and (3) the employee detrimentally relied on the policy in accepting or continuing employment." *Baron v. Port Auth.*, 271 F.3d 81, 85 (2d Cir. 2001); *Lobosco*, 96 N.Y.2d at 316-17 ("Routinely issued employee manuals, handbooks and policy statements should not lightly be converted into binding employment agreements."); *Ubal-Perez v. Delta Air Lines, Inc.*, No. 13 Civ. 2872, 2014 U.S. Dist. LEXIS 7398, at *15 (E.D.N.Y. Jan. 2, 2014); *Daniel v. Long Island Hous. P'ship*, No. 08 Civ. 01455, 2009 U.S. Dist. LEXIS 20251, at *34 (E.D.N.Y. Mar. 13, 2009). Plaintiff can show none of those elements.

In particular, Novick cannot demonstrate that he relied on the "Reporting Violations" clause. He does not even allege such reliance in his Second Amended Complaint, and he does not adduce any facts suggesting that he relied on the clause (or on any part of the Compliance Manual) when considering whether to enter the Agreements.

---

[6] Novick was not an employee, which makes the relationship between the provisions in the Compliance Manual and AXA's ability to terminate the Agreements even more tenuous than that described in the case law, which relies on an employment relationship.

28

6.      AXA Has Not Breached the Agreements or the Compliance Manual

Even if the anti-retaliation provision in the Compliance Manual is somehow read into either the Agent's Agreement or Registered Representative's Agreement, AXA's decision to terminate the Agreements, and its manner of doing so, were in full accord with both of the Agreements and with the Compliance Manual.  It is undisputed that selling away violates both FINRA and AXA rules and regulations, and that both AXA Advisors and AXA Network were permitted to terminate Novick's affiliations for violations of their rules and regulations.  It is also undisputed that Novick took actions that constituted selling away.  Therefore, as this Court has previously recognized, selling away was legitimate grounds for terminating the Agreements. (Nov. 7, 2011 Tr. at 14).

Furthermore, even if AXA had not been able to establish cause for terminating Novick's affiliations, the affiliations could have been terminated by either side, without cause, on thirty-days' notice.  Novick cannot demonstrate any damages resulting from a lack of notice, so his breach of contract claim should be dismissed for this additional reason.

7.      Novick's Claim for "New York Law" Retaliation Protection is Baseless

Evidently recognizing that he cannot raise an issue of fact as to whether AXA breached his Agreements by terminating them, Novick has argued that he has the protection of "New York law" against retaliation for whistleblowing.  That argument also misses the mark. In the first place, the cases previously cited by plaintiff for this proposition do not stand for some all-encompassing limitation on termination of the contracts of those who, at some time, report misconduct. *See Brady v. Calyon Secs. (USA)*, No. 05 Civ. 3470, 2007 U.S. Dist. LEXIS 92602, at *18-19 (S.D.N.Y. Dec. 17, 2007) (citing *Albert v. Losken*, No. 96 Civ. 219, 1996 WL 571112, at *3 (E.D.N.Y. Sept. 11, 1996); *Mulder v. Donaldson, Lufkin & Jenrette*, 208 A.D.2d 301, 307 (1st Dep't 1995); *Gorman v. Nat'l Med. Care, Inc.*, No. 103604-95, 1998 WL 1050970, at *3

29

(Sup. Ct. N.Y. Cty. Aug. 13, 1998)).   Rather, they discuss a limited exception to the at-will employment rule for *employees*.   That exception is based upon a breach of contract analysis which, as discussed above, cannot be extended to Novick here.   Furthermore, even the cases cited by plaintiff require an element of reliance upon the clause protecting employees from retaliation and, as noted above, Novick has offered no evidence even suggesting such reliance. *See also Sabetay v. Sterling Drug, Inc.*, 69 N.Y.2d 329 (1987).

Plaintiff uses the word "whistleblower" to mean, essentially, "said something to someone about someone else" and then tries to use it to imbue his garden-variety, constant complaints about people he disliked at AXA with the force of a legal shield.   The concept of legal protection for a true whistleblower simply will not stretch that far.   Novick fails to demonstrate that his termination could have been for "whistleblowing" rather than for selling away.

B.     The Clarifying Document is Not Ambiguous and AXA
       Did Not Improperly Take Novick's "Book of Business"

There was no breach of contract by defendants with respect to the handling of Novick's alleged "book of business" after he left AXA.   The following language in the Clarifying Document does not prohibit either AXA or Novick from seeking to service any AXA-related clients after Novick's departure:

> Any customer lists provided to an Associate by AXA Advisors or its affiliates or developed in connection with AXA Advisors' or its affiliates' business are and remain the property of AXA Advisors or its affiliates and all originals and copies of such lists must be returned to AXA Advisors should the Associate terminate from AXA Advisors.   Customer lists provided by an Associate to AXA Advisors as part of the Associate's initial hiring or contracting with AXA Advisors or any of its affiliates, or developed by an Associate during the Associate's affiliation with AXA Advisors or any of its affiliates which do not pertain to the business of AXA Advisors or its affiliates, are and remain the property of the Associate and need not be turned over to AXA Advisors should the Associate terminate from AXA Advisors.

30

Novick's alleged expectations upon entering into the Registered Representative Agreement and the Clarifying Document – that he had a "proprietary interest in" and would be able to take his book of business with him "unobstructed" upon his termination – are irrelevant. The terms of the Clarifying Document are unambiguous, and parol evidence is not admissible to vary those terms. "In New York, if a contract is straightforward and unambiguous, its interpretation presents a question of law for the court to be made without resort to extrinsic evidence." *LaSalle Bank Nat'l Ass'n v. Nomura Asset Capital Corp.*, 424 F.3d 195, 205 (2d Cir. 2005). "[T]he determination of whether contract language is unambiguous is made by the court with reference to the contract alone." *Waldman*, 423 F.3d at 149. The language is unambiguous if it "has a definite and precise meaning, unattended by the danger of misconception in the purport of the [contract] itself, and concerning which there can be no reasonable basis for a difference of opinion." *Metro. Life Ins. Co. v. RJR Nabisco, Inc.*, 906 F.2d 884, 889 (2d Cir. 1990) (alteration in original). "Language whose meaning is otherwise plain is not ambiguous merely because the parties urge different interpretations in the litigation." *Id. See also WWW Assocs. v. Giancontieri*, 77 N.Y.2d 157, 163 (1990) ("'extrinsic and parol evidence is not admissible to create an ambiguity in a written agreement which is complete and clear and unambiguous on its face.'") (citations omitted); *Schron v. Troutman Sanders LLP*, 20 N.Y.3d 430, 436 (2013) ("a written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms. ... As a general rule, extrinsic evidence is inadmissible to alter or add a provision to a written agreement.").

The Clarifying Document merely sets the ground rules on what Novick can -- and cannot -- take with him when his affiliation with AXA ends. The Clarifying Document does not prevent AXA from seeking to continue to service the customers Novick serviced while affiliated with

AXA. Instead, it distinguishes between scenarios in which: (a) a registered representative [Associate] develops his or her customers at AXA and in connection with the business of AXA, and (b) the registered representative brings his entire customer list to AXA, and/or develops customers that do not pertain to the business of AXA. In the former case, the registered representative must return all originals and all copies of the customer list to AXA upon termination. In the latter situation, the registered representative need not turn over all originals and copies of whatever portion of the customer list the registered representative brought to AXA. The Clarifying Document restricts what the registered representative can take with him upon termination – and presumably, the extent to which that registered representative could effectively solicit business from those customers whose details are not committed to memory – when the customer list was provided by, or developed in connection with, AXA. That restriction does not apply to customer lists developed prior to, or entirely separate from, the registered representative's AXA affiliation. The Clarifying Document does not discuss the status of customer *accounts* upon termination of a registered representative.

Plaintiff's alleged interpretation of the Clarifying Document would turn it into a reverse non-competition agreement such that AXA would not be permitted to try to retain customer accounts held at AXA. The Clarifying Document does nothing of the kind. It addresses customer lists, not customer accounts. In addition, AXA has an obligation to service the accounts of all of its customers. AXA Advisors is the responsible broker-dealer. If AXA were to stop contacting customers whose accounts it still held after the termination of the assigned registered representative, those customers' accounts would be subject to neglect, and potentially, to significant market losses. Thus, aside from the unambiguous language of the Clarifying Document which merely allows a registered representative who brought his own customer list to

32

AXA to take such list with him upon departure, the interpretation urged by Novick is untenable because it would expose customers and customer *accounts* to potential damage.

Accordingly, after Novick left, AXA was well within its contractual rights to contact clients that Novick had worked with, to service their accounts, and to seek to retain them as clients.  Novick retained at least a copy of his customer list improperly without any distinction between whether he brought those customers with him to AXA or developed the relationships while at AXA, and he used it, with substantial success, to contact and encourage the clients to follow him to his next institution.  AXA did not breach any of its contracts with Novick by engaging in such contacts or solicitations.

Novick's characterizations of AXA's interactions with its clients as "threats and intimidation" are inaccurate, but that is beside the point.  If the clients found AXA's "tactics" to be heavy-handed, or were uncomfortable continuing with AXA for any reason, or just wanted to follow Novick for any reason, they were free to do so.  Many did follow Novick.

Likewise, the equity letter does not demonstrate that Novick ever had an "equity interest" in the clients that would preclude AXA from seeking to retain them.  The equity letter relates to insurance business, not securities business.  It merely sets forth the terms under which Novick was entitled to receive "renewal compensation, service fees and/or asset based compensation," for proprietary insurance policies and annuities on which Novick had been designated service agent and/or commission agent prior to the termination of his Agreements.  The equity letter also notes that Novick has the right to sell his vested renewal compensation, service fees and/or asset based compensation to another agent if he follows certain notice requirements and AXA approves such agent.  The equity letter contains no provision limiting AXA's ability to

FIRM:36231500v1

communicate with the clients and/or to seek to retain their business at AXA after Novick's termination, and it has nothing to do with securities accounts.

C.   AXA Did Not Breach The Agreements with Regard To Novick's Compensation

AXA did not breach its contract to compensate Novick appropriately while he was affiliated with AXA Advisors and AXA Network.  Novick's unsupported assertions that he was not fully paid do not suffice.  He does not identify any instances where he was not credited with commissions according to the requisite schedules, and does not point out any revenue that was associated with him for which he was not properly credited.  He complains that he should have been paid by Gross Dealer Concessions ("GDCs") – the broker-dealer firm's gross commissions – but cites to no contractual provision or other controlling authority that might entitle him to a specific percentage of GDCs.  Instead, he was paid commissions and additional compensation according to Production Credits ("PCs"), together with Production Opportunity Payments ("POP") (a bonus beyond commissions that varied depending on the individual financial professional's production), like all of the other registered representatives.  He has not demonstrated any deficiencies in such payments.

To the damages allegations he provided in September 2015, Novick adds the additional allegation that Passaretti failed to credit Novick's father-in-law, Ronald Lorch, on certain accounts for which Lorch allegedly should have been credited, and Miller took credits "with AXA's knowledge and support."  There are no specific allegations supporting this.  Novick views this as his concern because he was to allegedly inherit Lorch's accounts.  In the first place, this dispute should be entirely between Novick, or Lorch, and Passaretti.  Jones, Head of the broker-dealer at the relevant time, noted that AXA makes a policy of staying out of disputes between independent financial professionals.  Second, and more importantly, Novick was reimbursed for the monies he claims should have been assigned to him that may have been mis-

34

assigned elsewhere.  He complained about $53,000 that was ultimately given to him.  While he has identified an additional $120,000 supposedly due Lorch, he cannot demonstrate that that money should have been paid to him, or that it was his claim rather than Lorch's.  He also now claims "$500,000" in such credit issues from Passaretti and Miller, but has identified no specifics.  He even sued Miller in retaliation and settled that lawsuit, releasing Miller.

For the foregoing reasons, AXA should prevail on Novick's breach of contract claim.

## **CONCLUSION**

For all of the foregoing reasons, this Court should issue judgment in favor of AXA Advisors LLC and AXA Network, LLC, awarding plaintiff Steven Novick nothing on his remaining claim of breach of contract, and awarding judgment to counterclaim-plaintiff AXA Network, LLC, regarding its remaining counterclaim for payment of the promissory note.

Regarding the Court's enumerated issues remaining for trial, AXA respectfully offers the following conclusions:

1) Defendants' damages for Plaintiff's non-payment of the January Note are $400,000 plus interest and attorneys' fees incurred by AXA in enforcing collection of the amounts due.  Novick was entitled to $100,000 of forgiveness of the original $500,000 loan, but no more.  None of the remaining $400,000 balance should have been forgiven.

2) Defendants were not contractually prohibited from terminating Plaintiff for reporting misconduct by other AXA affiliates.  Even if they were, Defendants did not breach any such contract, because Novick's affiliations were terminated due to Novick selling away, not reporting misconduct.

3) Defendants did not violate any express or implied agreement with Plaintiff by "triaging" his book of business following Plaintiff's termination.

35

4) Defendants did not breach their contracts with Plaintiff, and Plaintiff suffered

no damages.

5) Plaintiff received full compensation prior to the termination of his affiliation

with Defendants, and is not owed any more.

Dated: New York, New York
June 16, 2016                               EPSTEIN BECKER & GREEN, P.C.

By:     */s/ Aime Dempsey*
        Ronald M. Green
        Aime Dempsey
        David J. Clark

250 Park Avenue
New York, New York 10177-1211
(212) 351-4500
adempsey@ebglaw.com
dclark@ebglaw.com

*Attorneys for Defendants*

36